# EXHIBIT A

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

CIVIL DIVISION

INFINITY GLOBAL CONSULTING GROUP INC., a Florida corporation, JOSEPH M. VAZQUEZ III, an individual; and JOSEPH M. VAZQUEZ III, derivatively, as a shareholder, and on behalf of, TRIMAX Corporation, a Nevada corporation

     *Plaintiff,*

vs.

TILRAY INC., a Delaware corporation; PRIVATEER HOLDINGS INC., a Delaware corporation, LEFT COAST VENTURES, INC., a Delaware corporation, EKO HOLDINGS LLC, a California limited liability company; BRETT CUMMINGS, an individual, HUGO SAAVEDRA, an individual; DEBRA SAAVEDRA, an individual; and EQUITABLE TRANSITIONS INC., a California corporation

     *Defendants.*

_____/

## **VERIFIED COMPLAINT**

Plaintiffs, INFINITY GLOBAL CONSULTING GROUP INC., a Florida corporation ("Infinity Consulting"), and JOSEPH M. VAZQUEZ III, individually, and derivatively, as a shareholder on behalf of Trimax Corporation, a Nevada corporation (Mr. Vazquez") (each a "Plaintiff" and, collectively, "Plaintiffs") hereby file this action: (a) for emergency temporary

and permanent injunctive relief; (b) for breach of fiduciary duty;  (c) for conversion; (d) for fraud; (e) for intentional interference with contractual relations; (f) for negligent interference with prospective economic relations; and (g) for aiding and abetting the foregoing torts.  In support of this Verified Complaint, Plaintiffs allege as follows:

I.  **PRIVATEER HOLDINGS'  UNLAWFUL SCAM TO ACQUIRE THE ASSETS OF TRIMAX CORPORATION**

   A. <u>**Introduction**</u>

   1.      This action is brought to seek redress for a sophisticated scam, unscrupulously and unlawfully perpetuated by Privateer Holdings Inc., a Delaware corporation ("<u>Privateer</u>"),  its affiliates, and other parties named as Defendants herein, to *fraudulently* remove all the assets of a public company, Trimax Corporation, a Nevada corporation ("<u>Trimax</u>") (OTC: TMXN) for virtually no consideration, leaving all of Trimax creditors' debts unpaid, and rendering its shareholders' investments in Trimax completely worthless.

   2.      Privateer is a private equity firm which beneficially owns and controls approximately 75% of a publicly traded corporation named Tilray, Inc., a Delaware corporation ("<u>Tilray</u>"), which is traded on the NASDAQ stock exchange under the symbol "TLRY".  Tilray touts itself as a global leader in cannabis research, cultivation, processing and distribution, and as a leading supplier of cannabis flower and extract products to customers which included patients, physicians, pharmacies, hospitals, governments and researchers on five continents. Tilray's market capitalization is currently over $2 billion. As such, Privateer's 75% stock ownership in Tilray is presently valued at over $1.5 billion.

   3.      Prior to the scam described below and orchestrated by Privateer and the other Defendants named herein, Trimax owned, through its subsidiary, Saavy Naturals Inc., a Nevada

corporation ("Saavy Naturals"), all of the assets of the business known as Saavy Naturals, which included its infamous brand which marketed and sold luxurious high quality all-natural products such as edible soaps, body creams, body scrubs, bath bombs, hair care products, candles and other products online and in retail stores.

4.      Saavy Naturals was founded by Hugo Saavedra ("Mr. Saavedra") and Debra Saavedra (collectively, the "Saavedras") in 2014.  Hugo Saavedra is the sole director of Trimax and Saavy Naturals. He and Debra Saavedra are the sole senior executives of the companies. Saavy Naturals gained popularity when the Saavedras first appeared on the popular television show, *Shark Tank*, which aired on November 6, 2015. Saavy Naturals' revenue spiked significantly after the *Shark Tank* episode aired. Saavy Naturals grew rapidly and obtained agreements with Walmart, among others to roll-out Saavy Naturals Everyday's free-standing custom-made pallet displays, which hold 1,152 individual soaps in 12 scents.

5.      In late 2018, Saavy Naturals received purchase orders for over 200 Walmart locations to distribute its handcrafted soaps to the states of Indiana, Texas, Tennessee, New Hampshire, Arizona, Florida, Michigan, Virginia, Oregon, Colorado, New York, Wisconsin, Missouri, Pennsylvania, California, Illinois, Montana, Louisiana, Delaware, Alabama, North Carolina, Kentucky and Mississippi. Saavy Naturals also projected that it would expand its locations in order to reach its goal of distributing to over 1,000 Walmart locations nationwide. Thus, Saavy Naturals' future prospects were positive and rising rapidly.  See Trimax Press Releases from September 2018 and December 2018 attached hereto as **Exhibit A**.   Indeed, in November 2018, Bed Bath & Beyond's online division was going so well that it requested a meeting at their corporate office to discuss putting Saavy Natural's complete line of products into their over 1,000 BBB retail locations.

3

**B.**   **Privateer's and Left Coast Ventures' Interest in Saavy Naturals:**
**The First Unlawful Overture to Acquire its Assets**

6.      At approximately this same time period (beginning in August of 2018), Privateer

became interested in acquiring a major ownership stake in Saavy Naturals as a potential

complement to its line of Cannabidiol ("CBD") products offered by its various subsidiaries,

including its main subsidiary, Tilray.   Brett Cummings, who represented himself to be the Chief

Executive Officer ("CEO") of both Privateer and Left Coast Ventures, Inc., a Delaware

corporation ("Left Coast Ventures") told the Saavedras and Plaintiff Vazquez, who was an

advisor and business consultant to Trimax and Saavy Naturals through his wholly owned entity,

Infinity Consulting, that Privateer was interested in Saavy Naturals because of the credibility that

Saavy Naturals had established with its products on *Shark Tank* and *The Home Shopping*

*Network*. In addition, he advised that Privateer was interested in having Saavy Naturals create

and develop a full line of beauty/skin healthcare products that were 100% all natural and infused

with CBD oil, and also, in having Saavy Naturals manufacture the product line as a private label.

Privateer was also interested in Saavy Naturals because of the quality of the products made and

the fact that they were selling in Walmart, Bed Bath & Beyond, Costco, Whole Foods, Gelsons,

among others. These already existing relationships would prove valuable to Privateer with their

plans to create a new line of all-natural CBD infused beauty care products.

7.      Following various discussions with the Saavedras, Privateer presented two (2)

term sheets for investments in Saavy Naturals.  Attached hereto as  **Exhibit B** is an email from

Mr. Cummings describing the proposed transactions on behalf of Privateer together with the term

sheets.  One of the term sheets proposed a $1.5 million investment in Saavy Naturals which

calculated the pre-money valuation of Saavy Naturals at $2.5 million for a total post-money

valuation of $4 million. This initial offer was for a 37.5% minority stake in Saavy Naturals. The $2.5 million pre-money valuation was actually less than the market capitalization of Trimax (which included its wholly owned subsidiary, Saavy Naturals). For example, on November 1, 2018, Trimax's total market capitalization was approximately $4 million.

8.       Based on the term sheets presented and after discussions with Mr. Cummings and the Saavedras, it became apparent to Plaintiffs that Privateer was proposing to take Saavy Naturals "private" in a transaction where only the Saavedras and Privateer would end up as owners of the assets of Trimax, including the Saavy Naturals brand and that, as a result, they would own together with Privateer all of the corporate opportunities created by the new proposed business structures.  As a consequence, Plaintiff Vazquez became concerned that the creditors and public shareholders of Trimax would not participate in this proposed transactions, or receive any of their benefits.  Mr. Vazquez could not see how, based on the structure of the transactions as  presented, that the creditors and public shareholders would ever be compensated  for their respective stakes in Trimax.

9.       As a consequence, in October of 2018, Mr. Vazquez advised Hugo Saavedra that he would be shirking his fiduciary duties to the constituents of Trimax if he allowed the assets of Saavy Naturals to be transferred to Privateer in the transactions as proposed by Privateer.

10.      At approximately this same time period, Mr. Vazquez participated in several calls with Mr. Cummings and the Saavedras concerning the proposed transactions. In each call, Mr. Vazquez stressed the importance of protecting the creditors and shareholders of Trimax. However, Privateer's Brett Cummings would have none of this talk.  Rather, he reiterated during a call that Privateer was not going to enter into any investment transaction where any of its money would be used to pay existing creditors or shareholders of Trimax. At one point during a

5

discussion about the amount of the outstanding debt of Trimax, Mr. Cummings stated "Well, you've created quite the mess, haven't you Hugo [Saavedra]?" He went on to say: "Privateer will not put in a single dollar in this company if we have to take on a single penny of debt or liability from Saavy Naturals."

11.     In a subsequent call also in October of 2018, Mr. Vazquez learned that Privateer was now instructing Mr. Saavedra to "bankrupt Saavy Naturals" as a way to allow Privateer to acquire a stake in Saavy Naturals without adequately compensating any of its existing creditors or shareholders for the real value of the business. Following the end of the call, Mr. Vazquez was incredulous with Mr. Cummings' proposals and told Mr. Saavedra to walk away from Privateer.

12.     After a few days had passed, Mr. Vazquez believed that the proposed transactions were dead, and that the Saavedras were no longer pursuing a deal with Privateer since the Saavedras did not raise the issue again with him. As such, Mr. Vazquez continued to work with the Saavedras in the normal course of business without any knowledge of any continued proposals from Privateer or its affiliates. However, on December 18, 2018, one of the creditors of Trimax called Mr. Vazquez and asked him to assist him in locating Mr. Saavedra who was not returning his calls. Mr. Vazquez promptly emailed Mr. Saavedra and urged him to return the creditor's calls. Mr. Saavedra did not respond.

13.     Thereafter, for several weeks, Mr. Vazquez called Mr. Saavedra several times and sent him 19 work related emails but Mr. Vazquez never received a single response. Suddenly, after years of being a trusted advisor to Mr. Saavedra, Mr. Vazquez was apparently and inexplicably on the "outs." As explained below, this was because Mr. Saavedra was now under the influence of Privateer's and Left Coast Ventures' Brett Cummings.

**C.**   **Privateer's and Left Coast Ventures Loan to Own Scheme**

14.   After months of continued silence, in March of 2019, Mr. Vazquez received a letter from Defendant Equitable Transitions Inc., a Delaware corporation (Equitable Transitions") advising him that all of the assets of Saavy Naturals had been assigned to Equitable Transitions as an "assignee for the benefit of creditors".  Mr. Vazquez was taken aback to learn that Saavy Naturals no longer owned any assets and that all its assets were now in the hands of a professional asset liquidator.

15.   However, little did Mr. Vazquez know that this was only the first leg of the scheme.  Privateer had put aside the original investment transactions it had proposed in its term sheets; those were no longer part of the plan.  Instead, in its place was a plan far more devious, unethical and unlawful.

16.   Eventually, Mr. Vazquez learned that the transfer to Equitable Transitions was all part of an elaborate "loan to own" scheme (the "Loan to Own Scheme") that, unbeknownst to him, had occurred in late December of 2018 and was being orchestrated by Privateer through its authorized agent, Brett Cummings, and by the Saavedras and others to defraud the creditors and shareholders of Saavy Naturals by facilitating a fraudulent transfer of all of the assets of Saavy Naturals to a newly-formed entity, Eko Holdings, LLC, a California limited liability company ("Eko"). As detailed more fully below, the total consideration paid by Eko for all of these assets of Saavy Naturals was a mere $70,000 plus supposed partial loan forgiveness of $41,000 of Eko debt.  *This strikingly low figure was far less than the $700,000 or more owed to creditors, significantly less than Privateer's own proposed pre-money valuation of Saavy Naturals at $2.5 million, and considerably less than the market capitalization of Saavy Naturals which was close to $4 million at the time.*

**D.      Privateer, Left Coast Ventures, and Eko – All One and the Same**

17.      Notably, at the time of this sham transaction on or about December 24, 2018, Eko was owned and controlled by Left Coast Ventures, and Left Coast Ventures was a wholly owned subsidiary of Privateer.  More importantly, upon information and belief (i) no portion of the consideration presumably paid by Eko in the Loan to Own Scheme was used for the benefit of the creditors of Saavy Naturals or for the benefit of the shareholders of Trimax, and (ii) all, or almost entirely all, of the proceeds went to pay for the fees and transaction expenses of Equitable Transitions.  All of this was known to the Defendants at the time of the illicit transaction, as they all participated in the planning of this scheme.  In short, the transaction amounted to what was essentially an unlawful conversion of the assets of Saavy Naturals and Trimax for no consideration.

18.      Evidence of Left Coast Ventures ownership of, and close association with, Eko during at all times material hereto, includes, but is not limited to, the following: (i) immediately after the closing of the purchase of Saavy Naturals' assets by Eko in the Loan to Own Scheme in late December 2018, the demo website of Left Coast Ventures reflected Saavy Naturals as one of its "portfolio businesses" (attached hereto as **Exhibit C** is a copy of such Left Coast Ventures demo website); (ii) at all times thereafter, Saavy Naturals continues to be listed without interruption on Left Coast Venture's demo website as a portfolio business; (iii) both Brett Michel (not named as a Defendant herein) and Brett Cummings are employees of Left Coast Ventures, and Brett Cummings was the principal perpetrator of the Loan to Own Scheme, and Brett Michel met with an appraiser of Saavy Naturals' assets in connection with the Loan to Own Scheme, as reflected on the liquidation appraisal letter (the "Liquidation Opinion") attached hereto as **Exhibit D**; (iv) the publicly identified corporate office address of Left Coast Ventures and Eko

listed in its corporate filings are exactly the same: 975 Corporate Center Parkway, Suite 120, Santa Rosa, California, 94507 (see corporate filings of Left Coast Ventures and Eko attached hereto as **Exhibit E**; (v) the website for "saavynaturals.com" lists info@ekonaturals.us as its contact email address, and GoDaddy lists the registered entity owner of "ekonaturals.us" as Left Coast Ventures, and further lists the registrant's email contact as: brett.cummings@privateerholdings.com (see attached GoDaddy Registration for "ekonaturals.us" attached hereto as **Exhibit F;** (vi) Eko has an office address located at 20338 Corisco Street, Chatsworth, California 91311, and Left Coast Ventures' LinkedIn profile lists a Chatsworth, California location as an additional office of Left Coast Ventures (copy of LinkedIn profile attached hereto as **Exhibit G**; and (vii) upon information and belief, all email communications between the Saavedras and Brett Cummings concerning the Loan to Own Scheme were conducted by Mr. Cummings through his email address at Left Coast Ventures: Brett@leftcoastventures.us or his email address at Privateer: brett.cummings@privateerholdings.com.

19.     Privateer's relationship with Left Coast Ventures is undeniable.  Pursuant to an S-4 filed by Tilray on October 10, 2019, Left Coast Ventures was a wholly owned subsidiary of Privateer until February of 2019, at which time Privateer distributed all of its shares of Left Coast Ventures to its shareholders in anticipation of a proposed merger with Tilray. The merger is scheduled to close in the fourth quarter of 2019, as discussed more fully below. As a consequence, it is undisputed that Left Coast Ventures was owned by Privateer at the time of the Loan to Own Scheme, and continued to be owned by Privateer at least through January 31, 2019.

20.     Saavy Naturals' general assignment for the benefit of creditors and concomitant loan and sale to a newly formed entity, Eko, was a thinly-veiled, sham transaction. As described

more fully herein, it left no money after expenses for the creditors and numerous shareholders of Trimax, a publicly held corporation. Privateer, however, did just fine. Privateer achieved the exact purpose which was declared from the very beginning by its authorized representative, Brett Cummings, in his discussions with the Saavedras and Plaintiff Vazquez, which was to acquire the assets of Saavy Naturals without paying a single cent to the existing creditors and shareholders of Trimax.

21. The actions of Privateer, Left Coast Ventures and Eko, as effectuated by Brett Cummings, the Saavedras, and others "shocks the conscience."

22. Privateer and Left Coast Ventures were well aware of the actions of Brett Cummings in effectuating this scam. The CEO of Left Coast Ventures is Brett Cummings.

23. The Board of Directors of Left Coast Ventures are Michael Blue and Christian Groh. The Board of Directors of Privateer include two of the same directors: Michael Blue and Christian Groh, in addition to Brendan Kennedy. *How could Brett Cummings as the CEO of Left Coast Ventures (a wholly owned subsidiary of Privateer at the time of the sham transaction) effectuate a purchase of all of the assets of a public company for what amounted to "fake consideration" without the express knowledge and consent of Michael Blue, Christian Groh and Brendan Kennedy? Moreover, how could he do so when immediately prior to the sham transaction Privateer's very own valuation established Saavy Naturals at millions of dollars more than the illusory price paid in the sham transaction? Either these members of the Board of Directors of Privateer and Left Coast Ventures were grossly negligent in their oversight duties of its senor most executive or they were complicit in the fraud.* Either way, Privateer and Left Coast Ventures, among other Defendants in this lawsuit, should be held strictly accountable for the fraud perpetuated on the creditors and shareholders of Trimax. This Verified Complaint seeks

to do just that by not only seeking compensatory damages but also such other damages as may be available under law or in equity.

## II.   PARTIES

24.      Plaintiff, Joseph M. Vazquez III is an individual who resides in Miami-Dade, Florida and is *sui juris*.

25.      Plaintiff, Infinity Consulting Inc. is a Florida corporation with a principal place of business located in Miami-Dade County, Florida.

26.      Plaintiff, Trimax Corporation, in whose name Plaintiff Vazquez has additionally brought this action derivatively as a shareholder of Trimax, is a Nevada corporation.

27.      Defendant Privateer Holdings, Inc. is a Delaware corporation which committed tortious acts and caused the breach of a contract in Florida causing injury to Plaintiffs who were, at all times material hereto, residents of Miami-Dade County, Florida.   In addition, upon information and belief, at about the same time frame as the commission of such tortious acts, through its indirect wholly owned subsidiary, Eko Holdings, LLC, a California limited liability company formed in connection with the scam perpetuated upon Plaintiffs, sold products which were used or consumed in Florida, including in Miami-Dade County, Florida.

28.      Defendant Left Coast Ventures, Inc. is a Delaware corporation which committed tortious acts and caused the breach of a contract in Florida causing injury to Plaintiffs who were, at all times material hereto, residents of Miami-Dade County, Florida.  In addition, upon information and belief, at about the same time frame as the commission of such tortious acts, through its wholly owned subsidiary, Eko Holdings, LLC, a California limited liability company formed in connection with the scam perpetuated upon Plaintiffs, sold products which were used or consumed in Florida, including in Miami-Dade County, Florida.

11

29.     Defendant Eko Holdings LLC is a California limited liability company with a principal place of business in Santa Rosa, California.  Defendant Eko Holdings, Inc. committed tortious acts and caused the breach of a contract in Florida causing injury to Plaintiffs who were, at all times material hereto, residents of Miami-Dade County, Florida. In addition, upon information and belief, at about the same time frame as the commission of such tortious acts, it sold products which were used or consumed in Florida, including in Miami-Dade County, Florida.

30.     Plaintiffs are informed and believe that at all times material hereto, Defendant Brett Cummings was and is an individual residing in Contra Costa County, California. Defendant Brett Cummings committed tortious acts and caused the breach of a contract in Florida causing injury to Plaintiffs who were, at all times material hereto, residents of Miami-Dade County, Florida. In addition, upon information and belief, at about the same time frame as the commission of such tortious acts, he caused the sale of products which were used or consumed in Florida, including in Miami-Dade County, Florida.

31.     Defendant Hugo Saavedra was and is an individual who resides in and conducts business in Los Angeles County, California. Defendant Hugo Saavedra committed tortious acts and caused the breach of a contract in Florida against Plaintiffs who were, at all times material hereto, residents of Miami-Dade County, Florida.  In addition, upon information and belief, at about the same time frame as the commission of such tortious acts, he caused the sale of products which were used or consumed in Florida, including in Miami-Dade County, Florida.

32.     Defendant Debra Saavedra was and is an individual who resides in and conducts business in Los Angeles County, California.  Defendant Debra Saavedra committed tortious acts and caused the breach of a contract in Florida against Plaintiffs who were, at all times material

12

hereto, residents of Miami-Dade County, Florida.  In addition, upon information and belief, at about the same time frame as the commission of such tortious acts, she caused the sale of products which were used or consumed in Florida, including in Miami-Dade County, Florida.

33.     Defendant Equitable Transitions Inc. is a California corporation with its primary place of business located in Los Angeles County, California. Defendant Equitable Transitions Inc. committed tortious acts and caused the breach of a contract in Florida against Plaintiffs who were, at all times material hereto, residents of Miami-Dade County, Florida.

34.     Defendant Tilray, Inc. is a Delaware corporation with its principal place of business in Nanaimo, British Columbia, Canada.  Tilray is being named in this suit solely as an indispensable party since Plaintiffs is seeking an emergency injunction in Count I herein to stop a proposed merger between Privateer and Tilray which is scheduled to occur in the next few days, as more fully described herein.

35.     For the avoidance of doubt, there are no allegations of wrongdoing or damages sought against Tilray in this action at this time. Any reference to Defendants herein does not include Tilray unless Tilray is specifically identified as being included as a Defendant.

36.     Some or all of the Defendants were acting as the agents, representatives, employees, and/or alter egos of each other, and in doing the acts alleged herein were acting within the course and scope of such agency, representation, employment, and/or alter ego relationship and with their Co-Defendants' permission and consent.

37.     All of the Defendants conspired and agreed among and/or between themselves or with other Defendants to do the acts complained of, and by the conduct described herein, carried into action and completed their schemes, thus injuring and damaging Plaintiffs, Trimax, and Saavy Naturals, as set forth herein. In engaging in such conduct with other Defendants, these

Defendants have co-extensive liability for the conduct of such other Defendants. Except for

Defendant Tilray, any reference in any cause of action to a Defendant or Defendants shall

include the Defendants named in such cause of action and all Doe Defendants.

### III.   JURISDICTION AND VENUE

38.   Jurisdiction is proper in this Court as the amount in controversy exceeds

$15,000.00.

39.   Venue is proper in this Court because much of the conduct described herein

occurred in Miami-Dade County or caused injury in Miami-Dade County, Florida.

### IV.   GENERAL ALLEGATIONS

#### A.   The Loan to Own Scheme Significantly Damaged the Plaintiffs

40.   Plaintiff Infinity Consulting is one of the creditors of Trimax who was defrauded

by the Loan to Own Scheme. Infinity Consulting was an advisor and outside business consultant

to Trimax pursuant to an Advisory Service Agreement entered into by Infinity Consulting and

Trimax on or about August 1, 2017 (the "Advisory Agreement").  A copy of the Advisory

Agreement is attached hereto as **Exhibit H**.   The sole owner, president and CEO of Infinity

Consulting is Plaintiff, Joseph M. Vazquez III.

41.   As a result of the Loan to Own Scheme, Trimax was left with no assets within

which to pay Infinity Consulting's invoices for services rendered to Trimax pursuant to the

Advisory Agreement.  As of the date hereof, Plaintiff is owed at least $93,382.00 (exclusive of

interest, attorneys' fees and court costs) for past consulting services pursuant to the invoice dated

May 1, 2019 attached hereto as **Exhibit I**.

42.   In addition to the invoices which remain unpaid as a result of the Loan to Own

Scheme, Mr. Vazquez's reputation and that of Infinity Consulting have been severely and

irreparably damaged as a result of the scheme perpetuated by Privateer and the other Defendants. Mr. Vazquez's experience includes eight years of corporate management at executive levels for a retail franchise organization, six years in the financial service industry holding series 6, 7, 63 and series 24 principals' licenses (OSJ), and twenty-five years in the private investment banking field.  Mr. Vazquez has never been notified or been involved in a single NASD/FINRA/SEC complaint, arbitration, censure or investigation. Mr. Vazquez is a consummate professional who has enjoyed a reputation for honesty, integrity and for obtaining substantial results for his clients throughout his career.

43.      Mr. Vazquez's business has been built primarily on a referral basis, and he has never had to solicit or advertise for clients. Those referrals mostly come from a network of professionals comprised of securities lawyers, auditors, accountants, hedge funds, credit facilities, news distribution outlets, and marketing companies.  However, those referrals have largely dried up.

44.      Because of the Loan to Own Scheme, virtually every single person that Mr. Vazquez introduced to Trimax was burned and is owed money. These monies have amounted to hundreds of thousands of dollars.  Worse, Trimax shareholders have incorrectly assumed that Mr. Vazquez was somehow in on the scam perpetuated by Privateer, the Saavedras' and the other Defendants. In various stockholder messaging boards, stockholders have accused Mr. Vazquez on being "in on the scheme." They have called him a scam artist, googled his home address, and have resorted to making physical threats, including death threats.  Moreover, they have threatened to contact the authorities and the SEC on the entirely false basis that he participated in Privateer's and Left Coast's orchestrated multi-million dollar scam.

45.     Further, as a result of Privateer's and Left Coast Ventures' intentional interference with the business relationship that Mr. Vazquez and Infinity Consulting had with Trimax, the Advisory Agreement was terminated, and the entire business relationship between Trimax and Infinity Consulting has ended. But for such intentional interference, the business and contractual relationship between Trimax and Infinity Consulting would have undoubtedly continued as it had for years before.  Now, there is no Advisory Agreement, and Saavy Naturals has no business or assets within which to continue any business or contractual relationship with Infinity Consulting and Mr. Vazquez.

46.     Privateer, Left Coast and Brett Cummings and the other Defendants must have known that their Loan to Own Scheme would leave many creditors of Trimax (including Infinity Consulting) without recourse to collect  the debts owed to them, and would also permanently harm the current and future business relationships between Trimax and its suppliers and service providers. This is exactly what occurred to Infinity Consulting and such damage is continuing.

**B.    The Specifics of the Loan to Own Scheme Are Outrageous**

47.      The particulars of the Loan to Own Scheme are damning and hard to imagine.

48.     Over the course of five (5) days, between December 19, 2018 and December 24, 2018, Privateer, Left Coast Ventures, the Saavedras, Brett Cummings and Equitable Transitions engaged in a rapid process to liquidate Saavy Naturals without an adequate valuation or marketing of any kind, and contrary to Privateer's very own valuation of Saavy Naturals.

49.     Upon information and belief, Privateer's and Left Coast Ventures' Brett Cummings was the "quarterback" of the operation. The timing of the scheme reflects that it could not be anything other than a thinly veiled scam.

50.    The following orchestrated series of events sets forth the indicia of a conspiracy to defraud, conversion, and the other torts described herein:

(i)     At approximately the same time period in October of 2018 when Brett Cummings was advising Hugo Saavedra to bankrupt Saavy Naturals, Hugo Saavedra, at the direction of Brett Cummings, engaged Equitable Transitions to obtain a report from Parasec Global Document Filing & Retrieval ("Parasec Report") of all UCC-1 filings and liens relating to Saavy Naturals. The purpose of obtaining the report was to confirm the extent of the secured debt of Saavy Naturals and to put in place a plan for Privateer to obtain the assets of Saavy Naturals without adequate consideration and without paying off any of the secured and unsecured creditors of Saavy Naturals.  The Parasec Report was issued to Equitable Transitions on October 22, 2018. It showed at least three (3) UCC-1 liens that were active at the time of the Parasec Report on all the tangible and intangible assets of Trimax and Saavy Naturals.

(ii)    Understanding from the Parasec Report and from discussions with Hugo Saavedra that Saavy Naturals had hundreds of thousands of secured and unsecured debts, Brett Cummings, while acting on behalf of Privateer and Left Coast Ventures, put into motion a plan to avoid paying even "a single penny of debt," as Brett Cummings had put it, to any of Saavy Naturals creditors or to the shareholders of Trimax.

(iii)   The first step in the process was to confirm that Saavy Naturals was the owner of the assets that Privateer and Left Coast wanted to acquire as part of the scheme.   Soon thereafter, on December 19, 2018, as part of the plan, Saavy

Naturals obtained a legal opinion (the "Legal Opinion") from the law firm of

Carmel, Milazzo, & Dichiara LLP ("CMD").  The Legal Opinion indicated that

its purpose was to opine on "the ownership of the corporate assets."  The Legal

Opinion was issued to The Hamer Group Insolvency Solutions (the "Insolvency

Solutions") and was addressed to the attention of Insolvency Solutions' principal,

Nigel Hamer ("Mr. Hamer"). A true and correct copy of the Legal Opinion is

attached hereto as **Exhibit J**.   Importantly, Mr. Hamer— the principal of the

Hamer Group and recipient of the Legal Opinion—was employed, at all times

material hereto, by Equitable Transitions, which soon thereafter became the

assignee for the benefit of creditors.

(iv)      The Legal Opinion states that in rendering its opinion, it only

considered those documents provided to it by Saavy Naturals.  Notably, those

documents did not include any documents referencing the security interests held

by creditors in the assets of Saavy Naturals. Therefore, the Legal Opinion does

not render an opinion on whether the assets of Saavy Naturals were subject to any

security interests or UCC filings.  Such information appears to have been

intentionally withheld from the attorneys.

(v)      The next day, on December 20, 2018, at Mr. Saavedra's request

(but at the overall direction of Brett Cummings), Scott Van Horn of Van Horn

Auctions & Appraisal provided Mr.  Saavedra on behalf of Saavy Naturals with

the Liquidation Opinion of Saavy Naturals.    The Liquidation Opinion is based

on a physical site inspection of Saavy Natural's premises. **See Exhibit D**

(Liquidation Opinion, p. at 1).   The Liquidation Opinion notes that present at the

premises at the time of the inspection were Mr. Saavedras and Brett Michel.  The

presence of Brett Michel as representative of Privateer and Left Coast Ventures at

the inspection site represents another key tie to those entities' collective

involvement in the scheme since he was involved in the initial conference calls

with Saavy Naturals and at least one conference call with Mr. Vazquez in October

2018.

      (vi)     The Liquidation Opinion notes that Mr. Van Horn "was asked to

perform an on-site estimation, specifically, a 'liquidation' opinion of value of the

assets within the establishment." Id.  The Liquidation Opinion specifically states

that the liquidation values are not "fair market values," but cash value at auction

and should not be considered "as a final sales value when selling a business as a

turn-key operation." The Liquidation Opinion concludes that the fixtures and

equipment have a liquidation value of between $12,000 and $13,000, and the raw

materials, work in progress, and finished goods have a liquidation value between

$6,500 and $7,000. See *Id*. (Liquidation Opinion, p. at 2).

      (vii)    The Liquidation Opinion's "limiting conditions" provide that "[n]o

additional values or appraisals have been made requiring such tangibles as

patents, rights to manufacture, trademarks, goodwill, going concern, product line,

customer lists, etc." See *Id*. (Liquidation Opinion, p. at 4).  Thus, in addition to

not valuing the physical assets at fair market value, the Liquidation Opinion

purposely states that it does not value the intangible, intellectual property of

Saavy Naturals, despite that this was clearly the highest component of the total

value of Saavy Naturals' assets.

(viii)    The next step in the process was for Brett Cummings to establish a subsidiary which would be the acquiror of the assets of Saavy Naturals.  The establishment of subsidiaries to own the assets of each of their businesses is how Left Coast Ventures and Privateer customarily operate their businesses. Therefore, on the same day, December 20, 2018, as the Liquidation Opinion was issued, Brett Cummings formed Eko as a California limited liability company. There is no doubt that Eko was formed in contemplation of acquiring the assets of Saavy Naturals in the sham transaction.  Indeed, within a few days of its formation, Eko loaned monies to Saavy Naturals, and shortly thereafter, did, in fact, acquire all the assets of Saavy Naturals.  In addition, the name "Eko" may have been chosen deliberately so as to use that name in the marketing of Saavy Naturals' brand.  Currently, on the Saavy Naturals website, the contact information utilizes the name Eko as its email address: info@ekonaturals.us.

(ix)      Just two days after the formation of Eko, on December 22, 2018, Eko made a secured loan to Saavy Naturals in the original principal amount of $78,000 (the "Eko Loan"). The Eko Loan was evidenced by a Secured Promissory Note (the "Eko Note") and Security Agreement (the "Eko Security Agreement" together with the Eko Note, the "Eko Loan Documents"). True and correct copies of the Eko Loan Documents are attached hereto as **Exhibit  K**.  The Eko Loan was suspiciously structured to mature *just nine (9) days after the execution dat*e— on December 31, 2018—at which time Saavy Naturals was liable for payment of the entire principal balance of the Eko Loan. See **Exhibit K** (Eko Note, ¶ 1 at 1). It is inconceivable that Privateer's Brett Cummings would loan monies to Saavy

Naturals with a maturity date of 9 days unless there was a specific plan for repayment.  Indeed, the facts bear out that the debt would be used as partial consideration for the purchase of the assets of Saavy Naturals from Equitable Transitions, as assignee for the benefit of creditors, which was structured to occur just a few short days later.

      (x)     Indeed, just two (2) days after execution of the Eko Note, on December 24, 2018, Saavy Naturals made a general assignment for the benefit of creditors (the "General Assignment") to Equitable Transitions as assignee.[1]  A true and correct copy of the Notice of Assignment for the Benefit of Creditors and the General Assignment of Saavy Naturals, Inc. is attached hereto as **Exhibit L**. David Richard Haberbush ("Mr. Haberbush") is the Chief Executive Officer, Secretary, and Chief Financial Officer of Equitable Transitions. Mr. Hamer— the principal of the Hamer Group and recipient of the Legal Opinion—is employed by Equitable Transitions.  It was Mr. Hamer who executed the General Assignment on behalf of Equitable Transitions. **See Exhibit L**.

      (xi)    Then, remarkably, on December 24, 2018—the same day as the General Assignment—Mr. Hamer executed a Bill of Sale on behalf of Equitable Transitions as assignee.  A true and correct copy of the Bill of Sale is attached hereto as **Exhibit M**. The Bill of Sale transferred all of the assets of Saavy Naturals to Eko.  **See Exhibit M**. The consideration provided by Eko included

---

[1] A general assignment for the benefit of creditors is a state law alternative to filing a federal bankruptcy. Essentially, it is supposed to involve the assignment of an insolvent company's assets to a third party assignee who is selected by the company and charged with the duty of liquidating the company's assets to satisfy the creditors' claims against the company.

retirement of $41,000 of secured debt related to the Eko Loan and a cash payment in the amount of $70,000.

(xii)    The price paid for the assets was bewildering since it is the job of the assignee to use its best efforts to maximize the proceeds from the sale and disposition of the assets.  In this case, Equitable Transitions used no such best efforts, and evidently did nothing to market the assets.  Equitable Transitions never obtained a valuation of the most significant key assets of Saavy Naturals, which were its intellectual property. It sold all of the assets of Saavy Naturals to Eko relying solely on the Liquidation Opinion which valued only the tangible assets at their "liquidation value".    In short, Equitable Transitions engaged in a pre-planned scheme to sell the assets to Eko without undertaking the most basic due diligence or any marketing efforts with respect to all of the assets of Saavy Naturals.

(xiii)    The price paid for the assets of Saavy Naturals by Eko is telling. The cash portion of the purchase price paid by Eko was $70,000.00.   Did any of this money go to creditors which is the purpose of such an assignment?  No, upon information and belief, *not a single penny.*  Instead, all or virtually all of it went to Equitable Transitions to pay for its $65,000 priority fee[2] for serving as assignee and the remaining $5,000 went for its administrative and legal expenses, as determined in Equitable Transitions' sole and absolute discretion pursuant to the terms of the General Assignment.   Upon information and belief, the $70,000 figure was chosen by Brett Cummings and the other Defendants because this

---

[2] The General Assignment entitles Equitable Transitions to receive priority distributions from the proceeds of the Saavy Naturals sale before payment to creditors. See **Exhibit L** (General Assignment, at 6).

would be the minimum amount of cash needed to pay for the transaction expenses of the General Assignment, and would, at the same time, leave nothing for the creditors of Saavay Naturals or for the shareholders of Trimax, which was Privateer's Brett Cummings stated intention all along.

(xiv)   The non-cash portion of the purchase price, which was the retirement of $41,000 of the $78,000 of secured debt owed by Saavy Naturals pursuant to the Eko Loan, is an absolute and complete farce. Upon information and belief, this supposed "additional consideration" was chosen for a good reason: the retirement of a portion of the Eko Loan would appear to be akin to "real consideration," but require no additional cash outlay. Since there would be no monies remaining for creditors and shareholders after payment of the substantial transaction expenses (i.e., the fees of Equitable Transitions and related parties), there would need to be some sort of additional consideration provided to at least theoretically cover the amount of the liquidation value given to the assets of Saavy Naturals by the Liquidation Opinion.  The release of $41,000 of debt from the Eko Loan debt would presumably cover the alleged liquidation value of approximately $20,000 placed by the Liquidation Opinion on the physical assets, and perhaps, provide a little something more for the intangible assets for which no value was given by the Liquidation Opinion.

(xv)   However, the release of this debt and this portion of the consideration was, in all events, imaginary and non-existent because the transaction provided that all of the assets of Saavy Naturals were being transferred pursuant to the General Assignment. Thus, whether or not Eko released any debt,

it knew that its loan would be totally worthless and there was no chance of repayment since Saavy Naturals no longer owned any assets to enable it to pay the amount of debt outstanding on the Eko Loan. Thus, the $41,000 of supposed, additional consideration was a total ruse, and amounted to what was essentially an outright conversion of the assets of Saavy Naturals for no consideration.

(xvi)    At the end of the day, all of these steps in the sham transaction accomplished one thing: Privateer and Left Coast Ventures acquired through a newly established, wholly owned subsidiary: Eko, all of the assets of Saavy Naturals without paying a single penny to the creditors or the shareholders of Trimax.   Moreover, not only did Eko acquire the assets, it essentially acquired all ongoing operations of Saavy Naturals. In fact, upon information and belief, Eko kept all of the factory employees including Saavy Natural's controller and V.P. of Sales and offered both Hugo and Debra Saavedra lucrative positions with Eko. Factually, they never missed a single day of operations in fulfilling purchase orders, and even moved to a much larger facility.

51.    Privateer's and Left Coast Ventures' Brett Cummings accomplished all of this with willing participants which included the Saavedras and Equitable Transitions, who knowingly disregarded and violated their fiduciary duties in order to benefit themselves (at the expense of Trimax and Saavy Naturals creditors and shareholders).

52.    Prior to any assignment for the benefits of creditors by Trimax, its board of directors would have had a duty to maximize shareholder value and to protect a company's creditors.   Among other things, the board of directors of Trimax and Saavy Naturals should have first attempted to engage in possible alternatives to maximize shareholder value, such as a sale of

the company which would not only make the creditors whole but would also leave the shareholders with a recovery of their investment and possibly returns on their investment.  None of this occurred here. Rather, in a matter of five (5) days, a Legal Opinion as to the ownership of the assets of Saavy Naturals was obtained, a Liquidation Opinion as to the value was obtained, an assignment for the benefit of creditors was made pursuant to a General Assignment, and a sale of all the assets of Saavy Naturals occurred pursuant to a Bill of Sale to Eko.

53.     Upon information and belief, Eko continues to operate as Saavy Naturals. Indeed, Plaintiffs are informed and believe, and on that basis allege, the Saavedras are employed by Eko in its operations of the Saavy Naturals brand and business.

### C.     Defendants' Conspiracy to Commit Tortious Acts

54.     Each of the Defendants acted collectively over the course of only several days, to obtain the Legal Opinion and the Liquidation Opinion to estimate the liquidation value of Saavy Naturals at an artificially low price to facilitate the sham General Assignment and sale to Eko.

55.     Plaintiffs are informed and believe, and on that basis allege, that Brett Cummings on behalf of Privateer and Left Coast Ventures, together with the other Defendants, collectively proposed and structured the General Assignment and sham sale to Eko. Indeed, Mr. Hamer reviewed the Asset Opinion even before Equitable Transitions became the Assignee for the Benefit of Creditors.  Plaintiffs are further informed and believe, and on that basis allege, that Brett Cummings orchestrated the proposed sham sale through the General Assignment, particularly in light of the proximity in time between Eko's formation, Saavy Natural's execution of the Eko Loan, and Equitable Transition's execution of the General Assignment and Bill of Sale. The collective acts resulted in the torts described in Counts II-VII, *infra*.

56.     Plaintiffs are informed and believe, and on that basis allege, that Defendants were each aware that the other Defendants planned to commit the torts described in Counts II-VII, *infra*.

57.     Plaintiffs are further informed and believe, and on that basis allege, that each of the Defendants agreed with the other Defendants to commit the torts described herein and each intended to commit the torts described herein.

58.     As a direct and proximate result of these and other acts, Defendants caused Plaintiffs to suffer significant damages in an amount to be determined at trial including loss of their stock investment, loss of accounts receivables for services rendered, damage to reputation, lost profits, lost business opportunities, and other material harm caused derivatively to Trimax and Saavy Naturals. Defendants' actions were done with oppression, fraud, or malice.

**D.      Plaintiff Vazquez Brings Counts Derivatively on Behalf of Trimax and Saavy Naturals**

59.     Trimax and Saavy Naturals are Nevada corporations. It has been the law in Nevada that directors have a fiduciary duty to act in the best interests of all shareholders. Officers of a corporation owe a similar duty to the corporation. At all times material hereto, Hugo Saavedra served as the sole director of Trimax and Saavy Naturals, as well as their President. At all times material hereto, Debra Saavedra served as Secretary of both companies, and identified herself as President of Saavy Naturals. Based upon the acts and omissions of the Saavedras in direct violation of their fiduciary duties to act in the best interests of Trimax and Saavy Naturals, a pre-suit demand to bring the derivative claims asserted in Counts II through V, and Count VIII of this action is excused as a futile and useless act. The Saavedras personally engaged in the unscrupulous and unlawful acts of stripping all the assets out of Trimax and Saavy Naturals for virtually no consideration, which amounted to an unlawful conversion of the

26

assets of the companies which was in direct conflict with the advice given to them by their business consultant Plaintiff, Vazquez.   Upon information and belief, the Saavedras personally profited from the Loan to Own Scheme by obtaining for themselves new executive positions and enriched compensation packages with Eko, one of the principal perpetrators of the scheme and acquiror of all the assets of Saavy Naturals. In no event could the Saavedras be trusted to conduct an independent, objective and thorough investigation of the alleged wrongdoing, as they are completely conflicted and complicit as direct co-conspirators in the Loan to Own Scheme. The wrongful conduct of the Saavedras is not subject to protection under the business judgment rule.

60.     At all times material hereto, Plaintiff Joseph Vazquez was a shareholder, and continuously has been, and is a shareholder of Trimax, which owns 100% of Saavy Naturals. Plaintiff Vazquez and his undersigned counsel will adequately and fairly represent the interests of Trimax and Saavy Naturals in enforcing and protecting their rights.

### COUNT I- FIRST CAUSE OF ACTION

**For *Emergency* Injunctive Relief Against Privateer and Tilray**

61.     Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

62.     This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and Joseph Vazquez, derivatively, on behalf of Trimax and Saavy Naturals. Defendants Privateer and Tilray are scheduled to vote on a proposed merger on or about December 6, 2019, whereby Privateer will merge with and into a merger subsidiary, with the merger subsidiary surviving as a wholly owned subsidiary of Tilray. A copy of said merger agreement is attached hereto as **Exhibit N** (the "Merger Agreement").

63.     Privateer currently owns approximately 75% of the stock of Tilray valued at approximately $1.5 billion.  The stated reason for the merger is to effect the orderly release into the stock market of the 75 million shares of Tilray common stock currently owned by Privateer.

64.     Under the terms of the Merger Agreement, Tilray will issue to the Privateer equity holders newly issued and registered shares of Tilray common stock and options to purchase shares of Tilray common stock in an aggregate amount equal to the number of Tilray common shares currently held by Privateer. As set forth in the Merger Agreement, at its sole election (to be made prior to closing), Tilray may pay a portion of the merger consideration in cash in lieu of issuing an equivalent number of shares of Tilray. All Tilray shares held by Privateer and all outstanding Privateer stock will be cancelled upon consummation of the merger.

65.     Following the merger, Privateer will no longer be in existence as it will have merged into Tilray's wholly owned subsidiary, which will have no assets to speak of. As a result, Privateer will go from an entity which had over $1.5 billion in assets to an entity which is a subsidiary of Tilray but which will have no assets thereafter.

66.     As described herein, Privateer orchestrated the Loan to Own Scheme through its authorized agent, Brett Cummings, and is therefore responsible for millions of dollars of losses suffered by Plaintiffs, and by Trimax and Saavy Naturals' creditors and shareholders.

67.     In addition, as a result of the egregious, unlawful, unethical nature of the scam perpetuated by Privateer in concert with the other Defendants named herein, Plaintiffs intend to move this Court to amend this Verified Complaint to seek more than $150 million in punitive damages against Privateer.

68.     Pursuant to Florida law, an award of punitive damages is often based on a party's ability to pay or its net worth.

28

69.     An award of 10% of the total net worth of Privateer would be approximately $150 million.  Such an award if made would not be considered excessive under Florida law.

70.      In this case, the acts of Privateer were malicious, oppressive, unlawful, deceitful, and fraudulent, and would therefore support the highest punitive damage award permissible under Florida law.

71.     If the merger is allowed to proceed, Plaintiffs will have no ability to recover the potential punitive damage award which could ensue against Privateer since the merger subsidiary in which Privateer merged into will have no assets within which to pay any damages awarded.

72.     Although the Merger Agreement between Privateer and Tilray provides that approximately $125 million of the Tilray shares being issued in the merger to the Privateer equity holders will be held in escrow in the event of any claims against Tilray or its subsidiaries by third parties arising from pre-closing liabilities and other indemnification obligations, the indemnification obligation runs between Tilray and Privateer, and it is not clear whether Plaintiffs would have standing to demand payment from the escrow account created for Privateer's indemnification obligations under the Merger Agreement.  In addition, the sum of $125 million which has been escrowed for this purpose is subject to other claims by Tilray, itself, and other creditors should there be additional indemnification claims made against the escrowed amount.

73.     Moreover, it is clear that the sum of $125 million--even if all of it is available to cover Plaintiffs' claims--might be insufficient to cover the total award of compensatory and punitive damages which might be awarded in this case based on the egregious and unscrupulous nature of the actions committed by Privateer. Finally, the Tilray shares which have been placed in escrow are subject to significant market fluctuations which can vary wildly, based on past

Tilray's historical share price.  For example, in October 2018, Tilray stock was trading at almost $300 per share; it is now trading at $20 per share.

74.     Thus, Plaintiffs do not have an adequate remedy at law if the merger is allowed to occur and there is a serious risk of irreparable harm absent injunctive relief.

75.     Based on the verified allegations and evidence proffered in this Verified Complaint, Plaintiffs have demonstrated and will demonstrate that they have a substantial likelihood that they will prevail on the merits of the case.

76.     Although a merger between Privateer and Tilray would allow the 75 million shares of Tilray common stock to be sold into the stock market in a more orderly fashion than might otherwise be the case, the harm to Privateer and Tilray if the merger does not occur or is otherwise delayed is not readily apparent. As part of the merger, the shares to be issued to the Privateer equity holders will be subject to a lock-up agreement which will preclude the sale or transfer of the stock received except in accordance with the lock-up agreement to be signed by the Privateer equity holders.

77.     However, restrictions on sale or transfer pursuant to the lock-up agreement will lapse as to 50% of the shares on the first anniversary following the merger, and the restrictions on the remaining 50% will lapse 12.5% on each quarter thereafter, such that all restrictions will lapse by the second anniversary of the merger.  Thus, while the merger does limit the amount of shares that can be sold at one time, it does little to prevent significant drops in share price after the first few months of the effective date of the merger.

78.     Moreover, currently, there is no lock-up agreement and there has been none since January of 2019.  Privateer has effectively managed its ownership of 75% ownership interest in Tilray without the need of a merger.  In fact, Privateer has every reason to prevent a dumping of

its Tilray shares into the market over the short term, and an argument could be made that the merger is only likely to exacerbate the dumping of shares into the market after the expiration of the first year of the lock up.

79.     On the other hand, if the Court does not prevent the merger from going forward, all of the assets of Privateer will be disposed of in the merger in exchange for shares of Tilray stock which will no longer be in the possession of Privateer but instead in possession of its equity holders, and as a result, Plaintiffs will have no assets against which to pursue payment of its verified claims, except potentially only to the extent of the amount held in escrow pursuant to the terms of the Merger Agreement. As noted, this amount may be insufficient to satisfy all of the damages which may be awarded in this lawsuit.

80.     Accordingly, Plaintiffs seek a temporary and permanent injunction to prevent the closing of the merger which is scheduled to occur on <u>December 6, 2019</u> or shortly thereafter, pending the satisfaction of certain conditions to closing.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT II-SECOND CAUSE OF ACTION

### For Breach of Fiduciary Duty
### Against The Saavedras

81.     Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

82.     This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and Joseph Vazquez, derivatively on behalf of Trimax and Saavy Naturals against the Saavedras for breaches of their fiduciary duties as more fully described herein.

83.     At all times material hereto, there existed a fiduciary relationship between Trimax and Saavy Naturals, on the one hand, and the Saavedras, on the other. Specifically, Hugo Saavedra and Debra Saavedra owed fiduciary duties of loyalty and care to Saavy Naturals and Trimax as a result of their serving as directors and/or officers of Trimax and Saavy Naturals.

84.     The duty of care required the Saavedras to act in a prudent manner and in the best interests of Trimax and Saavy Naturals, with all of the information available to them. The duty of loyalty required the Saavedras to put the interests of Trimax and Saavy Naturals above their own pecuniary interests

85.     The Saavedras breached their fiduciary duties owed to Trimax and Saavy Naturals by knowingly engaging in the Loan to Own Scheme and effecting the transfer of assets of Saavy Naturals for practically no consideration. The Saavedras' purported transfer of assets violated Nevada corporate law in that the board of directors of Trimax and Saavy Naturals failed to obtain the consent of its shareholders to transfer all of Saavy Naturals' assets.  Upon information and belief, this failure was intentional and plainly violated Nevada's corporate law.

86.     The Saavedras participated in the Loan to Own Scheme at a time where the market capitalization of Trimax reflected it was worth millions of dollars and that its prospects were bright in that Saavy Naturals had claimed strong sales, substantial national distribution agreements, and an intention to continue as a going concern in the months (and days) leading up to the sale.  Yet, the Saavedras made no attempt (i) to obtain a valuation of Saavy Naturals as a going concern, (ii) to market the company, (iii) to engage an investment banker, or (iv) to obtain a fairness opinion.

87.     The Saavedras authorized and directed Saavy Naturals to enter into the Loan to Own Scheme where all, or virtually all, of the consideration paid was used for the fees and transaction expenses of Equitable Transitions.

88.     The Saavedras additionally breached their fiduciary duties by accepting as partial payment for the Saavy Naturals assets the cancellation of $41,000 of the $78,000 of secured debt owed by Saavy Naturals to Eko pursuant to the Eko Loan. The acceptance of such cancelation of debt as partial consideration made an already scandalous transaction a total farce.  The release of this debt and this portion of the consideration was, in all events, imaginary and non-existent because the transaction provided that all of the assets of Saavy Naturals were being transferred pursuant to the General Assignment. Thus, whether or not Eko released any debt, the Saavedras knew that the Eko Loan would be totally worthless and there was no chance of repayment since Saavy Naturals no longer owned any assets to enable it to pay the amount of debt outstanding on the Eko Loan. Thus, the $41,000 of supposed, additional consideration was an unmitigated ruse, and amounted to what was essentially an outright conversion of the assets of Saavy Naturals for no consideration.

89.     In a further breach of their fiduciary duties, after the sham transaction took place, the Saavedras failed to publicly disclose the sale of the assets of Trimax which would be considered to be a "material event." By not disclosing this material event, they not only harmed existing shareholders, but also allowed new unsuspecting investors to purchase shares, based on their recent prior press releases, in a completely worthless company.

90.     Upon information and belief, the Saavedras were at all times following the closing of the Loan to Own Scheme continuously employed by Eko with substantial positions and compensation packages and are currently still employed by Eko.  The Saavedras acted in a

33

manner which was morally and ethically corrupt in engaging in the Loan to Own Scheme and breached every corporate and fiduciary norm by completely disregarding the interests of the creditors and shareholders of Trimax and Saavy Naturals in order to substantially benefit themselves in the form of new executive positions and enriched compensation packages with Eko.

91.    As a direct and proximate result of these and other acts, Trimax and Saavy Naturals suffered the loss of all their assets to the detriment of all of their creditors for no value, and the shareholders lost approximately $4 million of market capitalization, essentially overnight, rendering all of their shares completely and utterly worthless.

92.    Privateer, Left Coast Ventures, Brett Cummings, and Equitable Transitions knowingly directed, orchestrated, engineered, and conspired with, and aided and abetted the Saavedras' breach of their fiduciary duties to Trimax and Saavy Naturals.

93.    The Saavedras and the other Defendants actions were done with oppression, fraud, or malice.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT III-THIRD CAUSE OF ACTION

**For Recovery of a Fraudulent Conveyance**
**Against All Defendants**
**(Actual Fraud)**

94.    Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

95.     This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and Joseph Vazquez, derivatively, on behalf of Trimax and Saavy Naturals against all the Defendants for their unlawful commission of a fraud, as more fully described herein.

96.     Saavy Naturals transferred substantially all of its assets to Eko though the General Assignment pursuant to the Loan to Own Scheme with the intent to defraud its creditors and the shareholders of Trimax.  The transfer left Saavy Naturals completely insolvent. Further, Eko did not pay fair value for the transfer of the assets. Rather, the entire transaction was a fraudulent scam perpetuated by the Defendants in concert with each other.

97.     Plaintiffs are informed and believe that the going concern value of Saavy Naturals is millions of dollars more than the consideration paid by Eko, which was illusory.  Trimax and Saavy Naturals were harmed as a result of the transfer of assets to Eko because the General Assignment and sham sale to Eko rendered the monies due to creditors, including Plaintiff, Infinity Consulting, completely uncollectible, and also rendered the stock of the shareholders of Trimax entirely worthless. The sham transfer additionally caused other substantial harm as described hereinabove.

98.     Plaintiffs are entitled to an order voiding and recovering all transfers of the assets of Saavy Naturals made to Equitable Transitions and Eko pursuant to the Loan to Own Scheme including, but not limited to, the General Assignment, and the assets sold by Equitable Transitions to Eko pursuant to the Bill of Sale.

99.     The actions of Privateer, Left Coast Ventures, the Saavedras, Equitable Transitions, and Eko in facilitating the transfer of Saavy Naturals' assets were done with oppression, fraud, or malice.

WHEREFORE, Plaintiffs pray for the relief set forth below.

35

## COUNT IV-FOURTH CAUSE OF ACTION

### For Conversion
### Against All Defendants

100.    Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

101.    This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and Joseph Vazquez, derivatively, on behalf of Trimax and Saavy Naturals against all the Defendants for their unlawful conversion of the assets of Saavy Naturals as more fully described herein.

102.    Prior to the Loan to Own Scheme, Saavy Naturals owned all of its assets and the right to possess its assets.

103.    Defendants intentionally and substantially interfered with Saavy Natural's property by engaging in the Loan to Own Scheme which resulted in the unlawful transfer of all of its property to Eko.

104.    The transfer of the assets was accomplished without proper authorization and consent, as the board of directors of Trimax and Saavy Naturals did not obtain the consent of their shareholders to the transfer of all the assets of Saavy Naturals, which was required under Nevada corporate law.

105.    The Defendants knew that the Saavedras transfer of assets was illegitimate and unlawful and knew that the entire Loan to Own Scheme was a fraud upon the creditors and shareholders of Trimax.

106.    Trimax and Saavy Naturals were harmed by the Loan to Own Scheme as the creditors and shareholders of Saavy Naturals received nothing in return for the transfer. All, or

virtually all, of the consideration paid was used for the fees and transaction expenses of Equitable Transitions.   The release of $41,000 of the $78,000 of secured debt owed by Saavy Naturals to Eko pursuant to the Eko Loan as partial payment for the Saavy Naturals assets was, in all events, imaginary and non-existent because the transaction provided that all of the assets of Saavy Naturals were being transferred pursuant to the General Assignment. Thus, whether or not Eko released any debt, the parties orchestrating the scheme knew that the Eko Loan would be totally worthless and there was no chance of repayment since Saavy Naturals no longer owned any assets to enable it pay the amount of debt outstanding on the Eko Loan. Thus, this purported consideration was completely illusory.

107.   The Defendants' conduct was a substantial factor in causing Plaintiffs' harm. As a direct and proximate result of these and other acts, Trimax and Saavy Naturals suffered the loss of all their assets to the detriment of all of their creditors for no value, and the shareholders lost approximately $4 million of market capitalization, essentially overnight, rendering all of their shares utterly worthless.

108.   Privateer, Left Coast Ventures, Brett Cummings, the Saavedras and Equitable Transitions knowingly directed, orchestrated, engineered, and conspired with, and aided and abetted the conversion of all the assets of Trimax and Saavy Naturals.

109.   The Defendants actions were done with oppression, fraud, or malice.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT V-FIFTH CAUSE OF ACTION

### For Breach of Fiduciary Duty
### Against Equitable Transitions, Inc.

110.    Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

111.    This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and Joseph Vazquez, derivatively, on behalf of Trimax and Saavy Naturals against Equitable Transitions.

112.    At all times relevant hereto, there existed a fiduciary relationship between Saavy Naturals on the one hand and Equitable Transitions on the other. Specifically, Equitable Transitions owed fiduciary duties of loyalty and care to Saavy Naturals pursuant to the General Assignment and applicable law. Those duties included the obligation to "use its best efforts to maximize the proceeds from the sale and disposition" of Saavy Naturals' assets and "exercise reasonable care and diligence in discharging its duties" under the General Assignment for the benefit of creditors. *See* **Exhibit L**  (General Assignment, § 1.4.2 at 2).

113.    Equitable Transitions further breached its fiduciary duties owed to Saavy Naturals by wholly abandoning its duties to investigate the value of Saavy Naturals' assets or to market Saavy Naturals' assets to maximize recovery for the benefit of creditors.  Plaintiffs are informed and believe, and on that basis allege, that Equitable Transitions undertook no marketing efforts.

114.    The Liquidation Opinion obtained admittedly addresses the liquidation value of Saavy Naturals' assets and does not consider Saavy Naturals' "goodwill, going concern, product line, customer lists, etc." *See id.* (Liquidation Opinion, at 4).  These considerations are fundamental to determine whether Eko paid fair value for all of the assets of Saavy Naturals,

particularly where the market capitalization at the time of the transaction reflected it was worth millions of dollars and that its prospects were bright in that Saavy Naturals had claimed strong sales, substantial national distribution agreements, and an intention to continue as a going concern in the months (and days) leading up to the sale.  Indeed, Trimax and Saavy Naturals had surpassed 200 locations for their custom pallet displays selling their hand crafted soaps to Walmart just 10 days prior to the sham transaction.

115.    Equitable Transitions further breached its fiduciary duties owed to Saavy Naturals by charging an exorbitant fee that is not consistent with the work performed. Equitable Transitions charged $65,000 for its services, plus expenses, to administer the General Assignment. Equitable Transitions' fee is nearly equal to the $70,000 cash proceeds from the sale. However, the sale to Eko occurred on the same day as the General Assignment, and there were few tasks that Equitable Transitions actually performed.

116.    Equitable Transitions additionally breached its fiduciary duties by accepting as partial payment for the Saavy Naturals assets the cancellation of $41,000 of the $78,000 of secured debt owed by Saavy Naturals to Eko pursuant to the Eko Loan. The acceptance of such cancelation of debt as partial consideration made an already scandalous transaction a total farce. The release of this debt and this portion of the consideration was, in all events, imaginary and non-existent because the transaction provided that all of the assets of Saavy Naturals were being transferred pursuant to the General Assignment. Thus, whether or not Eko released any debt, Equitable Transitions knew that the Eko Loan would be totally worthless and there was no chance of repayment since Saavy Naturals no longer owned any assets to enable it pay the amount of debt outstanding on the Eko Loan. Thus, the $41,000 of supposed, additional

consideration was an unmitigated ruse, and amounted to what was essentially an outright
conversion of the assets of Saavy Naturals for no consideration.

117.    As a direct and proximate result of these and other acts, Equitable Transitions
breached its fiduciary duties to Saavy Naturals and caused Trimax and Saavy Naturals to suffer
the loss of all their assets to the detriment of all of their creditors and shareholders, and
essentially causing approximately $4 million in loss of market capitalization, essentially
overnight.

118.    Privateer, Left Coast Ventures, the Saavedras, and Brett Cummings knowingly
directed, and aided and abetted Equitable Transitions' breach of is fiduciary duties to Trimax and
Saavy Naturals.

119.    Equitable Transitions' and the other Defendants actions were done with
oppression, fraud, or malice.

WHEREFORE, Plaintiffs pray for the relief set forth below.

**COUNT VI-SIXTH CAUSE OF ACTION**

**For Intentional Interference with Contractual Relations
Against All Defendants**

120.    Plaintiffs, Infinity Consulting and Mr. Vazquez, hereby re-allege and incorporate
by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

121.    Privateer, Left Coast, the Saavedras, and the other Defendants knew or should
have known that their Loan to Own Scheme would leave many creditors of Saavy Naturals,
including Plaintiff Infinity Consulting, without recourse to collect monies owed to them by
Saavy Naturals, and would also permanently harm the current and future business relationships

between Saavy Naturals and its suppliers and service providers, including Plaintiffs, Infinity Consulting and Joseph Vazquez.

122.    Plaintiffs, Infinity Consulting and Joseph Vazquez, are further informed and believe that each of the Defendants specifically knew of existing agreements and business arrangements between Saavy Naturals and its creditors, suppliers and service providers, including the Advisory Agreement either through due diligence for the Eko Loan, access to the Liquidation Opinion, or otherwise.

123.    Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants intended that Saavy Naturals breach the Advisory Agreement through the General Assignment and sham sale to Eko. Plaintiffs are further informed and believe, and on that basis allege, that each of the Defendants intended to utilize the General Assignment as an artifice to strip Saavy Naturals of its assets.

124.    Plaintiffs are also informed and believe that each of the Defendants knew or should have known that their conduct in formulating and effecting the Loan to Own Scheme would potentially ruin the reputation and credibility of Plaintiffs Infinity Consulting and Joseph Vazquez, as business consultants, and cause them significant monetary damage, expose them to unlimited liability, and ultimately cause permanent, irreparable  damage to their business and professional relationships.

125.    Defendants' conduct in planning, organizing, authorizing, and effectuating the General Assignment and sale to Eko caused Saavy Naturals to breach its obligations to Plaintiff Infinity Consulting under the terms of the Advisory Agreement and to permanently damage the reputation and credibility of Plaintiffs Infinity Consulting and Joseph Vazquez.

126.     As a direct and proximate result of these and other acts, each of the Defendants caused Plaintiffs millions of dollars of damages in an amount to be determined at trial including lost profits, lost business opportunities, and other harm.

127.     Each of the Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT VII-SEVENTH CAUSE OF ACTION

### For Negligent Interference with Prospective Economic Relations
### Against All Defendants

128.     Plaintiffs, Infinity Consulting and Mr. Vazquez, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

129.     At all times material hereto, Plaintiffs and Saavy Naturals were in an economic relationship pursuant to the terms of the Advisory Agreement.

130.     Plaintiffs Infinity Consulting and Joseph Vazquez are further informed and believe that each of the Defendants specifically knew of existing agreements and business arrangements between Saavy Naturals and its creditors, suppliers and service providers, including the Advisory Agreement either through due diligence for the Eko Loan, access to the Liquidation Opinion, or otherwise.

131.     Defendants knew or should have known that the economic relationship between Plaintiffs and Saavy Naturals would be disrupted if Defendants failed to act with reasonable care. Plaintiffs are informed and believe, and on that basis allege, that Defendants knew that the General Assignment and sham sale to Eko was certain to disrupt Saavy Naturals' performance of its obligations under the Advisory Agreement.

42

132.    Moreover, Plaintiffs are also informed and believe that each of the Defendants knew or should have known that their conduct in formulating and effecting the Loan to Own Scheme would potentially ruin the reputation and credibility of Plaintiffs Infinity Consulting and Joseph Vazquez, as business consultants, and cause them significant monetary damage, expose them to unlimited liability, and ultimately cause permanent, irreparable damage to their business and professional relationships.

133.    Defendants did not act with reasonable care by planning, organizing, authorizing, and effectuating the General Assignment and sham sale to Eko.

134.    As set forth more fully herein, each of the Defendants engaged in wrongful conduct to interfere with the economic relationship between Plaintiffs and Saavy Naturals. Among other things, Defendants entered into a scheme to fraudulently convey all of the assets of Saavy Naturals to Eko pursuant to the Loan to Own Scheme.

135.    The General Assignment disrupted the economic relationship between Plaintiffs and Saavy Naturals as set forth in the Advisory Agreement. The General Assignment rendered worthless the fees due and owing to Plaintiff, Vazquez, as well as all other payment entitlements under the Advisory Agreement.

136.    As a direct and proximate result of these and other acts, each of the Defendants negligently interfered with Plaintiffs' rights under the Advisory Agreement and caused Plaintiffs to suffer millions of dollars of losses and damages described herein in an amount to be determined at trial including lost profits, lost business opportunities, and other harm.

137.    Each of the Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT VIII-EIGHTH CAUSE OF ACTION

### For Aiding and Abetting
### Against All Defendants

Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

138.    Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions acted collectively over the course of only several months and days, to obtain the Legal Opinion and the Liquidation Opinion in order to provide an artificially low estimate of the liquidation value of Saavy Naturals to justify and facilitate the General Assignment and sham sale.  Indeed, Mr. Hamer reviewed the Asset Opinion even before Equitable Transitions became the assignee.  Plaintiffs  are  informed and believe, and on that basis allege, that Eko, through Privateer's and Left Coast Ventures' Brett Cummings, orchestrated the sham sale through the General Assignment, particularly in light of the proximity in time between Eko's formation, Saavy Natural's execution of the Eko Loan, and Equitable Transition's execution of the General Assignment and Bill of Sale. The collective acts resulted in the torts described in Counts II, III, IV, V, VI and VII, *supra*.

139.    Plaintiffs are informed and believe, and on that basis allege, that Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions each knew that the other Defendants planned to commit the torts described herein against Plaintiffs and Trimax and Saavy Naturals.

140.    Plaintiffs are informed and believe, and on that basis allege, that Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions each

substantially assisted or encouraged the other Defendants to commit the torts described herein against Plaintiffs and Trimax and Saavy Naturals.

141.    Plaintiffs are informed and believe, and on that basis allege, that the conduct of Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions in substantially assisting or encouraging the other Defendants to commit the torts described herein was a substantial factor in the harm caused to the Plaintiffs as a result of the torts.

142.    Accordingly, each Defendant is liable for aiding and abetting the commission of the torts described in Counts II, III, IV, V, VI and VII, *supra*.

143.    As a direct and proximate result of these and other acts, Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions caused Plaintiffs and Trimax and Saavy Naturals to suffer the losses and damages described herein in an amount to be determined at trial including lost profits, lost business opportunities, and other harm. Defendants' actions were done with oppression, fraud, or malice.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for a judgment on each count against each of the Defendants as follows:

1.    For a temporary and permanent injunction preventing the merger between Tilray and Privateer scheduled to occur on or shortly after December 6, 2019.

2.    For an order voiding the transfer of the assets of Saavy Naturals to Eko pursuant to the Bill of Sale;

45

3.      For actual, compensatory, consequential, and restitutionary damages according to proof;

4.      For pre-judgment and post-judgment interest according to proof;

5.      For attorneys' fees and costs in accordance with applicable statutory and decisional law; and

6.      For such other and further relief as the Court deems just and proper in favor of the Plaintiffs.

**SANCHEZ-MEDINA, GONZALEZ, QUESADA, LAGE, GOMEZ & MACHADO LLP**
Attorneys for Plaintiffs
201 Alhambra Circle, Suite 1205
Coral Gables, Florida 33134
Tel: 305.377.1000
Fax: 305.424.0237

By:    s/ Peter A. Gonzalez
       PETER A. GONZÁLEZ, ESQ.
       Florida Bar No. 036919
       Email: PGonzalez@SMGQLAW.com

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues which are subject to adjudication by a trier of fact.

**SANCHEZ-MEDINA, GONZALEZ, QUESADA,**
**LAGE, GOMEZ & MACHADO LLP**
Attorneys for Plaintiffs
201 Alhambra Circle, Suite 1205
Coral Gables, Florida 33134
Tel: 305.377.1000
Fax: 305.424.0237


By: ___s/ Peter A. Gonzalez_____
          PETER A. GONZÁLEZ, ESQ.
          Florida Bar No. 036919
          Email: PGonzalez@SMGQLAW.com

47

## **VERIFICATION STATEMENT**

Under penalties of perjury, I declare that I have read the foregoing Plaintiffs' Verified Complaint, and the facts stated in it are true and correct to the best of my knowledge and belief.


JOSEPH M. VAZQUEZ III

48

# EXHIBIT A



## Trimax Corporation and Saavy Naturals Inc. Begins Roll Out of Their Custom Full Pallet Displays for Their Handmade Soaps to Walmart Corp.



September 12, 2018 10:30 ET | **Source:** Trimax Corporation

**Saavy Naturals Expects To Roll Out Over One Million Hand Crafted Soaps Into Walmart ® Retail Locations By December 2018**

Chatsworth, CA, Sept. 12, 2018 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE -- Trimax Corporation, Inc. (OTC PINK: TMXN) (the "Company") and its wholly owned subsidiary Saavy Naturals Inc., is pleased to announce they have received confirmation and have begun to roll-out their custom-made free standing pallet displays for their hand-crafted scented soaps to Walmart ® Corporation. This will constitute the second product in the Savvy Naturals Everyday product line to be placed in Walmart ® retail locations.

The roll-out of Saavy's hand-crafted soaps started on September 10, 2018 and will initially be placed in 50 Walmart ® retail locations in Texas, with a continual roll-out to 1,000 locations nationwide by December 2018. These beautiful free-standing custom-made pallet displays are 48"W x 48"L x 56"H and will hold 1,152 individual soaps in 12 captivating scents.

This roll-out comes on the heels of a front page article in the Los Angeles Business Journal captioned "Titans Tapped" which highlighted Hugo Saavedra and Saavy Naturals as being selected out of thousands of applications to take part of Walmart's ® "Made in the USA" project. This recent selection, along with brisk

sales of Saavy Everyday Bath Bombs already in Walmart, should open the door for more Saavy Natural Everyday products on Walmart ® shelves over the next several months.

http://labusinessjournal.com/photos/2018/jun/22/35001/

Hugo Saavedra, CEO of Trimax Corporation and Saavy Naturals Inc., stated, "Our roll-out of our custom-made free standing pallet displays should be considered a testament to our commitment to get our entire Saavy Naturals Everyday product line on Walmart ® shelves. We have worked tirelessly over the last several months to see this project to fruition. We look forward to keeping our shareholders abreast of all newsworthy events coming up as we enter into a busy holiday season."

Hugo and Debra Saavedra, Saavy Naturals Inc.'s, CEO and President, gained instant popularity for their all-natural body care product line after being spotlighted and appearing on ABC's hit show Shark Tank. The Sharks took an instant liking to Hugo and Debra, their love story, their previous success in the body care industry, and the superior quality of their all-natural product. Hugo and Debra have since increased the company's product line exposure with several highlighted television features on The Home Shopping Network and are currently working on additional television marketing opportunities.

Saavy Naturals Inc. on Shark Tank:

https://vimeo.com/231634993

**About Trimax Corporation:**

Trimax Corporation, through its wholly owned subsidiary, Saavy Naturals Inc., offers a complete line of Natural Skin Care products, which includes body creams, body scrubs, body wash, shampoos, conditioners, handcrafted soaps, bath bombs, bath salts and candles. Saavy Naturals products are 100% natural, vegan, gluten-free, soy free, cruelty-free, non-GMO, and food-grade. Currently, Saavy Naturals can be found in some of the largest natural retail stores and exclusive boutiques and spas across the nation. Some of the retailers include Walmart ®, Whole Foods Market in the Northeast and Southern California regions, Gelson's Market, Vitamin Cottage, Bristol Farms, Erewhon, Lazy Acres and Earth Fare. Additionally, Saavy Naturals products can be purchased through numerous online retailers, including http://www.Amazon.com, and http://www.Saavynaturals.com.

For more information please visit our website:

http://www.saavynaturals.com

Saavy Naturals Inc. on Shark Tank:

https://vimeo.com/231634993

Saavy Naturals Inc. on HSN:

https://www.youtube.com/watch?v=jm9-NHZA6Vs

Social Media Links:

http://www.facebook.com/saavynaturals

http://www.instagram.com/Saavynaturals

http://www.twitter.com/saavynaturals

**Safe Harbor**

This release contains statements that constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements appear in a number of places in this release and include all statements that are not statements of historical fact regarding the intent, belief or current expectations of Trimax Corporation Inc., its directors or its officers with respect to, among other things: (i) financing plans; (ii) trends affecting its financial condition or results of operations; (iii) growth strategy and operating strategy. The words "may," "would," "should," "will," "expect," "estimate," "can," "believe," "potential" and similar expressions and variations thereof are intended to identify forward-looking statements. Investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, many of which are beyond Trimax Corporation Inc.'s ability to control, and that actual results may differ materially from those projected in the forward-looking statements as a result of various factors. More information about the potential factors that could affect the business and financial results is and will be included in Trimax Corporation Inc.'s filings with the Securities and Exchange Commission.

**Public Relations and Shareholder Information:**

Joseph M. Vazquez III

Phone: (800) 985-5711

Email: infinityglobalconsulting@gmail.com

Newswire Distribution Network & Management

- Home
- Newsroom
- RSS Feeds
- Legal

About Us

**GlobeNewswire** is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures and multimedia content to the media, investment community, individual investors and the general public.

© 2019 GlobeNewswire, Inc. All Rights Reserved.



## Trimax Corporation and Saavy Naturals Inc. Receive Vendor Approval to Sell Its Full Line of Luxurious Beauty Care Products on Bed Bath & Beyonds E-Commerce Website



September 17, 2018 10:00 ET | **Source:** Trimax Corporation

**Saavy Naturals In Final Discussions To Sell Their Complete Product Line In Over 1,000 Bed Bath & Beyond Retail Locations**

CHATSWORTH, CA , Sept. 17, 2018 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE -- Trimax Corporation, Inc. (OTC PINK: TMXN) (the "Company") and its wholly owned subsidiary Saavy Naturals Inc., is pleased to announce they have received final vendor approval to sell its complete line of Saavy Naturals health and beauty care products on Bed Bath and Beyond's e-commerce retail website bedbathandbeyond.com.

Saavy Naturals at Bed Bath & Beyond:

https://www.bedbathandbeyond.com/store/s/saavy-naturals?ta=typeahead&ml=v2

In addition to Saavy Naturals luxurious beauty line, the Company has created opulent gift sets of its popular Bay Rum & Hemp line exclusively for sale at bedbathandbeyond.com for the holiday season. Saavy's hemp line continues to be their number one selling product line on their website. Saavy's Bay Rum & Hemp

products include their finest lotions, scrubs, body wash, soap, shampoos and conditioners.

Saavy Naturals Gift Sets at Bed bath & Beyond:

https://www.bedbathandbeyond.com/store/s/hemp-body-wash

Founded in 1971, Bed Bath & Beyond Inc. (NASDAQ) and subsidiaries is an omnichannel retailer with 1,530 retail locations offering a wide selection of domestic merchandise and home furnishings. The Company's mission is to be trusted by its customers as the expert for the home and "heart-related" life events. These include certain life events that evoke strong emotional connections such as getting married, moving to a new home, having a baby, going to college and decorating a room, which the Company supports through its wedding and baby registries, new mover and student life programs, and its design consultation services. The Company's ability to achieve its mission is driven by three broad objectives: first, to present a meaningfully differentiated and complete product assortment for the home, of the right quality product, at the right value; second, to provide services and solutions that enhance the usage and enjoyment of its offerings; and third, to deliver a convenient, engaging, and inspiring shopping experience that is intelligently personalized over time.

Bed Bath & Beyond Inc. also operates a robust e-commerce platform consisting of various websites and applications, and an established retail store base under the names of Bed Bath & Beyond, Christmas Tree Shops, Christmas Tree Shops andThat! or andThat!, Harmon, Harmon Face Values or Face Values, buybuy BABY, World Market, Cost Plus World Market or Cost Plus. In addition, Bed Bath & Beyond Inc. operates Of a Kind, Inc., an e-commerce website that features specially commissioned, limited edition items from emerging fashion and home designers.

Hugo Saavedra, CEO of Trimax Corporation and Saavy Naturals, stated, "As we enter the 2018 holiday season, we are extremely pleased to announce our new relationship with Bed Bath & Beyond. Our vendor approval to sell our luxurious beauty care products on their very successful e-commerce website is the first step towards our goal of retaining shelf space in their retail locations. Currently, we are in the advance stages of discussions to make this happen and hope to have our complete line in over 1,000 Bed Bath & Beyond locations by the end of the year."

Trimax Corporation and Saavy Naturals recently announced its roll-out their custom-made free standing pallet displays for their hand-crafted scented soaps to Walmart ® Corporation. The first 50 have already been shipped to various Walmart

stores in Texas and the Company is in the process of building another 200 pallet displays in order to reach its goal of having 1,000 displays in Walmart retail locations nationwide by December 2018.

Recent Press Release:

http://www.newmediawire.com/news/trimax-corporation-and-saavy-naturals-inc-begins-roll-out-of-their-custom-full-pallet-displays-for-their-handmade-soaps-to-walmart-corp-4823563

Hugo and Debra Saavedra, Saavy Naturals Inc.'s, CEO and President, gained instant popularity for their all-natural body care product line after being spotlighted and appearing on ABC's hit show Shark Tank. The Sharks took an instant liking to Hugo and Debra, their love story, their previous success in the body care industry, and the superior quality of their all-natural product. Hugo and Debra have since increased the company's product line exposure with several highlighted television features on The Home Shopping Network and are currently working on additional television marketing opportunities.

**About Trimax Corporation:**

Trimax Corporation, through its wholly owned subsidiary, Saavy Naturals Inc., offers a complete line of Natural Skin Care products, which includes body creams, body scrubs, body wash, shampoos, conditioners, handcrafted soaps, bath bombs, bath salts and candles. Saavy Naturals products are 100% natural, vegan, gluten-free, soy free, cruelty-free, non-GMO, and food-grade. Currently, Saavy Naturals can be found in some of the largest natural retail stores and exclusive boutiques and spas across the nation. Some of the retailers include Walmart ®, Whole Foods Market in the Northeast and Southern California regions, Gelson's Market, Vitamin Cottage, Bristol Farms, Erewhon, Lazy Acres and Earth Fare. Additionally, Saavy Naturals products can be purchased through numerous online retailers, including http://www.Amazon.com, and http://www.Saavynaturals.com.

For more information please visit our website:

http://www.saavynaturals.com

Saavy Naturals Inc. on Shark Tank:

https://vimeo.com/231634993

Saavy Naturals Inc. on HSN:

https://www.youtube.com/watch?v=jm9-NHZA6Vs

Social Media Links:

http://www.facebook.com/saavynaturals

http://www.instagram.com/Saavynaturals

http://www.twitter.com/saavynaturals

**Safe Harbor**

This release contains statements that constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements appear in a number of places in this release and include all statements that are not statements of historical fact regarding the intent, belief or current expectations of Trimax Corporation Inc., its directors or its officers with respect to, among other things: (i) financing plans; (ii) trends affecting its financial condition or results of operations; (iii) growth strategy and operating strategy. The words "may," "would," "should," "will," "expect," "estimate," "can," "believe," "potential" and similar expressions and variations thereof are intended to identify forward-looking statements. Investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, many of which are beyond Trimax Corporation Inc.'s ability to control, and that actual results may differ materially from those projected in the forward-looking statements as a result of various factors. More information about the potential factors that could affect the business and financial results is and will be included in Trimax Corporation Inc.'s filings with the Securities and Exchange Commission.

```
Public Relations and Shareholder Information:
Joseph M. Vazquez III
Phone: (800) 985-5711
Email: infinityglobalconsulting@gmail.com
```

Newswire Distribution Network & Management

- Home
- Newsroom
- RSS Feeds
- Legal

About Us

**GlobeNewswire** is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures and multimedia content to the media, investment community, individual investors and the general public.

© 2019 GlobeNewswire, Inc. All Rights Reserved.

# Trimax Corporation and Saavy Naturals Inc. Surpasses 200 Locations for Their Custom Pallet Displays Selling Their Handcrafted Soaps to Walmart Corp.

 Email    Print Friendly    Share

December 13, 2018 08:40 ET | **Source:** Trimax Corporation, Inc.

CHATSWORTH, Calif., Dec. 13, 2018 (GLOBE NEWSWIRE) -- via OTC PR WIRE -- Trimax Corporation, Inc. (OTC PINK: TMXN) (the "Company") and its wholly owned subsidiary Saavy Naturals Inc., is pleased to announce they have surpassed 200 Walmart locations for their luxurious handcrafted soaps which is a part of their Saavy Naturals Everyday brand.

As previously reported, Walmart originally approved the roll-out of Saavy Naturals Everyday's beautiful free-standing custom-made pallet displays, which hold 1,152 individual soaps in 12 captivating scents, to 50 Walmart locations in Texas. Since October, the Company has received purchase orders for over 200 Walmart locations and now distributes their handcrafted soaps to the states of Indiana, Texas, Tennessee, New Hampshire, Arizona, Florida, Michigan, Virginia, Oregon, Colorado, New York, Wisconsin, Missouri, Pennsylvania, California, Illinois, Montana, Louisiana, Delaware, Alabama, North Carolina, Kentucky and Mississippi.

The Company eagerly anticipates continued consistent weekly orders from Walmart as they continue to expand their locations in order for the company to reach their goal of distributing to over 1,000 Walmart locations nationwide.

Hugo Saavedra, CEO of Trimax Corporation and Saavy Naturals Inc., stated, "We are extremely pleased to announce that our handcrafted soaps have now expanded from 50 stores in one state to over 200 locations in 23 states over the last two months. We are confident that we will hit our goal of distributing to 1,000 locations throughout all 50 states." He also stated, "We continue to experience consistent sales of our Savvy Naturals Everyday bath bombs to Walmart throughout the U.S. as well."

Hugo and Debra Saavedra, Saavy Naturals Inc.'s, CEO and President, gained instant popularity for their all-natural body care product line after being spotlighted and appearing on ABC's hit show Shark Tank. The Sharks took an instant liking to Hugo and Debra, their love story, their previous success in the body care industry, and the superior quality of their all-natural product. Hugo and Debra have since increased the company's product line exposure with several highlighted television features on The Home Shopping Network and are currently working on additional television marketing opportunities.

Saavy Naturals Inc. on Shark Tank:

https://vimeo.com/231634993

**About Trimax Corporation:**

Trimax Corporation, through its wholly owned subsidiary, Saavy Naturals Inc., offers a complete line of Natural Skin Care products, which includes body creams, body scrubs, body wash, shampoos, conditioners, handcrafted soaps, bath bombs, bath salts and candles. Saavy Naturals products are 100% natural, vegan, gluten-free, soy free, cruelty-free, non-GMO, and food-grade. Currently, Saavy Naturals can be found in some of the largest natural retail stores and exclusive boutiques and spas across the nation. Some of the retailers include Walmart , Whole Foods Market in the Northeast and Southern California regions, Gelson's Market, Vitamin Cottage, Bristol Farms, Erewhon, Lazy Acres and Earth Fare. Additionally, Saavy Naturals products can be purchased through numerous online retailers, including http://www.Amazon.com, and http://www.Saavynaturals.com.

For more information please visit our website:

http://www.saavynaturals.com

Naturals Inc. on Shark Tank:Saavy

https://vimeo.com/231634993

Saavy Naturals Inc. on HSN:

https://www.youtube.com/watch?v=jm9-NHZA6Vs

Social Media Links:

http://www.facebook.com/saavynaturals

http://www.instagram.com/Saavynaturals

**http://www.twitter.com/saavynaturals**

**Safe Harbor**

This release contains statements that constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These statements appear in a number of places in this release and include all statements that are not statements of historical fact regarding the intent, belief or current expectations of Trimax Corporation Inc., its directors or its officers with respect to, among other things: (i) financing plans; (ii) trends affecting its financial condition or results of operations; (iii) growth strategy and operating strategy. The words "may," "would," "should," "will," "expect," "estimate," "can," "believe," "potential" and similar expressions and variations thereof are intended to identify forward-looking statements. Investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, many of which are beyond Trimax Corporation Inc.'s ability to control, and that actual results may differ materially from those projected in the forward-looking statements as a result of various factors. More information about the potential factors that could affect the business and financial results is and will be included in Trimax Corporation Inc.'s filings with the Securities and Exchange Commission.

**Public Relations and Shareholder Information:**

Joseph M. Vazquez III

Phone: (800) 985-5711

Email: infinityglobalconsulting@gmail.com


Newswire Distribution Network & Management

- Home
- Newsroom
- RSS Feeds
- Legal

About Us

**GlobeNewswire** is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases financial disclosures

and multimedia content to the media, investment community, individual investors and the general public.

© 2019 GlobeNewswire, Inc. All Rights Reserved.

# EXHIBIT B

---------- Forwarded message ---------
From: **Debra Saavedra** <debra@saavynaturals.com>
Date: Tue, Sep 25, 2018 at 6:10 PM
Subject: Re: Conference Call
To: Joseph Vazquez <infinityglobalconsulting@gmail.com>, Hugo Saavedra
<hugo@saavynaturals.com>, Christopher Garitee <gugliottalaw@optonline.net>

Thank you, Joe.

Attached, please find the two term sheets.  Below is the email that
accompanied them which outlines the terms they propose.

All the best,
Debra

**Debra Saavedra**
**President & Co-Founder**
**Tel: 818-626-9696**
**Mobile: 818-264-6970**
**@saavynaturals**
www.saavynaturals.com

**From:** Brett Cummings <brett@leftcoastventures.us>
**Date:** Monday, September 24, 2018 at 5:13 PM
**To:** Hugo Saavedra <hugo@saavynaturals.com>, Aaron Plotkin <aaron@leftcoastventures.us>
**Subject:** Term sheet

Hugo - I hope you are doing well.  As discussed please find 2 term sheets: 1)
Saavy Naturals and 2) CBD entity to be created.

Here are the highlights and some commentary; please call me with any
questions:

**Saavy Naturals**

- Investment amount: $1.5M
- Post-money valuation: $4M
- Privateer ownership: 37.5%
- Unallocated option pool: 12.5%
- Hugo/Debra: 50%
- BOD: 2 common; 1 Privateer
- Notes: Goal here is to provide capital to fix operations, execute on
  Walmart POs, drop in sales and operational hires, keep you
  (Hugo/Debra) with control of common and BOD while providing

adequate oversight and provide additional hires to continue sales growth.  This provides you with ability to be face of the brand and to formulate CBD products without having to worry about day-to-day management.

## CBD

-
- Investment amount: $0.5M
- Post-money valuation: $0.667M
- Privateer ownership: 75%
- Unallocated option pool: 15%
- Hugo/Debra: 10%
- BOD: 1 common; 2 Privateer
- Notes: Brand new entity where we take the Saavy products and infuse them with CBD supplied by Privateer.  Start with current products produced by Saavy and move to produce new products (sunscreen, lip balm, etc.).  You would be in charge of all formulation and we will provide new brand(s), etc.


Hugo - I'm ecstatic to go through this journey with you and put Saavy on the map.  Your product quality and your story needs to be seen/heard by the world and with this capital and a few key hires we can get you there and get you back to the work you truly love.

Please call with any questions/comments and I can walk you through the term sheets, but the high level terms are above.

Best regards,
Brett


Brett Cummings
CEO
Left Coast Ventures
415-971-1592

**From:** 'Joseph Vazquez' <infinityglobalconsulting@gmail.com>
**Date:** Tuesday, September 25, 2018 at 2:48 PM
**To:** Hugo Saavedra <hugo@saavynaturals.com>, Debra Saavedra <debra@saavynaturals.com>,
Christopher Garitee <gugliottalaw@optonline.net>
**Subject:** Conference Call

All,

This email shall confirm our conference call set for 2 pm (EST).

Please use the conference call instructions below.

**Hugo - Please send the two term sheets to John for his review before the call tomorrow. His email is cc'd on this correspondence.

Regards,

Joseph M. Vazquez III
President

Infinity Global Consulting Group, Inc.
Office  (800) 554-5659
Cell     (754) 204-4549
**Conference Call:** (641) 715-0861   Code: 180300#
SKYPE: infinityglobalconsulting

## SALE OF SERIES A PREFERRED STOCK

### SUMMARY OF TERMS

| | |
|---|---|
| Issuer: | Saavy Naturals, Inc. (the "Company"). |
| Financing Amount: | $1.5 million. |
| Type of Security: | Series A Preferred Stock ("Series A Preferred"). |
| Price: | Price per share (the "Original Purchase Price") to be based on the fully-diluted post-money valuation of $4.0 million. The number of shares of Common Stock and options available for issuance under the Company's stock option plans shall be increased on a pre-money basis to equal at least 12.5% of the fully diluted capitalization of the Company following the closing of the financing. |
| Investors: | Privateer Holdings, Inc., and affiliates ("PH")          $1.5 million |
| Anticipated Closing (the "Closing"): | October 12, 2018. |
| Liquidation Preference: | In the event of any liquidation or sale of the Company, the holders of Series A Preferred shall be entitled to receive (parri passu with the holders of any existing preferred stock (together with Series A Preferred, the "Preferred Stock")) in preference to the holders of Common Stock a per share amount equal to the Original Purchase Price (the "Liquidation Preference"). After the payment of the Liquidation Preference, the remaining assets shall be distributed to holders of Common Stock. |
| Automatic Conversion: | The Series A Preferred shall be automatically converted into Common Stock, at the then applicable conversion price, upon either (i) the closing of a firmly underwritten public offering of shares of Common Stock of the Company at a per share price not less than three times (3.0x) the Original Purchase Price (as adjusted for stock splits, dividends and the like) and for a total offering of not less than $30 million (before deduction of underwriters commissions and expenses) or (ii) in the event that the holders of at least a majority of the outstanding Series A Preferred vote in favor of such conversion. |
| Board of Directors: | The Company's board of directors ("Board") will be set at three directors as follows: (a) the holders of Series A Preferred shall elect one director who will be designated by PH (the "Series A Director"), and (b) the holders of Common Stock shall elect two directors, one of whom will be the then-serving Chief Executive Officer. The Company will maintain D&O insurance with a carrier and in an amount satisfactory to the Board. |
| Protective Provisions: | The consent of the holders of at least a majority of the Preferred Stock shall be required for any action that, (i) increases or decreases the authorized number of shares of Common Stock or Preferred Stock, (ii) amends, repeals or waives any provision of the Certificate of Incorporation or Bylaws in a manner that adversely changes the rights, preferences, or privileges of the Preferred Stock, (iii) creates (by reclassification or otherwise) any new class or series of shares having rights, preferences or privileges senior to or on a parity with the |

1.

Preferred Stock, (iv) results in the redemption of any shares of Preferred Stock or Common Stock (other than pursuant to equity incentive agreements or employment agreements giving the Company the right to repurchase shares upon the termination of services), (v) results in the payment or declaration of any dividend on any shares of Common Stock, (vi) results in any merger, other corporate reorganization, sale of control, or other transaction in which holders of the Company's voting securities prior to such transaction hold less than 50% of the Company's voting securities upon the closing of such transaction, or a sale of all or substantially all of the assets of the Company, (vii) increases or decreases the size of the Board, (viii) sells, issues, sponsors or distributes any digital tokens, coins, blockchain-based assets or cryptocurrency created by the Company (collectively, the "Tokens"), including through a Simple Agreement for Future Tokens or other agreement, pre-sale, initial coin offering, token distribution event or crowdfunding, or develops a computer network either incorporating Tokens or permitting the generation of Tokens by network participants or (ix) waives or amends any price-based anti-dilution adjustment.

| | |
|---|---|
| Certain Transactions: | The prior approval of the Board, including the Series A Director, shall be required for any action that: (i) creates or authorizes the creation of any debt security or otherwise results in the incurrence of indebtedness for money borrowed in excess of $100,000 or (ii) increases the number of shares of Common Stock reserved for issuance under any equity incentive plan. |
| Other Rights: | Customary and market dividend rights, anti-dilution protections, preemptive rights, information rights, rights of first refusal, co-sale rights, registration rights and approval rights. |
| Fees and Expenses: | The Company shall pay the reasonable fees and expenses (not to exceed $15,000) of one special counsel to PH. |
| Exclusivity: | The Company agrees that during the period between acceptance of this summary of terms and 60 days thereafter, it will not enter into any agreement with any third party concerning a possible lead investment without the prior written consent of PH (the "Exclusivity Period"). |
| Confidentiality: | The Company shall keep the terms of this letter and its existence in confidence and shall not divulge any of it to any party. |
| Miscellaneous: | Except for the provisions labeled "Exclusivity" and "Confidentiality", this summary of terms is not intended to create any legally binding obligations on either party, and no such obligation shall be created unless and until the parties enter into definitive written agreements. |

* * * * * * *

2.

This summary of terms shall remain available for acceptance through 5:00 p.m. PT on September 28, 2018.  The parties to this summary of terms acknowledge their agreement to the terms contained herein by signing below:

**Saavy Naturals, Inc.**                              **Privateer Holdings, Inc.**

By:    _____        By:    _____
Name:  _____        Name:  _____
Title: _____        Title: _____
Date:  _____        Date:  _____

3.

## SALE OF SERIES A PREFERRED STOCK

### SUMMARY OF TERMS

| | |
|---|---|
| Issuer: | Saavy Naturals (CBD), Inc. (the "Company"). (NTD: Name to be updated) |
| Financing Amount: | $0.5 million. |
| Type of Security: | Series A Preferred Stock ("Series A Preferred"). |
| Price: | Price per share (the "Original Purchase Price") to be based on the fully-diluted post-money valuation of $0.667 million.  The number of shares of Common Stock and options available for issuance under the Company's stock option plans shall be increased on a pre-money basis to equal at least 15% of the fully diluted capitalization of the Company following the closing of the financing. |
| Investors: | Privateer Holdings, Inc., and affiliates ("PH")                 $0.5 million |
| Anticipated Closing (the "Closing"): | October 12, 2018. |
| Liquidation Preference: | In the event of any liquidation or sale of the Company, the holders of Series A Preferred shall be entitled to receive (parri passu with the holders of any existing preferred stock (together with Series A Preferred, the "Preferred Stock")) in preference to the holders of Common Stock a per share amount equal to the Original Purchase Price (the "Liquidation Preference").  After the payment of the Liquidation Preference, the remaining assets shall be distributed to holders of Common Stock. |
| Automatic Conversion: | The Series A Preferred shall be automatically converted into Common Stock, at the then applicable conversion price, upon either (i) the closing of a firmly underwritten public offering of shares of Common Stock of the Company at a per share price not less than three times (3.0x) the Original Purchase Price (as adjusted for stock splits, dividends and the like) and for a total offering of not less than $30 million (before deduction of underwriters commissions and expenses) or (ii) in the event that the holders of at least a majority of the outstanding Series A Preferred vote in favor of such conversion. |
| Board of Directors: | The Company's board of directors ("Board") will be set at three directors as follows: (a) the holders of Series A Preferred shall elect one director who will be designated by PH (the "Series A Director"), and (b) the holders of Common Stock shall elect two directors, one of whom will be the then-serving Chief Executive Officer.  The Company will maintain D&O insurance with a carrier and in an amount satisfactory to the Board. |
| Protective Provisions: | The consent of the holders of at least a majority of the Preferred Stock shall be required for any action that, (i) increases or decreases the authorized number of shares of Common Stock or Preferred Stock, (ii) amends, repeals or waives any provision of the Certificate of Incorporation or Bylaws in a manner that adversely changes the rights, preferences, or privileges of the Preferred Stock, (iii) creates (by reclassification or otherwise) any new class or series of shares having rights, preferences or privileges senior to or on a parity with the |

053514-0018

Preferred Stock, (iv) results in the redemption of any shares of Preferred Stock or Common Stock (other than pursuant to equity incentive agreements or employment agreements giving the Company the right to repurchase shares upon the termination of services), (v) results in the payment or declaration of any dividend on any shares of Common Stock, (vi) results in any merger, other corporate reorganization, sale of control, or other transaction in which holders of the Company's voting securities prior to such transaction hold less than 50% of the Company's voting securities upon the closing of such transaction, or a sale of all or substantially all of the assets of the Company, (vii) increases or decreases the size of the Board, (viii) sells, issues, sponsors or distributes any digital tokens, coins, blockchain-based assets or cryptocurrency created by the Company (collectively, the "Tokens"), including through a Simple Agreement for Future Tokens or other agreement, pre-sale, initial coin offering, token distribution event or crowdfunding, or develops a computer network either incorporating Tokens or permitting the generation of Tokens by network participants or (ix) waives or amends any price-based anti-dilution adjustment.

|  |  |
|---|---|
| Certain Transactions: | The prior approval of the Board, including the Series A Director, shall be required for any action that: (i) creates or authorizes the creation of any debt security or otherwise results in the incurrence of indebtedness for money borrowed in excess of $100,000 or (ii) increases the number of shares of Common Stock reserved for issuance under any equity incentive plan. |
| Other Rights: | Customary and market dividend rights, anti-dilution protections, preemptive rights, information rights, rights of first refusal, co-sale rights, registration rights and approval rights. |
| Fees and Expenses: | The Company shall pay the reasonable fees and expenses (not to exceed $15,000) of one special counsel to PH. |
| Exclusivity: | The Company agrees that during the period between acceptance of this summary of terms and 60 days thereafter, it will not enter into any agreement with any third party concerning a possible lead investment without the prior written consent of PH (the "Exclusivity Period"). |
| Confidentiality: | The Company shall keep the terms of this letter and its existence in confidence and shall not divulge any of it to any party. |
| Miscellaneous: | Except for the provisions labeled "Exclusivity" and "Confidentiality", this summary of terms is not intended to create any legally binding obligations on either party, and no such obligation shall be created unless and until the parties enter into definitive written agreements. |

* * * * * * *

2.

This summary of terms shall remain available for acceptance through 5:00 p.m. PT on September 28, 2018. The parties to this summary of terms acknowledge their agreement to the terms contained herein by signing below:

**Saavy Naturals (CBD), Inc.**                              **Privateer Holdings, Inc.**

By: _____                                 By: _____
Name: _____                               Name: _____
Title: _____                              Title: _____
Date: _____                               Date: _____

3.

# EXHIBIT C



Statewide distribution with over 400 active cannabis accounts

SelDsato.com

# SAAVY NATURALS

Saavy Naturals was created by husband and wife team, Hugo & Debra Saavedra, who both share backgrounds in food cultivation and service. They have owned and operated restaurants, been personal chefs, and designed and created menus for other restaurants. They also introduced and **grew** exotic edible flowers and baby greens which were mainstays at many 5-star restaurants in Southern California.

*"They create a feast for your senses with their food, for your skin"*

The Saavedra's know food. Their name was on the menu of Spago, Patina, and The Water Grill, **to** name a few. After years of cooking and growing herbs and edible flowers, they started experimenting with them in new ways, creating luxurious soaps, body creams, and body scrubs. They decided to offer some of their new creations at a local farmer's market, and the rest is history, as they say!

As great lovers of beauty, whether it's nature, art, music, or an amazing meal, the Saavedra's find inspiration in the lush bountiful wonders of the world. Just as a great chef cooks not only for the sense of taste, but also for the eyes, the nose, for all of the senses, they create a feast for your senses with their food for your skin.

SaavyNaturals.com

# EXHIBIT D



26895 Aliso Creek Road • Suite B, # 569 • Aliso Viejo, California 92656-5301
Email: vanhornauctions@cox.net • Website: www.vanhornauctions.com
Tel: (949) 206-2525 • Fax: (949) 831-1975

December 20, 2018

Hugo Saavedra, CEO & Co-Creator
Saavy Pure & Natural
8943 Oso Avenue, Suite C
Chatsworth, California 91311

Dear Mr. Saavy,

As you are aware, and as per your request, on Thursday, December 20th, 2018 at approximately 9:00am, I had the opportunity to travel to and physically inspect the assets belonging to Saavy Pure & Natural, located at 8943 Oso Avenue, Suite C, Chatsworth, California 91311, for the purpose of establishing a "Liquidation", opinion of value, of the assets within.

DESCRIPTION:

Saavy Pure & Natural is a company that was created by Mr. Saavedra and his wife in 2016 and is a company that believes in 100% natural, food-grade ingredients for each of their products produced.
This business is housed in an approximately 4,500 sq/ft facility, producing, by hand, bar and hand soaps, body wash, creams, scrubs, and bombs, shampoos, conditioners and candles of various scents.

OVERVIEW:

As per my instructions, I was asked to perform an on-site estimation, specifically a "liquidation" opinion of value, of the assets within the establishment. In addition, I took over 130 photographs of the machinery and equipment, as well as the raw and finished goods inventory and the furniture, fixtures and equipment in the offices.

On the day stated above, I met Mr. Saavedra and Brett Michel at 9:00am at the business location. At that time, Mr. Saavedra kindly gave me a tour of the facility, offices, production area and storage areas, and then explained exactly what assets were owned by this business. After a complete review of the company, I was allowed to conduct my business freely and without difficulty or interruption.

To arrive at the figures, in the "Findings" section below, I have conducted a comprehensive, on-site inspection of the raw material inventory, the finished goods inventory, the warehouse and manufacturing equipment, and the furniture, fixtures and equipment in the entire building, as well as reviewed all 135 photographs taken.

Additionally I have completed an extensive, online investigation, of similar assets, and investigated comparable assets being sold at retail and liquidation prices. I have also taken into consideration the age and depreciation of this inventory, as well as the demand for this material in the current market. It is from these determining factors and thirty years in the liquidation and auction industry that I am of the following opinion.



*VanHorn & Auctions*
APPRAISAL GROUP, LLC

26895 Aliso Creek Road • Suite B, # 569 • Aliso Viejo, California  92656-5301
Email: vanhornauctions@cox.net • Website: www.vanhornauctions.com
Tel: (949) 206-2525 • Fax: (949) 831-1975

FINDINGS:

It is my opinion the machinery and equipment, to include but not limited to the Preferred Packaging tunnel oven and wrapper, Hobart 60 quart mixer, stainless steel vats and mixers, Accutek rotary valve filler, stainless steel tables, Brookfield viscometer, Csplus Lepel cap induction, (3) assorted single burner stoves, stainless steel pots, stirring implements and tables, pallet jacks, pedestal fan, barrel dollies and carts, product scales, tape shooters, office furniture, fixtures and equipment has a liquidation, opinion of value of approximately $12,000.00 to $13,000.00.

No attempts have been made to verify leased equipment, and the values are based on the entirety of equipment inspected.

It is my opinion the raw materials, work in process and finished goods to include, but not limited to, please see "Saavy Naturals Raw Inventory" and the "Inventory Log" below, have a liquidation, opinion of value, of approximately $6,500.00 to $7,000.00. This figure includes all assets viewed on the date of my inspection. No efforts were made to verify leased equipment.

Please keep in mind the values listed above, are for the disposal of assets for cash. These values are not to be used for anything other than liquidation purposes. These are not fair market values and should not be considered as a final sales value when selling a business as a turn-key operation.

DEFINITIONS:

We define "Liquidation" opinion of value, as the price that goods in inventory and/or equipment would bring at a piece-meal public auction sale conducted on site, (As Is, Where Is). This figure is solely and estimation of the assets liquidation value at the present and current time (today). The purpose of the liquidation is the disposal of assets for cash.

These definitions are offered to provide the fundamental value concepts; they are not the only acceptable definitions, since contracts or jurisdictions may dictate somewhat different philosophies. Therefore, these definitions may be expanded or refined as the purpose and function of an appraisal dictate, as long as the fundamental concepts are not altered. In other cases, the laws of a country, state, region, or regulatory agency may require other terms, which therefore would take precedence over the definitions stated here.

"Liquidation" opinion of values are determined and derived from, but not limited to: online investigations, retail values, wholesale values, resale market, market capacity, periodicals and trade publications of certain industries, and thirty years of experience in the Liquidation/Auction Industry.

This report is intended for your use only. The appraiser does not intend the use of this report by others, nor is the report intended for any other use unless express written consent is further granted.



26895 Aliso Creek Road • Suite B, # 569 • Aliso Viejo, California  92656-5301
Email: vanhornauctions @ cox.net • Website: www.vanhornauctions.com
Tel: (949) 206-2525 • Fax: (949) 831-1975

As a member of Van Horn Auctions & Appraisal Group, LLC, I do state that neither I, nor Van Horn Auctions & Appraisal Group, LLC or any of its employees, have any present or future interest in the appraised property.

Thank you for the opportunity to be of service.

Sincerely,

Scott R. Van Horn

**LIMITING CONDITIONS:**

An appraisal is an estimate of value only. The amount is considered a reasonable and proper value under the concept of a definition and it is applied. For this reason, the value is, in most cases, an even number.

No additional values or appraisals have been made requiring such tangibles as patents, rights to manufacture, trademarks, goodwill, going concern, product line, customer lists, etc. The values made a part of this report are for the items listed only and are subject to the definition of the report itself.

Physical condition in most instances has been determined either by the appraiser or based on information provided by others. Any known or hidden conditions existing at the time of the inspection could alter the value.

In most cases, equipment is grouped in terms of cursory values, although certain areas may require an itemized listing and/or value.

All facts and data set forth in this report are true and accurate to the best of the appraiser's knowledge and belief. Neither the appraisers, nor any of their employees, have financial interest in the equipment appraised.

Since conclusions by the appraiser are based upon judgments, isolations of any single element as the sole basis of comparison to the whole appraisal may be inaccurate.

As the addressee has purchased this report, we assume it is to be used by the addressee in determination of the value at that point and time. Use of this report by others should be done so with the understanding that no risk or guarantees have been purchased by the owner of the report nor through the fee paid to the appraiser.

The fee for the appraisal report is neither contingent upon the values reported nor any court appearances either by the appraiser or his associates as part of the appraisal fee. If a court appearance in the future were needed, a separate fee would be established.

No investigation of legal fee or title to the equipment has been made by owner's claim to the equipment has been assumed to be valid. No consideration has been given to liens, or encumbrances, which may be against the equipment.

All opinions as to values are the opinions of the appraiser and his associate's based on the facts and data set forth in the report. The appraisers and their associates assume no responsibility for the changes in the market conditions or for the inability of the owner to locate a purchaser at the appraised value. Inspection of all equipment has been made by either on-site inspection or by photograph, or unless otherwise noted.

The appraisers and their associates are not responsible for changes that may develop in the market place or possible changes in the state of the art of certain machinery and equipment which could substantially change the assigned values.

Van Horn Auction Group is not responsible for market changes in the values of the appraised equipment, which may be affected by, but not limited to:

1) Technological obsolence
2) Economic changes
3) Comparable equipment sales which may saturate market values
4) OSHA regulations affecting market values
5) Environmental rules affecting business

The appraiser and Van Horn Auction Group reserve the right to recall all copies of the report to correct any omission or error.

This valuation study has been made by Van Horn Auction Group and will be held as confidential. It has been prepared by an experienced appraiser and is based on information, where possible, from contractors, manufacturers, sales comparables, dealers, etc. the analysis and final conclusion is arrived at from our experience in the appraisal of new and used equipment.

It is further understood that although individual values are placed upon each item, or a specific category, the individual sales are established by the entire composition of the plant. If any part of the plant were to be sold verses the entire plant, it is possible that the appraised value may be lessened for both the parts sold and the remaining equipment to be sold.

We trust the enclosed meets with your needs; however, should you have any questions or require any additional information, please let us know.

# Saavy Naturals Raw Inventory

| Product Name | Company | Sizes | Prices | QTY in stock | $ in Stock |
|---|---|---|---|---|---|
| | | | | | |
| Coconut Oil | Classic Distribution CO | 500Lb | $1.89 | 700 | $1,323.00 |
| Sweet Almond Oil | Classic Distribution CO | 396Lb | $20.25 | 45 | $911.25 |
| Moringa Oil | Moringa Connect | | $40.00 | 9 | $360.00 |
| Monoi Oil | | | | | $0.00 |
| Kahai Oil | | 100 Kg | $27.50 | 25 | $687.50 |
| Jojoba Oil | Vivion Inc | 396Lb | $14.93 | | $0.00 |
| Olive Oil | Norman Fox | 441 Lb | $3.30 | | $0.00 |
| Tea Tree Oil | | | 35.75 | 30 | $1,072.50 |
| Glycerin | Classic Distribution CO | 500 Lb | $0.65 | 200 | $130.00 |
| Zemea | Lipscomb | 440 Lb | $2.29 | 200 | $458.00 |
| Plantaren 1200 | PCC | 475Lb | $1.25 | 1425 | $1,781.25 |
| Plantaren 2000 | PCC | 475Lb | $1.25 | 1425 | $1,781.25 |
| Classic CAS/Tritesan BS | Classic Distribution CO | 465 Lb | $1.25 | 220 | $275.00 |
| Titanium Dioxide | | 50Lb | $3.22 | 29 | $93.38 |
| Stearic ACID | Classic Distribution CO | 50 lb | $1.25 | 45 | $56.25 |
| Sorbitol Solution 70% | PCC | 595 Lb | $0.68 | 500 | $340.00 |
| Kaltro CG | | | | | $0.00 |
| Allantoin | Classic Distribution CO | 50 Lb | $6.75 | 50 | $337.50 |
| Aloe Vera Powder 200 | | | 298 | 1 | $298.00 |
| Tego Care CG 90 | Glenn Corp | 15Kg | $62.44 | 15 | $936.60 |
| Botanimule GMS-SE | | | | 70 | $0.00 |
| Polawax | | | | 160 | $0.00 |
| Kalcol 8670 | Lipscomb | 20KG | $2.93 | 1500 | $4,395.00 |
| Kalcol 6098 | Lipscomb | 20 kg | $3.23 | 160 | $516.80 |
| Caprylic/Capric Triglycerides | Classic Distribution CO | 419Lb | $3.70 | 50 | $185.00 |
| Vitamin E ( Naturals) | Chemte | 55Lb | $32.51 | 15 | $487.65 |
| Shea Butter | Vivion Inc | 110Lb | $6.00 | 200 | $1,200.00 |
| Crodacol S-95-PA (MH) | | | | 50 | $0.00 |
| Gluconolactone | | | 2.5 | 300 | $750.00 |
| Japanese Honeysuckle Extract | | | | | $0.00 |
| Extract Blend K3580-WS (Lotion) | | | | | $0.00 |
| Caustic Sada 50% Soln | PCC | 55.12 Lg | $0.50 | 100 | $50.00 |
| Benzyl Alcohol | Norman Fox | 485 Lb | $3.40 | 375 | $1,275.00 |
| Arnica Extract | | | | | $0.00 |
| Kumquat Extract | | | | | $0.00 |
| Brown Sugar | | | | 20 | $0.00 |
| White Sugar | | | $0.15 | 500 | $75.00 |
| Medium Salt | | | $0.36 | 110 | $39.60 |

| | | | | | |
|---|---|---|---|---|---|
| Amisoft CS-22 | Ajinomoto | 440Lb | | 7.7 | 35 | $269.50 |
| Monomule 90-L12 | | | | 3.75 | 85 | $318.75 |
| Pordew 500 | | | | 13.75 | 75 | $1,031.25 |
| Andea Q Ultra | | | | 35.5 | 5 | $177.50 |
| Quinoa Pro EX | | | | 17.5 | 5 | $87.50 |
| Oat Meal | | | | | | $0.00 |
| Magnesium Sulfate | | | | | | $0.00 |
| Antil Soft SC | Glenn Corp | 25Kg | $10.79 | 5 | $53.95 |
| L-Arginine | | | | | | $0.00 |
| DL Panthenol | | | | | | $0.00 |
| Emulsense HC | Nexeo Solutions | 50 Lb | $14.51 | 100 | $1,451.00 |
| Cetiol C5 | Ross Organic | 175 Kg | $17.65 | 50 | $882.50 |
| Hydrolized Quinoa | | | | | | $0.00 |
| Fine Salt Culinox 999 | | | | | 20 | $0.00 |
| Xanthan Gum"s | Norman Fox | 55.12 Lb | $5.25 Lb | 10 | $0.00 |
| Stearyl Alcohol | Norman Fox | 55.115 Bag | $1.25 | 190 | $237.50 |
| Cetyl Alcohol | Classic Distribution CO | 50Lb | $1.45 | 100 | $145.00 |
| Dead Sea Salt | Classic Distribution CO | 55Lb | $1.45 | 60 | $87.00 |
| Campo Plantservative 20 Kg | Ross Organic | 20KJg | $192.00 | 15 | $2,880.00 |
| Glucona Delta Lactone | PCC | 55.12Lb | $1.80 | 220.48 | $396.86 |
| Citric Acid | PCC | 50Lb | $1.05 | 50 | $52.50 |
| | | | | | $0.00 |

$27,886.34

# Inventory Log

Date:

| ITEM # | Item Description | UPC | Total Cases | Price | Total Amount |
|---|---|---|---|---|---|
| | HANDCRAFTED BAR SOAPS- 8 oz. | | | | |
| 101 | Bulgarian Rose Bar Soap | 854022005006 | 12 | 5 | $ 360.00 |
| 102 | Green Tea & Lime Bar Soap | 854022005013 | 14 | 5 | $ 420.00 |
| 103 | Jasmine Bar Soap | 854022005020 | 8 | 5 | $ 240.00 |
| 104 | Lavender Chamomile Bar Soap | 854022005037 | 0 | 5 | $ - |
| 105 | Mango Papaya Bar Soap | 854022005044 | 14 | 5 | $ 420.00 |
| 106 | Oatmeal Almond Bar Soap | 854022005051 | 6 | 5 | $ 180.00 |
| 107 | Patchouli Rose Bar Soap | 854022005068 | 13 | 5 | $ 390.00 |
| 108 | Plumeria Violet Bar Soap | 854022005075 | 14 | 5 | $ 420.00 |
| 109 | Tahitian Vanilla & Kukui Bar Soap | 854022005082 | 15 | 5 | $ 450.00 |
| 110 | Yuzu & Meyer Lemon Bar Soap | 854022005099 | 4 | 5 | $ 120.00 |
| | HANDCRAFTED BAR SOAPS- NEW 5 oz. | | | | $ - |
| 151 | Bulgarian Rose Bar Soap | 85948005000 | 22 | 3 | $ 396.00 |
| 152 | Green Tea & Lime Bar Soap | 85948005017 | 14 | 3 | $ 252.00 |
| 153 | Jasmine Bar Soap | 85948005024 | 27 | 3 | $ 486.00 |
| 154 | Lavender Chamomile Bar Soap | 85948005031 | 0 | 3 | $ - |
| 155 | Mango Papaya Bar Soap | 85948005048 | 24 | 3 | $ 432.00 |
| 156 | Oatmeal Almond Bar Soap | 85948005055 | 27 | 3 | $ 486.00 |
| 157 | Patchouli Rose Bar Soap | 85948005062 | 17 | 3 | $ 306.00 |
| 158 | Plumeria Violet Bar Soap | 85948005079 | 18 | 3 | $ 324.00 |
| 159 | Tahitian Vanilla & Kukui Bar Soap | 85948005086 | 2 | 3 | $ 36.00 |
| 160 | Yuzu & Meyer Lemon Bar Soap | 85948005093 | 30 | 3 | $ 540.00 |
| | LUXURIOUS BODY CREAMS | | | | $ - |
| 201 | Bulgarian Rose Body Cream | 854022005105 | 0 | 6 | $ - |

| | | | | | |
|---|---|---|---|---|---|
| 202 | Green Tea & Lime Body Cream | 854022005112 | 0 | 6 | $ - |
| 203 | Jasmine Body Cream | 854022005129 | 0 | 6 | $ - |
| 204 | Lavender Chamomile Body Cream | 854022005136 | 0 | 6 | $ - |
| 205 | Mango Papaya Body Cream | 854022005143 | 4 | 6 | $ 144.00 |
| 206 | Oatmeal Almond Body Cream | 854022005150 | 3 | 6 | $ 108.00 |
| 207 | Patchouli Rose Body Cream | 854022005167 | 0 | 6 | $ - |
| 208 | Plumeria Violet Body Cream | 854022005174 | 0 | 6 | $ - |
| 209 | Tahitian Vanilla & Kukui Body Cream | 854022005181 | 0 | 6 | $ - |
| 210 | Yuzu & Meyer Lemon Body Cream | 854022005198 | 0 | 6 | $ - |
| | **DELICIOUS BODY SCRUBS** | | | | $ - |
| 301 | Coconut Lemongrass Brown Sugar Scrub | 854022005235 | 15 | 7.5 | $ 675.00 |
| 302 | Green Tea & Lime Salt Scrub | 854022005242 | 10 | 7.5 | $ 450.00 |
| 303 | Lavender Chamomile Salt Scrub | 854022005211 | 12 | 7.5 | $ 540.00 |
| 304 | Mango Papaya Sugar Scrub | 854022005228 | 3 | 7.5 | $ 135.00 |
| 305 | Tahitian Vanilla & Kukui Sugar Scrub | 854022005259 | 10 | 7.5 | $ 450.00 |
| 306 | Yuzu & Meyer Lemon Salt Scrub | 854022005266 | 0 | 7.5 | $ - |
| 307 | Jasmine Sugar Scrub | | 14 | 7.5 | $ 630.00 |
| 308 | Plumeria Violet Sugar Scrub | | 0 | 7.5 | $ - |
| 309 | Oatmeal Almond Salt Scrub | | 0 | 7.5 | $ - |
| 310 | Bulgarian Rose Sugar Scrub | | 0 | 7.5 | $ - |
| | **PAMPERING BODY WASHES** | | | | $ - |
| 501 | Bulgarian Rose Body Wash | 854022005600 | 19 | 5 | $ 570.00 |
| 502 | Green Tea & Lime Body Wash | 854022005617 | 9 | 5 | $ 270.00 |
| 503 | Jasmine Body Wash | 854022005624 | 0 | 5 | $ - |
| 504 | Mango & Papaya Body Wash | 854022005631 | 0 | 5 | $ - |
| 505 | Tahitian Vanilla & Kukui Body Wash | 854022005648 | 0 | 5 | $ - |
| 506 | Yuzu & Meyer Lemon Body Wash | 854022005655 | 10 | 5 | $ |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | 300.00 |
| 507 | Oatmeal Almond Body Wash | | 10 | 5 | $ 300.00 |
| 508 | Plumeria Violet Wash | | 10 | 5 | $ 300.00 |
| 509 | Lavender Chamomile Body Wash | | 10 | 5 | $ 300.00 |
| | **RICH LIQUID HAND SOAPS** | | | | $ - |
| 401 | Green Tea & Lime Liquid Hand Soap | 854022005518 | 20 | 5 | $ 600.00 |
| 402 | Tahitian Vanilla & Kukui Liquid Hand Soap | 854022005525 | 5 | 5 | $ 150.00 |
| 403 | Yuzu & Meyer Lemon Liquid Hand Soap | 854022005532 | 5 | 5 | $ 150.00 |
| | **SULFATE-FREE SHAMPOOS** | | | | $ - |
| 601 | Balancing Shampoo | 854022005549 | 4 | 6 | $ 144.00 |
| 602 | Color Protector Shampoo | 854022005556 | 21 | 6 | $ 756.00 |
| 603 | Moisturizing Shampoo | 854022005563 | 8 | 6 | $ 288.00 |
| | **SULFATE-FREE CONDITIONERS** | | | | $ - |
| 701 | Balancing Conditioner | 854022005570 | 0 | 6 | $ - |
| 702 | Color Protector Conditioner | 854022005587 | 0 | 6 | $ - |
| 703 | Moisturizing Conditioner | 854022005594 | 0 | 6 | $ - |
| | **COCONUT WAX CANDLES- NEW** | | | | $ - |
| 801 | Bulgarian Rose | 859498005321 | 84 | 7.5 | $ 3,780.00 |
| 802 | Jasmine | 859498005338 | 21 | 7.5 | $ 945.00 |
| 803 | Plumeria Violet | 859498005345 | 24 | 7.5 | $ 1,080.00 |
| 804 | Tahitian Vanilla & Kukui | 859498005352 | 15 | 7.5 | $ 675.00 |
| | **HANDCRAFTED BULK SOAP TOWER** | | | | $ - |
| 1001 | Blood Orange & Tahitian Vanilla Bulk Soap Tower | 854022005273 | 3 | 88 | $ 264.00 |
| 1002 | Bulgarian Rose Bulk Soap Tower | 854022005280 | 5 | 88 | $ 440.00 |
| 1003 | Coconut Lemongrass Bulk Soap Tower | 854022005297 | 2 | 88 | $ 176.00 |
| 1004 | Green Tea & Lime Bulk Soap Tower | 854022005303 | 3 | 88 | $ 264.00 |
| 1005 | Jasmine Bulk Soap Tower | 854022005310 | 4 | 88 | $ 352.00 |

| 1006 | Lavender Garden Bulk Soap  Tower | 854022005327 | 2 | 88 | $ 176.00 |
| 1007 | Plumeria Violet Bulk Soap Tower | 854022005334 | 4 | 88 | $ 352.00 |
| 1008 | Sandalwood Patchouli Bulk Soap Tower | 854022005341 | 2 | 88 | $ 176.00 |
| 1009 | Spearmint Oat Bulk Soap Tower | 854022005358 | 4 | 88 | $ 352.00 |
| 1010 | Tahitian Vanilla & Kukui Bulk Soap Tower | 854022005365 | 3 | 88 | $ 264.00 |
| 1011 | Yosemite Joe Bulk Soap Tower | 854022005372 | 1 | 88 | $ 88.00 |
| 1012 | Yuzu & Meyer Lemon Bulk Soap Tower | 854022005389 | 2 | 88 | $ 176.00 |
| | **HANDCRAFTED BULK SOAP CAKE** | | | | $ - |
| 1051 | Blood Orange & Tahitian Vanilla Bulk Soap Cake | 854022005396 | 4 | 72 | $ 288.00 |
| 1052 | Bulgarian Rose Bulk Soap Cake | 854022005402 | 2 | 72 | $ 144.00 |
| 1053 | Coconut Lemongrass Bulk Soap Cake | 854022005419 | 3 | 72 | $ 216.00 |
| 1054 | Green Tea & Lime Bulk Soap Cake | 854022005426 | 3 | 72 | $ 216.00 |
| 1055 | Jasmine Bulk Soap Cake | 854022005433 | 3 | 72 | $ 216.00 |
| 1056 | Lavender Garden Bulk Soap Cake | 854022005440 | 4 | 72 | $ 288.00 |
| 1057 | Plumeria Violet Bulk Soap Cake | 854022005457 | 2 | 72 | $ 144.00 |
| 1058 | Sandalwood Patchouli Bulk Soap Cake | 854022005464 | 6 | 72 | $ 432.00 |
| 1059 | Spearmint Oat Bulk Soap Cake | 854022005471 | 2 | 72 | $ 144.00 |
| 1060 | Tahitian Vanilla & Kukui Soap Cake | 854022005488 | 4 | 72 | $ 288.00 |
| 1061 | Yosemite Joe Soap Cake | 854022005495 | 2 | 72 | $ 144.00 |
| 1062 | Yuzu & Meyer Lemon Soap Cake | 854022005501 | 4 | 72 | $ 288.00 |
| | **HOLIDAY HANDCRAFTED BULK SOAP TOWER** | | | | $ - |
| 1015 | Evergreen Bulk Soap Tower | 859498005154 | 0 | 88 | $ - |
| 1016 | Frankincense & Myrrh Bulk Soap Tower | 859498005161 | 0 | 88 | $ - |
| 1017 | Peppermint Candy Bulk Soap Tower | 859498005178 | 0 | 88 | $ - |
| 1018 | Pumpkin Spice Bulk Soap Tower | 859498005185 | 0 | 88 | $ - |
| 1019 | Winter Solstice Bulk Soap Tower | 859498005192 | 0 | 88 | $ - |
| | **HOLIDAY HANDCRAFTED BULK SOAP** | | | | $ |

| | CAKE | | | | |
|---|---|---|---|---|---|
| | | | | | $ - |
| 1065 | Evergreen Bulk Soap Cake | 859498005109 | 0 | 72 | $ - |
| 1066 | Frankincense & Myrrh Bulk Soap Cake | 859498005116 | 1 | 72 | $ 72.00 |
| 1067 | Peppermint Candy Bulk Soap Cake | 859498005123 | 0 | 72 | $ - |
| 1068 | Pumpkin Spice Bulk Soap Cake | 859498005130 | 0 | 72 | $ - |
| 1069 | Winter Solstice Bulk Soap Cake | 859498005147 | 0 | 72 | $ - |
| | | | | | $ 25,958.00 |

# EXHIBIT E

ᴜ4168041



**Secretary of State**
**Statement and Designation by**
**Foreign Corporation**

S&DC-S/N

**IMPORTANT — Read Instructions before completing this form.**

Must be submitted with a current **Certificate of Good Standing** issued by the government agency where the corporation was formed.  See Instructions.

**Filing Fee** – **$100.00** (for a foreign stock corporation) or
**$30.00** (for a foreign nonprofit corporation)

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* Corporations may have to pay minimum $800 tax to the California Franchise Tax Board each year.  For more information, go to *https://www.ftb.ca.gov.*



**FILED**
Secretary of State
State of California

JUN 2 8 2018

*This Space For Office Use Only*

1.  **Corporate Name** (Go to *www.sos.ca.gov/business/be/name-availability* for general corporate name requirements and restrictions.)

2.  **Jurisdiction** (State, foreign country or place where this corporation is formed - must match the Certificate of Good Standing provided.)

Left Coast Ventures, Inc

Delaware

3.  **Business Addresses** (Enter the **complete** business addresses. Items 3a and 3b cannot be a P.O. Box or "in care of" an individual or entity.)

| a. Initial Street Address of Principal Executive Office - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 975 Corporate Center Pkwy, Suite 120 | Santa Rosa | CA | 95407 |
| b. Street Address of Principal Office in California, if any - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
| 975 Corporate Center Pkwy, Suite 120 | Santa Rosa | CA | 95407 |
| c. Mailing Address of Principal Executive Office, if different than Item 3a | City (no abbreviations) | State | Zip Code |
| | | | |

4.  **Service of Process** (Must provide either individual OR Corporation.)

INDIVIDUAL – Complete Items 4a and 4b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | | State CA | Zip Code |

CORPORATION – Complete Item 4c.  Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 4a or 4b |
|---|
| C T Corporation System |

5.  **Read and Sign Below** (See Instructions.  Office or title not required.)

I am a corporate officer and am authorized to sign on behalf of the foreign corporation.

_____
Signature

Brett Cummings
Type or Print Name

S&DC-S/N (REV 03/2017)

2017 California Secretary of State
www.sos.ca.gov/business/be

*416804.1*



Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "LEFT COAST VENTURES, INC" IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-EIGHTH DAY OF JUNE, A.D. 2018.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL FRANCHISE TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

6944864  8300

SR# 20185431167

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202981480

Date: 06-28-18

**Secretary of State**
**Articles of Organization**
Limited Liability Company (LLC)

**LLC-1**

2 0 1 8 3 5 5 1 0 4 1 5

**FILED**
Secretary of State
State of California

**DEC 2 0 2018**

This Space For Office Use Only

**IMPORTANT — Read instructions before completing this form.**

Filing Fee  –  **$70.00**

Copy Fees  –  First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* LLCs may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to https://www.ftb.ca.gov.

**1. Limited Liability Company Name** (See Instructions – Must contain an LLC identifier such as LLC or L.L.C. "LLC" will be added, if not included.)

Eko Holdings, LLC

**2. Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 975 Corporate Center Parkway, Suite 120 | Santa Rosa | CA | 94507 |
| b. Initial Mailing Address of LLC, if different than Item 2a | City (no abbreviations) | State | Zip Code |

**3. Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL – Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State  CA | Zip Code | |

CORPORATION – Complete Item 3c. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b |
|---|
| Cogency Global Inc. |

**4. Management** (Select only one box)

The LLC will be managed by:

☑ One Manager  ☐ More than One Manager  ☐ All LLC Member(s)

**5. Purpose Statement** (Do not alter Purpose Statement)

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**6. The information contained herein, including in any attachments, is true and correct.**

Organizer sign here

Robert R. Rugani, Jr.

Print your name here

LLC-1 (REV 12/2018)

2018 California Secretary of State
www.sos.ca.gov/business/be

# EXHIBIT F

# GoDaddy

## Search the WHOIS Database

Search

Private Registration     Local listings

# WHOIS search results

Domain Name: ekonaturals.us
Registry Domain ID: D3EBD7503A19C47BB9416EAD2834281BC–NSR
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Updated Date: 2019–01–14T16:57:52Z
Creation Date: 2019–01–14T16:57:51Z
Registrar Registration Expiration Date: 2021–01–14T16:57:51Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited
http://www.icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited
http://www.icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited
http://www.icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited
http://www.icann.org/epp#clientDeleteProhibited
Registry Registrant ID: CR352868075
Registrant Name: Brett Cummings
Registrant Organization: Left Coast Ventures
Registrant Street: 975 Corporate Center Parkway
Registrant Street: Suite 120
Registrant City: Santa Rosa
Registrant State/Province: California
Registrant Postal Code: 95407
Registrant Country: US


Contact Us

Registrant Phone: +1.4159711592
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: brett.cummings@privateerholdings.com
Registry Admin ID: CR352868077
Admin Name: Brett Cummings
Admin Organization: Left Coast Ventures
Admin Street: 975 Corporate Center Parkway
Admin Street: Suite 120
Admin City: Santa Rosa
Admin State/Province: California
Admin Postal Code: 95407
Admin Country: US
Admin Phone: +1.4159711592
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: brett.cummings@privateerholdings.com
Registry Tech ID: CR352868076
Tech Name: Brett Cummings
Tech Organization: Left Coast Ventures
Tech Street: 975 Corporate Center Parkway
Tech Street: Suite 120
Tech City: Santa Rosa
Tech State/Province: California
Tech Postal Code: 95407
Tech Country: US
Tech Phone: +1.4159711592
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: brett.cummings@privateerholdings.com
Name Server: NS67.DOMAINCONTROL.COM
Name Server: NS68.DOMAINCONTROL.COM
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2019-10-24T19:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

Contact Us

Notes:

IMPORTANT: Port43 will provide the ICANN–required minimum data set per
ICANN Temporary Specification, adopted 17 May 2018.
Visit https://whois.godaddy.com to look up contact data for domains
not covered by GDPR policy.

The data contained in GoDaddy.com, LLC's Whois database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior
written
permission of GoDaddy.com, LLC. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section. In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.

See Underlying Registry Data  |  Contact Domain Holder  |  Report Invalid Whois

## Want to buy this domain?

Get it with our Domain Broker Service.

Go

## Is this your domain?

Add hosting, email and more.

Go

 Contact Us

# EXHIBIT G



11:59

Left Coast Ventures | LinkedIn

**Company size**

51-200 employees

**Headquarters**

Santa Rosa, CA

**Type**

Privately Held

**Founded**

2018

## Locations

**Primary**

Santa Rosa, CA 95407, US

**Get directions** ↗

Chatsworth, CA 91311, US

**Get directions** ↗

Costa Mesa, CA 92627, US

**Get directions** ↗

Half Moon Bay, CA 94019, US

**Get directions** ↗

**Show more locations** ⌄

# EXHIBIT H

# ADVISORY SERVICE AGREEMENT

**THIS ADVISORY SERVICE AGREEMENT** (the "Agreement") is made this 01st day of August 2017 by and between Trimax Corporation (the "Company") and Infinity Global Consulting Group, Inc., 3867 NE 168th St. unit 404, North Miami Beach, FL. 33160, (the "Advisor").

**WHEREAS,** Advisor and Advisor's personnel and contacts have experience in advising corporate management, strategic planning, corporate development and forecasting, marketing, structuring investor relations programs, contract negotiations and performing general administrative duties for publicly-held companies and developing state investment ventures.

**NOW THEREFORE,** in consideration of the mutual promises and conditions set forth herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.   **Engagement.**   The Company hereby engages Advisor as of the date hereof and continuing until termination as provided herein to provide or assist the Company with the following:
   - Design and arrange public and investor relations campaigns and agreements for the company.
   - Distribute company news and relevant information to market makers, financial media outlets, selected Internet stock pages/threads and the OTC analyst community.
   - Manage message boards and revamp information boxes
   - Manage social media sites
   - Create and/or develop a new corporate website that will use and interact with social media
   - Create advertisements for financial periodicals to enhance market awareness programs.
   - Write, edit and proof any and all correspondence on behalf of the Company.
   - Distribute and disseminate all public materials to potential investors and shareholders.
   - Present client to various media and periodical sources, when appropriate, as well as, interact with national and regional media outlets including appropriate trade journals.
   - Create a Corporate Overview/Due Diligence package for dissemination to potential investors, shareholders and clients. Assist in the development of a public marketing strategy including video presentations.
   - Write, edit and proof all press releases as appropriate and in concert with client milestones, material and newsworthy events.
   - Consult with the company on general business and financial issues.



- Perform due diligence presentations to market makers at the company's request.
- If necessary, negotiate or assist in the negotiation of source, distribution and marketing agreements with third party sources.
- Introduce company to various principles of retail Investment Banking houses located in the United States.
- Facilitate all duties and responsibilities for the Company's Shareholder Relations Dept. Including speaking with potential and existing shareholders, creation and monitoring of all Internet message boards and the development of a diversified shareholder base on behalf of the client.
- Introduce client to various lenders, investor funding groups and hedge funds.
- Screen all potential individuals and business proposals on behalf of the Company in order to prevent any detrimental impacts on the public company.
- Advisor will take responsibility for guaranteeing a 24 hr. turnaround time in response to any and all information that needs to be communicated via emails and/or verbal responses to questions as related to general questions, corporate information or press releases. Further Advisor shall give any ongoing consulting support deemed necessary by client; (collectively the "Services").

2.   **Term.**  Unless sooner terminated in accordance with the termination provisions set forth in this Agreement, the term of this Agreement shall be for an initial term of 12 months commencing on the date hereof (the "Initial Term"), and shall automatically renew every 12 months unless a written termination notice is given either (30) thirty days prior to the end of the initial Term, or (30) thirty days prior to any month after the renewal period. Either party shall advise the other at least (30) thirty days in advance of its desire to terminate the contract any time during Initial Term or additional Terms thereafter agreed upon.

3.   **Time and Effort of Advisor Services.**  Advisor shall allocate such time and assign such of Advisor's personnel as it deems necessary to complete the Services to be provided under this Agreement. The Company agrees to provide any and all information and or documents reasonably requested by Advisor and/or Advisor's personnel to assist in the performance of the Services required hereunder.

4.   **Limitation of Advisors Liability.**  In the absence of willful malfeasance, bad faith, negligence, or reckless disregard for the obligations and duties hereunder by Advisor, neither Advisor nor Advisor's personnel shall be liable to the Company or any of its subsidiaries, officers, directors or shareholders for any act or omission in the course of or connected with rendering the Services, including, but not limited to, losses that may be sustained in any corporate act in any subsequent business opportunity undertaken by the Company as a result of advice provided by Advisor or Advisor's personnel.



5. **Advisory Services Compensation.** The Company shall pay to Advisor as compensation for the services under this Agreement during the Initial Term by way of delivery of $5,000 for the first month's retainer, and $5,000 per month, due every 30 days for the remaining eleven months of the contract. Additionally 500,000 options shall be issued under Rule 144 to the advisor. Options shall convert into free trading shares of Trimax Corporation common stock after six months and the exercise price shall be set at .10 (Ten) cents. All monies and options shall be deemed fully earned as of the date of the signing of this agreement.

6. **Costs and Expenses.** All third party costs and out-of-pocket expenses incurred by Advisor in excess of $300.00 shall be reimbursed to Advisor within thirty (30) days of issuance of invoice to the Company. Additionally, all expenses shall be pre-approved by the Company in advance to any monies being spent for reimbursement.

7. **Place of Services.** The Services to be provided hereunder shall be performed in such place as Advisor, in its sole discretion, deems is the best location for such Services and may include, but not be limited to the Advisor's offices, the Company's offices or other locations as required for the particular service to be performed.

8. **Independent Contractor.** Advisor will act as Independent Contractors in the performance of the Services under this Agreement. Accordingly, Advisor will be responsible for payment of all federal, state, and local taxes on compensation paid under this Agreement, including income and social security taxes, unemployment insurance, and any other taxes due relative to Advisor's personnel, and any and all business license fees as may be required. This Agreement neither expressly nor impliedly creates a relationship of principal and agent, or employment and employer, between Advisor and the Company. Neither Advisor nor Advisor's personnel are authorized to enter into any agreements on behalf of the Company. The Company expressly retains the right to approve, in its sole discretion, each opportunity introduced by Advisor, and to make all final decisions with respect to whether or not to accept or reject any business opportunity suggested or introduced by Advisor.

9. **Rejected Asset Opportunity or Business Opportunity.** If, during the Initial Term of this Agreement or the Additional Term, the Company elects not to proceed to acquire, participate or invest in any business opportunity identified and/or selected by Advisor or Advisor's personnel, notwithstanding the time and expense the Company may have incurred reviewing such transaction, such business



opportunity shall revert back to and become proprietary to Advisor, and Advisor shall be entitled to acquire or broker the sale or investment in such rejected business opportunity for its own account, or submit such assets or business opportunity elsewhere.  In such event, Advisor shall be entitled to any and all profits or fees resulting from Advisor's purchase, referral or placement of any such rejected business opportunity, or the Company's subsequent purchase or financing with such business opportunity in circumvention of Advisor.

10.   **No Agency Express or Implied.**  This Agreement neither expressly nor impliedly creates a relationship of principal and agent between the Company and Advisor, or

employee and employer as between Advisor and Advisor's personnel and the Company.

11.   **Termination.**  The Company and Advisor may unilaterally terminate this agreement at any time with 30 days written notice or email notice, after the first 3 months of the initial term. Either party, Company or Advisor may give notice of termination thirty (30) days prior to the end of the initial term or the additional term, contingent upon the advisor being paid in full and in advanced, the services of the following thirty (30) days from the time of termination notice or email termination notice. Additionally, either party may terminate this Agreement with thirty (30) days written notice, after the first 3 months of the initial term, if the Company is dissatisfied with the Advisor's services under the following conditions:

    (A)   **By the Company.**

        (1)   If during the Initial Term of this Agreement or the Additional Term, Advisor is unable to provide the Services as set forth herein for ten (10) consecutive business days because of illness, or other incapacity of Advisor's personnel; or,

        (2)   If Advisor willfully breaches or neglects the duties required to be performed hereunder.

    (B)   **By Advisor.**

        (1)   If the Company breaches this Agreement or fails to make payments or provide information and documents required hereunder;or,

        (2)   If the Company ceases business or sells a controlling interest to a third party, or agrees to a consolidation or merger of itself with or into another corporation, or enters into such a transaction outside of the scope of this Agreement, or sells substantially all of its assets to another corporation, entity or individual outside the scope of this Agreement; or,



(3)  If the Company subsequent to the execution hereof has a Receiver appointed for its business or assets, or otherwise becomes insolvent or unable to timely satisfy its obligations in the ordinary course of its business; or

(4)  If the Company subsequent to the execution hereof institutes, makes a general assignment for the benefit of creditors, has instituted against it any bankruptcy proceeding for reorganization or rearrangement of its financial affairs, files a petition in a court of bankruptcy, or is adjudicated a bankrupt; or

(5)  If any of the disclosures made herein or subsequent hereto by the Company to Advisor are determined to be materially false or misleading.

**Furthermore**, after the first 90 days of the execution of this agreement, or any time after the additional term, the Company and Advisor may unilaterally terminate this agreement with a 30 day written notice or email notice. Either party, Company or Advisor, may give notice of termination thirty (30) days prior to the end of the initial term or the additional term, contingent upon the advisor being paid in full or in advance, for the services of the following thirty (days) from the date of the written or email termination notice.

12.  **Indemnification.**  Subject to the provisions herein, the Company and Advisor agree to indemnify, defend and hold each other harmless from and against all demands, claims, actions, losses, damages, liabilities, costs and expenses, including without limitation, interest, penalties and attorney's fees and expenses asserted against or imposed or incurred by either party by reason of or resulting from any action or a breach of any representation, warranty, covenant, condition, or agreement of the other party to this Agreement.

13.  **Remedies.**  Any and all remedies available hereunder shall be cumulative and nonexclusive and shall be in addition to any other remedy to which the parties may be entitled.

14.  **Miscellaneous.**

(A)  Subsequent Events. Advisor and the Company each agree to notify the other party if, subsequent to the date of this Agreement, either party incurs obligations that could compromise its efforts and obligations under this Agreement.

(B)  Amendment.  This Agreement may be amended or modified at any time and in any manner only by an instrument in writing executed by both parties hereto.

(C)  Further Actions and Assurances.  At any time and from time to time, each party agrees, at its or their expense, to take actions and to execute and deliver documents as may be reasonably necessary to effectuate the purpose of this Agreement.



(D)   Waiver.  Any failure of any party to this Agreement to comply with any of its obligations, agreements, or conditions hereunder may be waived in writing by the party to whom such compliance is owed.  The failure of any party to this Agreement to enforce at any time of the provision of this Agreement shall in no way be construed to be a waiver of any such provision or a waiver of the right of such party thereafter to enforce each and every such provision.  No waiver of any breach of or noncompliance with this Agreement shall be held to be a waiver of any other or subsequent breach or noncompliance.

Assignment.   Neither this Agreement nor any right created by it shall be assignable by either party without the prior written consent of both parties.

(E)   Notices.  Any notice or other communication required or permitted by this Agreement must be in writing and shall be deemed to be properly given when delivered in person to an officer of the other party, when deposited in the United States mail for transmittal be certified or registered mail, postage prepaid, or when deposited with a recognized courier service for transmittal, or when sent by facsimile transmission and such transmission is evidenced by log as satisfactorily transmitted, and in each case provided that the communication is addressed:

(1) In the case of the Advisor:       Infinity Global Consulting Group, Inc.
                                       3967 NE 168th St. unit 404
                                       North Miami Beach, FL. 33160
                                       Joseph M. Vazquez, III    President


(2) In the case of the Company:       Trimax Corporation
                                       8943 Oso Ave. suite C
                                       Chatsworth, CA 91311
                                       Hugo Saavedra   CEO

or to such other person or address designated in writing by the Company or advisor to receive notice and served on the other party in accordance with this section.

(F)   Headings.  The section and subsection headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(G)   Governing Law.  This Agreement was negotiated and its being contracted for in Florida, and shall be governed by the laws of the State of Florida.  The parties expressly agree to venue in Miami-Dade County, Florida for any and all actions commenced relative to this Agreement.

(H)   Binding Effect.  This Agreement shall be binding upon the parties hereto and inure to the benefit of the parties, their respective heirs, administrators, executors, successors, and assigns,



(I)   Entire Agreement.  This Agreement contains the entire agreement between the parties hereto and supersedes any and all prior agreements, arrangements, or understandings between the parties relating to the subject matter of this Agreement.

(J)   Severability.  If any party of this Agreement is deemed to be unenforceable the balance of the Agreement shall remain in full force and effect.

(K)   Counterparts.  A facsimile, telecopy, or other reproduction of this Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The executed copy of this Agreement shall be valid and binding upon a party when transmitted by facsimile to the other party.  At the request of any party hereto, all parties agree to execute an original of this Agreement, as well as, any facsimile, telecopy or other reproduction hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date above written.

Infinity Global Consulting Group, Inc
Joseph M. Vazquez III
President

Trimax Corporation
Hugo Saavedra
CEO

Page 7 of 7

# EXHIBIT I

# INVOICE

**Joseph M. Vazquez III  D/B/A**
**Infinity Global Consulting Group, Inc.**

INVOICE # 1851199
DATE: MAY 01, 2019

3967 NE 168th Street, Suite 404, North Miami Beach, FL. 33160
Phone (754) 204-4549 Fax (305) 393-8450
infinityglobalconsulting@gmail.com

TO   Hugo Saavedra, CEO
     Trimax Corporation &
     Saavy Naturals Inc.
     8943 Oso Ave Suite C
     Chatsworth, CA 91311

| | JOB DESCRIPTION | PAYMENT TERMS | |
|---|---|---|---|
| | Monthly Retainer Fee | Due upon receipt | |

| CLIENT | JOB DESCRIPTION | START/COMPLETION DATE | AMOUNT DUE |
|---|---|---|---|
| Trimax Corporation | Past Due Invoice - 1851197 | 04/01/18 | $88,382.00 |
| & | Current Monthly Retainer | 05/01/19 | $5,000.00 |
| Saavy Naturals Inc. | | | |

| | | AMOUNT DUE | $93,382.00 |
|---|---|---|---|

MAKE ALL CHECKS PAYABLE TO: **Infinity Global Consulting Group, Inc.**
THANK YOU FOR YOUR BUSINESS!

# EXHIBIT J

**CMD**

**CARMEL, MILAZZO & DiCHIARA LLP**

ATTORNEYS AT LAW

December 19, 2018

<u>**VIA E-MAIL ONLY**</u>
The Hamer Group Insolvency Solutions
Attn: Nigel Hamer
444 West Ocean Blvd.
Suite 1400
Long Beach, CA 90802
nigel@etinsolvency.com

Re:        <u>Ownership of the Assets</u>

Dear Mr. Hamer:

We are counsel to Saavy Naturals, Inc., a Nevada business corporation (the "Company") and we have been requested to issue an opinion with respect to the ownership of the corporate assets (the "assets") represented by the documents provided to us by the Company through the dropbox current as of the date of this legal opinion.

<u>Relevant Background</u>

HuDeb LLC ("HuDeb") is a Delaware limited liability company formed on September 23, 2014.

Saavy Naturals, Inc. ("Saavy I") is a California corporation incorporated on September 24, 2013, and merged out to HuDeb on December 8, 2014. Saavy I appears to initially own the brand "Saavy Naturals."

Saavy Naturals, Inc. (the "Company") is a Nevada corporation incorporated on January 6, 2017. We rely on the representation of the Company that both the Company and HuDeb LLC are authorized to do business as "Saavy Naturals" as of the date of this Opinion.

Trimax Corporation ("Trimax") is a Nevada corporation incorporated on August 18, 1999 (initially, under a different name). Trimax is currently in default of its filing obligations to the Secretary of State of Nevada. Trimax owns 100% of the equity interest in the Company pursuant to the purchase agreement and board resolution dated April 4, 2018.[1] Therefore, all the assets of the Company shall be subject to the Company's status as a wholly-owned subsidiary of Trimax.

<u>Scope and Methodology of Legal Opinion</u>

In rendering the opinion expressed below, we have assumed without verification the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents

---

[1] This is not, however, in conformance with the earlier Asset Purchase Agreement dated January 9, 2017 for sale of business for 80,000,000 shares of common stock of Saavy Naturals Inc. Based on the resolution, however, it appears that the 80,000,000 shares of common stock of Saavy Naturals Inc. have never been issued.

Page **2** of **10**

submitted to us as originals, the conformity to the originals of all documents submitted to us as copies and the authenticity of the originals of such copies. In addition, we have assumed and not verified (a) the accuracy as to the factual matters of each document we have reviewed and the accuracy of, and compliance with, the representations provided by the Company, and (b) that each of the signatories had full power and authority to have taken all necessary action to effect such document.

The documents analyzed for this legal opinion were arranged, assorted, and listed in the dedicated ledger that shall be a part of the legal opinion but shall be kept with our Firm at all times. The privileged or potentially privileged documents have been designated as such in the ledger. The ledger is annexed hereto as **Exhibit A**. The original format of the ledger is *.xls.

For the purposes of this legal opinion, we do not regard any employment agreements and any agreements other than the constituting the goodwill of the company pursuant to extrinsic evidence, as assets.[2] Additionally, for the purposes of this legal opinion, the conclusory documents with regard to the bank accounts created without the participation of our Firm and not confirmed by any extrinsic evidence, such as account statements and alike, are disregarded (see, for instance, documents #68-69 of the document ledger). Furthermore, the assets including but not limited to leases that are owned by any of the shareholders, officers, directors, agents, or affiliates of any of the entities are not included as assets of the entities but indicated in the document ledger for informational purposes only.

In reliance upon the documents provided by the Company and representations of the Company we came to the following conclusions:

(i)     We have not found any evidence of fraudulent conveyances of assets;

(ii)    We have formed no opinion with regard to each and every transfer of assets whether the transferor was receiving reasonably equivalent value from the transferee under the circumstances;

(iii)   We have formed no opinion with regard to transferability of any of the assets, such matter shall be outside of the scope of this opinion;

(iv)   We have formed no opinion as to each and every transfer or agreement is legal, valid, binding, and enforceable on its terms; this opinion is not the "remedy opinion," and may not be used as such;

(v)    We have formed no opinion as to the probability of the "substantial identity" of the legal entities in question, and this opinion does not address any issues of the commingling of assets and business functions of the entities, the degree of difficulty in segregating and ascertaining individual assets and liabilities of the entities in question, the existence of intercorporate guarantees on loans that may

---

[2] In terms of the methodology of not considering contracts, *see Barnes Group Inc. v. U.S.*, 902 F.2d 1114, 1115 (2d Cir. 1990). Additionally, the bankruptcy judges found that "the fee argeements [sic!] to be nonassumable executory contracts and thus not assets of the bankruptcy estate. On appeal, the district court agreed with the bankruptcy court's reasoning that the agreements were personal service contracts, which are nonassumable under 11 U.S.C. § 365(c), and therefore not part of the estate." ¶ 69,765 IN RE TONRY, Bankr. L. Rep. P 69765
We do not state that the contractual rights and obligations are not assets for the purposes other than a potential bankruptcy proceeding, nor does this opinion intend to assume that the methodology chosen in the only methodology that can be adopted.

Page **3** of **10**

affect the assets, the unity of interests and ownership between the various corporate entities, or the transfer of assets without observance of corporate formalities. In other words, this opinion addresses the nominal owners of the assets, if any, or the uncertainty of identifying thereof based on the documents provided.

(vi)     We were not provided with any representations with regard to the presence or absence of consolidated financial statements of the entities in question.

(vii)    This opinion specifically addresses the assets that are mentioned in the document #119, "Inventory of Raw Materials and Finished Goods.xlsx.[3]" The document #119 does not address the matter of the ownership of the assets, but rather contains the list of the assets that were purchased for the purposes of conducting business under the brand name "Saavy Naturals." Upon our additional request for documentation, we were provided with the documents #266-259 of the ledger. Each of the documents is a purchase order from various vendors of materials: Color Maker, Jedwards, Lakshmi International LLC, Norman Fox & Co. The date of the mentioned 94 documents varies from January 10, 2017, to December 14, 2018. 93 of 94 were documents addressed to Saavy Naturals, Inc. Document #346 is addressed to "Hugo Saavedra, Saavy Naturals." Further, we were provided with the documents #359-418 consisting of invoices and demand notices with regard to the payment obligations in connection with the inventory and/or raw materials purchased during the period from November, 2015 to December, 2018. The addressees of invoices are named as the Company ("Saavy Naturals, Inc."), "Hugo Saavedra, Saavy Naturals," "Saavy," "Saavy Naturals Everyday," "Saavy Naturals Soaps," "Saavy Naturals Artisan Body CA," "Saavy Naturals, Debra Saavedra," "Saavy Natural," and Trimax ("Trimax Corporation"). Trimax is mentioned solely in the document #416 dated November 13, 2018. Further, as per representations of the Company[4], (i) all invoices, if paid, have been paid either through personal accounts of Debra Saavedra and Hugo Saavedra, or through banks accounts of the Company and HuDeb, and (ii) Trimax does not have any existing bank account. For the purposes of determining the title owner of the items of inventory, we deem that the "buyer in the ordinary course of business[5]" shall be deemed as the title owner, unless proved otherwise. Further, we found no evidence of bad faith transactions or other factors.[6] We rely on the rule that "when goods are entrusted to the possession of a merchant who deals in goods of that kind, a sale by the

---

[3] As per the statement of the Company, this document was created in the ordinary course of business based on the day-to-day operations of the Company.

[4] Representation via e-mail dated December 19, 2018.

[5] "Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Article 2 may be a buyer in ordinary course of business. "Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt. § 1-201. General Definitions., Unif.Commercial Code § 1-201

[6] For factors constituting "buyer in the ordinary course of business and factors showing otherwise we refer to 87 A.L.R.3d 11 (Originally published in 1978).

Page **4** of **10**

entrusted transfers the entruster's title to a buyer in the ordinary course of business." 77A C.J.S. Sales §418. Notwithstanding the payer's obligations or lack thereof, we were advised that (i) the Company was the intended owner, (ii) The company is the actual recipient of the goods from vendors (in all cases but one,) and (iii) in the only case where both Mr. Hugo Saavedra and the Company are recipients, Mr. Hugo Saavedra himself explicitly denies any proprietary claims to the inventory and materials. Therefore, we conclude that the Company is "the buyer in the ordinary course of business" and the owner of the inventory listed in the document #119.

(viii)    We were not provided with the information to form an opinion with regard to the probable rights of HuDeb to the shares of Common stock of the Company. More specifically, HuDeb and the Company entered certain Asset Purchase Agreement dated January 9, 2017 (document #201 of the document ledger) which was additionally approved by the board resolution of the Company. Pursuant to the referenced agreement, the entire business of HuDeb was to be transferred to the Company in consideration for 80,000,000 of common stock of the Company. There is no indication that the shares have ever been issued to HuDeb, that any assets of HuDeb have ever been transferred to the Company, or that the parties effectuated the above-referenced agreement in any manner whatsoever.[7] Upon additional inquiry, we received representation by the Company that the parties did not proceed with the transaction.[8] Therefore, we specifically indicate that we have not formed any opinion with regard to the assets in connection with this transaction, but acknowledge that the fact of the transaction may be relevant for further determinations with regard to the assets.[9]

(ix)    The beneficial ownership of the assets of the entities in question is allocated, as provided in the annexed table below.

---

[7] It is generally accepted that non-outstanding non-issued shares cannot be considered as assets. *See* 14 N.Y. Jur. 2d Business Relationships § 288

[8] Representation is made via e-mail on the date on December 17, 2018.

[9] Additionally, there is a problem of identification of the assets to be transferred under the agreement, if any

| Asset | Beneficial Owner | Document relied upon | Category of Asset | Notes, if any |
|---|---|---|---|---|
| 1,000,000 Class A Preferred stock of Trimax Corporation | HuDeb, LLC | Certificate of preferred Class A Preferred Stock providing that HuDeb LLC owns 1000000 of shares of Trimax Corporation [without date] Document #20.<br><br>Additionally, the document showing the same data is Treasure Order Issuance Resolution dated April 10, 2017 (Document #26) | Securities | |
| 200,000,000 Shares of Common Stock of Trimax Corporation | HuDeb, LLC | Shareholder Report of Trimax Corporation as of 10/03/2018. Shareholder Report references the certificate of common stock #3417 dated 04/19/2017 (Document #25)<br><br>Additionally, ownership can be confirmed by the Board Resolution dated April 4, 2017, of issuance of shares of common stock (document #28) | Securities | |
| Trademark "Saavy Naturals" in Japan | Saavy Naturals, Inc. | Certified copy of the decision to grant a Trademark Registration Japan Registration number 1374706 | Intellectual Property | |

| | | | | |
|---|---|---|---|---|
| Trademark "Saavy Naturals" for body lotions in the United States | Saavy Naturals, Inc. | Date of international registration: 2017/09/25 USPTO Certificate of TM registration number 1374706 5345836 Filing date: May 2, 2017 | Intellectual Property | |
| Lease for the premises 241 Atlantic Blvd., # 103 Jacksonville, FL 32266 | Unclear | South Coast Beaches Lease.pdf Document # 87 South Coast Beaches Lease.pdf | Real Property Lease | The Lease provides for Saavy Naturals, as a tenant, without any clarification in this regard. The Lease is dated February 24, 2016, therefore, it was entered before Saavy Naturals Inc. was incorporated in Nevada. As a result, we can be certain solely to the extent that Saavy Naturals Inc. is not entitled to any rights under the Lease to our best knowledge. |
| Registered business name in the state of Delaware | HuDeb, LLC | Fictitious business name statement (document #120) | Intellectual Property | |
| Undefined assets under Purchase of business Agreement dated January 9, 2017 | Saavy Naturals Inc. | Asset Purchase Agreement dated January 9, 2017 | Business equipment, outstanding business contracts, intellectual property | HuDeb, LLC had sold a certain amount of equipment and intellectual property in connection with the sale of goods and services under the business name "Saavy Naturals," none of which was identified. |

| | | | |
|---|---|---|---|
| Cash in the amount of $208.35 | Saavy Naturals Inc. | Account statement dated November, 2018 (document #256) and the balance as of the date of this legal opinion (document #258) | Cash | US Bank Account # 157514003928 |
| Cash in the amount of $14.42 | Saavy Naturals Inc. | Account statement dated November, 2018 (document #259) and the balance as of the date of this legal opinion (document #253) | Cash | Florida Savings Account # 243363993 |
| Cash in the amount of $2,030.50 | Saavy Naturals Inc. | Account statement dated November, 2018 (document #259) and the balance as of the date of this legal opinion (document #254) | Cash | Florida Checking account # 243364973 |
| Domain Names as follows: babysaavy.com bodysaavy.com saavynatural.biz saavynatural.com saavynatural.net saavynatural.org saavynaturals.com saavyorganics.com skinsaavy.com | Hugo Saavedra in his individual capacity | Account statement for the domain name registrations through "Network Solutions" (Documents # 261 and 262) | Intellectual Property | |
| Non-exclusive copyright licenses to images on Shutterstock available through the dedicated account | HuDeb, LLC | Shutterstock master licensing agreement dated June 5, 2015 (document #260) and the pdf files generated through opening the dedicated Shutterstock account (documents #263-265) | Intellectual Property | |

55 West 39th Street, 18th Floor New York, NY 10018 | (p) 212/658-0458 (f) 646/838-1314   cmdllp.com

| Property Lease | Hugo Saavedra in his individual capacity | Lease Agreement (document #252) | Commercial Lease | Premises: 8943 Oso Avenue, Unit C, Chatsworth, California 91311 |
|---|---|---|---|---|
| Inventory, raw materials, and other goods listed in the document #119 | Saavy Naturals Inc., subject to the analysis and disclaimers provided in the text of the opinion | Inventory of Raw materials and finished goods (#119), documents #266-419 showing the ordinary course of business, representations of the Company | Chattels | Subject to the analysis and disclaimers provided in the text of the opinion |
| Social media accounts (Facebook Pinterest, Instagram) | Unclear, likely by Ms. Debra Saavedra and Mr. Hugo Saavedra or by Saavy Naturals Inc. | Documents #419-426 (screenshots demonstrating the connection between the website and the accounts on social media and the fact that Ms. Debra Saavedra is in control of the account). | Intellectual property | The accounts are created for business in connection with the website domain owned by Mr. Hugo Saavedra. There is no indication of the assignment of the account to any of the legal entities. Ms. Debra Saavedra is the administrator of the accounts. At the same time, Saavy Naturals Inc. is the exclusive owner of the trademark "Saavy Naturals" that is used through accounts in connection with the goods and services in question. |

55 West 39th Street, 18th Floor  New York, NY 10018 | (p) 212/658-0458 (f) 646/838-1314  cmdllp.com

Page 9 of 10

Sincerely,

/s/ Ross David Carmel, Esq.
Ross David Carmel, Esq.
Carmel, Milazzo & DiChiara, LLP

**Exhibit A**
**Document Ledger**

| Number | Document | Asset | Owner/Adressee | Amount | Type of Asset | Additional Notes | Privledge Status |
|---|---|---|---|---|---|---|---|
| 1 | Retainer Letter from Amin Talati Attorneys at law dated May 29, 2014 | n/a | Savvy Naturals, Inc | $0.00 n/a | | | Yes |
| 2 | Notice from California Department of Tax and Fee Administration | amount owed | Savvy Naturals, Inc | -$9,332.60 tax, indebtness | | just to Savvy Naturals without type of entity | No |
| 3 | Data protection and TransArmor Solution Services Service Agreement together with participation Addendum dated 9/30/2010 | Clover Station with cash drawer & handling yearly services | HaDeb, LLC | $59.95 equipment lease | | the agreement provides for termination upon notice, and there is no indication of each among the documents provided for review | No |
| 4 | Carmel, Milazzo & DiChiara LLP Engagement Letter dated September 26, 2018 | n/a | Savvy Naturals, Inc | $0.00 n/a | | | No |
| 5 | Savvy Naturals Corporate Structure plan | n/a | n/a | n/a | n/a | | Yes |
| 6 | Savvy Holdings, Inc pdf - e-mail confirmation of registration of said corporatin | n/a | Trimax Corporation | n/a | n/a | Articles of Incorporation | No |
| 7 | Trimax Bylaws | n/a | Trimax Corporation | n a | n/a | Corporate Bylaws | No |
| 8 | Nevada Secretary of State 2017 & 2018 | n/a | Trimax Corporation | | Nevada business License | | No |
| 9 | Savvy Naturals, Inc. Purchase (board resolution approving issuance of shares for acquisition of 100% of equity interests in Savvy Naturals, Inc.) dated April 4, 2017 | | Trimax Corporation | | 100% of the equity in the corporation Savvy Naturals, Inc. (Nevada) | | No |
| 10 | Davisson & Associates, PA engagement letter | n/a | Trimax Corporation | n/a | n/a | | Yes |
| 11 | Infiniti Global Consulting pdf Advisory Service Agreement dated August 1, 2017 | n/a | Trimax Corporation | n/a | n/a | the term is subject to automatic renewal, there is no indication of termination | |
| 12 | Resolution of the board of directors without a meeting by unanimous written consent to activities of PatentStockDream.com | n/a | Trimax Corporation | n/a | n/a | | |
| 13 | Employment Agreement Alan Bradlaw | n/a | Trimax Corporation | n/a | n/a | | No |
| 14 | Employment Agreement with Debra Saavedra | n/a | Trimax Corporation | n/a | n/a | The file doesn't open | No |
| 15 | Employment Agreement with Hugo Saavedra | n/a | Trimax Corporation | n/a | n/a | The file doesn't open | No |
| 16 | Employment Agreement with Jarrod Butler | n/a | Trimax Corporation | n/a | n/a | | No |
| 17 | Employment Agreement with Justin Milero | n/a | Trimax Corporation | n/a | n/a | | No |
| 18 | Consolidated Statement of Stockholders Equity June 30, 2018 | n/a | Trimax Corporation | n/a | Securities | | No |
| 19 | Trimax 2nd quarter 2015 | n/a | Trimax Corporation | n/a | n/a | | No |
| 20 | Certificate of preferred A Class Stock providing that HaDeb LLC owns 1000000 of shares of Trimax Corporation | n/a | HaDeb, LLC | n/a | Securities | | No |
| 21 | Securities Purchase Agreement dated ___ Day of December, 2016 | n/a | HaDeb, LLC | n/a | n/a | Not executed: no signatures in the pdf file | No |
| 22 | Re-call dated October 12, 2017 at 10:36:27 AM Pacific Daylight Time from Milan Saha to Hugo Saavedra with the first board resolution of Savvy Naturals Inc. (Nevada) Attached | n/a | Savvy Naturals, Inc | n/a | n/a | | No |
| 23 | SS-4 for Trimax Corporation | | Trimax Corporation | n/a | n/a | | No |
| 24 | Certiutien of Annual List of Officer Fees for Trimax Corporation | | Trimax Corporation | n a | n/a | | No |
| 25 | Shareholder Report of Trimax Corporation as of 10/02/2018 | n/a | HaDeb, LLC | n/a | n/a | | No |
| 26 | Trimax Corporation Treasury order increases resolution dated April 10, 2017 | n a | HaDeb, LLC | n/a | Securities | | No |
| 27 | Trimax Corporation Resolution of issuance of shares of common stock | n/a | HaDeb, LLC | n/a | Securities | | No |
| 28 | Cancellation of shares dated April 4, 2017 | n/a | Trimax Corporation | n/a | n/a | | No |
| 29 | Opinion of Milan Saha. Esq. dated April 12, 2017 | n/a | Trimax Corporation | n/a | n a | | No |
| 30 | 03-13-2018 (11,686,300).pdf Green Luminaries | n/a | Trimax Corporation | n/a | n/a | | No |
| 31 | 03-16-2018 (10,000,000).pdf Green Luminaries | n/a | Trimax Corporation | n/a | n/a | | No |
| 32 | 8-24-2017 (11,000,000).pdf Green Luminaries | n/a | Trimax Corporation | n/a | n/a | | No |
| 33 | 09-28-2018 (28,000,000).pdf Green Luminaries | n/a | Trimax Corporation | n a | n/a | | No |
| 34 | 10-13-2017 (9,000,000).pdf Green Luminaries | n/a | Trimax Corporation | n/a | n/a | | No |
| 35 | 12-11-2017 (12,000,000).pdf Green Luminaries | n/a | Trimax Corporation | n/a | n/a | | No |
| 36 | Green Luminaries Loan.pdf | n a | Trimax Corporation | n a | n/a | liability | No |
| 37 | Settlement Agreement 4-7-2017.pdf | | Trimax Corporation | n/a | n a | liability | No |
| 38 | 03-15-2018 (2,489,136) Pdf shares transfer to Tangiere | n/a | Trimax Corporation | n a | n/a | the file cannot be opened, the content is anticipated | No |
| 39 | 03-20-2018 (12,674,992).pdf shares transfer to Tangiere | n/a | Trimax Corporation | n/a | n/a | the file cannot be opened, the content is anticipated | No |

| # | Document | | Party | | Category | Notes | Priv |
|---|---|---|---|---|---|---|---|
| 40 | Convertible Note – 03-16-2018.pdf Tangiers investment group | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 41 | American Financial Motion.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 42 | Recorded Lien.pdf American Financial Inc | n/a | HaDeb, LLC | n/a | n/a | | No |
| 43 | American Oil Products Sonneson.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | No |
| 44 | American Oil Products.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | No |
| 45 | 6-2-2017 Brian Whiteman.pdf | n/a | HaDeb, LLC, Savvy Naturals, Inc | n/a | n/a | | No |
| 46 | 10-18-2017 Brian Whiteman.pdf | n/a | HaDeb, LLC, Savvy Naturals, Inc | n/a | n/a | | No |
| 47 | 10-24-2018 Brian Whiteman.pdf | n/a | HaDeb, LLC, Savvy Naturals, Inc | n/a | n/a | | No |
| 48 | Brian Whiteman Loan.pdf | n/a | HaDeb, LLC, Savvy Naturals, Inc | n/a | n/a | | No |
| 49 | 7-30-17 Global Packaging, Inc.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 50 | 10-24-17 Global Packaging, Inc.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 51 | Global Packaging Inv & Packing slip.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 52 | 02-09-17 Mark Cohen Default.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 53 | 7-5-17 Mark Cohen Judgement.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 54 | Mark Cohen Note.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 55 | Municipal Packaging Judgement.pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | No |
| 56 | Garnishment + Old Dominion.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 57 | Old Dominion Freight Lines.pdf | n/a | HaDeb, LLC | n/a | n/a | | No |
| 58 | Robert Rose - Assert Collections.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | No |
| 59 | Robert Rose.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | No |
| 60 | Steven Bilotta Judgement.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | No |
| 61 | Steven Bilotta Settlement Agreement.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | No |
| 62 | Certified copy of decision to grant a Trademark Registration Japan Registration number 1374706 | Trademark "Savvy Naturals" in Japan | Savvy Naturals, Inc | | Intellectual Property | | No |
| 63 | USPTO Certificate of TM registration Registration number 1374706 5343636 | Trademark "Savvy Naturals" for body lotions in the USA | Savvy Naturals, Inc. | | Intellectual Property | | No |
| 64 | WIPO Registration.pdf International registration No. 1374 706 Savvy Naturals | International TM "Savvy Naturals" USPTO registration | Savvy Naturals, Inc | | Intellectual Property | | No |
| 65 | SOCal.biz.pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | No |
| 66 | LADWP (Debra Saavedra's name).pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | No |
| 67 | Savvy Naturals Trademark Registration.pdf | n/a | Savvy Naturals, Inc | n/a | Individual/Property | Duplicative | No |
| 68 | Schedule of Bank Accounts as of 11-05-2018.xlsx | n/a | n/a | n/a | Bank accounts | The document is disregarded as a work product by a person other than CMD LLP. we may not make conclusions upon it | No |
| 69 | Schedule of Bank Accounts and Tax ID v's.xlsx | n/a | n/a | n/a | Bank accounts | The document is disregarded as a work product by a person other than CMD LLP. we may not make conclusions upon it | No |
| 70 | City of L.A. Office of Finance.pdf Letter of Los Angeles Office of Finance, Tax Discovery Unit, August 7, 2014 | n/a | HaDeb LLC | n/a | n/a | Addressed to Savvy, but Savvy is merged into Hadeb | No |
| 71 | Savvy Naturals Taxing Authorities.xls | n/a | n/a | n/a | n/a | The document is disregarded as a work product by a person other than CMD LLP. we may not make conclusions upon it | No |
| 72 | County of LA - 11-13-2018 (Lien).pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | No |
| 73 | County of LA Lien 11-13-2017.pdf | n/a | HaDeb LLC | n/a | n/a | | No |
| 74 | Los Angeles County Tax Collector 2017.pdf | n/a | HaDeb LLC | n/a | n/a | | No |
| 75 | Franchise Tax Board LLC Tax.pdf | n/a | HaDeb LLC | n/a | n/a | | No |
| 76 | US Bank - # 8235.pdf | n/a | HaDeb LLC | n/a | n/a | Negative account balance | No |
| 77 | US Bank - # 8649 Diversified Consultants, Inc.pdf | n/a | Savvy Naturals, Inc | n/a | n/a | Letter indicating that account ending at 8649 is referred to collectors | No |
| 78 | US Bank - 8235 (Chargeoff).pdf Business Account Statement | n/a | HaDeb LLC | n/a | n/a | Ending balance is 0.00 which means no assets | No |
| 79 | UPS Supply Chain Solutions.pdf Collection letter | n/a | HaDeb LLC | n/a | n/a | | No |
| 80 | UPS Collection Notice.pdf | n/a | HaDeb LLC | n/a | n/a | | No |
| 81 | Markel FirstComp.pdf Collection letter | n/a | HaDeb LLC | n/a | n/a | | No |
| 82 | Markel Insurance - Workers Comp 2015 & 2016.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | No |
| 83 | Pivotal Payments.pdf letter of collection | n/a | Hugo Saavedra individually | n/a | n/a | | No |
| 84 | Lease Agreement September 24, 2013 8943 Oso Avenue, Unit C | | Hugo Saavedra individually | n/a | n/a | First page of the lease agreement only. Seems to have expired based on the term, the document #85 shows that it still lasts above the lease but cannot be taken into account without the lease agreement itself indicating said information | No |
| 85 | Real Property Lease Information.xls | n/a | n/a | n/a | n/a | | No |
| 86 | SHM Real Statement.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | No |

| # | Document | | Entity | | | Intellectual Property | Comment | Yes/No |
|---|---|---|---|---|---|---|---|---|
| 87 | | | unclear | | | | | |
| | South Coast Beaches Lease.pdf the lease agreement dated February 24, 2016 | n/a | | n/a | n/a | | The Lease provides for Savvy Naturals, as tenant, without any identification in this regard. The Lease is dated February 24, 2016, therefore, it was entered before Savvy Naturals Inc. was incorporated, therefore, we can be certain solely to the extent that this entity is not entitled to any rights under the Lease | No |
| 88 | Retainer Letter from Amin Talati Attorneys at law dated May 29, 2014 | n/a | Savvy Naturals, Inc | n/a | n/a | | Duplicative with the document #1 | Yes |
| 89 | California Dept. of Tax and Fee Admin.docx | n/a | Savvy Naturals, Inc | n/a | n/a | | Duplicative with the document #2 | No |
| 90 | Clover Addendum.pdf | n/a | HaDab LLC | n/a | n/a | | Duplicative | No |
| 91 | Clover Merchant Services.pdf | n/a | HaDab LLC | n/a | n/a | | Duplicative | No |
| 92 | CMD retainer agreement | n/a | Savvy Naturals, Inc | n/a | n/a | | Duplicative | Yes |
| 93 | Insolvency Assessment Agreement.pdf | n/a | Savvy Naturals, Inc | | | | | No |
| 94 | Florida Dept. of Revenue.pdf | n/a | Debra Quinn Saavedra | n/a | n/a | | | No |
| 95 | Giantronic Group, LLP | n/a | Savvy Naturals, Inc | n/a | n/a | | | Yes |
| 96 | | | unclear | | | | Savvy California Inc. could not have been in existence in 2017 | |
| | Kompogard Agreement.pdf | n/a | | n/a | n/a | | | |
| 97 | Pac-Van Storage Rental Agreement.pdf | n/a | unclear | n/a | n/a | | Savvy Naturals without identification what it is | No |
| 98 | Phillips Sales .pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | | No |
| 99 | | | HaDab LLC | | | | master licensing agreement, although appears not to have been signed by Shutterstock | |
| | Shutterstock.pdf | n/a | | n/a | | Intellectual Property | | No |
| 100 | Escrow Disbursement Agreement.pdf | n/a | HaDab LLC | n/a | | | | No |
| 101 | Pac-Van Storage Rental Agreement.pdf | n/a | unclear | n/a | n/a | | | No |
| 102 | Advanced Recovery Systems .pdf | n/a | Hugo Saavedra individually | n/a | n/a | | | No |
| 103 | Alliance One Receivables Management.pdf | n/a | HaDab LLC | | | | | No |
| 104 | Airgax Company, Inc.pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | | No |
| 105 | Bridgemill Remittance.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 106 | Bridgemill Responses, LLC.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 107 | US Bank - #235 (Charged).pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 108 | Container & Packaging.pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | | No |
| 109 | Creative Solutions.pdf | n/a | unclear | n/a | n/a | | | No |
| 110 | FedEx Corporate Services.pdf | n/a | unclear | n/a | n/a | | | No |
| 111 | First Data Global Leasing.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | | No |
| 112 | G2 Graphics Service .pdf | n/a | Hugo Saavedra individually | n/a | n/a | | | No |
| 113 | General Wax and Candle | n/a | Savvy Naturals, Inc | n/a | n/a | | | No |
| 114 | Greenleaf Organic Pest Management | n/a | Greenleaf Organic Pest Management, Inc | n/a | n/a | | | No |
| 115 | HP Scan 11-15-2018 | n/a | HaDab LLC | n/a | n/a | | | No |
| 116 | JAMS 12-05-2018 | n/a | Hugo Saavedra individually | n/a | n/a | | | No |
| 117 | Majestic Fire Protection Legal | n/a | unclear | n/a | n/a | | | No |
| 118 | Psychics.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 119 | Inventory of Raw Materials and Finished Goods.xlsx | | HaDab LLC | | | | | No |
| 120 | FBNS - Savvy Naturals.pdf business name registration statement Delaware | n/a | HaDab LLC | n/a | | Intellectual Property | | No |
| 121 | 10-26-2018 Brian Whiteman.pdf | | Hugo Saavedra, Savvy naturals, Inc. Hadab, LLC | n/a | n/a | | | No |
| 122 | Brian Whiteman Loan.pdf | n/a | Hugo Saavedra, Savvy naturals, Inc. Hadab, LLC | n/a | n/a | | | No |
| 123 | Bayyour Funding Application.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 124 | CSNK Factoring Agreement.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 125 | Dawn Davis Loan | | Hugo Saavedra individually | n/a | n/a | | | No |
| 126 | Einstax & Shore Loan.pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | | No |
| 127 | George Rivero | n/a | HaDab LLC | n/a | n/a | | | No |
| 128 | Kickfurther (07-21-2013).pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 129 | OKBY (Kickfurther) Agreement.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 130 | OKBY (Kickfurther).pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 131 | Convertible Note - 03-16-2018.pdf | n/a | Savvy Naturals, Inc | n/a | | | | No |
| 132 | Wide Merchant Investment Loan.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 133 | Aaron Schwartzbart.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | | No |
| 134 | FW loan.msg | n/a | Hugo Saavedra individually | n/a | n/a | | | No |
| 135 | American Financial Judgement.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 136 | Recorded Lien.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 137 | 10-26-2018 Brian Whiteman | n/a | Hugo Saavedra, Savvy naturals, Inc. Hadab, LLC | n/a | n/a | | | No |
| 138 | Brian Whiteman Loan | | Hugo Saavedra, Savvy naturals, Inc. Hadab, LLC | n/a | n/a | | | No |
| 139 | Brian Whiteman.pdf | n/a | Hugo Saavedra, Savvy naturals, Inc. Hadab, LLC | n/a | n/a | | | No |
| 140 | CSNK Factoring Agreement.pdf | n/a | HaDab LLC | n/a | n/a | | | No |
| 141 | Dawn Davis.pdf | n/a | Hugo Saavedra individually | n/a | n/a | | | No |
| 142 | Einstax & Shore Loan.pdf | n/a | Savvy Naturals, Inc | n/a | n/a | | | No |
| 143 | George Rivero.pdf | n/a | HaDab LLC | n/a | n/a | | | No |

| # | Document | | Entity | | | Notes | |
|---|---|---|---|---|---|---|---|
| 144 | Conversion Chart.pdf | n/a | HuDeb LLC | n/a | n/a | | No |
| 145 | David Oseguda - Promissory Note 12-12-2016.pdf | n/a | HuDeb LLC | n/a | n/a | | No |
| 146 | David Oseguda Promissory note 11-17-2016.pdf | n/a | HuDeb LLC | n/a | n/a | | No |
| 147 | David Oseguda Promissory note 12-1-2016.pdf | n/a | HuDeb LLC | n/a | n/a | | No |
| 148 | EXECUTED TA TMON LETTER.pdf | n/a | Trimax Corporation | n/a | n/a | | No |
| 149 | Green Luminaries Loan.pdf | n/a | Trimax Corporation | n/a | n/a | | No |
| 150 | Section 4(a)(1) opinion Trimax Green Executed.pdf | n/a | Trimax Corporation | n/a | n/a | | No |
| 151 | Secured Convertible Promissory Note.pdf | n/a | Trimax Corporation | n/a | n/a | | No |
| 152 | TA Instruction 20M Shares Trimax October 26 2018.pdf | n/a | Trimax Corporation | n/a | n/a | | No |
| 153 | Kickfurther 07-27-2017.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 154 | OKEBY (Kickfurther) Agreement.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 155 | Lawrence M. Groseman Notes.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 156 | Lawrence M. Groseman.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 157 | Mark Cohen Note.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 158 | Nicherio Contrato.pdf | n/a | Tabec Queen Saavedra | n/a | n/a | | No |
| 159 | R. Rosa Promissory Note.pdf | n/a | Hugo Saavedra Individually | n/a | n/a | | No |
| 160 | Ron Stockman.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 161 | 03-07-2018 Convertible Exchange Notes | n/a | Trimax Corporation | n/a | n/a | | No |
| 162 | 03-07-2018 Transfer Instructions.pdf | n/a | Trimax Corporation | n/a | n/a | | No |
| 163 | 03-15-2018-1 Convertible Note.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 164 | 03-15-2018-2 Convertible Note - Exhibits and Schedule 1.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 165 | Convertible Note Amendment # 1.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 166 | Convertible Note Amendment # 2.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 167 | Convertible Note Amendment # 3.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 168 | Tangiers Common Stock Purchase Warrant.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 169 | Tangiers Recon.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 170 | Wide Merchant Investment.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 171 | Shutterstock.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative (see 99), not executed | No |
| 172 | Delaware Secretary of State.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 173 | FBNS - Saavy Naturals.pdf | n/a | HuDeb, LLC | n/a | Intellectual Property | duplicative | No |
| 174 | Operating Agreement - HuDeb.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 175 | Preferred Stock.pdf | certificate of common stock | HuDeb, LLC | n/a | securities | duplicative | No |
| 176 | Saavy Naturals, Inc. Merger.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative | No |
| 177 | TMON Health Cert.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative | No |
| 178 | 2015 HuDeb Tax Returns.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative (see ~20) | No |
| 179 | 2016 HuDeb Tax Returns.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 180 | 2016 PR Tax Liability Report (EDD).pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 181 | EDD 1st Qtr. Return 2016 | n/a | HuDeb, LLC | n/a | n/a | | No |
| 182 | EDD 4th Quarter | n/a | HuDeb, LLC | n/a | n/a | | No |
| 183 | FITO Tax Lien 3rd Qtr. 2016 | n/a | HuDeb, LLC | n/a | n/a | | No |
| 184 | 1st Qtr. 2017 Payroll Liabilities.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 185 | 2nd Qtr. 2017 Payroll Liabilities.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 186 | 3rd Qtr. 2017 Payroll Liabilities.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 187 | 4th Qtr. 2017 Payroll Liabilities.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 188 | 2017 Payroll Tax Liabilities - State.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 189 | 2017 Payroll Tax Liabilities.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 190 | Final Return.pdf | n/a | Saavy Naturals, Inc. (old) | n/a | n/a | | No |
| 191 | FTB Assessment 2015.pdf | n/a | Saavy Naturals, Inc. (old) | n/a | n/a | | No |
| 192 | Delaware Secretary of State.pdf | n/a | Saavy Naturals, Inc. (old) | n/a | n/a | | No |
| 193 | Merger with HuDeb,LLC.pdf | n/a | Saavy Naturals, Inc. (old) | n/a | n/a | duplicative | No |
| 194 | Amin Talati.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | duplicative | Yes |
| 195 | Articles of Incorporation.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 196 | Bylaws Saavy Naturals, Inc.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 197 | Issuance of Shares.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 198 | Nevada Secretary of State - Saavy Naturals, Inc..pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 199 | Nevada Secretary of State 01-06-2017.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 200 | Nevada Secretary of State.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 201 | | | Saavy Naturals, Inc. | | | additionally, HuDeb, LLC received shares of common stock of Saavy Naturals, Inc. | |
| 202 | Purchase Agreement.pdf | n/a | Saavy Naturals, Inc. | n/a | equipment, contracts | | No |
| 203 | Phillips Sales.pdf | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 204 | 1st Qtr. 2018 Payroll Liabilities | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 205 | 2nd Qtr. 2018 Payroll Liabilities | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 206 | 2018 Payroll Tax Liabilities - State | n/a | Saavy Naturals, Inc. | n/a | n/a | | No |
| 207 | January thru September 2018 PR Liabilities | n/a | Saavy Naturals, Inc | n/a | n/a | | No |
| 208 | 941 1st Qtr Return .pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 209 | 941 4th Quarter Return.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 210 | IRS 941 Bill 4th Qtr. 2015.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 211 | IRS Bill 940 4th Qtr. 2015.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 212 | IRS Bill 941 1st Qtr. 2016.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 213 | IRS Bill 941 4th Qtr. 2016.pdf | n/a | HuDeb, LLC | n/a | n/a | | No |
| 214 | IRS 941 Bill 4th Qtr. 2015.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative | No |
| 215 | IRS Bill 940 4th Qtr. 2015.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative | No |
| 216 | 941 1st Qtr Return.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative | No |
| 217 | 941 4th Quarter Return.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative | No |
| 218 | IRS Bill 941 1st Qtr. 2016.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative | No |
| 219 | IRS Bill 941 4th Qtr. 2016.pdf | n/a | HuDeb, LLC | n/a | n/a | duplicative | No |
| 220 | 2017 Payroll Tax Liabilities - Federal.pdf | n/a | Saavy Naturals, Inc | n/a | n/a | | No |
| 221 | 10-01-2018.docx | n/a | Saavy Naturals, Inc. | n/a | n/a | duplicative | No |

| # | Description | Type | Owner | | | Category | Notes |
|---|---|---|---|---|---|---|---|
| 222 | Florida Department of Revenue Sales Tax Payment Plan.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | duplicative | No |
| 223 | Shutterstock.pdf | n/a | HnDeb, LLC | n/a | n/a | duplicative | No |
| 224 | Delaware Secretary of State.pdf | n/a | HnDeb, LLC | n/a | n/a | duplicative | No |
| 225 | Preferred Stock.pdf | common stock of Trinax, 1,000,000 shares | HnDeb, LLC | n/a | Securities | duplicative | No |
| 226 | Savvy Naturals, Inc. Merger.pdf | n/a | HnDeb, LLC | n/a | n/a | duplicative | No |
| 227 | 2015 HnDeb Tax Returns.pdf | n/a | HnDeb, LLC | n/a | n/a | duplicative | No |
| 228 | 2016 HnDeb Tax Returns.pdf | n/a | HnDeb, LLC | n/a | n/a | duplicative | No |
| 229 | 10-03-2018.docx | n/a | Savvy Naturals, Inc. | n/a | n/a | duplicative | No |
| 230 | Florida Department of Revenue Sales Tax Payment Plan.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | duplicative | No |
| 231 | Vendor List 11-03-2018.xlsx | unclear | unclear | unclear | unclear | | No |
| 232 | 2016 Plt. Tax Liability Report (EDD).pdf | n/a | HnDeb, LLC | n/a | n/a | | No |
| 233 | EDD 1st Qtr. Return 2016.pdf | n/a | HnDeb, LLC | n/a | n/a | | No |
| 234 | EDD 4th Quarter.pdf | n/a | HnDeb, LLC | n/a | n/a | | No |
| 235 | EDD Tax Lien 3rd Qtr. 2016.pdf | n/a | HnDeb, LLC | n/a | n/a | | No |
| 236 | 1st Qtr. 2017 Payroll Liabilities.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 237 | 2nd Qtr. 2017 Payroll Liabilities.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 238 | 3rd Qtr. 2017 Payroll Liabilities.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 239 | 4th Qtr. 2017 Payroll Liabilities.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 240 | 2017 Payroll Tax Liabilities - State.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 241 | 2018 Payroll Tax Liabilities - State.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 242 | 941 1st Qtr Return .pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 243 | 941 4th Quarter Return.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 244 | 941 1st Qtr Return .pdf | n/a | HnDeb, LLC | n/a | n/a | | No |
| 245 | 941 4th Quarter Return.pdf | n/a | HnDeb, LLC | n/a | n/a | | No |
| 246 | 2016 Fein Return (incorrect FEIN #).pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 247 | IRS 941 941 1st Qtr. 2016.pdf | n/a | HnDeb, LLC | n/a | n/a | | No |
| 248 | IRS 941 941 4th Qtr. 2016.pdf | n/a | HnDeb, LLC | n/a | n/a | | No |
| 249 | 2016 Fein Return (incorrect FEIN #).pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 250 | 2017 Payroll Tax Liabilities - Federal.pdf | n/a | Savvy Naturals, Inc. | n/a | n/a | | No |
| 251 | Real Property Lease Information.xls | unclear | unclear | unclear | unclear | duplicative | No |
| 252 | 8943 Lease Agreement (Full Version).pdf | property lease | Hugo Saavedra in his individual capacity | n/a | property lease | Full version received upon request on 12/17-2018 | |
| 253 | Florida Savings Account # 243562993.pdf | account 2993 | Savvy Naturals, Inc. | $14.42 bank funds | | | No |
| 254 | Florida Checking # 249304973.pdf | account 4973 | Savvy Naturals, Inc. | $2,030.50 bank funds | | | No |
| 255 | November 2018 - 3930.pdf | account 3930 proof of ownership | Savvy Naturals, Inc. | | bank funds | | No |
| 256 | November 2018 - 5928.pdf | account 5928 proof of ownership | Savvy Naturals, Inc. | | bank funds | | No |
| 257 | US Bank Account # 157514003930.pdf | account 3930 | Savvy Naturals, Inc. | -$298.46 bank funds | | | No |
| 258 | US Bank Account # 157514005928.pdf | account 5928 | Savvy Naturals, Inc. | $208.35 bank funds | | | No |
| 259 | November 2018 - 3993 & 4973.pdf | for both florida accounts | Savvy Naturals, Inc. | | bank funds | | No |
| 260 | Full agreement signed Shutterstock.pdf | copyright license for images | HnDeb, LLC | n/a | Intellectual Property | | |
| 261 | Network Solutions - Account Manager.pdf | domain name | Hugo Saavedra in his individual capacity | | Intellectual Property | | |
| 262 | Network Solutions -Domains List .pdf | domain name | Hugo Saavedra in his individual capacity | | Intellectual Property | | No |
| 263 | Shutterstock Images2.pdf | copyright license for images | HnDeb, LLC | n/a | Intellectual Property | | No |
| 264 | Shutterstock List with images .pdf | copyright license for images | HnDeb, LLC | n/a | Intellectual Property | | No |
| 265 | Shutterstock3.pdf | copyright license for images | HnDeb, LLC | n/a | Intellectual Property | | No |
| 266 | Color Maker 05-05-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 267 | Color Maker 05-15-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 268 | Color Maker 10-29-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 269 | Color Maker 11-21-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 270 | Color Maker 11-25-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 271 | Jedwards 02-08-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 272 | Jedwards 02-09-2017.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 273 | Jedwards 05-05-2017.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 274 | Jedwards 05-25-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 275 | Jedwards 06-11-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 276 | Lakshmi 10-01-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 277 | Lakshmi 11-16-2018 02 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 278 | Lakshmi 11-16-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 279 | Norman Fox 01-10-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 280 | Norman Fox 01-29-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 281 | Norman Fox 02-09-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 282 | Norman Fox 03-06-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 283 | Norman Fox 04-12-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 284 | Norman Fox 05-25-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 285 | Norman Fox 07-25-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 286 | Norman Fox 08-02-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 287 | Norman Fox 08-08-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 288 | Norman Fox 08-09-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 289 | Norman Fox 08-11-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 290 | Norman Fox 08-16-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 291 | Norman Fox 08-20-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 292 | Norman Fox 08-23-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 293 | Norman Fox 08-28-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 294 | Norman Fox 10-29-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 295 | Norman Fox 11-13-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 296 | Norman Fox 11-21-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 297 | Norman Fox 12-11-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 298 | Onyx 02-20-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 299 | Onyx 03-09-2017 PO2.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 300 | Onyx 03-21-2017 PO2.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 301 | Onyx 05-05-2018 PO2.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 302 | Onyx 08-11-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 303 | Pacific Coast Chem 01-10-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 304 | Pacific Coast Chem 01-25-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 305 | Pacific Coast Chem 02-20-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 306 | Pacific Coast Chem 02-24-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |
| 307 | Pacific Coast Chem 03-01-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | | No |

| | | | | | | |
|---|---|---|---|---|---|---|
| 308 | Pacific Coast Chem 03-09-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 309 | Pacific Coast Chem 03-21-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 310 | Pacific Coast Chem 04-30-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 311 | Pacific Coast Chem 05-01-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 312 | Pacific Coast Chem 05-11-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 313 | Pacific Coast Chem 08-01-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 314 | Rita Corporation 12-11-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 315 | Ross Organic 01-10-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 316 | Ross Organic 02-08-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 317 | Ross Organic 02-20-2019 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 318 | Ross Organic 03-02-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 319 | Ross Organic 03-15-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 320 | Ross Organic 03-21-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 321 | Ross Organic 05-25-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 322 | Ross Organic 07-05-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 323 | Ross Organic 07-30-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 324 | Ross Organic 08-06-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 325 | Ross Organic 08-29-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 326 | Ross Organic 08-24-2018.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 327 | Ross Organic 12-05-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 328 | Sweet Cakes 02-20-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 329 | Sweet Cakes 05-15-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 330 | Sweet Cakes 03-19-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 331 | Sweet Cakes 02-21-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 332 | Sweet Cakes 05-05-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 333 | Sweet Cakes 07-20-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 334 | Sweet Cakes 08-13-2018 02 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 335 | Sweet Cakes 08-11-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 336 | Sweet Cakes 09-04-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 337 | Sweet Cakes 09-06-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 338 | Sweet Cakes 11-02-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 339 | Sweet Cakes 11-15-2018 - 02 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 340 | Sweet Cakes 11-15-2018 - 03 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 341 | Sweet Cakes 11-15-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 342 | Sweet Cakes 12-11-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 343 | Sweet Cakes 11-30-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 344 | TKB Trading 02-13-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 345 | TKB Trading 05-05-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 346 | TKB 08-07-2018 (1).pdf | chattels - see #119 | Savvy Naturals, Inc., Hugo Saavedra | n/a | inventory and raw materials | No |
| 347 | Uline 09-22-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 348 | Weston Chemicals 02-16-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 349 | Weston Chemicals 03-15-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 350 | Weston Chemicals 03-21-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 351 | Weston Chemicals 04-13-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 352 | Weston Chemicals 05-02-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 353 | Weston Chemicals 05-05-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 354 | Weston Chemicals 6-09-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 355 | Weston Chemicals 09-21-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 356 | Weston Chemicals 11-12-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 357 | Weston Chemicals 11-24-2017 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 358 | Weston Chemicals 11-26-2018 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 359 | Weston Chemicals 12-14-2016 PO.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | inventory and raw materials | No |
| 360 | 2nc Printing.pdf | chattels - see #119 | Hugo Saavedra, Savvy Naturals | n/a | n/a | No |
| 361 | American Oil Product 01-30-2018 (Butterooil).pdf | chattels - see #119 | Savvy | n/a | n/a | No |
| 362 | Bright Box Image 08-29-2018 (2).pdf | chattels - see #119 | Savvy Naturals Everyday | n/a | n/a | No |
| 363 | Bright Box Image 08-29-2018.pdf | chattels - see #119 | Savvy Naturals Soaps | n/a | n/a | No |
| 364 | Invoice_1137_from_Bright_Box_Image.pdf | chattels - see #119 | Savvy Naturals Soaps | n/a | n/a | No |
| 365 | Clear Print 09-05-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals, Debra Saavedra | n/a | n/a | No |
| 366 | Clear Print 10042018.pdf | chattels - see #119 | Savvy Naturals, Debra Saavedra | n/a | n/a | No |
| 367 | Color Maker 02-17-2016 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 368 | Color Maker 03-25-2017 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 369 | Color Maker 09-14-2016 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 370 | Color Maker 09-25-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 371 | Color Maker 09-25-2018.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 372 | Color Maker 10-31-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 373 | Color Maker 11-06-2015 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 374 | Color Maker 11-28-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 375 | Creative Solutions Collections.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 376 | Invoice_1765_from_Creative_Solutions.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 377 | Invoice_1863_from_Creative_Solutions.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |

| # | Document | Category | Entity | | | |
|---|---|---|---|---|---|---|
| | Creative Solutions | | | | | |
| 378 | Invoice_1609_from_Creative_Solutions.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 379 | Creative Solutions Invoice_1694_from_Creative_Solutions.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 380 | Dekker 11062018 (1).pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | n/a | No |
| 381 | Dekker Design 06-09-2016 Invoice.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | n/a | No |
| 382 | Dekker Design 08-23-2016 Invoice.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | n/a | No |
| 383 | Dekker Design 11-21-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | n/a | No |
| 384 | Desert King 08-22-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals, Inc. | n/a | n/a | No |
| 385 | Desert King Inv_22926_from_Desert_King_International_7800.pdf | chattels - see #119 | Savvy Naturals, Inc | n/a | n/a | No |
| 386 | Firework Sample Company 11-14-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 387 | G2 Graphics Service.pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 388 | General Bottle - 11-30-2018 (1).pdf | chattels - see #119 | Savvy Naturals Artisan Body CA | n/a | n/a | No |
| 389 | Lakshmi 10-31-2018 Invoice.pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 390 | Lakshmi 11-15-2018 Invoice.pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 391 | National Papers 11-12-2018 (1).pdf | chattels - see #119 | Savvy Naturals, Inc | n/a | n/a | No |
| 392 | National Papers 11052018.pdf | chattels - see #119 | Savvy Naturals, Inc | n/a | n/a | No |
| 393 | Natural Oils Inv_297143_from_Natural_Oils_International_Inc_18724.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 394 | Norman Fox 07-31-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 395 | Norman Fox 07-31-2018.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 396 | Norman Fox 08-02-2018 Payment.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 397 | Norman Fox 08-09-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 398 | Norman Fox 08-16-2018 (Statement).pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 399 | Norman Fox 10-29-2018 Payment.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 400 | Norman Fox 11-15-2018 (Statement).pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 401 | Norman Fox 11-13-2018 Payment.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 402 | Ross Organic 07-26-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 403 | Ross Organic 08-03-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 404 | Ross Organic 08-17-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 405 | Ross Organic 08-20-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 406 | Ross Organic 08-29-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 407 | Stephen Gould Invoice 8-13-2018.pdf | chattels - see #119 | Savvy Naturals, Inc | n/a | n/a | No |
| 408 | Sweet Colors 11-12-2018 Payment.pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 409 | Sweet Colors 11-06-2018 Payment.pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 410 | Sweet Colors 11-05-2018 Payment.pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 411 | Sweet Colors 11-15-2018 (2 orders) (1).pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 412 | Sweet Colors 11-16-2018 (2) Invoice.pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 413 | Sweet Colors 11-16-2018 Invoice.pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 414 | TKH Trading 08-07-2018 (1).pdf | chattels - see #119 | Savvy Natural Hugo Saavedra | n/a | n/a | No |
| 415 | Truss Kitchen 04012018.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 416 | Ulrw 11-13-2018.pdf | chattels - see #119 | Trinarx Corporation | n/a | n/a | No |
| 417 | Wenzo Chemicals 12-26-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 418 | Wenzo Chemicals 12-04-2018 Invoice.pdf | chattels - see #119 | Savvy Naturals | n/a | n/a | No |
| 419 | Instagram, Savvy Naturals, Basic information.pdf | social media accounts | unclear | n/a | n/a | No |
| 420 | Instagram, SN, Account Info.pdf | social media accounts | unclear | n/a | n/a | No |
| 421 | Pinterest, SN, Account detail.pdf | social media accounts | unclear | n/a | n/a | No |
| 422 | Pinterest, SN, Acount Info.pdf | social media accounts | unclear | n/a | n/a | No |
| 423 | Facebook SN, Basic Info 2.pdf | social media accounts | unclear | n/a | n/a | No |
| 424 | Facebook, Savvy Naturals Home Page.pdf | social media accounts | unclear | n/a | n/a | No |
| 425 | Facebook, SN, Basic Info 1.pdf Facebook,Debra Saavedra. | social media accounts | unclear | n/a | n/a | No |
| 426 | Administrator of Savvy Naturals FB Page.pdf | social media accounts | unclear | n/a | n/a | No |

# EXHIBIT K

## SECURED PROMISSORY NOTE

$78,000.00                                                              December 22, 2018

     FOR VALUE RECEIVED, the undersigned, Saavy Naturals, Inc., a Nevada corporation, 8943 Oso Avenue, Suite C, Chatsworth, California 91311 ("Borrower") promises to pay to the order of Eko Holdings, LLC, a California limited liability company ("Lender"), at 975 Corporate Center Parkway, Suite 120, Santa Rosa, California 95407, or such other place as may be designated in writing by Lender, the principal sum of Seventy-Eight Thousand Dollars ($78,000.00) together with accrued interest at a rate of Five and One-Half Percent (5.50 %) per annum as provided herein. All sums owing hereunder (collectively, the "Debt") are payable in lawful money of the United States of America, in immediately available funds.

     1.    Payment Schedule.  Borrower on demand, or if no demand is made, on December 31, 2018, shall make the following payments to the order of Lender:  one payment in the sum of all principal and interest due hereunder.  Interest shall not begin to accrue until January 1, 2019.

     2.    No Prepayment Restrictions.  Borrower may prepay this Note at any time.

     3.    Event of Default.  The failure by Borrower to make any payment when due shall constitute a default under this Note (an "Event of Default").

     4.    Default Rate.  Upon the occurrence of an Event of Default, at the election of Lender, the entire unpaid principal sum, together with all accrued interest thereon and any other sum payable under the Loan Documents, shall immediately become due and payable, with interest thereon at the lesser of ten percent (10.0%) per annum or the highest rate not prohibited by applicable law from the date of such accelerated maturity until paid (both before and after any judgment) (the "Default Rate"). This charge shall be part of the debt due, and shall be deemed secured by the Security Agreement. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the debt, nor as a waiver of any other right or remedy available to Lender by reason of the occurrence of any Event of Default.

     5.    Amendments.  This Note contains or expressly incorporates by reference the entire agreement of the parties with respect to the matters contemplated therein and supersede all prior negotiations or agreements, written or oral. This Note shall not be modified except by written instrument executed by all parties. Any reference to this Note includes any amendments, renewals or extensions now or hereafter approved by Lender in writing.

     6.    Costs and Expenses.  If any attorney is engaged by Lender to enforce or defend any provision of this Note with or without the filing of any legal action or proceeding, then Borrower shall pay to Lender immediately upon demand all attorneys' fees and all costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance owing hereunder as if such unpaid attorneys' fees and costs had been added to the principal.

7.      Waivers.  No previous waiver and no failure or delay by Lender in acting with respect to the terms of this Note shall constitute a waiver of any breach, default, or failure of condition under this Note. A waiver of any term of this Note must be made in writing by all parties and shall be limited to the express written terms of such waiver. In the event of any inconsistencies between the terms of this Note and the terms of any other document related to the loan evidenced by this Note, the terms of this Note shall prevail.

8.      Time.  Time is of the essence with respect to every provision hereof.

9.      Governing Law.  This Note shall be construed and enforced in accordance with the laws of the State of California, except to the extent that federal laws preempt the laws of the State of California.

10.      Consent to Jurisdiction.  BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF CALIFORNIA, AND IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE SHALL BE LITIGATED IN SUCH COURTS. THE BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. THE BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON THE BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO THE BORROWER AT THE ADDRESS SET FORTH IN THIS NOTE AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

11:      Notice.  All notices or other communications required or permitted to be given pursuant to this Note shall be given to the Borrower or Lender at their respective addresses set forth above:

12.      Security.  This Note is secured by the Security Agreement of even date herewith.

13.      Execution of Further Documents.  For so long as Borrower remains indebted to Lender in any amount whatsoever, Borrower shall execute such agreements, documents or instruments in respect of the security for the Note as Lender may at any time reasonably request, all in form and substance satisfactory to Lender in its sole discretion.

14.      Successors and Assigns.  All rights of Lender hereunder inure to the benefit of its successors and assigns and shall be valid and fully enforceable against Borrower and its successors.  Unless otherwise expressly provided for herein, Borrower shall not assign any of its obligations under the Note or in any part of the security without the prior written consent of Lender.

15.      Attorneys' Fees and Costs.  In the event that an action is commenced to enforce this Note, the prevailing party shall be entitled to recover the reasonable attorneys' fees and costs incurred therein.

[Signatures follow on next page]

2

SECURED PROMISSORY NOTE

63235406v3

IN WITNESS WHEREOF, Borrower has duly executed and delivered this Secured Promissory Note the day and year first above written.

**BORROWER:**

SAAVY NATURALS, INC. a Nevada corporation

By: _____
    Hugo Saavedra
    President

By: _____
    Debra Saavedra
    Title: _____

3

SECURED PROMISSORY NOTE

63235406v3

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Security Agreement") is entered into as of December 22, 2018, by and between SAAVY NATURALS, INC., a Nevada corporation (the "Debtor"), 8943 Oso Avenue, Suite C, Chatsworth, CA 91311 and EKO HOLDINGS, LLC, a California limited liability company (the "Secured Party"); and by and among Secured Party, Hugo Saavedra, an individual, and Debra Saavedra, an individual, with respect Section 9 herein.

## RECITALS

WHEREAS, the Debtor is indebted to Secured Party pursuant to the terms of that certain Secured Promissory Note of even date herewith (the "Note"); and

WHEREAS, the Secured Party has required, and the Debtor has agreed, to execute and deliver this Security Agreement to secure the prompt and complete payment, observance and performance of all of the Secured Obligations (as defined below).

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, covenants and agreements set forth below, and the mutual benefits to be derived from this Security Agreement, and other good and valuable consideration, the parties hereto agree as follows:

1.    Grant of Security Interest.  To secure the "Secured Obligations" (as defined herein), the Debtor hereby transfers, conveys, assigns, and grants to the Secured Party a security interest in its assets, whether now owned, or hereafter acquired, whether now existing, or hereafter arising, and wherever located, including any and all assets that are or may be subject to an Assignment for the Benefit of Creditors made by the Debtor, as described more particularly in Exhibit A Collateral Description attached hereto and incorporated herein (the "Collateral").  The Secured Party shall be authorized to file financing statements under the Uniform Commercial Code.

2.    Obligations Secured. The security interest granted hereby is given as security for the Debtor's obligations under the Note (collectively, the "Secured Obligations").

3.    Continuing Security Interest.  This Security Agreement shall create a valid and continuing security interest in and to the Collateral, and shall (i) remain in full force and effect until all of the Debtor's obligations under the Note been performed in full in accordance with the terms of the Note; (ii) be binding upon the Debtor, its successors and assigns; and (iii) inure to the benefit of the Secured Party and its successors and assigns.  The security interest granted herein is irrevocable and shall remain in full force and effect until the Debtor performs all of its obligations under the Note or the security interest is released in writing by Secured Party.

4.    Termination of Security Interest.  Upon the performance of all of the Debtor's obligations under the Note, the security interest granted hereby shall automatically terminate. Upon any such termination, the parties shall execute and deliver such documents as reasonably necessary to evidence such termination and to effect the release of the Collateral; provided, however, the obligations of Debtor and its principals, Hugo Saavedra and Debra Saavedra, for

SECURITY AGREEMENT

further assurances and cooperation following the termination of the security interest shall survive the termination of the security interest and shall continue for a reasonable period thereafter.

5. <u>Event of Default</u>. The Debtor's failure to pay the Note when due or to perform any of its obligations under this Security Agreement shall constitute a default under this Security Agreement (an "<u>Event of Default</u>").

6. <u>Secured Party's Rights and Remedies Upon Event of Default</u>. Upon the occurrence of an Event of Default, Secured Party, at its option, may exercise any and all of the rights and remedies of a secured party under the Uniform Commercial Code, as enacted in Nevada (the "Commercial Code"). Secured Party shall have all the rights and remedies of a secured party under the Commercial Code and in any jurisdiction where enforcement is sought, whether in said state or elsewhere. All rights, powers and remedies of Secured Party hereunder shall be cumulative and not alternative. No delay on the part of Secured Party in the exercise of any right or remedy shall constitute a waiver thereof and no exercise by Secured Party of any right or remedy shall preclude the exercise of any other right or remedy or further exercise of the same remedy.

7. <u>Waiver of Requirement to Pursue Other Remedies</u>. The Debtor waives all right to require Secured Party to (a) proceed against any other person or entity; (b) apply any Collateral Secured Party may hold at any time; or (c) pursue any other remedy.

8. <u>Successors and Assigns</u>. This Security Agreement shall inure to the benefit of and bind Secured Party, its successors and assigns and the Debtor, its successors and assigns. Upon transfer by Secured Party of any part of the obligations secured hereby, Secured Party shall be fully discharged from any liability with respect to Collateral transferred therewith.

9. <u>Execution of Further Documents; Cooperation</u>. Borrower shall cause its principals, Hugo Saavedra and Debra Saavedra, to cooperate in the transfer of the Collateral to Secured Party and to execute such agreements, documents or instruments in the name of Borrower or otherwise, as may be the case, in respect of the Collateral as Secured Party may at any time reasonably request, all in form and substance satisfactory to Secured Party in its sole discretion.

10. <u>Interpretation</u>. Whenever possible, each provision of this Security Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision of this Security Agreement shall be prohibited or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such or the remaining provisions of this Security Agreement.

11. <u>Entire Agreement</u>. This Security Agreement and the Note constitute the entire and final agreement and understanding among the parties with respect to the subject matter hereof and the transactions contemplated hereby, and supersedes any and all prior oral or written agreements, statements, representations, warranties or understandings by any party, all of which are merged herein and superseded hereby.

12. <u>Governing Law</u>. This Security Agreement shall be construed in accordance with the laws of the State of California, without reference to conflict of laws principles.

2

SECURITY AGREEMENT

63235429v4

13.   <u>Notices</u>. All notices required or permitted hereunder shall be in writing and shall be sufficient if personally delivered or sent by mail, facsimile or Federal Express (or other reputable delivery or courier service).  Any notices shall be deemed given when received at the address or fax number set forth below, unless such address or fax number is changed by notice to the other party hereto.

**IN WITNESS WHEREOF**, the parties hereto have caused this Security Agreement to be duly executed and delivered as of the date first above written.

<div align="right">

**DEBTOR:**

SAAVY NATURALS, INC., a Nevada corporation

By: _____
Name: Hugo Saavedra
Title:  President

By: _____
Name: Debra Saavedra
Title:

**SECURED PARTY:**

EKO HOLDINGS LLC, a California limited liability company

By: _____
Name: Brett Cummings, Manager

</div>

<u>CONSENT AND AGREEMENT</u>:

We hereby consent to the terms of this Security Agreement and agree to perform the obligations set forth in Section 9 herein.

_____
Hugo Saavedra

_____
Debra Saavedra

<div align="center">3</div>

<div align="right">SECURITY AGREEMENT</div>

6323:5429v4

Exhibit A
Collateral Description

Any and all of Debtor's accounts, cash, chattel paper, goods, deposit accounts, machinery, equipment, fixtures, furniture, payment intangibles, intellectual property and general intangibles, including all rights to the name "Saavy Naturals", all rights to trademarks owned or used by Debtor, all raw materials, all finished goods that are not held in inventory, any and all licenses and rights to use and exploit photographs and writings, whether any of the foregoing is owned now or acquired later; know how; all accessions, additions, replacements, and substitutions relating to any of the foregoing; any and all books and records of any kind relating to any of the foregoing, including all electronic records of Debtor and the computers, servers or other machinery on which such records are kept; any and all products and proceeds of any of the foregoing, including insurance proceeds, general intangibles, products, and proceeds from accounts.

4

SECURITY AGREEMENT

# EXHIBIT L

## EQUITABLE TRANSITIONS, INC.
### 444 West Ocean Blvd., Suite 1400
### Long Beach, CA 90802

## NOTICE OF ASSIGNMENT FOR THE BENEFIT OF THE CREDITORS OF SAAVY NATURALS, INC.

An Assignment for the Benefit of the Creditors concerning the debtor listed above and below was made on December 24, 2018. You may be a creditor of the debtor. This Notice lists important deadlines. You may want to consult an attorney to protect your rights.

NOTE: Equitable Transitions, Inc. and its employees CANNOT give legal advice.

ASSIGNOR: SAAVY NATURALS, INC.

Assignor Tax-payer I.D. No.: 81-4928658

| | ASSIGNEE:<br>Equitable Transitions, Inc.<br>444 West Ocean Blvd., Suite 1400<br>Long Beach, CA 90802<br>Telephone No.: (562) 435-0800 |
|---|---|

### DEADLINES

Claims must be received by Equitable Transitions, Inc., by the following deadline:

DEADLINE TO SUBMIT PROOF OF CLAIM: JUNE 2, 2019

| Proofs of Claim Forms and other communications must be sent to:<br>EQUITABLE TRANSITIONS, INC.<br>444 West Ocean Blvd., Suite 1400<br>Long Beach, CA 90802<br>Ph.# (562) 435-0800<br>Fax#: (562) 435-6335<br>e-mail: ahaberbush@etinsolvency.com | EQUITABLE TRANSITIONS, INC.<br><br>By: _____<br>ALEXANDER HABERBUSH, Estate Administrator |
|---|---|
| Hours Open: 9:00 a.m.-5:00 p.m. | Dated: JANUARY 4, 2019 |



## GENERAL ASSIGNMENT

THIS ASSIGNMENT is effective December 24, 2018 , between SAAVY NATURALS, INC., (hereinafter referred to as "ASSIGNOR") and assignee for the benefit of ASSIGNOR'S creditors, EQUITABLE TRANSITIONS, INC., a California corporation (hereinafter referred to as "ET").

## RECITALS:

ASSIGNOR is indebted to diverse persons and is desirous of providing payment to the same, so far as in its power, by an assignment of all its property for that purpose.

NOW, THEREFORE, ASSIGNOR, for a valuable consideration, receipt of which is hereby acknowledged, does hereby make the following General Assignment for the benefit of ASSIGNOR'S creditors to ET, under the following terms and conditions:

## 1.
## ASSIGNMENT OF PROPERTY

1.1     To the fullest extent allowed by law, ASSIGNOR does hereby grant, bargain, sell, assign, and transfer to ET, its successors and assigns, in trust for the ultimate benefit of ASSIGNOR'S creditors generally, all of the property rights, titles and interests in the assets of the ASSIGNOR of every kind and nature and wheresoever situated, whether in possession, reversion, remainder, or expectancy, both real and personal, and any interest or equity therein not exempt from execution; including without limitations all inventory, merchandise, furniture, fixtures, machinery, equipment, raw materials, work in process inventory, refunds, book accounts, books, accounts receivable, cash on hand, intellectual property, general intangibles, all choses in action (personal or otherwise), insurance policies, real property and all other property of every kind and nature owned by the ASSIGNOR, and without limiting the generality of the foregoing, including all of the assets pertaining to that certain company known as SAAVY NATURALS, INC. ("Assigned Property"). This instrument transfers all legal title and possession of all of ASSIGNOR'S assets.

1.2     This Assignment constitutes a grant deed to all real property owned by ASSIGNOR, whether or not said real property is specifically described herein. ASSIGNOR agrees to execute such other and further documents as are necessary and appropriate, determined by ET in its sole discretion, to carry out the intent of this paragraph 1.2.

1.3     ASSIGNOR agrees to deliver to ET all books of account and records, to execute and deliver all additional necessary documents immediately upon request by ET, and to endorse all indicia of ownership where required by ET, in order to complete the



transfer of all assets to ET as intended by this General Assignment including without limitation, all of ASSIGNOR'S real and personal property and/or ASSIGNOR'S interest therein, including mortgages, deeds of trust, motor vehicles, patent and copyrights, and general intangibles. ET is hereby authorized to execute all endorsements and demands requiring ASSIGNOR'S signature, in the name of ASSIGNOR. ASSIGNOR further authorizes ET to apply for any deposits, refunds (including specifically, among all others, claims for refund of taxes paid) or claims wherever necessary, in the name of ASSIGNOR. ET is authorized to direct all ASSIGNOR'S United States mail to be delivered to ET, and ET is expressly authorized and directed to open said mail as agent of ASSIGNOR. ASSIGNOR authorizes ET to do any thing or act which ET in its sole and absolute discretion deems necessary or advisable to effectuate the purposes of this General Assignment.

1.4    ASSIGNOR and ET agree to the following:

1.4.1    This instrument transfers legal title and possession to ET of all the Assigned Property and, ET, in its own discretion, may determine whether to continue all, or part, of ASSIGNOR'S business operations, or to liquidate said assets; if ET deems it advisable it may operate the business, except that it is the intent of the parties that such operation shall be limited in duration and shall be for the purpose of maximizing the value of the Assigned Property.

1.4.2    ET, at its sole discretion, may sell and/or dispose of ASSIGNOR'S assets upon such terms and conditions as it may deem fit, at public or private sale, provided, however, that ET shall use its best efforts to maximize the proceeds from the sale and disposition of said assets; ET shall not be liable in any manner, and ET's obligations shall be in its representative capacity, only, as an ASSIGNEE for the general benefit of ASSIGNOR'S creditors. ET shall administer the estate created hereby to the best of its ability and it is expressly understood that it, its agents, servants or employees shall be liable only for failure to exercise reasonable care and diligence in discharging its duties hereunder, and it shall not be liable for any act or thing done by it, its agents, servants, or employees in good faith and/or in reliance on advice of counsel in connection herewith.

1.4.3    ASSIGNOR shall be fully and solely responsible for the preparation and filing of all income tax returns, including without limitation the payment for the preparation of such returns and the payment of any taxes reported as due and payable in such returns. As a condition to the effectiveness of this Agreement, ASSIGNOR has, concurrently with the execution hereof, provided to ET copies of all state and federal payroll and/or sales tax returns through and including the fourth quarter of 2018 and (a) closing return(s) for the short period of the fourth quarter of 2018. ASSIGNOR has provided ET proof of payment of all payroll and/or sales taxes or delivered cash to ET, concurrently with the execution hereof, sufficient to pay in full all payroll and/or sales



taxes reported on such tax returns together with any and all interest and penalties accruing thereon.

### 1.5    Excluded Matters

1.5.1    Leases and leasehold interests in real or personal property are not included in this Assignment. If, however, ET determines any lease or leasehold interest may be assigned, and also that the same has realizable value for ASSIGNOR'S creditors, then ASSIGNOR agrees that upon demand of ET, it will assign and transfer such lease or leasehold interest to ET, or its nominee, for administration under the terms of this Assignment.

1.5.2    Employee benefit plans (which includes any related employee trust fund) including without limitation, any ERISA-qualified plan or other similar employee plan created and/or maintained by ASSIGNOR are not property of ASSIGNOR and are not included in this Assignment. ET shall not, as a result of this Agreement, be, nor be deemed to be, an administrator under such employee benefit plan, nor shall ET have any role in, or responsibility for, the termination of any such employee benefit plan of ASSIGNOR and/or its employees.

1.5.3    In the event ASSIGNOR is engaged in the sale of alcoholic beverages, ASSIGNOR hereby appoints ET as its agent for the sole purpose of filing such documents as are necessary and/or appropriate to the completion of any sale of permit(s) for the sale of alcoholic beverages in the ASSIGNOR'S place of business and/or sale of alcoholic beverage license(s) ("Sale"). ET is hereby vested with absolute discretion in regard to any transfer or sale of ASSIGNOR'S permit(s) for the sale of alcoholic beverages in the ASSIGNOR'S place of business and/or sale of alcoholic beverage license(s) and ET assumes no liability by reason thereof . ASSIGNOR hereby assigns to ET all of the proceeds of the Sale for the benefit of ASSIGNOR'S creditors, generally in accordance with the terms of this agreement.

### 2.
### POWERS OF THE ASSIGNEE

Except as otherwise allowed or limited by statutes, ET shall have the following powers:

2.1    ET may sell, lease or use the property of ASSIGNOR whichever ET determines to be in the best interest of all parties. Subject to all valid secured claims, from all funds received from gross proceeds of sales, collections of all sums due, operation of ASSIGNOR'S business, and all other sources (hereinafter "Gross Proceeds"), ET shall pay itself a reasonable fee of $65,000 for services it provides as ASSIGNEE, excluding any costs



for booking and other administrative matters, pursuant to the terms hereof on and after the effective date hereof. "Gross Proceeds" are defined as all proceeds realized on the account of disposition of assets whether or not such proceeds are received or handled by ET.

 2.2 ET may in its sole and absolute discretion also pay from the Proceeds:

  2.2.1 Its actual out-of-pocket expenses including without limitation, photocopy, postage, messenger, overnight mail, mileage, parking and records storage.

  2.2.2 Remuneration for fees and expenses incurred before or after the date of this agreement, payable at ET's sole discretion, to professionals, para-professionals and agents including without limitation, bookkeepers, consultants, employees and reasonable fees and expenses to accountants, attorneys other professionals employed by ET or ASSIGNOR. ET may employ persons as ET determines are necessary to perform its duties hereunder in its sole discretion and judgment.

  2.2.3 The costs and expenses incurred by any creditor who may have levied an attachment or other lien on assets of ASSIGNOR.

  2.2.4 Any and all fees, expenses and/ or charges incurred in the defense of an involuntary bankruptcy petition, including, without limitation, a motion for abstention by ET.

  2.2.5 All of the aforementioned amounts are to be determined at ET's sole discretion and judgment.

 2.3 ET may compromise claims, complete or reject ASSIGNOR'S executory contracts, discharge at its option any liens on said assets and any indebtedness which under law is entitled to priority of payment. ET shall have the power to borrow money, hypothecate and pledge as security for repayment of a debt the assets, and to do all matters and things which said ASSIGNOR could have done prior to this General Assignment. Any act or thing done by ET hereunder shall bind the assignment estate and ET only in its capacity as ASSIGNEE for the benefit of ASSIGNOR'S creditors. ET shall have the right to sue as the successor of the ASSIGNOR, or ET is hereby given the right and power to institute and prosecute legal proceedings in the name of the ASSIGNOR, the same as if the ASSIGNOR had itself instituted and prosecuted such proceedings or actions. ET is hereby authorized and has the right in its sole discretion to defend all actions instituted against the ASSIGNOR, and to appear on behalf of the ASSIGNOR in all proceedings (legal or otherwise) in which ASSIGNOR is a party. /ASSIGNOR does hereby appoint ET as the ASSIGNOR'S attorney in fact with full power to act for and in place of the ASSIGNOR in



such actions or proceedings or in any other matters, including the right to verify all pleadings or other documents on behalf of ASSIGNOR.

2.4     ET shall not be personally liable in any manner in connection with the performance of its duties and obligations hereunder. ET's obligations hereunder shall be in a representative capacity only as an ASSIGNEE for the general benefit of ASSIGNOR'S creditors. ET shall administer this estate to the best of its ability and it is expressly understood that ET, and its agents, servants or employees, shall be liable only for reasonable care and diligence in the administration of the Assignment Estate. ET shall not be liable for any act or thing done by ET, its agents, servants, or employees in good faith in connection herewith. ET is not liable or responsible for any obligations of any nature whatsoever incurred at any time by ASSIGNOR, whether before or after the date of this Assignment.

2.5     ET agrees, unless otherwise provided at law, to make any and all claims for refund of taxes which may be due from the Director of Internal Revenue and/or the State Taxing Authorities for tax refunds, or otherwise. In the event any such refunds are received by ASSIGNOR, ASSIGNOR agrees to pay them over to ET, and hereby empowers ET, as attorney in fact of ASSIGNOR, to make all claims for refunds which may be made by an attorney-in-fact. ASSIGNOR further agrees, to the extent that any tax or the refund claim is not assignable, to make any and all claims for refund of taxes or any other money due, from any governmental agency, for tax refunds, or otherwise, and to forthwith upon receipt of any such funds, pay them over to ET, and hereby empowers ET, his attorney-in-fact of ASSIGNOR, to make all claims for refunds which may be made by an attorney-in-fact.

2.6     ET shall have all powers, pursuant to the laws of the State of California or any other applicable law to recover preferential transfers and fraudulent conveyances and may sell and/or transfer such powers to a third party.

## 3.
## ALLOWANCE AND PAYMENT OF CLAIMS

3.1     Except as otherwise provided herein, allowance of claims shall be determined by the standards set forth in *11 U.S.C. §§ 501 and 502*. ET shall have no obligation to make disbursement of funds to claimants unless the funds realized through the liquidation, net of all administrative expenses, the claims of secured creditors, and the claims of taxing authorities, are in excess of $3500. In the event that the funds realized through the liquidation, after payment of all administrative expenses, the claims of secured creditors, and the claims of taxing authorities is not greater than $3500, such funds shall be payable to ET. Additionally, any Unclaimed Funds, as defined by paragraph 3.7, shall be additional compensation to ET.



3.2     June 2, 2019, shall be the last day to submit claims.  Written notice of said last day to submit claims shall be given by first class mail, postage fully pre-paid, to all creditors.  A claim shall be deemed submitted if the creditor making such claim completes, signs and submits to ASSIGNEE the Proof of Claim form, without alteration, provided to them by ASSIGNEE.  By submitting a claim, each creditor shall waive and forever release and discharge all claims it has or may have against the property transferred by this agreement or against ASSIGNOR, its officers, directors, shareholders and attorneys.  The release and discharge provided in this paragraph is in consideration of and in exchange for the release by officers, directors, and shareholders of any and all unsecured claims they have or may in the future have against ASSIGNOR including without limitation, claims for indemnity and/or contribution under applicable law.  The consideration for the release herein is the acknowledgment by the shareholders of ASSIGNOR that ASSIGNEE shall disallow any unsecured claims held by such shareholders whether on account of monies owed them on the date of this assignment or on account of subrogation, indemnity or any other basis.  All claims not received by ET by the last day to submit claims may, in ET's sole and absolute discretion, be disregarded for purposes of distribution of assets as required hereunder.

3.3     ASSIGNEE shall, if a purpose would be served, determine whether any claim shall be allowed for payment hereunder pursuant to paragraph 3.1. hereof.  If ET determines that a claim should not be allowed in whole or partially for distribution ("Rejected Claim"), ET shall give written notice by first class mail, postage prepaid, addressed to the holder of such claim ("Notice") at least 20 days prior to making any distribution to any claims having the same or lower priority as determined by paragraph 3.6 and its sub-parts hereof.  In the event that a creditor who holds a claim which is a Rejected Claim disputes ET's rejection of such claim, such creditor must, within twenty (20) days from the date of the Notice, commence an action for declaratory relief only in the California Superior Court, Los Angeles County, Long Beach Division, to establish such claim.  Failure to timely file and prevail in a lawsuit to establish the Rejected Claim will result in its allowance or disallowance, as provided in the Notice,  for purposes of distributions of funds pursuant to the terms hereof.

3.4     With respect to any claim that is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim shall be limited to:

3.4.1   The rent reserved by such lease, without acceleration, for the greater of one year, or 15%, not to exceed three years, of the remaining term of such lease, following the earlier of:

3.4.1.1     The date of this Agreement; and



EQUITABLE
TRANSITIONS

3.4.1.2  The date on which such lessor repossessed, or the lease surrendered, the leased property; plus

3.4.2  Any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

3.5     A claim based upon an employment contract shall be allowed only to the extent that it does not exceed (a) one year's compensation under the contract measured from the earlier of the assignment date or the date that either the employee or employer terminated the contract; plus (b) unpaid compensation due under the contract on the earlier of such dates.

3.6     After payment of all valid claims of secured creditors and the items set forth in paragraph 2.1 and 2.2 and its sub-parts, claims shall be paid in the following order of priority:

3.6.1 First, FEDERAL taxes of any nature whatsoever owing as of the date of this Assignment, or such claim of any Federal governmental agency as defined under *31 U.S.C. § 3713*, including, without limitation, Federal withholding taxes, Federal unemployment taxes and any other Federal income, excise, property and employment tax.

3.6.2 Second, to claims for wages and employment benefits to the extent provided by *11 U.S.C. §507(a)(4)*.

3.6.3 Third, up to $900 per individual for deposits for purchase, lease, or rental of real property or for the purchase goods or services for personal, household and/or family use that were not delivered or provided.

3.6.4 Fourth, to all state, county and municipality taxes of any nature whatsoever owing as of the date of this Assignment, including, without limitation, implement, property and income taxes.

3.6.5 Fifth, with the exception of those classes set forth above, all distributions to other creditors shall be, within each class, pro-rata in accordance with the terms of each creditor's indebtedness, until all such debts are paid in full. ET may, but is not required to, make interim distributions whenever ET has cumulative sufficient funds to enable it to make a reasonable distribution.

3.6.6 Sixth, the surplus of monies and property, if any, to be transferred and conveyed to ASSIGNOR.



3.6.7 If any undistributed dividends to creditors or any reserve of other funds shall remain unclaimed for a period of ninety (90) days after issuance of distribution checks by ET ("Unclaimed Funds"), then the same shall become the property of ET and used to supplement its fees for services rendered for administering this Assignment.

3.7 ET shall make distributions, as referenced in paragraph 3.5 above, as often as is reasonable and practical, as determined in ET's sole and absolute discretion; provided, however, that such distributions shall be made no more often than every 90 days.

3.8 All distributions made by ET shall have appearing on them the following legend:"Acceptance of this check by endorsement or other form of negotiation constitutes an absolute waiver of any right to contest the release stated to be in effect upon the filing of a claim pursuant to paragraph 3.2 of the General Assignment Agreement. THIS CHECK IS VOID IF NOT CASHED WITHIN 90 DAYS". Any check voided pursuant to this paragraph 3.7 shall be Unclaimed Funds.

3.9 In the event that ET contest the validity of a Claim[1] (as set forth more fully in detail in paragraph 3.3 above) falling within any of the classifications set forth in paragraph 3.5 and its subparts hereinabove, ET may withhold the pro-rata distribution (whether interim or final) to which the holder of such contested Claim would otherwise be entitled to receive until the allowance of the contested claim is determined by a Court of competent jurisdiction or by agreement with ET, provided, however, such court determination is timely sought by the holder of the contested Claim.

## 4.
## OTHER PROVISIONS

4.1 It is agreed and understood that this transaction is a general assignment for the benefit of all of ASSIGNOR'S creditors; and that this is a "general assignment for the benefit of creditors," as set forth in and defined by the *California Code of Civil Procedure § 493.010,* and all other laws of the State of California pertaining thereto. This Agreement shall be construed in accordance with, and be governed by, the internal laws of the State of California, which shall have exclusive jurisdiction of any and all disputes hereunder.

4.2 ASSIGNOR acknowledges and affirms it is required, pursuant to *California Code of Civil Procedure Section 1802(c),* to provide ET concurrently herewith a verified list of <u>ALL</u> creditors (including, without limitation, disputed creditors and persons and/or entities having lawsuits against ASSIGNOR), equity holders, and any other parties in interest, which shall include the name(s), address(es), city(s), state(s), and ZIP Code(s) for

---

[1]      The term "Claim" for purposes of this agreement shall mean a right to payment as defined by 11 U.S.C. §101(5) and the Federal case law construing it.



each creditor together with an amount of the creditor's anticipated claim in the General Assignment proceedings ("Verified List"). The Verified List shall be signed under penalty of perjury by the ASSIGNOR'S representative. ASSIGNOR and ET agree that ASSIGNOR is better informed of identity of the nature and extent of its creditors (including, without limitation, disputed creditors and persons and/or entities having lawsuits against ASSIGNOR), equity holders, and any other parties in interest as of the moment this General Assignment became effective than is ET. Therefore, ASSIGNOR acknowledges and agrees not withstanding any other information imparted to ET at any time prior to the effective date of this General Assignment, ET will exclusively rely on the Verified List and no other information in giving notice of this General Assignment to ASSIGNOR'S creditors (including, without limitation, disputed creditors and persons and/or entities having lawsuits against ASSIGNOR), equity holders, and any other parties in interest.

4.3     ASSIGNOR understands and agrees that it shall provide ET at the time of making of this Assignment a list of unpaid accounts receivable and or amounts due to ASSIGNOR, if any, which shall include the name(s), addresses, city(s), state(s), ZIP Code(s), and the amount owing for each debtor or account debtor of ASSIGNOR. Additionally, ASSIGNOR shall deliver to ET, at or before the execution of this General Assignment, any and all documentation supporting each account receivable or amount due to ASSIGNOR.

4.4     ASSIGNOR acknowledges and agrees it has solely relied upon the advice of its own legal counsel, or has had an opportunity to do so, prior to and when making the decision to enter into its General Assignment by executing this contract. ASSIGNOR further acknowledges and agrees it has not directly or indirectly received advice or counsel from ET prior to and when making the decision to enter into this General Assignment. ASSIGNOR further acknowledges and agrees at all times prior to executing this General Assignment, it knew and understood ET did and does not engage in providing legal services or legal advice and provided neither to ASSIGNOR.

4.5     Except as otherwise provided herein, this Agreement shall be construed in accordance with and governed by the laws of the State of California.

4.6     Venue and jurisdiction of any legal action to enforce the terms of this Agreement or to enforce the powers granted to ET by this Agreement or at law, including, without limitation, the powers granted by paragraph 2.1, 2.2, 2.3, 2.4, 2.5 and 2.6 and the *California Code of Civil Procedure Section 1800*, by this Agreement may be exclusively in the Superior Court of California, County of Los Angeles, State of California.   By submitting to ET a proof of claim pursuant to paragraph 3.2 of this Agreement, the claimant submitting such claim consents to be bound by the terms of this paragraph 4.6.



**EQUITABLE TRANSITIONS**

4.7     In the event that any court holds any provision, term, covenant, or condition of this Agreement to be invalid, then any such invalidity shall not effect any other term, covenant, or condition and the remaining provisions of this Agreement shall be given full force and effect pursuant to the laws of the State of California, unless such invalid term, covenant, or condition is a material part of this Agreement.

4.8     In the event that ET should elect to defend any challenge by any creditor of all or any portion of this Agreement, including the defense of a rejection or partial allowance of a claim pursuant to paragraph 3.3 hereof, ET shall be entitled to reasonable attorneys' fees and costs from such creditor.

4.9     This assignment supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and thereof and contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof and thereof.

4.10    Any party, whether ASSIGNOR a creditor or other party, ("Requesting Party") requesting access to information held or maintained by ASSIGNEE, shall not be entitled to such information until the 121st day after the effective date hereof and then only on the condition that Requesting Party pay to ASSIGNEE the actual expenses incurred by the Assignment Estate for providing such information or providing access to such information.

This GENERAL ASSIGNMENT is made this 24th day of _____DECEMBER_____, 2018 at Los Angeles, CALIFORNIA .

**ASSIGNOR:**

Vandrie Berry
NOTARY PUBLIC
STATE OF FLORIDA
Comm# FF891772
Expires 5/11/2020

(B) — Vandrie Berry
Notarized: 12/23/2018

SAAVY NATURALS, INC.

By: _____
        Hugo Saavedra          CA DL # A7296230 -exp 10/8/2022

The foregoing GENERAL ASSIGNMENT is hereby accepted this 24th day of December, 2018 at Los Angeles, California.

**ASSIGNEE:**
EQUITABLE TRANSITIONS, INC.

By: _____
        Nigel Hamet, President

©Equitable Transitions 2015                Page 10 of 10

**EQUITABLE TRANSITIONS, INC.**
**444 West Ocean Boulevard, Suite 1400**
**Long Beach, California 90802**

**PROOF OF CLAIM**

Assignor (Debtor): **SAAVY NATURALS, INC.**

Creditor's Name and Address (See Instructions on Reverse Side):

Name and address where Notices should be sent (if different from above):

☐ Check this box to indicate that this claim amends a previously filed claim

Filed on _____

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach a copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of the Date of the General Assignment: $_____

If all or part of your claim is secured, complete item 4 below; however, if your entire claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. Basis for Claim.

(See Instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies Assignor: _ _ _ _

3a. (See Instructions of Reverse Side):

4. Secured Claim (See Instruction #4 on reversed side.)

Check the appropriate box if your claim is secured by a lien on property or a right of set off and provide the requested information

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicl ☐ Other

Value of Property $_____ Annual Interest Rate _____%

Amount of arrearage and other charges as of time of General Assignment included in secured claim.

if any: $_____ Basis for Perfection: _____

Amount of Secured Claim: $_____ Amount of Unsecured Claim: $_____

6. Credits The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See Instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING If the documents are not available, please explain

8. The undersigned has received and read the General Assignment and hereby agrees to be bound by all of its terms

5 Amount of Claim Entitled to Priority. If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim

☐ Wages, salaries, or commissions (up to $4,300) earned within 90 days before the General Assignment Calif. Code of Civ Pro § 1204

☐ Contributions to an employee benefit plan Calif Code of Civ Proc § 1204

☐ Up to $900.00 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use Calif Code of Civ Proc § 1204

☐ Taxes or penalties owed to governmental units

☐ Other –

Amount entitled to priority:

$_____

Date _____ Signature The person submitting this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to submit this claim and state address and telephone number if different from the notice address above Attach copy of power of attorney if any

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law.*

### Items to Be Completed Proof of Claim Form

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the General Assignment  Please include any phone number, facsimile number, and/or email address for the primary contact  A separate space is provided for the payment address if it differs from the notice address  The creditor has a continuing obligation to keep the Equitable Transitions, Inc , informed of its current address

1. **Amount of claim as of Date of the General Assignment**
   State the total amount owed to the creditor on the date of the General Assignment  Follow the instructions concerning whether to complete items 4 and 5  Check the box of interest or other charges are included in the claim

2. **Basis for Claim.**
   State the type of debt or how it was incurred  Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card  If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services, so as to avoid embarrassment or the disclosure of confidential health care information  You may be required to provide additional disclosure if requested by Equitable Transitions, Inc

3. **Last Four digits of Any number by Which Creditor Identifies Assignor**
   State only the last digits of the Assignor's account or other number used by the creditor to identify the Assignor

   **3a.**  Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the Assignor

4. **Secured Claim:**
   Check the appropriate box and provide the requested information if the claim is fully or partially secured  Skip this section if the claim is entirely unsecured  (See DEFINITIONS, below.)  State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claims as of the date of the General Assignment

5. **Amount of Claim Entitled to Priority**
   If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority  A claim may be partly priority and partly non-priority  For example, in some of the categories, the law limits the amount entitled to priority

6. **Credits.**
   An authorized signature on this proof of claim serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the Assignor credit for any payments received toward the debt

7. **Documents**
   Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt  You may also attach a summary  You must also attach copies of documents that evidence perfection of any security interest  You may also attach a summary  Do not send original documents, as attachments may be destroyed after scanning.

   **Date and Signature**
   The person submitting this proof of claim must sign and date it  Print the name and title, if any, of the creditor or other person authorized to submit this claim  State the filer's address and telephone number  Attach a complete copy of any power of attorney.

## DEFINITIONS

**Assignor**
An Assignor is the person, corporation, or other entity that made the General Assignment.

**Creditor**
A creditor is a person, corporation, or other entity owed a debt by the Assignor that arose on or before the date of the General Assignment.  A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the Assignor on the date of the General Assignment  The creditor must submit the form to Equitable Transitions, Inc.

**Secured Claim**
A secured claim is one backed by a lien on property of the debtor  The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors.  The amount of the secured claim cannot exceed the value of the property  Any amount owed to the creditor in excess of the value of the of the property is an unsecured claim  Examples of liens on property include a mortgage on real estate or a security interest in a car

A lien may be involuntarily granted by an Assignor or may be obtained through a court proceeding  In some states, a court judgment is a lien.  A claim also may be secured if the creditor owes the Assignor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim  A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien

**Claim Entitled to Priority**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a General Assignment before other unsecured claims.

**Redacted**
A document has been redacted when the person submitting it has masked, edited out, or otherwise deleted, certain information.  A creditor should redact and use only the last four digits of any social security, individual's tax-identification, or financial account number, all but the initials of a minor's name and only the year of any personal's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## INFORMATION

**Acknowledgement of Submission of Claim**
To receive acknowledgement of your submission, you must enclose a stamped, self-addressed envelope and a copy of this proof of claim.

EXHIBIT M

**BILL OF SALE**

(Personal Property)

The undersigned, **EQUITABLE TRANSITIONS, INC., ASSIGNEE FOR THE BENEFIT OF THE CREDITORS OF SAAVY NATURALS, INC.,** for valuable consideration received forgiveness of secured debt as reflected in a Secured Promissory Note and Security Agreement, each by and between Buyer (secured party) and Assignor (debtor), in the amount of Forty One Thousand Dollars ($41,000) principal, plus any and all accrued interest thereon, Cash payment of Seventy Thousand Dollars ($70,000.00) the receipt of which is hereby acknowledged, does hereby sell to Eko Holdings, LLC, a California limited liability company, ("Buyer") all personal property (Exhibit 1) including and without limitation general intangibles and choses in action (including any claims which the Assignor may have against any person or entity).

Said sale is without representations or warranties of any kind, express or implied, including, without limitation, representations of merchantability and/or fitness for any particular purpose.

Buyer is responsible for the payment of, and shall pay as and when due, any and all sales - related taxes arising out of this transaction which is subject of this bill of sale.

Dated: December 24, 2018

EQUITABLE TRANSITIONS, INC, Assignee for the Benefit of the Creditors of Saavy Naturals, Inc.

By _____

Nigel Hamer, President

# EXHIBIT N

Table of Contents

## AGREEMENT AND PLAN OF MERGER AND REORGANIZATION

THIS AGREEMENT AND PLAN OF MERGER AND REORGANIZATION (this "*Agreement*") is made and entered into as of September 9, 2019, by and among **Tilray, Inc.**, a Delaware corporation ("*Tilray*"), **Down River Merger Sub, LLC**, a Delaware limited liability company and wholly owned subsidiary of Tilray ("*Merger Sub*"), and **Privateer Holdings, Inc.**, a Delaware corporation ("*Privateer*") and, solely in his capacity as the initial Stockholder Representative hereunder, Michael Blue (the "*Stockholder Representative*"). Certain capitalized terms used in this Agreement are defined in **Exhibit A**.

## RECITALS

A. Tilray and Privateer intend to effect a merger of Privateer with and into Merger Sub (the "*Merger*") in accordance with this Agreement and the DGCL. Upon consummation of the Merger, Privateer will cease to exist and Merger Sub will survive as a wholly owned Subsidiary of Tilray.

B. The Parties intend that the Merger qualify as a "reorganization" within the meaning of Section 368(a) of the Code, and by executing this Agreement, the Parties intend to adopt a plan of reorganization within the meaning of Treasury Regulations Sections 1.368-2(g) and 1.368-3.

C. The special committee of the board of directors of Tilray comprised of Maryscott Greenwood, Christine T. St.Clare and Rebekah Dopp (the "*Tilray Special Committee*") has (i) determined that the Contemplated Transactions are fair to, advisable and in the best interests of Tilray and its stockholders, (ii) approved and declared advisable this Agreement and the Contemplated Transactions, including the issuance of shares of Tilray Common Stock to the Privateer Stockholders pursuant to the terms of this Agreement, and (iii) determined to recommend, upon the terms and subject to the conditions set forth in this Agreement, that the stockholders of Tilray vote to approve the Tilray Stockholder Matters.

D. The sole member of Merger Sub has (i) determined that the Contemplated Transactions are fair to, advisable, and in the best interests of Merger Sub and its sole unitholder, (ii) approved and declared advisable this Agreement and the Contemplated Transactions, and (iii) determined to recommend, upon the terms and subject to the conditions set forth in this Agreement, that the unitholder of Merger Sub votes to adopt this Agreement and thereby approve the Contemplated Transactions.

E. The Privateer Board has (i) determined that the Contemplated Transactions are fair to, advisable and in the best interests of Privateer and the Privateer Stockholders, (ii) approved and declared advisable this Agreement and the Contemplated Transactions, and (iii) determined to recommend, upon the terms and subject to the conditions set forth in this Agreement, that the Privateer Stockholders vote to approve Privateer Stockholder Matters.

F. Concurrently with the execution and delivery of this Agreement and as a condition and inducement to Tilray's willingness to enter into this Agreement, the Privateer Stockholders listed on **Schedule A** are executing support agreements in favor of Tilray in substantially the form attached hereto as **Exhibit B** (the "*Privateer Support Agreement*"), pursuant to which such Privateer Stockholders have agreed to vote all of their shares of Privateer Capital Stock in favor of the Privateer Stockholder Matters.

## AGREEMENT

The Parties, intending to be legally bound, agree as follows:

## 1.   DESCRIPTION OF TRANSACTION

1.1 **The Merger**. Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time, Privateer shall be merged with and into Merger Sub, and the separate existence of Privateer shall cease. Merger Sub will continue as the surviving entity in the Merger (the "*Surviving Company*").

Table of Contents

**1.2 Effects of the Merger.** The Merger shall have the effects set forth in this Agreement, the Certificate of Merger and in the applicable provisions of the DGCL and DLLCA. As a result of the Merger, Privateer will become a wholly owned Subsidiary of Tilray.

**1.3 Closing; Effective Time.** Unless this Agreement is earlier terminated pursuant to the provisions of Section 9.1, and subject to the satisfaction or waiver of the conditions set forth in Sections 6, 7 and 8, the consummation of the Merger (the "**Closing**") shall take place remotely as promptly as practicable (but in no event later than the second Business Day following the satisfaction or waiver of the last to be satisfied or waived of the conditions set forth in Sections 6, 7 and 8, other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of each of such conditions), or at such other time, date and place as Tilray and Privateer may mutually agree in writing. The date on which the Closing actually takes place is referred to as the "**Closing Date**." At the Closing, the Parties shall cause the Merger to be consummated by executing and filing with the Secretary of State of the State of Delaware a certificate of merger with respect to the Merger, satisfying the applicable requirements of the DGCL and DLLCA and in a form reasonably acceptable to Tilray and Privateer (the "**Certificate of Merger**"). The Merger shall become effective at the time of the filing of such Certificate of Merger with the Secretary of State of the State of Delaware or at such later time as may be specified in such Certificate of Merger with the consent of Tilray and Privateer (the time as of which the Merger becomes effective being referred to as the "**Effective Time**").

**1.4 Certificate of Incorporation and Bylaws; Directors and Officers.** At the Effective Time:

(a) the certificate of formation of Merger Sub, as in effect immediately prior to the Effective Time, shall be the certificate of formation of the Surviving Company until thereafter amended as provided by the DLLCA and such certificate of formation; and

(b) the managers and officers of the Surviving Company, each to hold office in accordance with the Organizational Documents of the Surviving Company, shall be the managers and officers of Merger Sub.

**1.5 Conversion of Shares.**

(a) At the Effective Time, by virtue of the Merger and without any further action on the part of Tilray, Merger Sub, Privateer or any stockholder of Privateer or Tilray:

(i) any shares of Privateer Capital Stock held as treasury stock or held or owned by Tilray, Merger Sub or any Subsidiary of Tilray immediately prior to the Effective Time shall be canceled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor;

(ii) any shares of Tilray Common Stock held or owned by Privateer immediately prior to the Effective Time shall be canceled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor; and

(iii) subject to Section 1.5(c) and Section 1.11 each share of Privateer Common Stock outstanding immediately prior to the Effective Time (excluding shares to be canceled pursuant to Section 1.5(a)(i) and Dissenting Shares pursuant to Section 1.8) shall be automatically converted solely into the right to receive a portion of the Stock Merger Consideration and, pursuant to Section 1.5(d), a portion of the Cash Merger Consideration, if applicable, in each case as calculated in accordance with the Privateer Allocation and as set forth on the Allocation Certificate. All such shares of Privateer Common Stock, when so converted, shall no longer be outstanding and shall automatically be canceled and shall cease to exist.

(b) If any shares of Privateer Common Stock outstanding immediately prior to the Effective Time are unvested or are subject to a repurchase option or a risk of forfeiture under any applicable restricted stock purchase agreement or other similar agreement with Privateer, then the shares of Tilray Common Stock issued in exchange for such shares of Privateer Common Stock will to the same extent be unvested and subject to the same

2

Table of Contents

repurchase option or risk of forfeiture, and such shares of Tilray Common Stock shall accordingly be marked with appropriate legends. Privateer shall take all actions that may be reasonably necessary to ensure that, from and after the Effective Time, Tilray is entitled to exercise any such repurchase option or other right set forth in any such restricted stock purchase agreement or other agreement in accordance with its terms.

(c) No fractional shares of Tilray Common Stock shall be issued in connection with the Merger, and no certificates or scrip for any such fractional shares shall be issued, and such fractional share interests shall not entitle the owner thereof to vote or to any rights of a holder of Tilray Common Stock. Any holder of Privateer Common Stock who would otherwise be entitled to receive a fraction of a share of Tilray Common Stock (after aggregating all fractional shares of Tilray Common Stock issuable to such holder) shall, in lieu of such fraction of a share and upon surrender by such holder of a Letter of Transmittal in accordance with Section 1.7 and any accompanying documents as required therein, be paid in cash (rounded to the nearest whole cent), without interest, determined by multiplying such fraction by the Tilray Closing Price, in each case as set forth in the Allocation Certificate.

(d) Prior to the Closing, Tilray's board of directors shall have the right to elect, in its sole discretion (and shall be under no obligation), to designate all or any portion of the net proceeds from an Offering to be paid in cash pro rata (i) in lieu of a portion of the Stock Merger Consideration to the holders of Privateer Common Stock who would otherwise be entitled to receive Tilray Class 2 Common Stock pursuant to Section 1.5(a)(iii) and (ii) in lieu of a portion of the Option Merger Consideration to the Privateer Service Providers to which such holders would otherwise be entitled pursuant to Sections 5.5(b) and 5.5(c) (such aggregate cash amount, if any, the "*Cash Merger Consideration*"); *provided* that the percentage equal to the *quotient of* (A) the Cash Consideration Shares *divided by* (B) the Total Merger Consideration shall not be greater than 20%. Any such amounts shall be paid in cash (rounded to the nearest whole cent), without interest, determined in accordance with the Privateer Allocation and the Cash-Out Options Allocation, as applicable, and as set forth on the Allocation Certificate. Upon making an election to provide Cash Merger Consideration, Tilray shall notify Privateer in writing of such election and the amount of the Cash Merger Consideration and the applicable Offering Price associated with each identifiable portion of the Cash Merger Consideration at least seven Business Days prior to the Closing Date.

(e) All Privateer Options outstanding immediately prior to the Effective Time under the Privateer Plan shall be treated in accordance with Section 5.5.

(f) Each unit of Merger Sub shall, as of the Effective Time, shall become a unit of the Surviving Company.

(g) Notwithstanding the other provisions of this Section 1.5, the Stock Merger Consideration, and if applicable, the Cash Merger Consideration shall be adjusted appropriately to reflect the effect of any stock split, reverse stock split, stock dividend (including any dividend or other distribution of securities convertible into Tilray Common Stock), reorganization, recapitalization, reclassification, combination, exchange of shares or other like change with respect to the number of shares of Privateer Capital Stock, Tilray Class 1 Common Stock, or Tilray Class 2 Common Stock outstanding after the date hereof and prior to the Effective Time so as to provide the holders of shares of Privateer Capital Stock with the same economic effect as contemplated by this Agreement prior to such event; *provided, however*, that this sentence shall not be construed to permit Privateer to take any action with respect to its securities that is prohibited by Section 4.1(b).

1.6 Closing of Privateer's Transfer Books. At the Effective Time: (a) all shares of Privateer Common Stock outstanding immediately prior to the Effective Time shall be treated in accordance with Section 1.5(a), and all holders of certificates representing shares of Privateer Capital Stock that were outstanding immediately prior to the Effective Time (each such certificate, a "*Privateer Stock Certificate*") or shares of Privateer Common Stock held in direct registration form ("*Privateer Book-Entry Shares*") shall cease to have any rights as Privateer Stockholders except the right to receive a portion of the Stock Merger Consideration and, if applicable, the Cash

3

Table of Contents

Merger Consideration (and cash in lieu of any fractional share of Tilray Common Stock); and (b) the stock transfer books of Privateer shall be closed with respect to all shares of Privateer Capital Stock outstanding immediately prior to the Effective Time. No further transfer of any such shares of Privateer Capital Stock shall be made on such stock transfer books after the Effective Time. If, after the Effective Time, a valid Privateer Stock Certificate previously representing any shares of Privateer Capital Stock, including any valid Privateer Stock Certificate representing any shares of Privateer Preferred Stock previously converted into shares of Privateer Common Stock in connection with the Preferred Stock Conversion, is presented to the Exchange Agent or to the Surviving Company, such Privateer Stock Certificate shall be canceled and shall be exchanged as provided in Sections 1.5 and 1.7.

**1.7 Payment Procedures; Escrow.**

(a) Prior to the Effective Time, Tilray shall appoint Philadelphia Stock Transfer, Inc. or such other bank or trust company reasonably acceptable to Privateer to act as exchange and paying agent (the "**Exchange Agent**") for the payment of the Stock Merger Consideration and for the payment of the Cash Merger Consideration, if any. At or prior to the Effective Time, Tilray shall deposit with the Exchange Agent evidence of book-entry shares representing the Tilray Common Stock issuable pursuant to Section 1.5(a) and shall pay or cause to be paid to the Exchange Agent the Cash Merger Consideration in U.S. dollars by wire transfer of immediately available funds to the bank account designated in writing by the Exchange Agent no later than one (1) Business Day prior to the Closing Date. From time to time as needed as reasonably determined by Tilray, Tilray shall deposit with the Exchange Agent cash sufficient to make payments in lieu of fractional shares in accordance with Section 1.5(c). The Tilray Common Stock, Cash Merger Consideration, if any, and any other cash amounts so deposited with the Exchange Agent, together with any dividends or distributions received by the Exchange Agent with respect to such shares, are referred to collectively as the "**Exchange Fund**."

(b) Promptly after the Effective Time, Tilray shall cause the Exchange Agent to mail to the Privateer Stockholders who were record holders of shares of Privateer Capital Stock that were converted into the right to receive a portion of the Stock Merger Consideration and Cash Merger Consideration (if applicable) (i) a letter of transmittal in customary form and containing such provisions as Tilray may reasonably specify (with all other documentation required to be delivered pursuant to the letter of transmittal) (together, the "**Letter of Transmittal**"), including instructions for surrendering to the Exchange Agent such holder's Privateer Capital Stock in exchange for shares of Tilray Common Stock and the applicable portion of the Cash Merger Consideration (as set forth on the Allocation Certificate) that delivery shall be effected, and risk of loss and title to any Privateer Stock Certificates or Privateer Book-Entry Shares shall pass, only upon delivery of such Privateer Stock Certificates or Privateer Book-Entry Shares to the Exchange Agent, and (ii) a Stockholder Lock-up Agreement in the form attached hereto in **Exhibit C** (the "**Stockholder Lock-up Agreement**").

(c) After the Effective Time, upon surrender of a Privateer Stock Certificate for cancelation, if applicable, together with delivery to the Exchange Agent of (A) a Letter of Transmittal, duly completed and duly executed in accordance with the instructions thereto and (B) a Stockholder Lock-up Agreement, duly completed and duly executed, such Privateer Stockholder shall be entitled to receive in exchange therefor book-entry shares representing such Privateer Stockholder's portion of the Stock Merger Consideration (in a number of whole shares of Tilray Common Stock) and the applicable portion of the Cash Merger Consideration (each as set forth on the Allocation Certificate) that such Privateer Stockholder has the right to receive pursuant to the provisions of Section 1.5(a) (and cash in lieu of any fractional share of Tilray Common Stock pursuant to the provisions of Section 1.5(c)), *less* such Privateer Stockholder's Escrow Allocation, which shall be held in escrow in accordance with this Agreement and the Escrow Agreement. Until surrendered as contemplated by this Section 1.7(b), any Privateer Stock Certificate or Privateer Book-Entry Share shall be deemed, from and after the Effective Time, to represent only the right to receive upon such surrender such Privateer Stockholder's portion of the Stock Merger Consideration and the applicable portion of the Cash Merger Consideration (and cash in lieu of any fractional share of Tilray Common Stock) in exchange for Privateer Capital Stock held by such Privateer Stockholder pursuant to this Agreement. A Privateer Stockholder shall not be entitled to receive any portion of

4

Table of Contents

the Stock Merger Consideration or Cash Merger Consideration to which they are otherwise entitled until such Privateer Stockholder properly delivers a duly executed Letter of Transmittal, Stockholder Lock-up Agreement, and such other documents as may be reasonably required by the Exchange Agent or Tilray. The Stock Merger Consideration, the Cash Merger Consideration (if any), cash payable pursuant to Section 1.5(c), and any dividends or other distributions as are payable pursuant to Section 1.7(d) shall be deemed to have been in full satisfaction of any and all rights pertaining to Privateer Capital Stock. No interest shall be paid or shall accrue on the cash payable under Section 1.5 or this Section 1.7. The terms and conditions of the Letter of Transmittal and the Stockholder Lock-up Agreement were specifically negotiated by Tilray, Privateer and Merger Sub as an inducement for Tilray, Privateer and Merger Sub to enter into this Agreement and such terms and conditions are an integral part of the terms of this Agreement.

(d) No dividends or other distributions with respect to Tilray Common Stock with a record date after the Effective Time shall be paid to the holder of any Privateer Stock Certificate or Privateer Book-Entry Share, and no portion of Cash Merger Consideration or cash payment in lieu of fractional shares shall be paid to any such holder pursuant to Section 1.5(c), until the surrender of such Privateer Stock Certificate or Privateer Book-Entry Share in accordance with this Section 1.7. Subject to Section 1.7(g), following surrender of any such Privateer Stock Certificate or Privateer Book-Entry Share, there shall be paid to the holder of the Tilray Common Stock issued in exchange therefor, without interest, (i) at the time of such surrender, the applicable portion of the Cash Merger Consideration (as set forth on the Allocation Certificate), the amount of any cash payable in lieu of a fractional share of Tilray Common Stock to which such holder is entitled pursuant to Section 1.5(c), and the amount of dividends or other distributions with a record date after the Effective Time previously paid with respect to such whole shares of Tilray Common Stock and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to such surrender and a payment date subsequent to such surrender payable with respect to such whole shares of Tilray Common Stock.

(e) If payment is to be made to a Person other than the Privateer Stockholder in whose name such surrendered shares are registered on the stock transfer books of Privateer, it shall be a condition of payment that such Person shall have properly delivered a duly executed Letter of Transmittal, Stockholder Lock-up Agreement, and such other documents as may be reasonably required by the Exchange Agent or Tilray, and paid all applicable transfer and other Taxes required by reason of such payment to a Person other than the registered holder of Privateer Capital Stock surrendered or shall have established to the satisfaction of the Exchange Agent that such Taxes either have been paid or are not applicable.

(f) Any portion of the Exchange Fund that remains undistributed as of the date that is one (1) year after the Closing Date shall be delivered to Tilray upon demand, and any former holders of Privateer Capital Stock who have not theretofore properly delivered a duly executed Letter of Transmittal (with all other documentation required to be delivered pursuant to the Letter of Transmittal), Stockholder Lock-up Agreement, and such other documents as may be reasonably required by the Exchange Agent or Tilray in accordance with this Section 1.7 shall thereafter look only to Tilray for satisfaction of their claims for a portion of the Stock Merger Consideration or Cash Merger Consideration (as applicable), any cash in lieu of fractional shares of Tilray Common Stock, or any dividends or distributions with respect to shares of Tilray Common Stock.

(g) No Party shall be liable to any Privateer Stockholder or to any other Person with respect to any shares of Tilray Common Stock (or dividends or distributions with respect thereto) or for any cash amounts delivered to any public official pursuant to any applicable abandoned property Law, escheat Law, Tax Law or other similar Law.

(h) At the Closing, Tilray shall deposit with the Escrow Agent the Escrow Amount, as security for the indemnification claims of the Tilray Indemnified Parties for any Losses suffered or incurred by them and for which they are entitled to recovery under the provisions of Section 11.

(i) At the Closing, Privateer shall deposit (or cause to be deposited) with the Stockholder Representative (as directed by the Stockholder Representative) the Reserve Amount. To the extent any amount

5

Table of Contents

becomes payable out of the Reserve Account to the Privateer Stockholders pursuant to Section 10.1(c), the Stockholder Representative shall distribute to each Privateer Stockholder, such Privateer Stockholder's Pro Rata Portion of such amount promptly following the date on which such amount is authorized to be released from the Reserve Amount.

**1.8 Appraisal Rights.**

(a) Notwithstanding any provision of this Agreement to the contrary, shares of Privateer Capital Stock (excluding shares to be canceled pursuant to Section 1.5(a)(i)) that are outstanding immediately prior to the Effective Time and which are held by stockholders who have exercised and perfected appraisal rights for such shares of Privateer Capital Stock in accordance with the DGCL (collectively, the "***Dissenting Shares***") shall not be converted into or represent the right to receive the Stock Merger Consideration nor any Cash Merger Consideration described in Section 1.5 attributable to such Dissenting Shares. Such stockholders shall be entitled to receive payment of the appraised value of such shares of Privateer Capital Stock held by them in accordance with the DGCL, unless and until such stockholders fail to perfect or effectively withdraw or otherwise lose their appraisal rights under the DGCL. All Dissenting Shares held by stockholders who shall have failed to perfect or shall have effectively withdrawn or lost their right to appraisal of such shares of Privateer Capital Stock under the DGCL (whether occurring before, at or after the Effective Time) shall thereupon be deemed to be converted into and to have become exchangeable for, as of the Effective Time, the right to receive the Stock Merger Consideration and the applicable portion of the Cash Merger Consideration (each as set forth on the Allocation Certificate), without interest, attributable to such Dissenting Shares upon their surrender in the manner provided in Sections 1.5 and 1.7.

(b) Privateer shall give Tilray (i) prompt written notice of any demands received by Privateer for appraisal of Privateer Capital Stock or exercise of dissenter's rights or similar rights, attempted written withdrawals of such demands, and any other instruments served on Privateer and any correspondence received by Privateer in connection with such demands, and (ii) the opportunity to direct all negotiations and proceedings with respect to any exercise of such appraisal rights or dissenter's rights under the DGCL. Privateer shall not, except with the prior written consent of Tilray, voluntarily make any payment with respect to, or settle or offer to settle, any such demands, or approve any withdrawal of any such demands or agree to do any of the foregoing.

**1.9 Further Action.** If, at any time after the Effective Time, any further action is determined by the Surviving Company to be necessary or desirable to carry out the purposes of this Agreement or to vest the Surviving Company with full right, title and possession of and to all rights and property of Privateer, then the officers and managers of the Surviving Company shall be fully authorized, and shall use their and its commercially reasonable efforts (in the name of Privateer, in the name of Merger Sub, in the name of the Surviving Company and otherwise) to take such action.

**1.10 Withholding.** The Parties and the Exchange Agent shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Privateer Stockholder or any other Person such amounts as such Party or the Exchange Agent is required to deduct and withhold under the Code or any other Law with respect to the making of such payment. The payor shall provide commercially reasonable notice to the payee upon becoming aware of any such withholding obligation, and the Parties shall cooperate with each other to the extent reasonable to obtain reduction of or relief from such withholding. To the extent that amounts are so deducted and withheld and paid to the appropriate Person, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

**1.11 Merger Consideration.** The shares of Tilray Class 1 Common Stock and Tilray Class 2 Common Stock to be delivered by Tilray as Stock Merger Consideration, and any shares issuable upon options to be delivered by Tilray as Option Merger Consideration or otherwise pursuant to Tilray Options, shall be, in each case subject to the Lock-up Provisions. The shares of Tilray Class 1 Common Stock and Tilray Class 2 Common

6

11/19/2019                                                                         S-4/A

Table of Contents

Stock to be delivered by Tilray as Stock Merger Consideration pursuant to the terms of this Agreement are subject to the indemnification obligations set forth in Section 11, and the escrow provisions in the Escrow Agreement and in this Agreement.

**2.    REPRESENTATIONS AND WARRANTIES OF PRIVATEER**

Subject to Section 12.13(h), except as set forth in the disclosure letter delivered by Privateer to Tilray (the "*Privateer Disclosure Letter*"), Privateer represents and warrants to Tilray and Merger Sub as follows:

**2.1 Due Organization; Subsidiaries.**

(a) Privateer is duly incorporated, validly existing and in good standing under the Laws of Delaware and has all necessary corporate power and authority: (i) to conduct its business in the manner in which its business is currently being conducted; (ii) to own or lease and use its property and assets in the manner in which its property and assets are currently owned or leased and used; and (iii) to perform its obligations under all Contracts by which it is bound.

(b) Privateer is duly licensed and qualified to do business, and is in good standing (to the extent applicable in such jurisdiction), under the Laws of all jurisdictions where the nature of its business requires such licensing or qualification other than in jurisdictions where the failure to be so qualified individually or in the aggregate would not be reasonably expected to have a Privateer Material Adverse Effect.

(c) Privateer has no Subsidiaries, except for the Entities identified in Section 2.1(c) of the Privateer Disclosure Letter; and neither Privateer nor any of the Entities identified in Section 2.1(c) of the Privateer Disclosure Letter owns any capital stock of, or any equity, ownership or profit sharing interest of any nature in, or controls directly or indirectly, any other Entity other than the Entities identified in Section 2.1(c) of the Privateer Disclosure Letter. Each Subsidiary of Privateer is a corporation or other legal Entity duly organized, validly existing and, if applicable, in good standing and licensed and qualified to do business under the Laws of the jurisdiction of its organization and all jurisdictions where the nature of its business requires such licensing or qualification and has all necessary corporate or other power and authority to conduct its business in the manner in which its business is currently being conducted and to own or lease and use its property and assets in the manner in which its property and assets are currently owned or leased and used, except where the failure to have such power or authority would not reasonably be expected to have a Privateer Material Adverse Effect.

**2.2 Organizational Documents.** Privateer has made available to Tilray accurate and complete copies of the Organizational Documents of Privateer and each of its Subsidiaries in effect as of the date of this Agreement. Neither Privateer nor any of its Subsidiaries is in material breach or violation of its respective Organizational Documents.

**2.3 Authority; Binding Nature of Agreement.**

(a) Privateer has all necessary corporate power and authority to enter into and to perform its obligations under this Agreement and the Transaction Documents to which it is a party, subject to receipt of the Required Privateer Stockholder Vote, to perform its obligations hereunder and to consummate the Contemplated Transactions. The Privateer Board (at meetings duly called and held) has unanimously (i) determined that the Contemplated Transactions are fair to, advisable, and in the best interests of Privateer and the Privateer Stockholders, (ii) approved and declared advisable this Agreement and the Contemplated Transactions, and (iii) determined to recommend, upon the terms and subject to the conditions set forth in this Agreement, that the Privateer Stockholders vote in favor of the Privateer Stockholder Matters. As of the date of this Agreement, none of the aforementioned actions by the Privateer Board has been amended, rescinded or modified. As of the date of this Agreement, except for obtaining the Required Privateer Stockholder Vote, no other corporate proceedings by Privateer are necessary to authorize this Agreement and the Transaction Documents, or to consummate the Contemplated Transactions. As of the Closing Date, no other corporate proceedings by Privateer are necessary to authorize this Agreement and the Transaction Documents, or to consummate the Contemplated Transactions.

7

Table of Contents

(b) This Agreement has been duly executed and delivered by Privateer and assuming the due authorization, execution and delivery by Tilray and Merger Sub, constitutes the legal, valid and binding obligation of Privateer, enforceable against Privateer in accordance with its terms, subject to the Enforceability Exceptions.

**2.4 Vote Required.** The affirmative vote (or written consent) of (a) a majority of the aggregate voting power of outstanding shares of Privateer Common Stock and Privateer Preferred Stock, voting as a single class, (b) a majority of the aggregate voting power of the outstanding shares of Privateer Preferred Stock, voting as a single class, (c) a majority of the outstanding shares of Privateer Series A Preferred Stock, voting as a single class, (d) a majority of the outstanding shares of Privateer Series B Preferred Stock, voting as a single class, and (e) a majority of the aggregate voting power of outstanding shares of Privateer Common Stock and Privateer Preferred Stock, voting as a single class (in each case, excluding shares of Privateer Common Stock and Privateer Preferred Stock held or beneficially owned by the Privateer Stockholders set forth on **Schedule** A), in each case, outstanding on the record date for the written consent in lieu of a meeting pursuant to Section 228 of the DGCL approving Privateer Stockholder Matters, in a form reasonably acceptable to Tilray (collectively, "***Privateer Stockholder Written Consent***" and entitled to vote thereon (collectively, the "***Required Privateer Stockholder Vote***"), is the only vote (or written consent) of the holders of any class or series of Privateer Capital Stock necessary to adopt and approve the Privateer Stockholder Matters.

**2.5 Non-Contravention; Consents.** Subject to obtaining the Required Privateer Stockholder Vote, the filing of the Certificate of Merger required by the DGCL and DLLCA, the expiration or termination of any waiting period under the HSR Act and any applicable foreign competition Laws, neither (x) the execution, delivery or performance of this Agreement by Privateer, nor (y) the consummation of the Contemplated Transactions, will directly or indirectly (with or without notice or lapse of time):

(a) contravene, conflict with or result in a violation of any of the provisions of Privateer's Organizational Documents;

(b) contravene, conflict with or result in a material violation of, or to the Knowledge of Privateer give any Governmental Body or other Person the right to challenge, the Contemplated Transactions or to exercise any material remedy or obtain any material relief under, any Law or any order, writ, injunction, judgment or decree to which Privateer or its Subsidiaries, or any of the assets owned or used by Privateer or its Subsidiaries, is subject, except as would not reasonably be expected to have a Privateer Material Adverse Effect;

(c) contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by Privateer or its Subsidiaries, except as would not reasonably be expected to have a Privateer Material Adverse Effect;

(d) contravene, conflict with or result in a violation or breach of, or result in a default (or an event that, with notice or lapse of time or both, would become a default or breach) under, any provision of any Privateer Material Contract, or give any Person the right to: (i) declare a default or exercise any remedy under any Privateer Material Contract; (ii) any material payment, rebate, chargeback, penalty or change in delivery schedule under any Privateer Material Contract; (iii) accelerate the maturity or performance of any Privateer Material Contract; or (iv) cancel, terminate or modify any term of any Privateer Material Contract, except in the case of any non-material breach, default, penalty or modification; or

(e) result in the imposition or creation of any Encumbrance upon or with respect to (i) the Owned Shares or (ii) any other material asset owned or used by Privateer or its Subsidiaries.

Except for (i) any Consent set forth on Section 2.5 of the Privateer Disclosure Letter under any Privateer Contract, (ii) the Required Privateer Stockholder Vote, (iii) the filing of the Certificate of Merger with

8

11/19/2019                                              S-4/A

Table of Contents

the Secretary of State of the State of Delaware pursuant to the DGCL and DLLCA, and (iv) such Consents as may be required under applicable federal and state securities Laws, the HSR Act, and all applicable foreign competition Laws, if any, neither Privateer nor any of its Subsidiaries is or will be required to make any filing with or give any notice to, or to obtain any Consent from, any Person in connection with (A) the execution, delivery or performance of this Agreement and the Transaction Documents or (B) the consummation of the Contemplated Transactions. The Privateer Board has taken and will take all actions necessary to ensure that the restrictions applicable to business combinations contained in Section 203 of the DGCL are, and will be, inapplicable to the execution, delivery and performance of this Agreement and the Transaction Documents and to the consummation of the Contemplated Transactions. No other state Takeover Statute or similar Law applies or purports to apply to the Merger, this Agreement and the Transaction Documents, or any of the Contemplated Transactions.

2.6 Capitalization; Ownership of the Owned Shares.

(a)  The authorized Privateer Capital Stock as of the Business Day immediately prior to the date of this Agreement, consists of (i) 184,006,055 authorized shares of Privateer Capital Stock, of which 56,596,456 shares have been issued and are outstanding as of the Business Day immediately prior to the date of this Agreement, consisting of (A) 27,905,068 shares of Privateer Class 1 Common Stock, (B) 6,265,490 shares of Privateer Class 2 Common Stock and (C) 230,195 shares of Privateer Class 3 Common Stock and (ii) 29,006,055 authorized shares of Privateer Preferred Stock, of which 27,198,454 shares have been issued and are outstanding as of the Business Day immediately prior to the date of this Agreement, consisting of (A) 9,600,000 shares of Series A Preferred Stock, (B) 8,887,667 shares of Series B Preferred Stock and (C) 8,710,787 shares of Series C Preferred Stock. No shares of Privateer Capital Stock are held by Privateer as treasury shares as of the Business Day immediately prior to the date of this Agreement. Section 2.6(a) of the Privateer Disclosure Letter lists, as of the Business Day immediately prior to the date of this Agreement, each record holder of issued and outstanding Privateer Capital Stock and the number and type of shares of Privateer Capital Stock held by such holder. There are no accrued or declared but unpaid dividends on any Privateer Capital Stock or the capital stock of any of Privateer's Subsidiaries.

(b)  All of the outstanding shares of Privateer Capital Stock have been duly authorized and validly issued, and are fully paid and nonassessable. All of the outstanding shares of capital stock (or other Equity Interest) of each Subsidiary of Privateer have been duly authorized and validly issued, and are fully paid and nonassessable, and are owned by Privateer or another Subsidiary of Privateer, free and clear of any Encumbrances. Except as set forth in the bylaws of Privateer or the Investor Agreements, none of the outstanding shares of Privateer Capital Stock is entitled or subject to any preemptive right, right of participation, right of maintenance or any similar right and none of the outstanding shares of Privateer Capital Stock is subject to any right of first refusal. Except as contemplated herein and in the bylaws of Privateer and the Investor Agreements, there is no Privateer Contract relating to the voting or registration of, or restricting any Person from purchasing, selling, pledging or otherwise disposing of (or granting any option or similar right with respect to), any shares of Privateer Capital Stock. Privateer is not under any obligation, nor is it bound by any Contract pursuant to which it may become obligated, to repurchase, redeem or otherwise acquire any outstanding shares of Privateer Capital Stock or other Equity Interests. Section 2.6(b) of the Privateer Disclosure Letter accurately and completely lists all repurchase or forfeiture rights held by Privateer with respect to shares of Privateer Capital Stock (including shares issued pursuant to the exercise of stock options). Each share of Privateer Preferred Stock is convertible into one share of Privateer Common Stock.

(c)  Except for the Privateer Plan, Privateer does not have any stock option plan or any other plan, program, agreement or arrangement providing for any equity-based compensation for any Person. Under the Privateer Plan (i) options to purchase 1,937,574 shares of Privateer Class 1 Common Stock have been granted and are currently outstanding; (ii) options to purchase 1,564,215 shares of Privateer Class 3 Common Stock have been granted and are currently outstanding; and (iii) (A) no shares of Privateer Class 1 Common Stock remain available for future issuance to officers, directors, employees and consultants of Privateer and (B) 1,382,900 shares of Privateer Class 3 Common Stock remain available for future issuance to officers, directors, employees

9

Table of Contents

and consultants of Privateer. Section 2.6(c) of the Privateer Disclosure Letter sets forth the following information with respect to each Privateer Option outstanding as of the Business Day immediately prior to the date of this Agreement: (i) the name of the optionee; (ii) whether such Privateer Option represents a right to acquire Privateer Class 1 Common Stock or Privateer Class 3 Common Stock; (iii) the number of shares of Privateer Common Stock subject to such Privateer Option at the time of grant; (iv) the number of shares of Privateer Common Stock subject to such Privateer Option as of the Business Day immediately prior to the date of this Agreement; (v) the exercise price of such Privateer Option; (vi) the date on which such Privateer Option was granted; (vii) the applicable vesting schedule, including the number of vested and unvested shares as of the Business Day immediately prior to the date of this Agreement and any acceleration provisions; (viii) the date on which such Privateer Option expires; (ix) whether the optionee is a Tilray Service Provider; and (x) with respect to any optionee that is a Privateer Service Provider, whether such optionee has terminated "Continuous Service" within the meaning of the Privateer Plan ("**Continuous Service**") and, if so, the date on which such optionee terminated Continuous Service and the reason therefor. Privateer has made available to Tilray an accurate and complete copy of the Privateer Plan and the form of stock option agreement used to evidence outstanding options granted thereunder.

(d) There is no: (i) outstanding subscription, option, call, warrant or right (whether or not currently exercisable) to acquire any shares of the capital stock or other securities of Privateer or any of its Subsidiaries; (ii) outstanding security, instrument or obligation that is or may become convertible into or exchangeable for any shares of the capital stock or other securities of Privateer or any of its Subsidiaries; or (iii) condition or circumstance that is reasonably likely to give rise to or provide a basis for the assertion of a claim by any Person to the effect that such Person is entitled to acquire or receive any shares of capital stock or other securities of Privateer or any of its Subsidiaries. There are no outstanding or authorized stock appreciation, phantom stock, profit participation or other similar rights with respect to Privateer or any of its Subsidiaries.

(e) All outstanding shares of Privateer Common Stock, Privateer Preferred Stock, Privateer Options and other Equity Interests of Privateer and each of its Subsidiaries have been issued and granted in compliance with (i) all applicable securities Laws and other applicable Law, and (ii) all requirements set forth in applicable Contracts.

(f) Privateer is the sole record and beneficial owner 16,666,667 shares of Tilray Class 1 Common Stock and 58,333,333 shares of Tilray Class 2 Common Stock (collectively, the "**Owned Shares**"), has good and valid title to the Owned Shares, and has no other Equity Interests in the Tilray. Other than this Agreement: (i) there is no Encumbrance over or affecting any of the Owned Shares, nor is there any agreement or commitment of Privateer to create any such Encumbrance and no Person has claimed any right or interest with respect to the Owned Shares, nor is there any basis for such a claim, and (ii) no Contract exists between Privateer and any other Person (other than Tilray) with respect to the Owned Shares.

**2.7 Financial Statements.**

(a) Section 2.7 of the Privateer Disclosure Letter sets forth true and complete copies of (i) Privateer's unaudited consolidated balance sheets at December 31, 2018 and December 31, 2017 together with related unaudited consolidated statements of income, stockholders' equity and cash flows, and notes thereto, of Privateer for the fiscal years then ended and (ii) the Privateer Unaudited Interim Balance Sheet, together with the unaudited consolidated statements of income, stockholders' equity and cash flows of Privateer for the period reflected in Privateer Unaudited Interim Balance Sheet (collectively, the "**Privateer Financials**"). The Privateer Financials were prepared in accordance with GAAP (except as may be indicated in the notes to such financial statements and except that the Privateer Financials may not contain footnotes and are subject to normal and recurring year-end adjustments, none of which are material) applied on a consistent basis throughout the periods indicated and fairly present, in all material respects, the financial position and operating results of Privateer and its consolidated Subsidiaries (including Tilray), as of the dates and for the periods indicated therein.

10

Table of Contents

(b) Each of Privateer and its Subsidiaries maintains accurate books and records reflecting their assets and liabilities and maintains a system of internal accounting controls designed to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorizations and (ii) transactions are recorded as necessary to permit preparation of the financial statements of Privateer and its Subsidiaries in conformity with GAAP and to maintain accountability of Privateer's and its Subsidiaries' assets. Privateer and each of its Subsidiaries maintains internal control over financial reporting that provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes.

(c) Since January 1, 2017, there have been no formal internal investigations regarding financial reporting or accounting policies and practices discussed with, reviewed by or initiated at the direction of the Chief Executive Officer, Chief Financial Officer, or General Counsel of Privateer, the Privateer Board or any committee thereof. Since January 1, 2017, neither Privateer nor its independent auditors have identified (i) any significant deficiency or material weakness in the design or operation of the system of internal accounting controls utilized by Privateer and its Subsidiaries, (ii) any fraud, whether or not material, that involves Privateer, any of its Subsidiaries, Privateer's management or other employees who have a role in the preparation of financial statements or the internal accounting controls utilized by Privateer and its Subsidiaries or (iii) any claim or allegation regarding any of the foregoing.

**2.8 Absence of Changes.** Since the date of the Privateer Unaudited Interim Balance Sheet, and as of the date of this Agreement, Privateer has conducted its business only in the Ordinary Course of Business (except for the execution and performance of this Agreement and the discussions, negotiations and transactions related thereto) and there has not been any (a) Privateer Material Adverse Effect or (b) action, event or occurrence that would have required consent of Tilray pursuant to Section 4.1(b) had such action, event or occurrence taken place after the execution and delivery of this Agreement.

**2.9 Absence of Undisclosed Liabilities.** Neither Privateer nor any of its Subsidiaries has any Liability, Indebtedness, obligation or expense of any kind, individually or in the aggregate, except for: (a) Liabilities or Indebtedness disclosed, reflected or reserved against in the Privateer Unaudited Interim Balance Sheet; (b) Liabilities that have been incurred by Privateer or its Subsidiaries since the date of the Privateer Unaudited Interim Balance Sheet in the Ordinary Course of Business, none of which, individually or the aggregate, are material to Privateer; (c) Liabilities for the performance of obligations of Privateer or any of its Subsidiaries under Privateer Contracts (excluding any Liabilities arising from or related to any breach of any Privateer Contract); (d) Privateer Transaction Expenses; and (e) Liabilities which would not, individually or in the aggregate, reasonably be expected to be material to Privateer (both where the ownership of capital stock of Tilray is and is not excluded from such materiality determination).

**2.10 Title to Assets.** Each of Privateer and its Subsidiaries owns, and has good and valid title to, or, in the case of leased properties and assets, valid leasehold interests in, all tangible properties or tangible assets and equipment used or held for use in its business or operations or purported to be owned by it that are material to Privateer or its business, including: (a) all tangible assets reflected on the Privateer Unaudited Interim Balance Sheet; and (b) all other tangible assets reflected in the books and records of Privateer or any of its Subsidiaries as being owned by Privateer or such Subsidiary. All of such assets are owned or, in the case of leased assets, leased by Privateer or its Subsidiaries free and clear of any Encumbrances. No new assets have been acquired by Privateer or any of its Subsidiaries since the date of the Privateer Unaudited Interim Balance Sheet.

**2.11 Real Property; Leasehold.** Neither Privateer nor any of its Subsidiaries owns or has ever owned any real property. Section 2.11 of the Privateer Disclosure Letter sets forth an accurate and complete list of all real properties with respect to which Privateer directly or indirectly holds a valid leasehold interest as well as any other real estate that is in the possession of or leased by Privateer or any of its Subsidiaries. Privateer has made available to Tilray true and correct copies of all leases under which any such real property is possessed (the "*Privateer Real Estate Leases*"), each of which is in full force and effect, with no existing default thereunder by

11

Table of Contents

any party, and no event has occurred which with the passage of time and/or the giving of notice would constitute a default thereunder by any party. There are no real property leases or Contracts to which Privateer or any of its Subsidiaries is a party granting Privateer or any of its Subsidiaries the right to use or occupy any real property other than the Privateer Real Estate Leases. Privateer's use and operation of each such leased property conforms to all applicable Laws, and Privateer has exclusive possession of each such leased property and has not granted any occupancy rights to tenants or licensees with respect to such leased property. In addition, each such leased property is free and clear of all Encumbrances other than Permitted Encumbrances.

### 2.12 Intellectual Property.

(a) Except as has not had and would not reasonably be expected to have individually or in the aggregate, a Privateer Material Adverse Effect, Privateer or its Subsidiaries solely owns, is the sole assignee of, or has license to all Privateer IP (other than as disclosed on Section 2.12(a) of the Privateer Disclosure Letter), free and clear of all Encumbrances other than Permitted Encumbrances. Each Privateer Associate involved in the creation or development of any material Privateer IP, pursuant to such Privateer Associate's activities on behalf of Privateer or its Subsidiaries, has signed a written agreement containing an assignment of such Privateer Associate's rights in such Privateer IP to Privateer or its Subsidiaries and confidentiality provisions protecting Privateer IP.

(b) No funding, facilities or personnel of any Governmental Body or any university, college, research institute or other educational institution has been used to create Privateer IP, except for any such funding or use of facilities or personnel that does not result in such Governmental Body or institution obtaining ownership rights to such Privateer IP or the right to receive royalties for the practice of such Privateer IP.

(c) The conduct of the business of Privateer as currently conducted does not infringe, misappropriate, dilute or otherwise violate any Intellectual Property Rights of any Person; *provided, however,* the foregoing representation and warranty is made to the Knowledge of Privateer (without any duty or obligation to perform any patent searches) with respect to patents and patent infringement. To the Knowledge of Privateer, no other Person is infringing, misappropriating or otherwise violating any Privateer IP. No Legal Proceeding is pending (or, to the Knowledge of Privateer, is threatened in writing) (i) against Privateer or its Subsidiaries alleging that the operation of the businesses of Privateer or its Subsidiaries infringes or constitutes the misappropriation or other violation of any Intellectual Property Rights of another Person or (ii) by Privateer or its Subsidiaries alleging that another Person has infringed, misappropriated or otherwise violated any of Privateer IP or any Intellectual Property Rights exclusively licensed to Privateer or its Subsidiaries. Since January 1, 2016, neither Privateer nor its Subsidiaries has received any written notice or other written communication alleging that the operation of the business of Privateer or its Subsidiaries infringes or constitutes the misappropriation or other violation of any Intellectual Property Right of another Person.

(d) None of the Privateer IP or, to the Knowledge of Privateer, any Intellectual Property Rights exclusively licensed to Privateer or its Subsidiaries is subject to any pending or outstanding injunction, directive, order, judgment or other disposition of dispute that adversely and materially restricts the use, transfer, registration or licensing by Privateer or its Subsidiaries of any such Privateer IP or material Intellectual Property Rights exclusively licensed to Privateer or its Subsidiaries.

### 2.13 Agreements, Contracts and Commitments.

(a) Section 2.13(g) of the Privateer Disclosure Letter sets forth a complete and correct list (grouped according to the categories described in the subsections below) of Privateer Contracts that are executory as of the date of this Agreement (each, a "*Privateer Material Contract*" and collectively, the "*Privateer Material Contracts*"):

(i) each Privateer Contract relating to any agreement obligating Privateer or any of its Subsidiaries to indemnify, advance expenses to, or hold harmless any Person or any agreement of guaranty;

12

Table of Contents

(ii) each Privateer Contract containing (A) any covenant that purports to limit the freedom of Privateer, its Subsidiaries, or the Surviving Company to engage in any line of business or compete with any Person in any geographic area or line of business, make sales to any Person in any manner, or develop, market or distribute products or service, (B) any most-favored pricing arrangement, any type of discount rights, or any right of first refusal, first notice or first negotiation, (C) any exclusivity provision, (D) any non-solicitation provision with respect to employees of other Persons, or (E) any restriction on the use, exploitation or enforcement of any Intellectual Property Rights owned by or exclusively licensed to Privateer or any of its Subsidiaries;

(iii) each Privateer Contract relating to capital expenditures and requiring payments after the date of this Agreement in excess of $50,000 pursuant to its express terms and not cancelable without penalty;

(iv) each Privateer Contract relating to the disposition or acquisition of material assets or any ownership interest in any Entity, in each case, involving payments in excess of $50,000, other than Privateer Contracts in which the applicable acquisition or disposition has been consummated and there are no material ongoing obligations;

(v) each Privateer Contract relating to Indebtedness, including any mortgages, indentures, loans, notes or credit agreements, security agreements or other agreements or instruments relating to the borrowing of money or extension of credit or creating any material Encumbrances with respect to any assets of Privateer or any of its Subsidiaries or any loans or debt obligations with officers or directors of Privateer, in each case, having an outstanding principal in an amount in excess of $50,000;

(vi) each Privateer Contract requiring payment by or to Privateer after the date of this Agreement in excess of $50,000 pursuant to its express terms relating to: (A) any distribution agreement (identifying any that contain exclusivity provisions); (B) any dealer, distributor, joint marketing, alliance, joint venture, cooperation, development or other agreement currently in force under which Privateer has continuing obligations to develop or market any product, technology or service, or any agreement pursuant to which Privateer has continuing obligations to develop any Intellectual Property Rights that will not be owned, in whole or in part, by Privateer; or (C) any Contract to license any third party to manufacture or produce any product, service or technology of Privateer or any Contract to sell, distribute or commercialize any products or service of Privateer or any of its Subsidiaries;

(vii) each Privateer Contract pursuant to which Privateer or any of its Subsidiaries has provided funds to or made any loan, capital contribution or other investment in, or assumed, guaranteed or agreed to act as a surety with respect to any Liability of, any Person;

(viii) each Privateer Contract for the issuance of any debt or equity security or other ownership interest, or the conversion of any obligation, instrument or security into debt or equity securities or other ownership interests of, or the acquisition of tangible assets of a substantial nature or operating business of, Privateer or any of its Subsidiaries, or for the acquisition of any debt or equity security or other ownership interest of, or any tangible assets of a substantial nature or operating business of, any Person;

(ix) each Privateer Contract that requires a Consent of any Person in connection with, or otherwise contains a provision relating to a "change of control," or that would prohibit or delay the consummation of, the Contemplated Transactions;

(x) each Privateer Contract wherein Privateer or its Subsidiaries grants or obtains a right or license to any Privateer IP, other than (i) click-wrap or shrink-wrap standard licenses for commercially available off-the-shelf software; (ii) open source software; and (iii) agreements with any customer of Privateer or its Subsidiaries entered into in the Ordinary Course of Business;

13

Table of Contents

(xi) each Privateer Contract with any financial advisor, broker, finder, investment banker or other similar Person, providing advisory services to Privateer in connection with the Contemplated Transactions;

(xii) each Privateer Real Estate Lease;

(xiii) each Privateer Contract with any Governmental Body;

(xiv) each Privateer Contract containing any royalty, dividend or similar arrangement based on the revenues or profits of Privateer or any of its Subsidiaries;

(xv) each Privateer Contract relating to a joint venture or partnership, joint development, merger, asset or share purchase or divestiture involving Privateer or any of its Subsidiaries;

(xvi) each Privateer Contract relating to settlement of any Legal Proceedings;

(xvii) each Privateer Contract, offer letter, employment agreement, consulting agreement, or independent contractor agreement with any employee, consultant or independent contractor that (A) is not terminable at will, without notice, severance, or other cost or Liability, or (B) provides for retention payments, change of control payments, severance, accelerated vesting, or any payment or benefit that may or will become due as a result of the Merger or the other Contemplated Transactions (whether alone or in connection with any other event); or

(xviii) any other Privateer Contract that is not terminable at will (with no penalty or payment) by Privateer or its Subsidiaries, as applicable, and (A) which involves payment or receipt by Privateer or its Subsidiaries after the date of this Agreement under any such Contract of more than $50,000 in the aggregate, or obligations after the date of this Agreement in excess of $50,000 in the aggregate, or (B) that is material to the business or operations of Privateer and its Subsidiaries, taken as a whole (both where the ownership of capital stock of Tilray is and is not excluded from such materiality determination).

(b) Privateer has delivered or made available to Tilray accurate and complete copies of all Privateer Material Contracts, including all restatements, modifications, amendments, and supplements thereto. There are no Privateer Material Contracts that are not in written form. Neither Privateer nor any of its Subsidiaries has, nor to Privateer's Knowledge, as of the date of this Agreement has any other party to a Privateer Material Contract, breached, violated or defaulted under, or received notice that it breached, violated or defaulted under, any of the terms or conditions of any Privateer Material Contract. As to Privateer and its Subsidiaries, as of the date of this Agreement, each Privateer Material Contract is valid, binding, enforceable and in full force and effect, subject to the Enforceability Exceptions. As of the date of this Agreement, no Person is renegotiating, or has a right pursuant to the terms of any Privateer Material Contract to change, any material amount paid or payable to Privateer under any Privateer Material Contract or any other material term or provision of any Privateer Material Contract.

2.14 **Compliance; Permits; Restrictions.**

(a) Each of Privateer and its Subsidiaries is and has at all times been in compliance with all applicable Laws. Neither Privateer nor any of its Subsidiaries has received any written notice, order, complaint or other communication from any Governmental Body or any other Person that Privateer or any of its Subsidiaries has any Liability under any applicable Laws or that it is not or has at any time not been in compliance with any applicable Laws. No investigation or review by any Governmental Body regarding a violation of any applicable Laws with respect to Privateer or any of its Subsidiaries has occurred, is pending or, to the Knowledge of Privateer, threatened.

14

Table of Contents

(b) Privateer has not received any inspection report, notice of adverse finding, warning letter, untitled letter or other correspondence with or notice from any Governmental Body alleging or asserting noncompliance with any applicable Laws, including the Food and Drugs Act R.S.C. 1985, c. F-27 or the Controlled Drugs and Substances Act S.C. 1996, c. 19, that has not been resolved by Privateer or that otherwise would not, individually or in the aggregate, reasonably be expected to have a Privateer Material Adverse Effect. Privateer and any person acting on behalf of Privateer have been in compliance with applicable Laws relating to the regulation of Privateer in any country, including health care, cannabis, privacy, and personal health information Laws. Privateer has not, either voluntarily or involuntarily, initiated, conducted or issued or caused to be initiated, conducted or issued, any recall, market withdrawal or replacement, safety alert, post-sale warning or other notice or action relating to the alleged safety or efficacy of any product or any alleged product defect or violation and there is no basis for any such notice or action.

(c) Privateer has not, and to the Knowledge of Privateer, no Person acting on behalf of Privateer has, cultivated, produced, processed, imported or distributed, or has any current intention to cultivate, produce, process, import or distribute, any cannabis or cannabinoid product or has otherwise engaged, or has any current intention to otherwise engage, in any direct or indirect dealings or transactions in or to the United States of America, its territories and possessions, any state of the United States and the District of Columbia or any other federal, provincial, state, municipal, local or foreign jurisdiction where such activity is illegal. Privateer has instituted and maintained and will continue to maintain policies and procedures reasonably designed to ensure that Privateer does not carry on any activities in, or distribute any products to, any jurisdiction where such activities or products are not fully in compliance with all applicable Laws.

(d) There is no agreement, judgment, injunction, order or decree binding upon Privateer which (i) has or would reasonably be expected to have the effect of prohibiting or materially impairing any business practice of Privateer, any acquisition of material property by Privateer or the conduct of business by Privateer as currently conducted, (ii) has or would reasonably be expected to have an adverse effect on Privateer's ability to comply with or perform any covenant or obligation under this Agreement, or (iii) that may have the effect of preventing, delaying, making illegal or otherwise interfering with the Contemplated Transactions.

(e) Privateer holds all required Governmental Authorizations which are required or necessary for the operation of the business of Privateer as currently conducted (the "*Privateer Permits*"). Section 2.14(e) of the Privateer Disclosure Letter identifies each Privateer Permit. Privateer is and has at all times been in material compliance with the terms of the Privateer Permits. No Legal Proceeding is pending or, to the Knowledge of Privateer, threatened, which seeks to revoke, limit, suspend, or materially modify any Privateer Permit. The rights and benefits of each Privateer Permit will be available to the Surviving Company immediately after the Effective Time on terms substantially identical to those enjoyed by Privateer as of the date of this Agreement and immediately prior to the Effective Time and will not be cancelled, terminated, revoked, limited in scope or otherwise adversely affected by the Contemplated Transactions.

**2.15** __Legal Proceedings; Orders__.

(a) There is no Legal Proceeding to which Privateer or any of its Subsidiaries is a party or of which any property or assets of Privateer or any of its Subsidiaries is the subject, including any Legal Proceeding before any Governmental Body, which, individually or in the aggregate, if determined adversely to Privateer or any of its Subsidiaries, would reasonably be expected to have a Privateer Material Adverse Effect; and, to the Knowledge of Privateer, no such Legal Proceedings are threatened or contemplated by a Governmental Body or other Person. Privateer is in compliance with all applicable Laws governing its business as prescribed by any Governmental Body in any country engaged in the regulation of cannabis, controlled drugs and substances or pharmaceuticals, except where noncompliance would not, individually or in the aggregate, reasonably be expected to have a Privateer Material Adverse Effect. All preclinical and clinical studies conducted on behalf of Privateer have been conducted by third parties, to the Knowledge of Privateer, in compliance with all applicable Laws, rules, orders and regulations in any country.

15

Table of Contents

(b) There is no pending Legal Proceeding and, to the Knowledge of Privateer, no Person has threatened in writing to commence any Legal Proceeding: (i) that involves (A) Privateer, (B) any of its Subsidiaries, (C) any Privateer Associate (in his or her capacity as such) or (D) any of the assets owned or used by Privateer or its Subsidiaries; or (ii) that challenges, or that would have the effect of preventing, delaying, making illegal or otherwise interfering with, the Contemplated Transactions.

(c) Since January 1, 2017, no Legal Proceeding against Privateer has resulted in material Liability to Privateer.

(d) There is no order, writ, injunction, judgment or decree to which Privateer or any of its Subsidiaries, or any of the material assets owned or used by Privateer or any of its Subsidiaries, is subject. No officer or employee of Privateer or any of its Subsidiaries is subject to any order, writ, injunction, judgment or decree that prohibits such officer or employee from engaging in or continuing any conduct, activity or practice relating to the business of Privateer or any of its Subsidiaries or to any assets owned or used by Privateer or any of its Subsidiaries.

(e) There is no Legal Proceeding by Privateer or any of its Subsidiaries pending, or which Privateer or any of its Subsidiaries has commenced preparations to initiate, against any other Person and, to the Knowledge of Privateer.

2.16 Tax Matters.

(a) Privateer and each of its Subsidiaries have timely filed all income Tax Returns and other material Tax Returns that they were required to file under applicable Law. All such Tax Returns are correct and complete in all material respects and have been prepared in compliance with all applicable Law. No claim has ever been made by any Governmental Body in any jurisdiction where Privateer or any of its Subsidiaries does not file a particular Tax Return or pay a particular Tax that Privateer or such Subsidiary is subject to taxation by that jurisdiction.

(b) All income and other material Taxes due and owing by Privateer or any of its Subsidiaries on or before the date hereof (whether or not shown on any Tax Return) have been fully paid. The unpaid Taxes of Privateer and its Subsidiaries did not, as of the date of the Privateer Unaudited Interim Balance Sheet, materially exceed the reserve for Tax liability (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax items) set forth on the face of the Privateer Unaudited Interim Balance Sheet. Since the date of the Privateer Unaudited Interim Balance Sheet, neither Privateer nor any of its Subsidiaries has incurred any material Liability for Taxes outside the Ordinary Course of Business.

(c) All Taxes that Privateer or any of its Subsidiaries are or were required by Law to withhold or collect have been duly and timely withheld or collected in all material respects on behalf of its respective employees, independent contractors, stockholders, lenders, customers or other third parties and, have been timely paid to the proper Governmental Body or other Person or properly set aside in accounts for this purpose.

(d) There are no Encumbrances for material Taxes (other than Permitted Encumbrances) upon any of the assets of Privateer or any of its Subsidiaries.

(e) No deficiencies for income or other material Taxes with respect to Privateer or any of its Subsidiaries have been claimed, proposed or assessed by any Governmental Body in writing. There are no pending or ongoing, and to the Knowledge of Privateer, threatened audits, assessments or other actions for or relating to any liability in respect of a material amount of Taxes of Privateer or any of its Subsidiaries. Neither Privateer nor any of its Subsidiaries (or any of their predecessors) has waived any statute of limitations in respect of any income or other material Taxes or agreed to any extension of time with respect to any income or other material Tax assessment or deficiency.

(f) Privateer has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

16

Table of Contents

(g) Neither Privateer nor any of its Subsidiaries is a party to any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement, or similar agreement or arrangement, other than customary commercial Contracts entered into in the Ordinary Course of Business the principal subject matter of which is not Taxes.

(h) Neither Privateer nor any of its Subsidiaries will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any Tax period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for Tax purposes filed on or prior to the Closing Date; (ii) use of an improper method of accounting for a Tax period ending on or prior to the Closing Date; (iii) "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) executed on or prior to the Closing Date; (iv) intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any similar provision of state, local or foreign Law) entered into on or prior to the Closing Date; (v) installment sale or open transaction disposition made on or prior to the Closing Date; (vi) prepaid amount received on or prior to the Closing Date; or (vii) election under Section 108(i) of the Code (or any similar provision of state, local or foreign Law) made on or prior to the Closing Date. Privateer has not made any election under Section 965(h) of the Code.

(i) Neither Privateer nor any of its Subsidiaries has ever been (i) a member of a consolidated, combined or unitary Tax group (other than a group of which Privateer is the common parent) or (ii) a party to any joint venture, partnership, or other arrangement that is treated as a partnership for U.S. federal income Tax purposes. Neither Privateer nor any of its Subsidiaries has any Liability for any material Taxes of any Person (other than Privateer and any of its Subsidiaries) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign Law), or as a transferee or successor.

(j) Since January 1, 2016, neither Privateer nor any of its Subsidiaries has distributed stock of another Person, or had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 of the Code or Section 361 of the Code (or any similar provisions of state, local or foreign Law).

(k) Neither Privateer nor any of its Subsidiaries (i) is a "controlled foreign corporation" as defined in Section 957 of the Code; (ii) is a "passive foreign investment company" within the meaning of Section 1297 of the Code; (iii) has ever had a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise had an office or fixed place of business in a country other than the country in which it is organized; (iv) is or was a "surrogate foreign corporation" within the meaning of Section 7874(a)(2)(B) or is treated as a U.S. corporation under Section 7874(b) of the Code; or (v) was created or organized in the U.S. such that such Entity would be taxable in the U.S. as a domestic Entity pursuant to the dual charter provision of Treasury Regulations Section 301.7701-5(a).

(l) Neither Privateer nor any of its Subsidiaries has participated in or been a party to a transaction that, as of the date of this Agreement, constitutes a "listed transaction" that is required to be reported to the IRS pursuant to Section 6011 of the Code and applicable Treasury Regulations thereunder.

(m) Neither Privateer nor any of its Subsidiaries has taken or agreed to take any action or has Knowledge of any fact that would reasonably be expected to prevent the Merger from qualifying for the Intended Tax Treatment.

For purposes of this Section 2.16, each reference to Privateer or any of its Subsidiaries shall be deemed to include any Person that was liquidated into, merged with, or is otherwise a predecessor to, Privateer or such Subsidiary, respectively.

17

Table of Contents

**2.17 Employee and Labor Matters; Benefit Plans.**

(a) Section 2.17(a) of the Privateer Disclosure Letter is a list of all material Privateer Benefit Plans. "*Privateer Benefit Plan*" means each (i) "employee benefit plan" as defined in Section 3(3) of ERISA and (ii) other pension, retirement, deferred compensation, excess benefit, profit sharing, bonus, incentive, equity or equity-based (other than individual Privateer Options made pursuant to Privateer's standard forms, in which case all forms that are representative standard forms of such stock option agreements as well as any material deviation therefrom shall be scheduled along with an indication of which options were granted pursuant to which forms), phantom equity, employment, offer letter, consulting, severance, change-of-control, retention, health, life, disability, group insurance, paid-time off, holiday, welfare and fringe benefit plan, program, agreement, contract, or arrangement (whether written or unwritten), in any case, maintained, contributed to, or required to be contributed to, by Privateer or any of its Subsidiaries for the benefit of any current or former employee, director, officer or independent contractor of Privateer or any of its Subsidiaries or under which Privateer or any of its Subsidiaries has any Liability.

(b) As of immediately prior to the Effective Time, Privateer and its Subsidiaries will have no independent contractors who are natural Persons or employees and will have no Liability with respect to any current or former employee, director, officer or independent contractor of Privateer or any of its current or former Subsidiaries and Privateer will sponsor no Privateer Benefit Plan and will have no further Liability with respect to any Privateer Benefit Plan.

(c) As applicable with respect to each Privateer Benefit Plan, Privateer has made available to Tilray, true and complete copies of (i) each Privateer Benefit Plan, including all amendments thereto, and in the case of an unwritten Privateer Benefit Plan, a written description thereof, (ii) all current material trust documents, investment management contracts, custodial agreements, administrative services agreements and insurance and annuity contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the most recently filed annual reports with any Governmental Body (*e.g.*, Form 5500 and all schedules thereto), (v) the most recent IRS determination, opinion or advisory letter, (vi) the most recent summary annual reports, nondiscrimination testing reports, actuarial reports, financial statements and trustee reports, and (vii) all records, notices and filings concerning IRS or Department of Labor or other Governmental Body audits or investigations, and all documents related to any "prohibited transactions" within the meaning of Section 406 of ERISA or Section 4975 of the Code.

(d) Each Privateer Benefit Plan has been maintained, operated and administered in compliance in all respects with its terms and any related documents or agreements and the applicable provisions of ERISA, the Code and all other Laws.

(e) Privateer Benefit Plans which are "employee pension benefit plans" within the meaning of Section 3(2) of ERISA and which are intended to meet the qualification requirements of Section 401(a) of the Code have received determination or opinion letters from the IRS on which they may currently rely to the effect that such plans are qualified under Section 401(a) of the Code.

(f) Neither Privateer, any of its Subsidiaries nor any Privateer ERISA Affiliate maintains, contributes to, is required to contribute to, or has any Liability with respect to, (i) any "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code, (ii) any "multiemployer plan" (within the meaning of Section 3(37) of ERISA), (iii) any "multiple employer plan" (within the meaning of Section 413 of the Code) or (iv) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA).

(g) There are no pending audits or investigations by any Governmental Body involving any Privateer Benefit Plan, and no pending or, to the Knowledge of Privateer, threatened claims (except for individual claims for benefits payable in the normal operation of Privateer Benefit Plans and appeals thereof), suits or proceedings involving any Privateer Benefit Plan.

18

11/19/2019                                                                S-4/A

Table of Contents

(h) Neither Privateer nor any of its Subsidiaries or Privateer ERISA Affiliates, nor to the Knowledge of Privateer, any fiduciary, trustee or administrator of any Privateer Benefit Plan, has engaged in, or in connection with the Contemplated Transactions will engage in, any transaction with respect to any Privateer Benefit Plan which would subject any such Privateer Benefit Plan, Privateer, any of its Subsidiaries or Privateer ERISA Affiliates or Tilray to a Tax, penalty or Liability for a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code.

(i) Neither the execution of, nor the performance of the Contemplated Transactions will either alone or in connection with any other event(s) (i) result in any payment becoming due to any current or former employee, director, officer, or independent contractor of Privateer or any of its Subsidiaries, (ii) increase any amount of compensation or benefits otherwise payable under any Privateer Benefit Plan, (iii) result in the acceleration of the time of payment, funding or vesting of any benefits under any Privateer Benefit Plan, (iv) require any contribution or payment to fund any obligation under any Privateer Benefit Plan or (v) limit the right to merge, amend or terminate any Privateer Benefit Plan.

(j) Neither the execution of, nor the consummation of the Contemplated Transactions (either alone or when combined with the occurrence of any other event, including without limitation, a termination of employment) will result in the receipt or retention by any person who is a "disqualified individual" (within the meaning of Code Section 280G) with respect to Privateer and its Subsidiaries of any payment or benefit that is or could be characterized as a "parachute payment" (within the meaning of Code Section 280G), determined without regard to the application of Code Section 280G(b)(5).

(k) The exercise price of each Privateer Option is not less than the fair market value of one share of Privateer Common Stock as of the grant date of such Privateer Option.

(l) No current or former employee, officer, director or independent contractor of Privateer or any of its Subsidiaries has any "gross up" agreements with Privateer or any of its Subsidiaries or other assurance of reimbursement by Privateer or any of its Subsidiaries for any Taxes imposed under Code Section 409A or Code Section 4999.

(m) No Privateer Benefit Plan is maintained outside of the United States and no employee of Privateer is employed outside the United States.

(n) Privateer has provided to Tilray a true and correct list, as of the date of this Agreement, containing the names of all full-time, part-time or temporary employees and independent contractors (and indication as such), and, as applicable: (i) the annual dollar amount of all compensation (including wages, salary or fees, commissions, director's fees, fringe benefits, bonuses, profit sharing payments, and other payments or benefits of any type) payable to each person; (ii) dates of employment or service; (iii) title; (iv) any eligibility to receive severance, retention payment, change of control payment, or other similar compensation; and (v) with respect to employees, a designation of whether they are classified as exempt or non-exempt for purposes of the Fair Labor Standards Act, as amended ("*FLSA*") and any similar state Law.

(o) Neither Privateer nor any of its Subsidiaries is or has ever been a party to, bound by, or has a duty to bargain under, any collective bargaining agreement or other Contract with a labor union, labor organization, or similar Person representing any of its employees, and there is no labor union, labor organization, or similar Person representing or, to the Knowledge of Privateer, purporting to represent or seeking to represent any employees of Privateer or its Subsidiaries, including through the filing of a petition for representation election. There is not and has not been in the past three years, nor is there or has there been in the past three years any threat of, any strike, slowdown, work stoppage, lockout, union election petition, demand for recognition, or any similar activity or dispute, or, to the Knowledge of Privateer, any union organizing activity, against Privateer or any of its Subsidiaries. No event has occurred, and no condition or circumstance exists, that might directly or indirectly be likely to give rise to or provide a basis for the commencement of any such strike, slowdown, work stoppage, lockout, union election petition, demand for recognition, any similar activity or dispute, or, to the Knowledge of Privateer, any union organizing activity.

19

11/19/2019                                                                                                                    S-4/A

Table of Contents

(p) Privateer and each of its current and former Subsidiaries is, and has at all times been, in compliance with all applicable Laws respecting labor, employment, employment practices, and terms and conditions of employment, including worker classification, discrimination, harassment and retaliation, equal employment opportunities, fair employment practices, meal and rest periods, immigration, employee safety and health, payment of wages (including overtime wages), unemployment and workers' compensation, leaves of absence, and hours of work. Except as would not result in a Liability to Privateer or any of its Subsidiaries, with respect to employees of Privateer and its Subsidiaries, each of Privateer and its Subsidiaries: (i) has withheld and reported all amounts required by Law or by agreement to be withheld and reported with respect to wages, salaries and other payments, benefits, or compensation to employees, (ii) is not liable for any arrears of wages (including overtime wages), severance pay or any Taxes or any penalty for failure to comply with any of the foregoing, and (iii) is not liable for any payment to any trust or other fund governed by or maintained by or on behalf of any Governmental Body, with respect to unemployment compensation benefits, disability, social security or other benefits or obligations for employees (other than routine payments to be made in the Ordinary Course of Business). There are no actions, suits, claims, charges, lawsuits, investigations, audits or administrative matters pending or, to the Knowledge of Privateer, threatened or reasonably anticipated against Privateer or any of its Subsidiaries relating to any employee, applicant for employment, consultant, employment agreement or Privateer Benefit Plan (other than routine claims for benefits with respect to the full amount of any such claim or threatened claim is fully covered by insurance, including with respect to costs and attorneys' fees).

(q) Except as would not result in a Liability to Privateer or any of its Subsidiaries, with respect to each individual who currently renders or in the past has rendered services to Privateer or any of its Subsidiaries, Privateer and each of its Subsidiaries has accurately classified each such individual as an employee, independent contractor, or otherwise under all applicable Laws and, for each individual classified as an employee, Privateer and each of its Subsidiaries has accurately classified him or her as exempt or non-exempt under all applicable Laws. Neither Privateer nor any of its Subsidiaries has any Liability with respect to any misclassification of: (i) any Person as an independent contractor rather than as an employee, (ii) any employee leased from another employer, or (iii) any employee currently or formerly classified as exempt under all applicable Laws.

(r) Within the preceding three years, Privateer has not implemented any "plant closing" or "mass layoff" of employees that would reasonably be expected to require notification under the WARN Act or any similar state or local Law, no such "plant closing" or "mass layoff" will be implemented before the Closing Date without advance notification to and approval of Tilray, and there has been no "employment loss" as defined by the WARN Act within the 90 days prior to the Closing Date.

(s) There is no Legal Proceeding, claim, unfair labor practice charge or compliant, labor dispute or grievance pending or, to the Knowledge of Privateer, threatened against Privateer or its Subsidiaries relating to labor, employment, employment practices, or terms and conditions of employment.

2.18 Environmental Matters. Privateer and each of its Subsidiaries have complied with all applicable Environmental Laws, which compliance includes the possession by Privateer of all permits and other Governmental Authorizations required under applicable Environmental Laws and compliance with the terms and conditions thereof, except for any failure to be in such compliance that, either individually or in the aggregate, would not reasonably be expected to be material to Privateer or its business. Neither Privateer nor any of its Subsidiaries has received since January 1, 2017 (or prior to that time, which is pending and unresolved), any written notice or other communication (in writing or otherwise), whether from a Governmental Body or other Person, that alleges that Privateer or any of its Subsidiaries is not in compliance with or has Liability pursuant to any Environmental Law and, to the Knowledge of Privateer, there are no circumstances that would reasonably be expected to prevent or interfere with Privateer's or any of its Subsidiaries' compliance in any material respects with any Environmental Law, except where such failure to comply would not reasonably be expected to have a Privateer Material Adverse Effect. No current or (during the time a prior property was leased or controlled by Privateer or any of its Subsidiaries) prior property leased or controlled by Privateer or any of its Subsidiaries has had a release of or exposure to Hazardous Materials in material violation of or as would result in any material

20

11/19/2019                                                        S-4/A

Table of Contents

Liability of Privateer or any of its Subsidiaries pursuant to Environmental Law. No Consent of or registration or filing with any Governmental Body is required by Environmental Laws in connection with the execution and delivery of this Agreement or the Contemplated Transactions. Prior to the date hereof, Privateer has provided or otherwise made available to Tilray true and correct copies of all material environmental reports, assessments, studies and audits in the possession or control of Privateer or any of its Subsidiaries with respect to any property leased or controlled by Privateer or any of its Subsidiaries or any business operated by them.

2.19 **Insurance**. Section 2.19 of the Privateer Disclosure Letter lists all of the insurance policies and all self-insurance programs and arrangements of Privateer and each of its Subsidiaries, as of the date of this Agreement, relating to the business, assets, liabilities and operations of Privateer and each of its Subsidiaries (the "***Insurance Policies***"; each, an "***Insurance Policy***"), complete and correct copies of which have been delivered and made available to Tilray. Each Insurance Policy is in full force and effect, all premiums due thereon have been paid in full, and Privateer and each of its Subsidiaries are in compliance in all material respects with the terms thereof. Other than customary end of policy notifications from insurance carriers, since January 1, 2017, neither Privateer nor any of its Subsidiaries has received any notice or other communication regarding any actual or possible: (i) cancellation or invalidation of any Insurance Policy; or (ii) refusal or denial of any coverage, reservation of rights or rejection of any material claim under any Insurance Policy. Privateer and each of its Subsidiaries have provided timely written notice to the appropriate insurance carrier(s) of each Legal Proceeding that is currently pending against Privateer or any of its Subsidiaries for which Privateer or such Subsidiary has insurance coverage, and no such carrier has issued a denial of coverage or a reservation of rights with respect to any such Legal Proceeding, or informed Privateer or any of its Subsidiaries of its intent to do so. There has not been any claim made against any Insurance Policy that has not been resolved. No Insurance Policy will terminate or lapse (or be affected in any other adverse manner) by reason of the Contemplated Transactions.

2.20 **No Financial Advisors**. No broker, finder or investment banker is entitled to any brokerage fee, finder's fee, opinion fee, success fee, transaction fee or other fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Privateer or any of its Subsidiaries.

2.21 **Disclosure**. The statements made, and information supplied, by Privateer and each of its Subsidiaries for inclusion or incorporation by reference in (a) the Proxy Statement (including the Privateer Financials) will not, as of the date of the Proxy Statement or as of the date such information is first mailed to Tilray's stockholders, or (b) the Registration Statement, at the time the Registration Statement is filed with the SEC, at any time it is amended or supplemented or at the time it is declared effective under the Securities Act, in each case, (x) contain any statement that is inaccurate or misleading with respect to any material facts, or (y) omit any material fact necessary in order to make such information, in light of the circumstances under which such statement is made or information provided, not false or misleading.

2.22 **Transactions with Affiliates**.

(a) Section 2.22(a) of the Privateer Disclosure Letter (i) describes any material transactions or relationships. since January 1, 2017, between, on one hand, between Privateer or any of its Subsidiaries and, on the other hand, any Related Party of Privateer or to the Knowledge of Privateer, any Immediate Family Member and (ii) identifies each Person who is (or who may be deemed to be) an Affiliate of Privateer as of the date of this Agreement. Except as would not be material to Privateer or its business, no Related Party of Privateer or any of its Subsidiaries, or to the Knowledge of Privateer, any Immediate Family Member: (a) owns or has owned, directly or indirectly, any equity or other financial or voting interest in any competitor, supplier, licensor, lessor, distributor, customer, independent contractor or licensor of Privateer or any of its Subsidiaries or their business; (b) owns or has owned, directly or indirectly, or has or has had any interest in any property (real or personal, tangible or intangible) that Privateer or any of its Subsidiaries uses or has used in or pertaining to the business of Privateer or any of its Subsidiaries; (c) has or has had any business dealings or a financial interest in any transaction with Privateer or any of its Subsidiaries or involving any assets or property of Privateer or any of its Subsidiaries, other than business dealings or transactions conducted in the Ordinary Course of Business consistent with past practice at prevailing market prices and on prevailing market terms; (d) licenses to or from

21

Table of Contents

Privateer or any of its Subsidiaries any Intellectual Property Rights or holds any Intellectual Property Rights, tangible or fixed assets or any other assets currently used or required by the Privateer or its Subsidiaries to carry on their businesses as currently conducted; (e) has any outstanding payment claims against Privateer or any of its Subsidiaries (including fees from licenses, services or products, whether for specific performance, damages or otherwise); (f) has any claims to enter into an agreement with, or to acquire from or dispose to Privateer or its Subsidiaries any Intellectual Property Rights, fixed or tangible assets or other assets or to license to or from Privateer or its Subsidiaries any Intellectual Property Rights; or (g) has made or, to the Knowledge of Privateer, threatened any alleged claims against Privateer or its Subsidiaries.

(b) Section 2.22(h) of the Privateer Disclosure Letter lists each stockholder agreement, voting agreement, registration rights agreement, voting trust, proxy, co-sale agreement, management rights agreement, or other similar Contract between Privateer and any holder of Equity Interests in Privateer, including any such Contract granting any Person investor rights, rights of first refusal, rights of first offer or negotiation, registration rights, director designation rights or similar rights (collectively, the "*Investor Agreements*").

(c) All of the Investor Agreements can be terminated by Privateer effective upon the Closing (regardless of any provisions therein providing for the survival of any obligations or Liability of Privateer or its Subsidiaries thereunder), and upon termination in accordance with Section 5.12 will be of no further force or effect, and none of the parties to any of the Investor Agreements will have any obligation or Liability to any other party thereunder. Upon such termination of each Investor Agreement, no party thereto will have any surviving rights, remedies or powers in relation to any failure on the part of any other party or any other Person to perform any duty or obligation under such Investor Agreement.

**2.23** **Anti-Bribery.** None of Privateer or any of its Subsidiaries or any of their respective directors, officers, employees, agents or any other Person acting on their behalf has directly or indirectly offered, promised, or paid anything of value, including but not limited to bribes, rebates, payoffs, influence payments, kickbacks, political or charitable contributions, cash, entertainment gifts, free goods or services, employment, or any other benefit, or taken any other action, in violation of the Foreign Corrupt Practices Act of 1977, the UK Bribery Act of 2010 or any other anti-bribery or anti-corruption Law, as amended, or any rules or regulations thereunder (collectively, the "*Anti-Bribery Laws*"). Neither Privateer nor any of its Subsidiaries is or has been the subject of any investigation or inquiry, whether internal or initiated by any third party or Governmental Body, with respect to potential violations of Anti-Bribery Laws in the past five years.

**2.24** **Disclaimer of Other Representations or Warranties.**

(a) Except as previously set forth in this Section 2 or in any certificate delivered by Privateer to Tilray and/or Merger Sub pursuant to this Agreement, Privateer makes no representation or warranty, express or implied, at law or in equity, with respect to it or any of its assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed.

(b) Privateer acknowledges and agrees that, except for the representations and warranties of Tilray and Merger Sub set forth in Section 3, neither Privateer nor any of its Representatives is relying on any other representation or warranty of Tilray or any other Person made outside of Section 3, including regarding the accuracy or completeness of any such other representations or warranties or the omission of any material information, whether express or implied, in each case, with respect to the Contemplated Transactions.

3.     **REPRESENTATIONS AND WARRANTIES OF TILRAY AND MERGER SUB**

Subject to Section 12.13(h), except (a) as set forth in the disclosure letter delivered by Tilray to Privateer (the "*Tilray Disclosure Letter*") or (b) as disclosed in the Tilray SEC Documents filed with or furnished to the SEC prior to the date hereof and publicly available on the SEC's Electronic Data Gathering Analysis and Retrieval system (but (i) without giving effect to any amendment thereof filed with or furnished to

22

11/19/2019                                                         S-4/A

Table of Contents

the SEC on or after the date hereof and (ii) excluding any disclosures contained under the heading "Risk Factors" and any disclosure of risks included in any "forward-looking statements" disclaimer or in any other section to the extent they are forward predictive or forward-looking in nature), Tilray and Merger Sub represent and warrant to Privateer as follows:

**3.1 Due Organization; No Subsidiaries.**

(a) Each of Tilray and Merger Sub is duly organized, validly existing and in good standing under the Laws of Delaware, and has all necessary organizational power and authority: (i) to conduct its business in the manner in which its business is currently being conducted; (ii) to own or lease and use its property and assets in the manner in which its property and assets are currently owned or leased and used; and (iii) to perform its obligations under all Contracts by which each is bound. Since the date of its formation, Merger Sub has not engaged in any activities other than activities incident to its formation or in connection with or as contemplated by this Agreement.

(b) Tilray is duly licensed and qualified to do business, and is in good standing (to the extent applicable in such jurisdiction), under the Laws of all jurisdictions where the nature of its business requires such licensing or qualification other than in jurisdictions where the failure to be so qualified individually or in the aggregate would not be reasonably expected to have a Tilray Material Adverse Effect.

**3.2 Organizational Documents.** Tilray has made available to Privateer accurate and complete copies of Tilray's and Merger Sub's Organizational Documents in effect as of the date of this Agreement. Neither Tilray nor Merger Sub is in material breach or violation of its respective Organizational Documents.

**3.3 Authority; Binding Nature of Agreement.**

(a) Each of Tilray and Merger Sub has all necessary organizational power and authority to enter into and to perform its obligations under this Agreement and, subject, with respect to Tilray, to receipt of the Required Tilray Stockholder Vote and, with respect to Merger Sub, the adoption of this Agreement by Tilray in its capacity as sole member of Merger Sub, to perform its obligations hereunder and to consummate the Contemplated Transactions. The Tilray Special Committee (at meetings duly called and held) has: (i) determined that the Contemplated Transactions are fair to, advisable and in the best interests of Tilray and its stockholders; (ii) authorized, approved and declared advisable this Agreement and the Contemplated Transactions, including the issuance of the Stock Merger Consideration to the Privateer Stockholders, the issuance of the Option Merger Consideration and the treatment of Privateer Options pursuant to this Agreement, and the adoption of the Amended and Restated Tilray Charter, provided that any Cash Merger Consideration or Aggregate Cash Option Consideration to be paid shall be subject to the subsequent approval and determination of the Tilray Board pursuant to Section 1.5(d); and (iii) determined to recommend, upon the terms and subject to the conditions set forth in this Agreement, that the stockholders of Tilray vote to approve the Tilray Stockholder Matters. Tilray in its capacity as sole member of Merger Sub has: (A) determined that the Contemplated Transactions are fair to, advisable, and in the best interests of Merger Sub and its sole member; (B) authorized, approved and declared advisable this Agreement and the Contemplated Transactions; and (C) upon the terms and subject to the conditions set forth in this Agreement, adopted this Agreement and thereby approved the Contemplated Transactions.

(b) This Agreement has been duly executed and delivered by each of Tilray and Merger Sub and, assuming the due authorization, execution and delivery by Privateer, constitutes the legal, valid and binding obligation of Tilray and Merger Sub, enforceable against each of Tilray and Merger Sub in accordance with its terms, subject to the Enforceability Exceptions.

**3.4 Vote Required.** (a) The affirmative vote of (i) a majority of the aggregate voting power of the votes cast at the Tilray Stockholders' Meeting and (ii) the holders of a majority of the outstanding shares of Tilray Class 1 Common Stock and Tilray Class 2 Common Stock, each voting separately as a class, are the only votes of the

23

Table of Contents

holders of any class or series of Tilray's capital stock necessary to approve the proposals in Section 5.3(a)(i) and (b) the affirmative vote of (i) a majority of the aggregate voting power of outstanding shares of Tilray Common Stock, and (ii) the holders of a majority of the voting power of the Tilray Class 1 Common Stock, voting together as a single class are the only votes of the holders of any class or series of Tilray's capital stock necessary to approve the proposals in Section 5.3(a)(ii) (the "**Required Tilray Stockholder Vote**").

3.5 <u>Non-Contravention; Consents</u>.

(a) Assuming the Enumerated Items have each been obtained, neither (x) the execution, delivery or performance of this Agreement by Tilray or Merger Sub, nor (y) the consummation of the Contemplated Transactions, will directly or indirectly (with or without notice or lapse of time):

(i) contravene, conflict with or result in a violation of any of the provisions of the Organizational Documents of Tilray or Merger Sub, except for any such conflicts, violations or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Tilray and Merger Sub to consummate the Contemplated Transactions;

(ii) contravene, conflict with or result in a material violation of, or give any Governmental Body or other Person the right to challenge, the Contemplated Transactions or to exercise any material remedy or obtain any material relief under, any Law or any order, writ, injunction, judgment or decree to which Tilray or Merger Sub, or any of the assets owned or used by Tilray or Merger Sub, is subject;

(iii) contravene, conflict with or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by Tilray, except for any such conflicts, violations or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Tilray and Merger Sub to consummate the Contemplated Transactions; or

(iv) contravene, conflict with or result in a violation or breach of, or result in a default (or an event that, with notice or lapse of time or both, would become a default or breach) under, any provision of any Tilray Contract, except for any such conflicts, violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Tilray and Merger Sub to consummate the Contemplated Transactions.

(b) Except for (i) any Consent set forth on Section 3.5 of the Tilray Disclosure Letter under any Tilray Contract, (ii) the Required Tilray Stockholder Vote, (iii) the filing of the Certificate of Merger with the Secretary of State of the State of Delaware pursuant to the DGCL and DLLCA, and (iv) such Consents, as may be required under applicable federal and state securities Laws, the HSR Act and all applicable foreign competition Laws, if any, and the Nasdaq rules (the foregoing, the "**Enumerated Items**"), Tilray is not and will not be required to make any filing with or give any notice to, or to obtain any Consent from, any Person in connection with (A) the execution, delivery or performance of this Agreement or (B) the consummation of the Contemplated Transactions, which if individually or in the aggregate were not given or obtained, would prevent or materially delay the ability of Tilray and Merger Sub to consummate the Contemplated Transactions. The Tilray Special Committee and the sole member of Merger Sub have taken and will take all actions necessary to ensure that the restrictions applicable to business combinations contained in Section 203 of the DGCL are, and will be, inapplicable to the execution, delivery and performance of this Agreement and to the consummation of the Contemplated Transactions. No other state Takeover Statute or similar Law applies or purports to apply to the Merger, this Agreement, or any of the other Contemplated Transactions.

3.6 <u>No Financial Advisors</u>. Other than Imperial Capital, LLC and Crowe LLP, no broker, finder or investment banker is entitled to any brokerage fee, finder's fee, opinion fee, success fee, transaction fee or other fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Tilray.

24

11/19/2019                                      S-4/A

Table of Contents

**3.7 Valid Issuance.** The Tilray Common Stock to be issued in the Merger will, when issued in accordance with the provisions of this Agreement, be validly issued, fully paid, and nonassessable.

**3.8 Opinion of Financial Advisor.** The Tilray Special Committee has received an opinion of Imperial Capital, LLC to the effect that, as of the date of such opinion and subject to the assumptions, qualifications, limitations and other matters set forth therein, that the Contemplated Transactions are fair, from a financial point of view, to Tilray and the stockholders thereof (other than the controlling stockholders of Tilray). It is agreed and understood that such opinion is for the benefit of the Tilray Special Committee and may not be relied upon by Privateer.

**3.9 Disclaimer of Other Representations or Warranties.**

(a) Except as previously set forth in this Section 3 or in any certificate delivered by Tilray or Merger Sub to Privateer pursuant to this Agreement, neither Tilray nor Merger Sub makes any representation or warranty, express or implied, at law or in equity, with respect to it or any of its assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed.

(b) Each of Tilray and Merger Sub acknowledges and agrees that, except for the representations and warranties of Privateer set forth in Section 2, none of Tilray, Merger Sub or any of their respective Representatives is relying on any other representation or warranty of Privateer or any other Person made outside of Section 2, including regarding the accuracy or completeness of any such other representations or warranties or the omission of any material information, whether express or implied, in each case, with respect to the Contemplated Transactions.

**4.     CERTAIN COVENANTS OF THE PARTIES**

**4.1 Operation of Privateer's Business.**

(a) Except as set forth on Section 4.1(a) of the Privateer Disclosure Letter, as expressly required under this Agreement, or as required by applicable Law, during the period commencing on the date of this Agreement and continuing until the earlier to occur of the termination of this Agreement pursuant to Section 9 and the Effective Time (the "*Pre-Closing Period*"), Privateer shall and shall cause each of its Subsidiaries to conduct its business and operations in the Ordinary Course of Business and in compliance in all material respects with all applicable Laws and the requirements of all Contracts to which Privateer or any of its Subsidiaries is a party or for which any of the assets of Privateer or its Subsidiaries is subject.

(b) Except as set forth on Section 4.1(b) of the Privateer Disclosure Letter, as expressly required under this Agreement, or as required by applicable Law, without limiting the generality or effective of the provisions of Section 4.1(a), during the Pre-Closing Period, Privateer shall not, and shall cause its Subsidiaries to not, directly or indirectly, do any of the following:

(i) declare, accrue, set aside or pay any dividend or make any other distribution in respect of any shares of its capital stock or repurchase, redeem or otherwise reacquire any shares of its capital stock or other securities (except for shares of Privateer Common Stock from terminated employees, directors or consultants of Privateer);

(ii) except pursuant to the valid exercise of Privateer Options that are outstanding on the date of this Agreement, in accordance with their terms as existing on the date of this Agreement, (A) sell, issue, grant, pledge, or otherwise dispose of, Encumber, or authorize any of the foregoing with respect to any Equity Interest, (B) modify, waive or amend terms, or the rights of any holder, of any outstanding Equity Interest (including to reduce or alter the consideration to be paid to Privateer upon the exercise of any Equity Interest), (C) grant any new Privateer Option, or (D) accelerate, amend or change the period of exercisability or vesting of any Privateer Option or similar right or authorize any cash payment in exchange for any Privateer Option or similar right, except as specifically authorized under this Agreement;

25

11/19/2019                                                                                        S-4/A

Table of Contents

(iii) except as required to give effect to anything in contemplation of the Closing, amend or otherwise change any of its or its Subsidiaries' Organizational Documents, or effect or be a party to any merger, consolidation, share exchange, business combination, recapitalization, reclassification, repurchase or redemption of shares, stock split, reverse stock split or similar transaction except for the Contemplated Transactions;

(iv) form any Subsidiary or acquire any Equity Interest in any other Entity or enter into a joint venture with any other Entity;

(v) (A) lend money to any Person, (B) incur or guarantee any Indebtedness, (C) assume, endorse, guarantee, or otherwise become responsible for (contingently or otherwise), the obligations of any Person, (D) make any loans, advances or capital contributions, (E) make any capital expenditures or commitments, or (F) enter into or amend any Contract with respect to any of the above;

(vi) other than as required by applicable Law or the terms of any Privateer Benefit Plan as in effect on the date of this Agreement and disclosed in Section 4.1(b)(vi) of the Privateer Disclosure Letter, (A) adopt, terminate, establish or enter into any Privateer Benefit Plan, (B) cause or permit any Privateer Benefit Plan to be amended in any material respect, (C) pay any bonus or make any profit-sharing or similar payment to, or increase the amount of the wages, salary, commissions, benefits or other compensation or remuneration payable to, any of its directors, officers, or employees, (D) increase or accelerate the compensation payable or to become payable (including bonus grants and retention payments) or increase or accelerate the vesting of any benefits provided, or pay or award any payment or benefit, to any of its directors, officers, employees or consultants, (E) increase the severance or change of control benefits offered to any current or new directors, officers, or employees, or (F) terminate or give notice of termination to any (x) officer or (y) employee whose annual base salary is or is expected to be more than $50,000 per year, other than any termination for cause;

(vii) recognize any labor union, labor organization, or similar Person, except as otherwise required by Law and after advance notice to Tilray;

(viii) acquire any material asset or property (including any real property, whether via acquisition or lease) or sell, lease or otherwise irrevocably dispose of any of its material assets or properties (including any real property and any right or interest in any Privateer Real Estate Leases), or grant any Encumbrance with respect to such assets or properties;

(ix) sell, assign, transfer, or otherwise dispose of, purchase or otherwise acquire or obtain, or grant or receive any license, sublicense or other rights under, any Intellectual Property Rights;

(x) make, change or revoke any material Tax election, fail to pay any income or other material Tax as such Tax becomes due and payable, file any amendment making any material change to any Tax Return, settle or compromise any income or other material Tax Liability, enter into any Tax allocation, sharing, indemnification or other similar agreement or arrangement (other than customary commercial contracts entered into in the Ordinary Course of Business, the principal subject matter of which is not Taxes), request or consent to any extension or waiver of any limitation period with respect to any claim or assessment for any income or other material Taxes (other than pursuant to an extension of time to file any Tax Return granted in the Ordinary Course of Business of not more than six months), or adopt or change any material accounting method in respect of Taxes;

(xi) enter into, amend, breach, or consent to the termination of any Privateer Material Contract, amend, modify, waive or consent to the termination of any of Privateer's or its Subsidiaries' rights under any Privateer Material Contract, or waive, release or consent to the termination of any claims or rights of material value to Privateer or any of its Subsidiaries under any Privateer Material Contract;

26

11/19/2019                                                   S-4/A

Table of Contents

(xii) other than the incurrence or payment of any Privateer Transaction Expenses, make any expenditures, incur any Liabilities or discharge or satisfy any Liabilities, in each case, in amounts that exceed $50,000 in the aggregate;

(xiii) other than as required by Law or GAAP, take any action to change accounting policies or procedures;

(xiv) initiate, settle, or take any action not required in connection with any Legal Proceeding;

(xv) terminate, cancel, amend, modify, allow to lapse or fail to renew any insurance coverage policy maintained by Privateer or any of its Subsidiaries that is not promptly replaced by a comparable amount of insurance coverage;

(xvi) file a petition in bankruptcy, make an assignment for the benefit of creditors or file a petition seeking reorganization or arrangement or other action under federal or state bankruptcy Laws; or

(xvii) agree, resolve or commit to do any of the foregoing.

**4.2 Access and Investigation.**

(a) During the Pre-Closing Period, upon reasonable notice, Tilray, on the one hand, and Privateer, on the other hand, shall and shall use commercially reasonable efforts to cause such Party's Representatives to: (i) provide the other Party and such other Party's Representatives with reasonable access during normal business hours to such Party's Representatives, personnel, property and assets and to all existing books, records, Tax Returns, work papers and other documents and information relating to such Party and its Subsidiaries; (ii) provide the other Party and such other Party's Representatives with such copies of the existing books, records, Tax Returns, work papers, product data, and other documents and information relating to such Party and its Subsidiaries, and with such additional financial, operating and other data and information regarding such Party and its Subsidiaries as the other Party may reasonably request; (iii) permit the other Party's officers and other employees to meet, upon reasonable notice and during normal business hours, with the chief financial officer and other officers and managers of such Party responsible for such Party's financial statements and the internal controls of such Party to discuss such matters as the other Party may deem necessary or appropriate; and (iv) make available to the other Party copies of unaudited financial statements, material operating and financial reports prepared for senior management or the board of directors of such Party, and any material notice, report or other document filed with or sent to or received from any Governmental Body in connection with the Contemplated Transactions. Any investigation conducted by either Tilray or Privateer pursuant to this Section 4.2 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the other Party.

(b) Notwithstanding the foregoing, either of Tilray or Privateer may restrict the foregoing access to the extent that any Law applicable to such Party requires such Party to restrict or prohibit access to any such properties or information, and Tilray and Privateer shall not be required to take any action under Section 4.2(a) which would constitute a waiver of the attorney-client privilege.

**4.3 Acquisition Proposals.**

(a) Notwithstanding anything contained in this Agreement to the contrary, prior to obtaining the Required Tilray Stockholder Vote, in response to a *bona fide* Acquisition Proposal by any Person, Tilray may: (i) provide information in response to a request therefor (including nonpublic information regarding Tilray or any of its Subsidiaries) to the Person who made such Acquisition Proposal and (ii) participate in any discussions or negotiations with any such Person regarding such Acquisition Proposal, in each case, if, and only if, prior to taking any action described in clauses (i) or (ii) above, the Tilray Board determines in good faith after consultation with its outside legal counsel that, (x) based on the information then available and after consultation

27

11/19/2019                                                                                    S-4/A

Table of Contents

with its financial advisor, such Acquisition Proposal either constitutes a Superior Offer or could reasonably be expected to result in a Superior Offer and (y) that the failure to take such action could be inconsistent with the fiduciary duties of the Tilray Board to the stockholders of Tilray under applicable Law.

(b) If Tilray or any Representative of Tilray receives an Acquisition Proposal or Acquisition Inquiry at any time during the Pre-Closing Period, then Tilray shall promptly (and in no event later than twenty-four (24) hours after Tilray becomes aware of such Acquisition Proposal or Acquisition Inquiry) advise Privateer orally and in writing of such Acquisition Proposal or Acquisition Inquiry (including the identity of the Person making or submitting such Acquisition Proposal or Acquisition Inquiry, and the material terms thereof). Tilray shall keep Privateer reasonably informed with respect to the status and material terms of any such Acquisition Proposal or Acquisition Inquiry and any material modification or proposed material modification thereto.

4.4 **Notification of Certain Matters**.

(a) During the Pre-Closing Period, Privateer shall promptly notify Tilray in writing and furnish copies of all relevant documents, if any of the following occurs: (i) any Privateer Material Adverse Effect, (ii) any notice or other communication is received from any Person alleging that the Consent of such Person is or may be required in connection with any of the Contemplated Transactions, (iii) any Legal Proceeding against or involving or otherwise affecting Privateer or its Subsidiaries is commenced, or, to the Knowledge of Privateer, threatened against Privateer or its Subsidiaries or any director or officer of Privateer or its Subsidiaries, (iv) Privateer becomes aware of any inaccuracy in any representation or warranty made by it in this Agreement, or (v) Privateer fails to comply with any covenant or obligation binding on it under this Agreement, in the case of (iv) and (v) that would reasonably be expected result in conditions set forth in Sections 6 or 7 to not be satisfied as of the time such representation or warranty shall have become inaccurate or as of the time of such breach. No notification given to Tilray pursuant to this Section 4.4(a) shall change, limit or otherwise affect any of the representations, warranties, covenants or obligations of Privateer or any of its Subsidiaries contained in this Agreement or Privateer Disclosure Letter for purposes of Sections 6 or 7, as applicable.

(b) During the Pre-Closing Period, Tilray shall promptly notify Privateer in writing and furnish copies of all relevant documents, if any of the following occurs: (i) any Tilray Material Adverse Effect, (ii) any notice or other communication is received from any Person alleging that the Consent of such Person is or may be required in connection with any of the Contemplated Transactions, (iii) any Legal Proceeding against or involving or otherwise affecting Tilray is commenced, or, to the Knowledge of Tilray, threatened against Tilray or any director or officer of Tilray, (iv) Tilray becomes aware of any inaccuracy in any representation or warranty made by it in this Agreement, or (v) Tilray or Merger Sub fail to comply with any covenant or obligation binding on Tilray or Merger Sub under this Agreement, in the case of (iv) and (v) that would reasonably be expected result in conditions set forth in Sections 6 or 8 to not be satisfied as of the time such representation or warranty shall have become inaccurate or as of the time of such breach. No notification given to Privateer pursuant to this Section 4.4(b) shall change, limit or otherwise affect any of the representations, warranties, covenants or obligations of Tilray or Merger Sub contained in this Agreement or the Tilray Disclosure Letter for purposes of Sections 6 or 8, as applicable.

4.5 **Payment and Discharge of Indebtedness**. Prior to the Closing, Privateer will pay in full (or caused to be paid in full) all Liabilities (including accounts payable and accrued expenses) and Indebtedness of Privateer that are outstanding prior to the Closing and would be included or reflected on a consolidated balance of Privateer and its Subsidiaries as of immediately prior to the Closing, including all amounts described in Section 2.9(a), (b) and (g) (but excluding up to $1 million of Privateer Transaction Expenses).

28

11/19/2019 S-4/A

Table of Contents

## 5. ADDITIONAL AGREEMENTS OF THE PARTIES

### 5.1 Registration Statement; Proxy Statement.

(a) As promptly as reasonably practicable after the date of this Agreement, Tilray shall cause to be prepared and filed with the SEC, the Registration Statement, in which the Proxy Statement will be included as a prospectus. Tilray shall use its reasonable best efforts to have the Registration Statement declared effective under the Securities Act as promptly as practicable after such filing. Privateer shall furnish, and shall require its Representatives to furnish, all information concerning itself and its Affiliates (excluding Tilray and Merger Sub) to Tilray, and provide such other assistance, as may be reasonably requested by Tilray in connection with the preparation, filing and distribution of the Proxy Statement and the Registration Statement. Privateer covenants and agrees that the information provided by Privateer or its Subsidiaries to Tilray for inclusion in the Proxy Statement (including Privateer Financials) will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make such information not misleading. Tilray makes no covenant, representation or warranty with respect to statements made in the Proxy Statement (and the letter to stockholders, notice of meeting and form of proxy included therewith), if any, based on information provided by Privateer or its Subsidiaries or any of their Representatives specifically for inclusion therein. Privateer makes no covenant, representation or warranty with respect to statements made in the Proxy Statement (and the letter to stockholders, notice of meeting and form of proxy included therewith), if any, other than with respect to the information provided by Privateer or its Subsidiaries or any of their Representatives for inclusion therein. Privateer and its legal counsel shall be given reasonable opportunity to review and comment on the Proxy Statement, including all amendments and supplements thereto, prior to the filing thereof with the SEC, and on the response to any comments of the SEC on the Proxy Statement, prior to the filing thereof with the SEC. Each of the Parties shall use commercially reasonable efforts to cause the Registration Statement and the Proxy Statement to comply with the applicable rules and regulations promulgated by the SEC, to respond promptly to any comments of the SEC or its staff and to have the Registration Statement declared effective under the Securities Act as promptly as practicable after it is filed with the SEC. Tilray shall use commercially reasonable efforts to cause the Proxy Statement to be mailed to Tilray's stockholders as promptly as practicable after the Registration Statement is declared effective under the Securities Act. Each Party shall promptly furnish to the other Party all information concerning such Party and such Party's Affiliates and such Party's stockholders that may be required or reasonably requested in connection with any action contemplated by this Section 5.1.

(b) Prior to the Effective Time, each of the Parties will also take all commercially reasonable actions (other than qualifying to do business in any jurisdiction in which it is not now so qualified) required to be taken under the applicable securities laws of each State in the United States in which any registered holder of Privateer Capital Stock has an address of record on the applicable record date for determining the holders of Privateer Capital Stock entitled to notice and to vote pursuant to Privateer Stockholder Written Consent.

(c) Privateer will use commercially reasonable efforts to cause to be delivered to Tilray a consent letter of Privateer's independent accounting firm (reasonably satisfactory in form and substance to Tilray), that is customary in scope and substance for consent letters delivered by independent public accountants in connection with registration statements similar to the Registration Statement, before each of the date on which the Registration Statement is (i) initially filed and (ii) becomes effective (but, in each case, dated no more than two Business Days prior to such date).

### 5.2 Privateer Information Statement; Stockholder Written Consent.

(a) Promptly after the Registration Statement shall have been declared effective under the Securities Act, and in any event no later than five Business Days thereafter, Privateer shall prepare, with the cooperation of Tilray, and commence mailing to its stockholders an information statement (the "*Information Statement*") to solicit the Privateer Stockholder Written Consent evidencing the Required Privateer Stockholder Vote for purposes of (i) adopting and approving this Agreement and the Contemplated Transactions, (ii) adopting and approving the Amended and Restated Privateer Charter, (iii) acknowledging that the approval given thereby is

29

Table of Contents

irrevocable and that such stockholder is aware of its rights to demand appraisal for its shares pursuant to Section 262 of the DGCL, a true and correct copy of which will be attached thereto, and that such stockholder has received and read a copy of Section 262 of the DGCL, (iv) acknowledging that by its approval of the Merger it is not entitled to appraisal rights with respect to its shares in connection with the Merger and thereby waives any rights to receive payment of the fair value of its capital stock under the DGCL, and (v) approving the Preferred Stock Conversion (collectively, the "***Privateer Stockholder Matters***"). Under no circumstances shall Privateer assert that any approval or consent is necessary by its stockholders to approve Privateer Stockholder Matters, other than the Required Privateer Stockholder Vote. All materials (including any amendments thereto) submitted to the Privateer Stockholders in accordance with this Section 5.2(a) shall be subject to Tilray's advance review and reasonable approval.

(b) Privateer covenants and agrees that the Information Statement, including any pro forma financial statements included therein, the letter to stockholders and the form of the Privateer Stockholder Written Consent included therewith, will not: (i) at the time that the Information Statement or any amendment or supplement thereto is first mailed to the Privateer Stockholders, (ii) at the time of receipt of the Required Privateer Stockholder Vote, and (iii) at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, Privateer makes no covenant, representation or warranty with respect to statements made in the Information Statement, the letter to the stockholders, or the form of the Privateer Stockholder Written Consent included therewith, if any, based on information furnished in writing by Tilray specifically for inclusion therein. Each of the Parties shall use commercially reasonable efforts to cause the Information Statement to comply with the applicable rules and regulations promulgated by the SEC in all material respects.

(c) Promptly following receipt of the Required Privateer Stockholder Vote, Privateer shall prepare and mail a notice (the "***Stockholder Notice***") to every stockholder of Privateer that did not execute the Privateer Stockholder Written Consent. The Stockholder Notice shall (i) be a statement to the effect that the Privateer Board unanimously determined that the Merger is advisable in accordance with Section 251(b) of the DGCL and in the best interests of the Privateer Stockholders and approved and adopted this Agreement, the Merger and the other Contemplated Transactions; (ii) provide the Privateer Stockholders to whom it is sent with notice of the actions taken in the Privateer Stockholder Written Consent, including the adoption and approval of this Agreement, the Merger and the other Contemplated Transactions in accordance with Section 228(e) of the DGCL, the Organizational Documents of Privateer; (iii) include a statement indicating that the Privateer Board intends for the drag-along provisions set forth in Section 5.8 of the Privateer Amended and Restated Investor Rights Agreement, dated July 24, 2017, to apply to the Contemplated Transactions; and (iv) include a description of the appraisal rights of Privateer Stockholders available under the DGCL, along with such other information as is required thereunder and pursuant to applicable Law. All materials (including any amendments thereto) submitted to the Privateer Stockholders in accordance with this Section 5.2(c) shall be subject to Tilray's advance review and reasonable approval.

(d) Privateer agrees that: (i) the Privateer Board shall unanimously declare the Merger advisable and recommend that the Privateer Stockholders vote to approve Privateer Stockholder Matters, (ii) the Privateer Board shall use reasonable best efforts to solicit such approval from each of the Privateer Stockholders within the time set forth in Section 5.2(a) (the recommendation of the Privateer Board that the Privateer Stockholders vote to adopt and approve this Agreement being referred to as the "***Privateer Board Recommendation***"); and (iii) the Privateer Board Recommendation shall not be withdrawn or modified (and the Privateer Board shall not publicly propose to withdraw or modify the Privateer Board Recommendation) in a manner adverse to Tilray, and no resolution by the Privateer Board or any committee thereof to withdraw or modify the Privateer Board Recommendation in a manner adverse to Tilray or to adopt, approve or recommend (or publicly propose to adopt, approve or recommend) any Acquisition Proposal shall be adopted or proposed.

30

Table of Contents

**5.3** Tilray Stockholders' Meeting.

(a) Promptly after the Registration Statement has been declared effective by the SEC under the Securities Act, Tilray shall take all action necessary under applicable Law to call, give notice of and hold a meeting of the holders of Tilray Common Stock for the purpose of seeking approval of:

(i) this Agreement, including the issuance of shares of Tilray Common Stock to the Privateer Stockholders in connection with the Contemplated Transactions and the change of control of Tilray resulting from the Merger pursuant to the Nasdaq rules; and

(ii) the Amended and Restated Tilray Charter; (the matters contemplated by the clauses 5.3(a)(i)– 5.3(a)(ii) are referred to as the "*Tilray Stockholder Matters*," and such meeting, the "*Tilray Stockholders' Meeting*").

(b) Tilray shall set a record date for Persons entitled to notice of, and to vote at, the Tilray Stockholders' Meeting, which shall be held as promptly as practicable after the Registration Statement is declared effective under the Securities Act. Notwithstanding anything to the contrary contained in this Agreement, Tilray may adjourn or postpone the Tilray Stockholders' Meeting: (i) to the extent necessary to ensure that any supplement or amendment to the Proxy Statement that is required by applicable Law (or in connection with the settlement of any applicable litigation) is timely provided to Tilray's stockholders; (ii) if as of the time for which the Tilray Stockholders' Meeting is originally scheduled there are insufficient shares of Tilray Common Stock represented (either in person or by proxy) to constitute a quorum necessary to conduct the business to be conducted at the Tilray Stockholders' Meeting; (iii) if additional time is reasonably required to solicit proxies in favor of the approval of the Tilray Stockholder Matters; or (iv) if a *bona fide* written Acquisition Proposal is submitted to Tilray within 10 Business Days of the Tilray Stockholders' Meeting (and not withdrawn), which Acquisition Proposal the Tilray Board determines in good faith, after consultation with its financial advisor and outside legal counsel, is, or could reasonably be expected to, result in a Superior Offer; *provided, however*, that the Tilray Stockholders' Meeting shall not be postponed or adjourned later than the date that is 10 Business Days after the date on which Tilray receives such Acquisition Proposal (the "*Initial Receipt Period*"); *provided* that in the event the Tilray Board reaffirms the Tilray Board Recommendation during the Initial Receipt Period, the Tilray Stockholders' Meeting may be postponed or adjourned to the date that is five Business Days after the date the Tilray Board reaffirms the Tilray Board Recommendation; *provided further* that in no event shall any such postponement or adjournment result in Tilray establishing a new record date for such meeting.

(c) Except to the extent permitted by Section 5.3(d): (i) the Tilray Board shall recommend that the Tilray stockholders vote to approve the Tilray Stockholder Matters at the Tilray Stockholders Meeting, (ii) the Proxy Statement shall include a statement to the effect that the Tilray Board recommends that the Tilray stockholders vote to approve the Tilray Stockholder Matters at the Tilray Stockholders Meeting (such determination and recommendation being referred to as the "*Tilray Board Recommendation*"); and (iii) the Tilray Board Recommendation shall not be withdrawn or modified (or proposed to be withdrawn or modified) in a manner adverse to Privateer (an "*Tilray Board Adverse Recommendation Change*").

(d) Notwithstanding anything to the contrary contained in this Agreement, at any time prior to the approval of Tilray Stockholder Matters by the Required Tilray Stockholder Vote, the Tilray Board may (A) effect, or cause Tilray to effect, as the case may be, a Tilray Board Adverse Recommendation Change, in the case of clauses (i) and (ii) below or (B) cause Tilray to terminate this Agreement pursuant to Section 9.1(h), in the case of clause (i) below:

(i) if, (A) after the date of this Agreement, a *bona fide* written Acquisition Proposal is made to Tilray and is not withdrawn; (B) the Tilray Board determines in its good faith judgment, after consulting with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes a Superior Offer; (C) the

31

Table of Contents

Tilray Board does not effect, or cause Tilray to effect, a Tilray Board Adverse Recommendation Change or cause Tilray to terminate this Agreement pursuant to Section 9.1(b) at any time within four Business Days (together with any subsequent shorter period as contemplated by clause (D) below (the "*Notice Period*")) after Privateer receives (1) written notice from Tilray that the Tilray Board has determined that such Acquisition Proposal is a Superior Offer and (2) a summary of the material terms and conditions of the Acquisition Proposal (provided, that a new notice shall be required with respect to each material modification to such offer (it being understood that any change in the purchase price or form of consideration in such offer shall be deemed a material modification) and a new Notice Period (of two Business Days) shall begin); (D) during the applicable Notice Period, if requested by Privateer, Tilray engages in good faith negotiations, and directs its financial advisors and outside legal advisors to, engage in good faith negotiations, with Privateer to amend this Agreement in such a manner that the competing Acquisition Proposal does not constitute a Superior Offer; (E) at the end of the applicable Notice Period, such Acquisition Proposal has not been withdrawn and constitutes a Superior Offer (taking into account any changes to the terms of this Agreement proposed by Privateer as a result of the negotiations required by clause (D) or otherwise); and (F) the Tilray Board determines in good faith, after having consulted with its financial advisor and outside legal counsel, that, in light of such Superior Offer, a failure to make a Tilray Board Adverse Recommendation Change could reasonably be expected to be inconsistent with the fiduciary duties of the Tilray Board to the stockholders of Tilray under applicable Law and such Acquisition Proposal constitutes a Superior Offer (taking into account (x) any modification to such offer and (y) any changes to the terms of this Agreement proposed by Privateer as a result of the negotiations required by clause (D) or otherwise); or

(ii) if other than in connection with or as a result of the making of an Acquisition Proposal with respect to Tilray or an Acquisition Inquiry with respect to Tilray, a material development, event, effect, state of facts or change in circumstances that was not known or reasonably foreseeable (or if known or reasonably foreseeable, the probability or magnitude of consequences of which were not known or reasonably foreseeable) occurs, arises or becomes known to the Tilray Board after the date of this Agreement and prior to the approval of the Tilray Stockholder Matters by the Required Tilray Stockholder Vote (such material development, event, effect, state of facts or change in circumstances being referred to as an "*Intervening Event*") (it being understood that that in no event shall the receipt, existence of or terms of an Acquisition Proposal with respect to Tilray or an Acquisition Inquiry with respect to Tilray or the consequences thereof constitute an Intervening Event): (A) the Tilray Board determines in its good faith judgment, after consulting with its financial advisor and outside legal counsel that an Intervening Event has occurred; (B) the Tilray Board does not effect, or cause Tilray to effect, a Tilray Board Adverse Recommendation Change at any time within four Business Days after Privateer receives written notice from Tilray that the Tilray Board has determined that an Intervening Event requires the Tilray Board to effect, or cause Tilray to effect, a Tilray Board Adverse Recommendation Change (provided that a new notice shall be required with respect to any change in circumstances and a new notice period of two Business Days shall begin); (C) during such applicable period, if requested by Privateer, Tilray engages in good faith negotiations, and directs its financial advisors and outside legal advisors to, engage in good faith negotiations, with Privateer to amend this Agreement in such a manner that obviates the need for the Tilray Board to effect, or cause Tilray to effect, a Tilray Board Adverse Recommendation Change as a result of such Intervening Event; and (D) the Tilray Board determines in good faith, after having consulted with its outside legal counsel, that, in light of such Intervening Event, a failure to make a Tilray Board Adverse Recommendation Change could reasonably be expected to be inconsistent with the fiduciary duties of the Tilray Board to Tilray's stockholders under applicable Law.

(e) (i) Nothing contained in this Section 5.3 will prohibit Tilray from taking and disclosing to its stockholders a position required by Rule 14e-2(a) or Rule 14d-9 promulgated under the Exchange Act and (ii) no disclosure that the Tilray Board may determine in good faith (after consultation with outside counsel) that it or Tilray, as applicable, is required to make under applicable Law will constitute a violation of this Agreement; *provided, however*, that in any event under clause (i) or (ii) the Tilray Board shall not make an Tilray Board Adverse Recommendation Change except in accordance with this Section 5.3. It is expressly understood and

32

11/19/2019                                                       S-4/A

Table of Contents

agreed by the Parties that a "stop, look and listen" or similar communication of the type contemplated by Rule 14d-9(f) of the Exchange Act shall not be deemed a Tilray Board Adverse Recommendation Change; *provided* that the Tilray Board expressly reaffirms the Tilray Board Recommendation within 10 Business Days of the public announcement of any applicable Acquisition Proposal.

**5.4 Regulatory Approvals.**

(a) Tilray and Privateer shall each promptly execute and file, or join in the execution and filing of, any application, notification, or other document that may be necessary in order to obtain the authorization, approval, expiration or termination of any waiting period or Consent of any Governmental Body that may be reasonably required or advisable in connection with the consummation of the Contemplated Transactions.

(b) Tilray and Privateer shall each use its commercially reasonable efforts to obtain all such authorizations, approvals, expirations or terminations of waiting periods, and Consents as promptly as possible after the execution of this Agreement, including the expiration or termination of the waiting period under the HSR Act, or under foreign competition Laws, with respect to the transactions contemplated by this Agreement. Without limiting the foregoing, to the extent not completed prior to the date hereof, Tilray and Privateer shall each use its commercially reasonable efforts to make, or cause to be made, all filings required of it or any of its respective Affiliates under the HSR Act and foreign competition Laws with respect to the transactions contemplated by this Agreement as promptly as reasonably practicable, and in any event shall file a Notification and Report Form pursuant to the HSR Act 10 Business Days after the execution of this Agreement, and any other filing or notification required pursuant to any foreign competition Law within 10 Business Days after the execution of this Agreement. Tilray and Privateer shall furnish promptly to the Federal Trade Commission (the "**FTC**"), the Antitrust Division of the United States Department of Justice and any other requesting governmental authority additional information reasonably requested pursuant to the HSR Act or any foreign competition Laws in connection with such filings.

(c) Tilray and Privateer shall each use its commercially reasonable efforts to resolve objections, if any, as may be asserted by any Governmental Body with respect to the Contemplated Transactions under any applicable antitrust Laws, including responding promptly to and complying with any requests for information relating to this Agreement or any initial filings required under the HSR Act, and any other additional filings ("**Merger Notification Filings**") from any Governmental Body charged with enforcing, applying, administering or investigating any antitrust Laws.

(d) Notwithstanding anything to the contrary herein, (i) Tilray shall not have any obligation to litigate or contest any such Legal Proceeding or order resulting therefrom and (ii) Tilray shall not be under an obligation to make proposals, execute or carry out agreements or submit to orders providing for (A) the sale, license, divestiture, or other disposition or holding separate of any assets of Tilray or any of its respective Affiliates, (B) the imposition of any limitation or restriction on the ability of Tilray or any of its respective Affiliates to freely conduct its business, or (C) any limitation or regulation on the ability of Tilray or any of its Affiliates to exercise full rights of ownership of Privateer.

**5.5 Stock Option Matters.**

(a) At the Effective Time, Tilray shall assume the Privateer Plan.

(b) At the Effective Time, each Privateer Class 1 Option (x) that is not a Terminating Privateer Option and (y) that is outstanding and unexercised immediately prior to the Effective Time under the Privateer Plan, whether or not vested, shall be (i) converted into and become an option to purchase Tilray Class 2 Common Stock (the "**Class 1 Tilray Options**"), and Tilray shall assume each such Privateer Class 1 Option in accordance with the terms of the Privateer Plan (as in effect as of the date of this Agreement) and the terms of the stock option agreement by which such Privateer Class 1 Option is evidenced; or (ii) cancelled and, pursuant to Section 1.5(d), converted into a right to receive a portion of the Cash Merger Consideration, if applicable, as

33

11/19/2019                                                                                                                   S-4/A

Table of Contents

calculated in accordance with the Cash-Out Options Allocation and as set forth on the Allocation Certificate. All rights with respect to Privateer Class 1 Common Stock under such Privateer Class 1 Options assumed by Tilray shall thereupon be converted into rights with respect to Tilray Class 2 Common Stock. Accordingly, from and after the Effective Time: (i) each such Privateer Class 1 Option assumed by Tilray may be exercised solely for shares of Tilray Class 2 Common Stock; (ii) the number of shares of Tilray Class 2 Common Stock subject to each such Privateer Class 1 Option assumed by Tilray shall be determined by *multiplying* (A) the number of shares of Privateer Class 1 Common Stock that were subject to such Privateer Option, as in effect immediately prior to the Effective Time, *by* (B) the Option Exchange Ratio, rounding the resulting number down to the nearest whole number of shares of Tilray Class 2 Common Stock; (iii) the per share exercise price for the Tilray Class 2 Common Stock issuable upon exercise of each such Privateer Class 1 Option assumed by Tilray shall be determined by dividing (A) the per share exercise price of Privateer Class 1 Common Stock subject to such Privateer Class 1 Option, as in effect immediately prior to the Effective Time, by (B) the Option Exchange Ratio and rounding the resulting exercise price up to the nearest whole cent; and (iv) any restriction on the exercise of any Privateer Class 1 Option assumed by Tilray shall continue in full force and effect and the term, exercisability, and vesting schedule of such Privateer Class 1 Option shall otherwise remain unchanged. Notwithstanding anything to the contrary in this <u>Section 5.5(b)</u>, the exercisability of each such Privateer Class 1 Option assumed by Tilray shall be conditioned on the holder thereof having first properly delivered a duly executed Option Assumption Agreement in form and substance reasonably satisfactory to Tilray (the "***Option Assumption Agreement***") and such other documents as may be reasonably required by Tilray. Notwithstanding anything to the contrary in this <u>Section 5.5(b)</u>, the conversion of each such Privateer Class 1 Option (regardless of whether such option qualifies as an "incentive stock option" within the meaning of Section 422 of the Code) into an option to purchase shares of Tilray Class 2 Common Stock shall be made in a manner intended to be consistent with Treasury Regulation Section 1.424-1, such that the conversion of a Privateer Class 1 Option shall be intended to not constitute a "modification" of such Privateer Class 1 Option for purposes of Section 409A or Section 424 of the Code.

(c) At the Effective Time, each Privateer Class 3 Option (x) that is not a Terminating Privateer Option and (y) that is outstanding and unexercised immediately prior to the Effective Time under the Privateer Plan, whether or not vested, shall be (i) converted into and become an option to purchase Tilray Class 2 Common Stock (the "***Class 3 Tilray Options***" and, together with the Class 1 Tilray Options, the "***Tilray Options***"), and each such Privateer Class 3 Option in accordance with the terms (as in effect as of the date of this Agreement) of the Privateer Plan and the terms of the stock option agreement by which such Privateer Class 3 Option is evidenced; or (ii) cancelled and, pursuant to <u>Section 1.5(d)</u>, converted into a right to receive a portion of the Cash Merger Consideration, if applicable, as calculated in accordance with the Cash-Out Options Allocation and as set forth on the Allocation Certificate. All rights with respect to Privateer Common Stock under such Privateer Class 3 Options assumed by Tilray shall thereupon be converted into rights with respect to Tilray Class 2 Common Stock. Accordingly, from and after the Effective Time: (i) each such Privateer Class 3 Option assumed by Tilray may be exercised solely for shares of Tilray Class 2 Common Stock; (ii) the number of shares of Tilray Class 2 Common Stock subject to each such Privateer Class 3 Option assumed by Tilray shall be determined by *multiplying* (A) the number of shares of Privateer Common Stock that were subject to such Privateer Class 3 Option, as in effect immediately prior to the Effective Time, *by* (B) the Option Exchange Ratio, rounding the resulting number down to the nearest whole number of shares of Tilray Class 2 Common Stock; (iii) the per share exercise price for the Tilray Class 2 Common Stock issuable upon exercise of each such Privateer Class 3 Option assumed by Tilray shall be determined by *dividing* (A) the per share exercise price of Privateer Common Stock subject to such Privateer Class 3 Option, as in effect immediately prior to the Effective Time, *by* (B) the Option Exchange Ratio and rounding the resulting exercise price up to the nearest whole cent; and (iv) any restriction on the exercise of any Privateer Class 3 Option assumed by Tilray shall continue in full force and effect and the term, exercisability, and vesting schedule of such Privateer Class 3 Option shall otherwise remain unchanged. Notwithstanding anything to the contrary in this <u>Section 5.5(c)</u>, the exercisability of each such Privateer Class 3 Option assumed by Tilray shall be conditioned on the holder thereof having first properly delivered a duly executed Option Assumption Agreement and such other documents as may be reasonably required by Tilray. Notwithstanding anything to the contrary in this <u>Section 5.5(c)</u>, the conversion of each such Privateer Class 3

34

11/19/2019                                                                                                    S-4/A

Table of Contents

Option (regardless of whether such option qualifies as an "incentive stock option" within the meaning of Section 422 of the Code) into an option to purchase shares of Tilray Class 2 Common Stock shall be made in a manner intended to be consistent with Treasury Regulation Section 1.424-1, such that the conversion of a Privateer Class 3 Option shall be intended to not constitute a "modification" of such Privateer Class 3 Option for purposes of Section 409A or Section 424 of the Code.

(d) If the Tilray Board elects to pay Cash Merger Consideration pursuant to Section 1.5(d) such that a holder of Privateer Service Provider Options is entitled to a payment of Individual Option Cash Consideration as provided for in Section 5.5(b) and Section 5.5(c) above, then (i) any such Individual Option Cash Consideration shall be paid to the holders of the applicable Privateer Service Provider Options thereof pursuant to Tilray's standard payroll procedures as soon as practicable after the Closing; and (ii) any such payments of Individual Option Cash Consideration to a holder of Privateer Service Provider Options shall be subject to and made net of all applicable withholding and deductions. Prior to the Effective Time, Privateer shall cause its management company to pay to Tilray any employer's share of any employment or payroll-related Taxes with respect to the Individual Option Cash Consideration (whether incurred by Tilray or Privateer).

(e) At least 10 Business Days prior to the Closing, but subject to the occurrence of, the Effective Time, Privateer shall provide notification as to whether it has elected to effect the cancellation and termination of each Privateer Option with a per share exercise price that is equal to or greater than $27.00 (each, a "**Terminating Privateer Option**"), and in consideration of such cancellation and termination each applicable holder thereof shall be entitled to receive one-half of a share of Privateer Class 1 Common Stock or Privateer Class 3 Common Stock, as applicable, for each share of Privateer Common Stock subject to such Terminating Privateer Option (rounded down to the nearest whole share) (such number of shares of Privateer Common Stock, in the aggregate, the **Terminating Privateer Option Consideration**). The cancellation of each Terminating Privateer Option shall be conditioned on the holder thereof having first properly delivered a duly executed option cancellation agreement in form and substance reasonably satisfactory to Tilray. The Terminating Privateer Option Consideration shall be paid to the holders of Terminating Privateer Options effective as of immediately prior to the Effective Time and shares of Privateer Common Stock included in the Terminating Privateer Option Consideration shall be deemed to be outstanding as of the Effective Time, and eligible for treatment in connection with the Merger as described herein. In addition, the Terminating Privateer Option Consideration, shall be subject to and made net of all applicable withholding and deductions, and Privateer, in its sole discretion, may elect to satisfy any such withholding obligations by withholding shares of Privateer Common Stock that would otherwise be issued to holders of Terminating Privateer Options under this section. Privateer acknowledges and agrees that the cancellation of the Terminating Privateer Options shall be effected in accordance with the Privateer Plan and applicable Laws.

(f) Prior to the Effective Time, Privateer shall take all actions that may be necessary or as may be reasonably requested by Tilray (under the Privateer Plan and otherwise) to effectuate the provisions of this Section 5.5 and to ensure that, from and after the Effective Time, holders of Privateer Options have no rights with respect thereto other than those specifically provided in this Section 5.5.

**5.6 Indemnification of Officers and Directors.**

(a) From the Effective Time through the sixth anniversary of the date on which the Effective Time occurs, each of Tilray and the Surviving Company shall indemnify and hold harmless each person who is now, or has been at any time prior to the date hereof, or who becomes prior to the Effective Time, a director or officer of Tilray or Privateer and their respective Subsidiaries, respectively (the "**D&O Indemnified Parties**"), against all claims, losses, liabilities, damages, judgments, fines and reasonable fees, costs and expenses, including attorneys' fees and disbursements (collectively, "**Costs**"), incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to the fact that the D&O Indemnified Party is or was a director or officer of Tilray or of Privateer, whether asserted or claimed prior to, at or after the Effective Time, in each case, to the fullest extent permitted under applicable Law. Each

35

Table of Contents

D&O Indemnified Party will be entitled to advancement of expenses incurred in the defense of any such claim, action, suit, proceeding or investigation from each of Tilray and the Surviving Company, jointly and severally, upon receipt by Tilray or the Surviving Company from the D&O Indemnified Party of a request therefor; *provided* that any such person to whom expenses are advanced provides an undertaking to Tilray, to the extent then required by the DGCL, to repay such advances if it is ultimately determined that such person is not entitled to indemnification.

(b) The provisions of the certificate of incorporation and bylaws of Tilray with respect to indemnification, advancement of expenses and exculpation of present and former directors and officers of Tilray that are presently set forth in the certificate of incorporation and bylaws of Tilray shall not be amended, modified or repealed for a period of six years from the Effective Time in a manner that would adversely affect the rights thereunder of individuals who, at or prior to the Effective Time, were officers or directors of Tilray. The Organizational Documents of the Surviving Company shall contain, and Tilray shall cause the Organizational Documents of the Surviving Company to so contain, provisions no less favorable with respect to indemnification, advancement of expenses and exculpation of present and former managers and officers as those presently set forth in the certificate of incorporation and bylaws of Tilray.

(c) From and after the Effective Time, (i) the Surviving Company shall fulfill and honor in all respects the obligations of Privateer to its D&O Indemnified Parties as of immediately prior to the Closing pursuant to any indemnification provisions under Privateer's Organizational Documents and pursuant to any indemnification agreements between Privateer and such D&O Indemnified Parties, with respect to claims arising out of matters occurring at or prior to the Effective Time and (ii) Tilray shall fulfill and honor in all respects the obligations of Tilray to its D&O Indemnified Parties as of immediately prior to the Closing pursuant to any indemnification provisions under Tilray's Organizational Documents and pursuant to any indemnification agreements between Tilray and such D&O Indemnified Parties, with respect to claims arising out of matters occurring at or prior to the Effective Time.

(d) From and after the Effective Time, Tilray shall maintain directors' and officers' liability insurance policies, with an effective date as of the Closing Date, on commercially available terms and conditions and with coverage limits no less favorable to Tilray than in effect as of the date of this Agreement (provided, that Tilray may substitute therefor policies of at least the same coverage containing terms and conditions which are no less advantageous). In addition, Privateer shall purchase, prior to the Effective Time, a six year prepaid "tail policy" for the non-cancellable extension of the directors' and officers' liability coverage of Privateer's existing directors' and officers' insurance policies for a claims reporting or discovery period of at least six years from and after the Effective Time with respect to any claim related to any period of time at or prior to the Effective Time (the "*Privateer D&O Tail Policy*").

(e) From and after the Effective Time, Tilray shall pay all expenses, including reasonable attorneys' fees, that are incurred by the persons referred to in this Section 5.6 in connection with their successful enforcement of the rights provided to such persons in this Section 5.6.

(f) The provisions of this Section 5.6 are intended to be in addition to the rights otherwise available to the current and former officers and directors of Tilray and Privateer by Law, charter, statute, bylaw or agreement, and shall operate for the benefit of, and shall be enforceable by, each of the D&O Indemnified Parties, their heirs and their representatives.

(g) In the event Tilray or the Surviving Company or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving Entity of such consolidation or merger, or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of Tilray or the Surviving Company, as the case may be, shall succeed to the obligations set forth in this Section 5.6. Tilray shall cause the Surviving Company to perform all of the obligations of the Surviving Company under this Section 5.6.

36

11/19/2019                                                                S-4/A

Table of Contents

**5.7 Additional Agreements.** The Parties shall use commercially reasonable efforts to cause to be taken all actions necessary to consummate the Contemplated Transactions. Without limiting the generality of the foregoing, each Party to this Agreement: (a) shall as promptly as practicable make all filings and other submissions (if any) and give all notices (if any) required to be made and given by such Party in connection with the Contemplated Transactions; (b) shall use reasonable best efforts to obtain each Consent (if any) reasonably required to be obtained (pursuant to any applicable Law or Contract, or otherwise) by such Party in connection with the Contemplated Transactions or for such Contract (with respect to Contracts set forth in Section 5.7 of the Privateer Disclosure Letter) to remain in full force and effect; (c) shall use commercially reasonable efforts to lift any injunction prohibiting, or any other legal bar to, the Contemplated Transactions; and (d) shall use commercially reasonable efforts to satisfy the conditions precedent to the consummation of this Agreement.

**5.8 Disclosure.** The initial press release relating to this Agreement shall be a joint press release issued by Privateer and Tilray and thereafter Tilray and Privateer shall consult with each other before issuing any further press release(s) or otherwise making any public statement or making any announcement to Tilray Associates or Privateer Associates (to the extent not previously issued or made in accordance with this Agreement) with respect to the Contemplated Transactions and shall not issue any such press release, public statement or announcement to Tilray Associates or Privateer Associates without the other Party's written consent (which shall not be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, (a) each Party may, without such consultation or consent, make any public statement in response to questions from the press, analysts, investors or those attending industry conferences, make internal announcements to employees and make disclosures in Tilray SEC Documents, so long as such statements are consistent with previous press releases, public disclosures or public statements made jointly by the Parties (or individually, if approved by the other Party), and (b) a Party may, without the prior consent of the other Parties hereto but subject to giving advance notice to the other Parties, issue any such press release or make any such public announcement or statement as may be required by any Law, court process or by obligations pursuant to any listing agreement with or listing rules of Nasdaq or any other national securities exchange or national securities quotation system, in which case, if reasonably practicable, the Party proposing to issue such press release or make such public announcement or statement shall use its commercially reasonable efforts to consult in good faith with the other Parties before making issuing any such press release or making such public announcement or statement.

**5.9 Listing.** Tilray shall use its commercially reasonable efforts, (a) to maintain its existing listing on Nasdaq until the Effective Time, (b) to the extent required by the rules and regulations of Nasdaq, to prepare and submit to Nasdaq a notification form for the listing of the shares of Tilray Class 2 Common Stock to be issued in connection with the Contemplated Transactions, and to cause such shares to be approved for listing (subject to official notice of issuance); and (c) to the extent required by Nasdaq Marketplace Rule 5110, to file an initial listing application for the Tilray Class 2 Common Stock on Nasdaq (the "**Nasdaq Listing Application**") and to cause such Nasdaq Listing Application to be conditionally approved prior to the Effective Time. The Parties will use commercially reasonable efforts to coordinate with respect to compliance with Nasdaq rules and regulations. Each Party will promptly inform the other Party of all verbal or written communications between Nasdaq and such Party or its representatives. Tilray and Privateer agree to evenly split all Nasdaq fees associated with the Nasdaq Listing Application, if any (the "**Nasdaq Fees**"). Privateer will cooperate with Tilray as reasonably requested by Tilray with respect to the Nasdaq Listing Application and promptly furnish to Tilray all information concerning Privateer and its stockholders that may be required or reasonably requested in connection with any action contemplated by this Section 5.9.

**5.10 Tax Matters.**

(a) For United States federal income Tax purposes, (i) the Parties intend that the Merger qualify as a "reorganization" within the meaning of Section 368(a) of the Code (the "**Intended Tax Treatment**"), and (ii) this Agreement is intended to be, and is hereby adopted as, a "plan of reorganization" for purposes of Section 354 and 361 of the Code and Treasury Regulations Section 1.368-2(g) and 1.368-3(a), to which the Tilray, Merger Sub and Privateer are parties under Section 368(b) of the Code. The Parties shall treat and shall not take any tax

37

11/19/2019                                                          S-4/A

Table of Contents

reporting position inconsistent with the treatment of the Merger as a reorganization within the meaning of Section 368(a) of the Code for U.S. federal, state and other relevant Tax purposes, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code.

(b) The Parties shall use their respective reasonable best efforts to cause the Merger to qualify, and will not take any action or cause any action to be taken which action would reasonably be expected to prevent the Merger from qualifying, for the Intended Tax Treatment.

(c) Each of the Parties shall use its reasonable best efforts to obtain (i) the Tilray Registration Statement Tax Opinion, (ii) Privateer Registration Statement Tax Opinion, (iii) the Tilray Closing Tax Opinion and (iv) Privateer Closing Tax Opinion, including (A) delivering to Cooley LLP ("*Cooley*") and Paul Hastings LLP ("*Paul Hastings*") prior to the filing of the Registration Statement, tax representation letters substantially in the forms set forth in **Schedule C-1** (the "*Privateer Tax Representation Letter*") and **Schedule D-1** (the "*Tilray Tax Representation Letter*"), respectively, and (B) delivering to Cooley and Paul Hastings, dated and executed as of the dates of such Tax opinions, the Privateer Tax Representation Letter and the Tilray Tax Representation Letter. Each of the Parties shall use its reasonable best efforts not to, and not permit any Affiliate to, take or cause to be taken any action that would cause to be untrue (or fail to take or cause not to be taken any action which inaction would cause to be untrue) any of the representations and covenants made to counsel in the tax representation letters described in this Section 5.10(c).

(d) The Stockholder Representative shall, at its expense, file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to Privateer and its Subsidiaries with respect to any Pre-Closing Tax Period and shall pay (or cause to be paid) any Taxes due in respect of such Tax Returns. All such Tax Returns shall be prepared in a manner consistent with prior practice except as otherwise required by Law. All such Tax Returns shall be provided to Tilray for review no later than 20 calendar days prior to their due date (including any extensions) for Tilray's review, and Tilray shall have the right to comment on such returns no later than 10 calendar days prior to their due date (including any extensions); any such comments shall be considered in good faith by the Stockholder Representative. Tilray shall, at its expense, file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to Privateer and its Subsidiaries for all other Tax periods and shall pay (or cause to be paid) any Taxes due in respect of such Tax Returns. To the extent permitted or required by applicable Law, the taxable year of each of Privateer and its Subsidiaries that includes the Closing Date shall be treated as closing on (and including) the Closing Date.

(e) To the extent it is necessary for purposes of this Agreement to determine the allocation of Taxes among any Straddle Period, the portion of any such Taxes attributable to the period up to and including the Closing Date shall be (i) in the case of Taxes that are either (A) based upon or related to income or receipts, or (B) imposed in connection with any sale of property, deemed equal to the amount that would be payable if the Tax period of Privateer or the applicable Subsidiary ended with (and included) the Closing Date; *provided* that, exemptions, allowances or deductions that are calculated on an annual basis shall be allocated between the period ending on and including the Closing Date and the period beginning after the Closing Date in proportion to the number of days in each period, and (ii) in the case of Taxes that are imposed on a periodic basis with respect to the assets or capital of any of Privateer or a Subsidiary, deemed to be the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the period ending on and including the Closing Date and the denominator of which is the number of days in the entire period.

(f) If after the Closing Date, Tilray, Privateer or any of their Affiliates receives a refund of any Tax of Privateer or any of its Subsidiaries attributable to a Pre-Closing Tax Period (whether received in cash or as a credit against other Taxes), Tilray shall pay to the Privateer Stockholders within 15 calendar days after such receipt an amount equal to such refund, together with any interest received or credited thereon, regardless of the nature of or reason for the refund.

38

11/19/2019                                                          S-4/A

Table of Contents

(g) The Privateer Stockholders shall be responsible for all Transfer Taxes incurred in connection with the Merger. Any Transfer Tax described in the preceding sentence shall be paid to the relevant Tax authority when due by the Privateer Stockholders, and shall their own expense, timely file any Tax Return or other document with respect to such Transfer Tax.

5.11 **Legends**. Tilray shall be entitled to place appropriate legends on the book entries and/or certificates evidencing any shares of Tilray Common Stock (a) to be received in the Merger by equity holders of Privateer who may be considered "affiliates" of Tilray for purposes of Rules 144 and 145 under the Securities Act reflecting the restrictions set forth in Rules 144 and 145 and (b) subject to the Lock-up Provisions and, in each case, to issue appropriate stop transfer instructions to the transfer agent for such Tilray Common Stock.

5.12 **Termination of Certain Agreements and Rights**. Privateer shall terminate or shall cause to be terminated any Investor Agreements prior to the Effective Time, without any surviving obligation or Liability on any Person such that no party thereto will have any surviving rights, remedies or powers in relation to any failure on the part of any other party or any other Person to perform any duty or obligation under such Investor Agreement.

5.13 **Section 16 Matters**. Provided that Privateer delivers to Tilray, in a timely fashion, all requisite information necessary for Tilray and Merger Sub to take the actions contemplated by this Section 5.13, Tilray and Privateer shall, prior to the Effective Time, take all such steps as may be required (to the extent permitted under applicable Laws) to cause any acquisitions of Tilray Common Stock, restricted stock awards to acquire Tilray Common Stock, and any options to purchase Tilray Common Stock in connection with the Contemplated Transactions, by each individual who is reasonably expected to become subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to Tilray immediately prior to the Effective Time, to be exempt under Rule 16b-3 promulgated under the Exchange Act.

5.14 **Further Assurances**. Each Party agrees to execute and deliver such further documents, certificates, agreements and instruments and to take such other actions as may be reasonably requested by the other Party to evidence or reflect the Contemplated Transactions and to carry out the intent and purposes of this Agreement.

5.15 **Allocation Certificate**. Privateer shall prepare and deliver to Tilray at least five Business Days prior to the Closing Date a certificate signed by the Chief Financial Officer of Privateer in a form reasonably acceptable to Tilray (the "**Allocation Certificate**") setting forth (as of immediately prior to the Effective Time) (i) each holder of Privateer Common Stock and Privateer Options; (ii) such holder's name; (iii) the number and type of Privateer Common Stock held and/or underlying Privateer Options as of the immediately prior to the Effective Time for each such holder; (iv) the number and type of shares of Tilray Common Stock to be issued to such holder, or to underlie any Tilray Option to be issued to such holder, pursuant to this Agreement and calculated in accordance with the Privateer Allocation in respect of Privateer Common Stock or in accordance with Section 5.5(d) in respect of Privateer Options held by such holder as of immediately prior to the Effective Time, (v) the cash dollar amount (rounded to the nearest whole cent), without interest, to be issued to such holder, if applicable, in lieu of any fractional shares of Tilray Common Stock pursuant to Section 1.5(c), (vi) the cash dollar amount (rounded to the nearest whole cent), without interest, to be issued to such holder, if applicable, of the portion of Cash Merger Consideration to be paid to such holder pursuant to this Agreement and calculated in accordance with the Privateer Allocation or the Cash-Out Options Allocation, as applicable, (vii) the Pro Rata Consideration Ratio, (viii) each Privateer Stockholder's Pro Rata Cash Portion, (ix) each Privateer Stockholder's Pro Rata Portion (x) each Founder Pro Rata Portion, (xi) the Option Exchange Ratio, (xii) the Cash Consideration Shares, including the Stock Cash Consideration Shares and the Option Cash Consideration Shares, (xiii) each Privateer Stockholder's Escrow Allocation, (xiv) the Aggregate Cash Option Consideration, (xv) the Aggregate In-the-Money Option Value, (xvi) the Option FMV, (xvii) the Total Cash-Out Options, (xviii) with respect to each holder of a Privateer Option that is a Privateer Service Provider, (A) such holder's Individual In-the-Money Option Value, (B) such holder's Optionholder Cash Percentage, (C) such holder's Individual Option Cash Consideration, (D) such holder's Cash-Out Options Allocation for each grant, and (E) such holder's aggregate

39

11/19/2019                                                                                                    S-4/A

Table of Contents

number of Terminating Privateer Options (if any) and (xix) each calculation underlying or related to the foregoing, and (xx) with respect to each holder of a Privateer Option that is a Privateer Service Provider, whether such holder has terminated Continuous Service and if so, the date of such termination and the reason therefor. Concurrently with the execution of this Agreement, Privateer shall deliver to Tilray a draft of the Allocation Certificate containing the above information as reasonably anticipated to be immediately prior to the Effective Time.

5.16 <u>Takeover Statutes</u>. If any Takeover Statute is or may become applicable to the Contemplated Transactions, each of Privateer, Privateer Board, Tilray and the Tilray Board (including any committees thereof), as applicable, shall grant such approvals and take such actions as are reasonably necessary so that the Contemplated Transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise act to eliminate or minimize the effects of such statute or regulation on the Contemplated Transactions.

5.17 <u>Stockholder Litigation</u>. Each Party shall (i) keep the other Party reasonably informed regarding any Legal Proceeding brought or threatened by any stockholder against such Party or any of its respective directors or officers relating to or challenging this Agreement or the consummation of the Contemplated Transactions. Prior to the Closing, each Party shall reasonably consult with and permit the other Party and its Representatives to participate in the defense of any such Legal Proceeding and each Party shall give consideration to the other Party's advice with respect to such Legal Proceeding. Each Party shall promptly advise the other Party orally and in writing of the initiation of, and shall keep the other Party reasonably apprised of any material developments in connection with, any such Legal Proceeding, including any settlement negotiations.

5.18 <u>Tilray Equity Plan</u>.

(a) Tilray shall file with the SEC, promptly after the Effective Time, a registration statement on Form S-8 (or any successor or alternative form), if available for use by Tilray, relating to the shares of Tilray Common Stock issuable with respect to Privateer Options assumed by Tilray in accordance with <u>Section 5.5</u>.

(b) Effective as of, but subject to, the Effective Time, the vesting of each then-outstanding and unvested option that as of the date hereof is an option to purchase shares of Tilray Common Stock held by any Privateer Service Provider shall accelerate.

5.19 <u>Preferred Stock Conversion</u>. Privateer shall take all necessary action to effect the conversion of Privateer Preferred Stock into Privateer Class 2 Common Stock immediately prior to the Effective Time (the "*Preferred Stock Conversion*").

5.20 <u>Escrow Matters</u>. Each of Privateer, the Stockholder Representative, Tilray and Merger Sub shall negotiate in good faith and, prior to or concurrently with the Closing, enter into a mutually agreed escrow agreement (the "*Escrow Agreement*") with each other and the Escrow Agent for the establishment of the escrow account and provision of the escrow services in accordance with the terms and subject to the conditions of this Agreement and providing, among other items, that the Privateer Stockholders shall hold voting rights to the Escrow Shares (as allocated in accordance with the Escrow Allocation) during the period between the Effective Time and the Escrow Release Date unless such Escrow Shares are Released Shares.

5.21 <u>Interim Lock-up</u>. Without Tilray's written consent (which consent shall be granted or withheld at Tilray's sole discretion), Privateer will not, prior to the Effective Time, offer to Transfer, or Transfer, any of the capital stock of Tilray, including any shares of Tilray Class 1 Common Stock or Tilray Class 2 Common Stock.

40

11/19/2019                                                                                          S-4/A

Table of Contents

6.   **CONDITIONS PRECEDENT TO OBLIGATIONS OF EACH PARTY**

   The obligations of each Party to effect the Merger and otherwise consummate the Contemplated Transactions are subject to the satisfaction or, to the extent permitted by applicable Law, the written waiver by each of the Parties, at or prior to the Closing, of each of the following conditions:

   **6.1 <u>Effectiveness of Registration Statement</u>.** The Registration Statement shall have become effective in accordance with the provisions of the Securities Act, and shall not be subject to any stop order or proceeding (or threatened proceeding by the SEC) seeking a stop order with respect to the Registration Statement that has not been withdrawn.

   **6.2 <u>No Restraints</u>.** No temporary restraining order, preliminary or permanent injunction, judgement, or other order or decree shall have been issued and remain in effect by any tribunal, court, or other Governmental Body of competent jurisdiction or Law which has the effect of preventing, making illegal, or prohibiting the consummation of the Contemplated Transactions. There shall not be pending any Legal Proceeding by any Governmental Body of competent jurisdiction seeking to prohibit the consummation of the Contemplated Transactions.

   **6.3 <u>Stockholder Approval</u>.** (a) Tilray shall have obtained the Required Tilray Stockholder Vote and (b) Privateer shall have obtained the Required Privateer Stockholder Vote.

   **6.4 <u>Listing</u>.** The shares of Tilray Class 2 Common Stock to be issued in the Merger pursuant to this Agreement shall have been approved for listing (subject to official notice of issuance) on Nasdaq as of the Closing.

   **6.5 <u>Regulatory Approvals</u>.** The applicable approvals, clearances, or waiting periods (and any extensions thereof) under the HSR Act or any foreign competition Laws that are applicable to the Contemplated Transactions or the acquisition of voting securities by individuals set forth on **Schedule A** shall have been obtained, expired or been earlier terminated.

   **6.6 <u>Charter Amendments</u>.** (a) Privateer shall have filed the amended and restated charter of Privateer in the form attached hereto as **Exhibit D** (the "*Amended and Restated Privateer Charter*") and (b) Tilray shall have filed the amended and restated charter of Tilray in the form attached hereto as **Exhibit E** (the "*Amended and Restated Tilray Charter*").

   **6.7 <u>Contract Terminations</u>.** Privateer covenants and agrees to cause the Contracts set forth on <u>Schedule 6.7</u> to be terminated or extinguished, with no liability or obligation to Privateer, within 20 Business Days after the date of this Agreement.

7.   **ADDITIONAL CONDITIONS PRECEDENT TO OBLIGATIONS OF TILRAY AND MERGER SUB**

   The obligations of Tilray and Merger Sub to effect the Merger and otherwise consummate the Contemplated Transactions are subject to the satisfaction or the written waiver by Tilray, at or prior to the Closing, of each of the following conditions:

   **7.1 <u>Accuracy of Representations</u>.** Except for the representations and warranties set forth in <u>Sections 2.6(a)</u>, <u>2.6(b)</u> (other than the first two sentences thereof), <u>2.6(c)</u> and <u>2.6(d)</u>, the Privateer Fundamental Representations shall have been true and correct in all respects as of the date of this Agreement and shall be true and correct in all respects on and as of the Closing Date with the same force and effect as if made on and as of such date (except to the extent such representations and warranties are specifically made as of a particular date, in which case such representations and warranties shall be true and correct in all material respects as of such date). The representations and warranties of Privateer set forth in <u>Sections 2.6(a)</u>, <u>2.6(b)</u> (other than the first two sentences

41

11/19/2019                                                                S-4/A

Table of Contents

thereof), 2.6(c) and 2.6(d) shall have been true and correct in all respects as of the date of this Agreement and shall be true and correct in all respects on and as of the Closing Date (other than, as of the Closing Date, inaccuracies that are *de minimis* in the aggregate on the Closing Date) with the same force and effect as if made on and as of such date. The representations and warranties of Privateer contained in this Agreement (other than Privateer Fundamental Representations) shall have been true and correct in all material respects as of the date of this Agreement and shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on the Closing Date (without giving effect to any references therein to any Privateer Material Adverse Effect or other materiality qualifications), except for those representations and warranties which address matters only as of a particular date (which representations shall have been true and correct in all material respects without giving effect to any references therein to any Privateer Material Adverse Effect or other materiality qualifications as of such particular date) (it being understood that, for purposes of determining the accuracy of such representations and warranties, any update of or modification to Privateer Disclosure Letter made or purported to have been made after the date of this Agreement shall be disregarded).

7.2 **Performance of Covenants.** Privateer shall have performed or complied with in all material respects all agreements and covenants required to be performed or complied with by it under this Agreement at or prior to the Effective Time.

7.3 **No Privateer Material Adverse Effect.** Since the date of this Agreement, there shall not have occurred any Privateer Material Adverse Effect.

7.4 **Preferred Stock Conversion.** Privateer shall have effected the Preferred Stock Conversion.

7.5 **Termination of Investor Agreements.** The Investor Agreements shall all have been terminated in accordance with Sections 2.22(g) and 5.12.

7.6 **Agreements and Documents.** Tilray shall have received the following documents, each of which shall be in full force and effect:

(a) a certificate executed by the Chief Executive Officer or Chief Financial Officer of Privateer certifying that the conditions set forth in Sections 6.6(a), 7.1, 7.2, 7.3, 7.4, 7.5, and 7.8 have been duly satisfied;

(b) the Allocation Certificate, duly executed by the Chief Financial Officer of Privateer;

(c) a Stockholder Lock-up Agreement and Privateer Support Agreement delivered by each Privateer Stockholder listed on **Schedule A**;

(d) a letter of resignation and waiver, in form reasonably satisfactory to Tilray, duly executed by each member of the board of directors (or equivalent governing body) and each officer of Privateer and each of its Subsidiaries, in each case, effective as of the Effective Time, evidencing the resignation of each such director and officer and waiving any and all Claims against Privateer (other than Claims that such director or officer is entitled to indemnification under the Organizational Documents of, or any indemnification agreements with, Privateer or its Subsidiaries);

(e) evidence reasonably satisfactory to Tilray that Privateer has purchased the Privateer D&O Tail Policy;

(f) the Escrow Agreement, duly executed by the Escrow Agent and the Stockholder Representative;

(g) the Docklight Letter Agreement, duly executed by Docklight Brands Inc.; and

(h) the Founders Guarantee Agreement, duly executed by each of the Founders.

42

Table of Contents

**7.7** **FIRPTA Certificate.** Tilray shall have received (i) an original signed statement from Privateer that Privateer is not, and has not been at any time during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code, a "United States real property holding corporation," as defined in Section 897(c)(2) of the Code, conforming to the requirements of Treasury Regulations Section 1.1445-2(c)(3) and 1.897-2(h), and (ii) an original signed notice to be delivered to the IRS in accordance with the provisions of Treasury Regulations Section 1.897-2(h)(2), together with written authorization for Tilray to deliver such notice to the IRS on behalf of Privateer following the Closing, each dated as of the Closing Date, duly executed by an authorized officer of Privateer, and in form and substance reasonably acceptable to Tilray.

**7.8** **Privateer Stockholder Written Consent.** The Privateer Stockholder Written Consent evidencing the Required Privateer Stockholder Vote shall be in full force and effect.

**7.9** **Closing Tax Opinions.** Tilray shall have received the Tilray Closing Tax Opinion.

**7.10** **Appraisal Rights.** Privateer Stockholders holding no more than one and a half percent (1.5%) of the outstanding Privateer Capital Stock shall continue to have a right to seek appraisal, dissenters', or similar rights under applicable Law with respect to their Privateer Capital Stock by virtue of the Merger.

**8.** **ADDITIONAL CONDITIONS PRECEDENT TO OBLIGATIONS OF PRIVATEER**

The obligations of Privateer to effect the Merger and otherwise consummate the Contemplated Transactions are subject to the satisfaction or the written waiver by Privateer, at or prior to the Closing, of each of the following conditions:

**8.1** **Accuracy of Representations.** The Tilray Fundamental Representations shall have been true and correct in all respects as of the date of this Agreement and shall be true and correct in all respects on and as of the Closing Date with the same force and effect as if made on and as of such date (except to the extent such representations and warranties are specifically made as of a particular date, in which case such representations and warranties shall be true and correct in all material respects as of such date). The representations and warranties of Tilray and Merger Sub contained in this Agreement (other than the Tilray Fundamental Representations) shall have been true and correct in all material respects as of the date of this Agreement and shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on the Closing Date (without giving effect to any references therein to any Tilray Material Adverse Effect or other materiality qualifications), except for those representations and warranties which address matters only as of a particular date (which representations shall have been true and correct in all material respects without giving effect to any references therein to any Tilray Material Adverse Effect or other materiality qualifications as of such particular date) (it being understood that, for purposes of determining the accuracy of such representations and warranties, any update of or modification to the Tilray Disclosure Letter made or purported to have been made after the date of this Agreement shall be disregarded).

**8.2** **Performance of Covenants.** Tilray and Merger Sub shall have performed or complied with in all material respects all of their agreements and covenants required to be performed or complied with by each of them under this Agreement at or prior to the Effective Time.

**8.3** **Tilray Closing Certificate.** Privateer shall have received a certificate executed by the Chief Executive Officer or Chief Financial Officer of Tilray confirming that the conditions set forth in Sections 6.6(b), 8.1, and 8.2 have been duly satisfied.

**8.4** **Closing Tax Opinions.** Privateer shall have received the Privateer Closing Tax Opinion.

**8.5** **Escrow Agreement.** Privateer shall have received the Escrow Agreement duly executed by Tilray and the Escrow Agent.

43

Table of Contents

9.    **Termination**

9.1 <u>Termination</u>. This Agreement may be terminated prior to the Effective Time (whether before or after approval of the Privateer Stockholder Matters by the Privateer Stockholders and whether before or after approval of the Tilray Stockholder Matters by Tilray's stockholders, unless otherwise specified below):

(a) by mutual written consent of Tilray and Privateer;

(b) by either Tilray or Privateer if the Contemplated Transactions shall not have been consummated by March 9, 2020 (subject to possible extension as provided in this <u>Section 9.1(b)</u>, the "**End Date**"); *provided, however,* that the right to terminate this Agreement under this <u>Section 9.1(b)</u> shall not be available to Privateer, on the one hand, or to Tilray, on the other hand, if such Party's action or failure to act has been a principal cause of the failure of the Contemplated Transactions to occur on or before the End Date and such action or failure to act constitutes a breach of this Agreement; *provided, further,* that in the event a request for additional information has been made by any Governmental Body, or in the event the SEC has not declared the Registration Statement effective under the Exchange Act by at least 60 calendar days prior to the End Date, then either Privateer or Tilray shall be entitled to extend the End Date for an additional 60 calendar days by written notice to the other Party;

(c) by either Tilray or Privateer if a tribunal, court, or other Governmental Body of competent jurisdiction shall have issued a final and nonappealable judgment, order, decree or ruling, or shall have taken any other action, having the effect of permanently restraining, enjoining or otherwise preventing or prohibiting the Contemplated Transactions;

(d) by either Tilray or Privateer if the Privateer Stockholder Written Consent evidencing the Required Privateer Stockholder Vote shall not have been obtained within 15 Business Days of the Registration Statement becoming effective in accordance with the provisions of the Securities Act; *provided* that once the Privateer Stockholder Written Consent evidencing the Required Privateer Stockholder Vote has been obtained, neither Tilray nor Privateer may terminate this Agreement pursuant to this <u>Section 9.1(d)</u>;

(e) by either Tilray or Privateer if (i) the Tilray Stockholders' Meeting (including any adjournments and postponements thereof) shall have been held and completed and Tilray's stockholders shall have taken a final vote on the Tilray Stockholder Matters and (ii) the Tilray Stockholder Matters shall not have been approved at the Tilray Stockholders' Meeting (or at any adjournment or postponement thereof) by the Required Tilray Stockholder Vote; *provided, however,* that the right to terminate this Agreement under this <u>Section 9.1(e)</u> shall not be available to Tilray where the failure to obtain the Required Tilray Stockholder Vote has been caused by the action or failure to act of Tilray or Merger Sub and such action or failure to act constitutes a material breach by Tilray or Merger Sub of this Agreement;

(f) by Privateer, upon a breach by Tilray or Merger Sub of any representation, warranty, covenant or agreement set forth in this Agreement or if any representation or warranty of Tilray or Merger Sub shall have become inaccurate, in either case, such that the conditions set forth in <u>Section 8.1</u> or <u>Section 8.2</u> would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become inaccurate; *provided* that Privateer is not then in material breach of any representation, warranty, covenant or agreement under this Agreement; *provided, further,* that if such breach by Tilray or Merger Sub or such inaccuracy in Tilray's or Merger Sub's representations and warranties is curable by Tilray or Merger Sub prior to the End Date, then this Agreement shall not terminate pursuant to this <u>Section 9.1(f)</u> as a result of such particular breach or inaccuracy until the expiration of a 15-day period commencing upon delivery of written notice from Privateer to Tilray of such breach or inaccuracy and Privateer's intention to terminate pursuant to this <u>Section 9.1(f)</u> (it being understood that this Agreement shall not terminate pursuant to this <u>Section 9.1(f)</u> as a result of such particular breach or inaccuracy if such breach or inaccuracy is cured prior to such termination becoming effective);

44

11/19/2019                                                                                                      S-4/A

Table of Contents

(g) by Tilray, upon a breach by Privateer of any representation, warranty, covenant or agreement set forth in this Agreement or if any representation or warranty of Privateer shall have become inaccurate, in either case, such that the conditions set forth in Section 7.1 or Section 7.2 would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become inaccurate; *provided* that Tilray is not then in material breach of any representation, warranty, covenant or agreement under this Agreement; *provided, further*, that if such breach by Privateer or such inaccuracy in Privateer's representations and warranties is curable by Privateer prior to the End Date then this Agreement shall not terminate pursuant to this Section 9.1(g) as a result of such particular breach or inaccuracy until the expiration of a 15-day period commencing upon delivery of written notice from Tilray to Privateer of such breach or inaccuracy and Tilray's intention to terminate pursuant to this Section 9.1(g) (it being understood that this Agreement shall not terminate pursuant to this Section 9.1(g) as a result of such particular breach or inaccuracy if such breach or inaccuracy is cured prior to such termination becoming effective);

(h) by Tilray at any time prior to the approval of the Tilray Stockholder Matters by the Required Tilray Stockholder Vote in order to enter into a definitive agreement to consummate a Superior Offer; *provided* that Tilray has complied in all material respects with its obligations under Section 5.3(d); or

(i) by Privateer, at any time prior to the approval of the Tilray Stockholder Matters by the Required Tilray Stockholder Vote, the Tilray Board has made a Tilray Board Adverse Recommendation Change.

**9.2 Effect of Termination.** In the event of the termination of this Agreement as provided in Section 9.1, this Agreement shall be of no further force or effect; *provided, however*, that (a) Section 5.8, this Section 9.2, Section 9.3, Section 12 and the terms defined in such Sections shall survive the termination of this Agreement and shall remain in full force and effect, and (b) the termination of this Agreement shall not relieve any Party of any Liability for any willful and material breach of any representation, warranty, covenant, obligation or other provision contained in this Agreement.

**9.3 Termination Fee; Lock-Up.**

(a) If this Agreement is terminated by either Tilray or Privateer pursuant to Section 9.1(d), then (i) the Lock-up Agreement executed and delivered by Privateer and Tilray concurrently with this Agreement (the "***Privateer Lock-up Agreement***") shall be automatically effective in accordance with its terms; and (ii) within three months of the expiration date of the Privateer Lock-up Agreement, Privateer shall reimburse Tilray for its reasonable out-of-pocket fees, costs or expenses incurred in connection with the Contemplated Transactions (and for which Tilray has provided invoices to Privateer evidencing such fees, costs or expenses); *provided, however*, that in no event shall such reimbursement payment exceed $3,000,000.

(b) Any fee payable by Privateer pursuant to this Section 9.3 shall be paid by wire transfer of same day funds. The Parties agree that, in all cases, (i) subject to Section 9.2, any fee payable by Privateer to Tilray under this Section 9.3 shall, in the circumstances in which it is owed in accordance with the terms of this Agreement, constitute the sole and exclusive remedy of Tilray following the termination of this Agreement under the circumstances described in this Section 9.3, it being understood that in no event shall Privateer be required to pay the amounts payable pursuant to this Section 9.3 on more than one occasion and (ii) following payment of any fee payable by Privateer to Tilray under this Section 9.3 (A) Privateer shall have no further liability to Privateer in connection with or arising out of this Agreement or the termination thereof, any breach of this Agreement by Privateer giving rise to such termination, or the failure of the Contemplated Transactions to be consummated, (B) neither Tilray nor any of its Affiliates shall be entitled to bring or maintain any other claim, action or proceeding against Privateer or seek to obtain any recovery, judgment or damages of any kind against such Parties (or any partner, member, stockholder, director, officer, employee, Subsidiary, Affiliate, agent or other Representative of such Parties) in connection with or arising out of this Agreement or the termination thereof, any breach by any such Parties giving rise to such termination or the failure of the Contemplated Transactions to be consummated and (C) Tilray and its Affiliates shall be precluded from any other remedy against Privateer and

45

11/19/2019                                                                S-4/A

Table of Contents

its Affiliates, at law or in equity or otherwise, in connection with or arising out of this Agreement or the termination thereof, any breach by such Party giving rise to such termination or the failure of the Contemplated Transactions to be consummated; *provided, however,* that nothing in this Section 9.3(b) shall limit the rights of the Parties under Section 12.9; *provided, further,* that nothing in this Section 9.3 shall limit the rights of Tilray with respect to any breach of the Privateer Lock-up Agreement.

(c) Each of the Parties acknowledges that (i) the agreements contained in this Section 9.3 are an integral part of the Contemplated Transactions, (ii) without these agreements, the Parties would not enter into this Agreement and (iii) any amount payable pursuant to this Section 9.3 is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Tilray in the circumstances in which such amount is payable.

## 10.   STOCKHOLDER REPRESENTATIVE

### 10.1 Designation of Stockholder Representative.

(a) Michael Blue is hereby appointed as the Stockholder Representative (and each successor appointed in accordance with Section 10.1(c)) to perform all such acts as the Stockholder Representative is authorized to take under the Transaction Documents and the Contemplated Transactions, which will include the power and authority to: (i) execute and deliver all documents that the Stockholder Representative is authorized to execute and deliver under the Transaction Documents; (ii) receive payments under or pursuant to this Agreement and disbursement thereof to the Privateer Stockholders and others, as contemplated by this Agreement; (iii) receive and, if applicable, forward notices and communications pursuant to this Agreement; (iv) give or agree to, on behalf of all or any of the Privateer Stockholders, any and all consents, waivers, amendments or modifications deemed by the Stockholder Representative, in its sole and absolute discretion, to be necessary or appropriate under this Agreement and the execution or delivery of any documents that may be necessary or appropriate in connection therewith; (v) following the Closing, amend, modify or supplement this Agreement or any of the instruments to be delivered to Tilray pursuant to this Agreement; (vi) engage attorneys, accountants, agents or consultants on behalf of the Privateer Stockholders in connection with this Agreement or any other agreement contemplated hereby and paying any fees related thereto; (vii) make all other elections or decisions that the Stockholder Representative is authorized to make under any Transaction Document; (viii) authorized release of the Escrow Shares; and (ix) perform each such act and thing whatsoever that Stockholder Representative may be or is required to do, or which Stockholder Representative in its sole good faith discretion determines is desirable to do, pursuant to or to carry out the intent of the Transaction Documents, and to amend, modify or supplement any of the foregoing. Each Privateer Stockholder, by execution of the Letter of Transmittal, as applicable, acknowledges Michael Blue as the Stockholder Representative and its authority as set forth herein.

(b) The grant of authority provided for in this Section 10.1 (i) is coupled with an interest and is being granted, in part, as an inducement to Privateer and Tilray to enter into this Agreement and will be irrevocable and survive the death, incompetency, bankruptcy, liquidation, merger or change of control of any Privateer Stockholder and will be binding on any successor thereto and (ii) subject to this Section 10.1, may be exercised by Stockholder Representative acting by signing as Stockholder Representative of any Privateer Stockholder.

(c) If Stockholder Representative or its heirs or their respective Representatives, as the case may be, advise Privateer Stockholders that it is unavailable to perform it duties hereunder, within three Business Days of notice of such advice, an alternative Stockholder Representative will be appointed by a majority in interest of Privateer Stockholders. Any references in this Agreement to Stockholder Representative shall be deemed to include any duly appointed successor Stockholder Representative.

(d) All acts of the Stockholder Representative hereunder in its capacity as such shall be deemed to be acts on behalf of the Privateer Stockholders and not of the Stockholder Representative individually. The Stockholder Representative shall not have any Liability for any amount owed to any Person pursuant to this Agreement, or any Transaction Document. The Stockholder Representative shall not be liable to Privateer,

46

Table of Contents

Tilray, the Merger Sub or any other Person in his or its capacity as the Stockholder Representative, for any Liability of any Privateer Stockholder or otherwise, or for anything that it may do or refrain from doing in connection with this Agreement. The Stockholder Representative shall not be liable to any Privateer Stockholder, in his or its capacity as the Stockholder Representative, for any Liability of any Privateer Stockholder or otherwise, or for any error of judgment, or any act done or step taken or omitted by it in good faith, or for any mistake in fact or applicable Law, or for anything which it may do or refrain from doing in connection with this Agreement, except in the case of the Stockholder Representative's willful misconduct or fraud as determined in a final and non-appealable judgment of a court of competent jurisdiction. The Stockholder Representative may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties or rights hereunder, and it shall incur no Liability in its capacity as the Stockholder Representative to Tilray, the Merger Sub, Privateer, any Privateer Stockholder or any other Person and shall be fully protected with respect to any action taken, omitted or suffered by it in good faith in accordance with the advice of such counsel. The Stockholder Representative shall not by reason of this Agreement have a fiduciary relationship in respect of any Securityholder, except in respect of amounts received on behalf of a Privateer Stockholder.

(e) The Stockholder Representative is hereby authorized to establish an account for the purposes of holding the Reserve Amount (the "*Reserve Account*"). The Stockholder Representative may use the Reserve Amount to pay any fees, costs, expenses or other obligations incurred by the Stockholder Representative acting in its capacity as such. Without limiting the foregoing, each Privateer Stockholder shall, only to the extent of such holder's Pro Rata Portion of consideration actually received pursuant to this Agreement in respect of such person's Privateer Capital Stock, indemnify and defend the Stockholder Representative and hold the Stockholder Representative harmless against any loss, damage, cost, liability or expense actually incurred without fraud, gross negligence or willful misconduct by the Stockholder Representative (as determined in a final and non-appealable judgment of a court of competent jurisdiction) and arising out of or in connection with the acceptance, performance or administration of the Stockholder Representative's duties under this Agreement. Any expenses incurred by the Stockholder Representative in connection with the performance of its duties under this Agreement shall not be the personal obligation of the Stockholder Representative but shall be payable by and attributable to the Privateer Stockholders based on each such Person's Pro Rata Portion, as applicable. Notwithstanding anything to the contrary in this Agreement, the Stockholder Representative shall be entitled and is hereby granted the right to set off and deduct any unpaid or non-reimbursed expenses and unsatisfied liabilities incurred by the Stockholder Representative in connection with the performance of its duties hereunder from amounts actually delivered to the Stockholder Representative pursuant to this Agreement. Additionally, in connection with any unpaid or non-reimbursed expenses and unsatisfied liabilities incurred by the Stockholder Representative in connection with the performance of its duties hereunder, the Stockholder Representative shall be entitled and is hereby granted the right to direct any funds that would otherwise be actually payable to Privateer Stockholders from the Reserve Account to itself no earlier than the date such payments are actually made. The Stockholder Representative may also from time to time submit invoices to the Privateer Stockholders covering such expenses and liabilities, which shall be paid by the Privateer Stockholders promptly following the receipt thereof on a pro rata basis based on their respective Pro Rata Portion, as applicable. Upon the request of any Privateer Stockholder, the Stockholder Representative shall provide such Privateer Stockholder with an accounting of all expenses and liabilities paid by the Stockholder Representative in its capacity as such. The Reserve Amount shall be retained in whole or in part by the Stockholder Representative for such time as the Stockholder Representative shall determine in its sole discretion. If the Stockholder Representative shall determine in its sole discretion to return all or any portion of the Reserve Amount to the Privateer Stockholders, such amount shall be distributed to the Privateer Stockholders in accordance with Section 1.7(i).

## 11.   INDEMNIFICATION

11.1   Survival Periods. The Parties, intending to modify any applicable statute of limitations, agree that (a) the Privateer Fundamental Representations shall survive the Closing and shall continue in full force and effect for as long as there are any Escrow Shares remaining, including any Escrow Shares that may be subject to Claims

47

Table of Contents

that have not yet been finally resolved, (b) the representations and warranties of Privateer (other than the Privateer Fundamental Representations) in this Agreement (including the Privateer Disclosure Letter and any certificate delivered by or on behalf of Privateer pursuant to this Agreement) shall survive the Closing until, and shall terminate on the Escrow Release Date, and (c) all covenants and agreements of the Parties contained in this Agreement shall survive the Closing Date in accordance with their respective terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the Tilray Indemnified Party to the Stockholder Representative prior to the expiration of the applicable survival period shall survive until finally resolved pursuant to this Section 11. Notwithstanding anything to the contrary in this Agreement, any Fraud Claim will survive the Closing indefinitely.

**11.2 Indemnification of Tilray.** Subject to the terms and limitations in this Section 11, from and after the Closing, the Privateer Stockholders (the "***Indemnifying Parties***") shall indemnify and hold harmless Tilray, its Subsidiaries, and their respective Representatives (collectively, the "***Tilray Indemnified Parties***") from and against, and shall compensate and reimburse each of the Tilray Indemnified Parties for, any loss, Liability, fine, penalty or damage, including reasonable out of pocket fees, costs and expenses of counsel and other professionals, reasonable out of pocket expenses of investigation, including consequential damages to the extent reasonably foreseeable to the Parties, but excluding any special, punitive, exemplary, treble or similar damages (other than to the extent paid or payable to a third party) (a "***Loss***") that such Tilray Indemnified Party suffers resulting from, arising out of, or imposed upon or incurred by any Tilray Indemnified Party by reason of (regardless of whether or not such Losses relate to any Third Party Claim):

(a) any breach or inaccuracy of any representation or warranty made by or on behalf of Privateer or the Stockholder Representative in this Agreement, the Privateer Disclosure Letter, or any certificate delivered by Privateer pursuant to this Agreement (a "***Warranty Breach***");

(b) any breach by Privateer or the Stockholder Representative of any covenant or agreement in this Agreement (a "***Covenant Breach***");

(c) any inaccuracy in or omission from the Allocation Certificate (including any calculations, assumptions, or assertions therein), including in the calculation of the amount of the Total Merger Consideration, the Stock Merger Consideration, the Cash Merger Consideration, the Option Merger Consideration, the Aggregate Cash Option Consideration or other amounts set forth therein that are delivered to a Person in excess of the amounts such Person is entitled to receive pursuant to the terms of this Agreement, any amounts a Person was entitled to receive pursuant to the terms of this Agreement or the Privateer Allocation or the Cash-Out Options Allocation that was omitted from the Allocation Certificate, or any amount of any Privateer Transaction Expense Overage or any other item not accurately and completely reflected therein or otherwise not deducted from or applied to the Total Merger Consideration, the Stock Merger Consideration, the Cash Merger Consideration, the Option Merger Consideration or the Aggregate Cash Option Consideration pursuant thereto;

(d) any Dissenter Costs;

(e) any D&O Matter;

(f) any Equityholder Matter (without duplication of any Losses recovered under Section 11.2(c) above);

(g) any Privateer Transaction Expense Overage, but only to the extent not taken into account in the calculation of the Total Merger Consideration;

(h) any Pre-Closing Liabilities (including any Pre-Closing Taxes);

(i) the matters set forth on Schedule 11.2(i); and

(j) any claim for Fraud arising out of or relating to Privateer's negotiation, execution and delivery of this Agreement or any other Transaction Document (each, a "***Fraud Claim***").

48

11/19/2019                                                                                                          S-4/A

Table of Contents

For purposes of calculating any Losses under this Section 11, all materiality and material adverse effect qualifications, limiting the scope of any provision of this Agreement or any other Transaction Document shall be disregarded.

**11.3 Limitations; Knowledge Savings; Benefit of Bargain.**

(a) Even if a Tilray Indemnified Party would otherwise be entitled to indemnification for a Loss pursuant to this Agreement for any Warranty Breach, such Tilray Indemnified Party shall not be indemnified for such Loss unless and until the amount of Losses eligible for indemnification pursuant to Section 11.2(a) (other than with respect to any breach of any Privateer Fundamental Representation) with respect to such claim (together with any other Warranty Breach which is based on the same underlying facts, situations, circumstances, actions, failures to act, activities or transactions as such Warranty Breach) exceeds an amount equal to five thousand dollars ($5,000) (the "*Per Claim Threshold*"), and then, subject to this Section 11.3, the Tilray Indemnified Parties shall be entitled to recover the aggregate amount of all Losses from the first dollar (it being understood that no Tilray Indemnified Party shall be entitled to receive indemnification for any Losses with respect to any single claim or series of related claims in the event that such Losses are less than the Per Claim Threshold).

(b) Subject to the limitations set forth in this Section 11, any Losses for which the Indemnifying Parties have indemnification obligations under this Section 11 shall be recovered by Tilray Indemnified Parties solely by cancellation of Released Shares to satisfy the amount of any such Losses; *provided, however*, that any Losses shall be satisfied (i) first, from the portion of the Escrow Shares that constitute the Stockholder Escrow Shares (as calculated in accordance with the Escrow Allocation) and (ii) second, if the Stockholder Escrow Shares are insufficient to cover such Losses, then, from the portion of the Escrow Shares that constitute the Founder Escrow Shares (as calculated in accordance with the Escrow Allocation).

(c) Each of Tilray and Merger Sub acknowledge and agree that the Escrow Shares shall be the Tilray Indemnified Party's sole and exclusive source of recovery with respect to claims arising under, or otherwise in connection with, this Agreement and that, following release in full of the Escrow Shares, the Tilray Indemnified Parties shall have no further rights to indemnification hereunder.

(d) Notwithstanding any investigation by, right of investigation, or Knowledge of, Tilray or Merger Sub of the affairs of Privateer, or waiver or non-assertion by Tilray or Merger Sub of any condition or right hereunder, Tilray and Merger Sub shall have the right to rely fully upon the representations, warranties, covenants and agreements of the other parties contained in this Agreement and in any other Transaction Document; *provided*, that other than with respect to Fraud Claims, no Tilray Indemnified Party shall be required to show reliance thereon in order to be entitled to any right or remedy hereunder.

**11.4 Procedures for Third Party Claims.**

(a) In the event Tilray becomes aware of a Claim or demand by another Person (other than the Stockholder Representative) (a "*Third Party Claim*") that Tilray in good faith believes will result in an indemnification claim pursuant to this Section 11, the Tilray Indemnified Party shall deliver to the Stockholder Representative, as soon as practicable, but in any event within 30 Business Days of becoming aware of any facts or circumstances that would reasonably be expected to give rise to a claim for indemnification hereunder, written notice thereof, specifying, to the extent then known by the Tilray Indemnified Party, the amount of such claim and the nature and basis of such claim, including copies of all notices and documents received by the Tilray Indemnified Party relating to the Third Party Claim; *provided, however*, that no delay on the part of the Tilray Indemnified Party in notifying the Stockholder Representative shall relieve the Indemnifying Parties of any Liability hereunder, except to the extent that the defense of any third party Legal Proceeding has been prejudiced by the Tilray Indemnified Party's failure to give such notice. Thereafter, the Tilray Indemnified Party shall keep the Indemnifying Party informed on a current basis as to any changes or developments with respect to the foregoing, including by providing copies of all material notices and material documents (including court papers) from time to time received by the Tilray Indemnified Party from a third party relating to the Third Party Claim.

49

Table of Contents

(b) If a Third Party Claim is made against an Tilray Indemnified Party, Tilray shall, on behalf of the Tilray Indemnified Parties, have the right in its sole discretion to conduct the defense of, and to settle or otherwise resolve, any such Third Party Claim, and for clarity, to be indemnified, reimbursed, and compensated for its costs and expenses in connection with any such Third Party Claim, pursuant to and as set forth in Section 11.2 and the Securityholders' Representative shall be entitled on behalf of the Indemnifying Parties, at their expense, to participate in, but not to determine or conduct, the defense of such Third Party Claim. The Tilray Indemnified Party shall seek the prior written consent of the Stockholder Representative on behalf of the Indemnifying Parties with respect to any settlement of a Third Party Claim, which consent shall not be unreasonably withheld, conditioned or delayed; *provided, however*, that with respect to any Pending Claim, the Stockholder Representative may withhold its prior written consent to any settlement in its sole discretion and the Tilray Indemnified Party shall not be permitted to settle any Pending Claim without the prior written consent of the Stockholder Representative. The written consent of the Indemnifying Parties with respect to any settlement or other resolution of any Third Party Claim (other than with respect to any Pending Claim) shall be deemed to have been given unless the Stockholder Representative shall have objected within 10 Business Days after a written request for such consent by the Tilray Indemnified Party. In the event that the Indemnifying Parties have consented to any such settlement or other resolution of a Third Party Claim (or in the event such consent has been unreasonably withheld, conditioned or delayed with respect to a Third Party Claim other than a Pending Claim), the amount of any such settlement shall be dispositive of the existence of an indemnifiable claim hereunder and the amount of Losses attributable to such claim (plus (i) any reasonable out of pocket fees, costs and expenses of counsel and other professionals and reasonable out of pocket expenses of investigation incurred by the Tilray Indemnified Parties that are not addressed by any such settlement or resolution and (ii) any Losses incurred by the Tilray Indemnified Parties with respect to equitable remedies or non-monetary obligations attributable to such Third Party Claim that are not addressed by any such settlement or resolution). If such written consent is not given (unless such consent was unreasonably withheld, conditioned or delayed with respect to a Third Party Claim other than a Pending Claim), the Tilray Indemnified Party may agree to any such settlement or compromise, and may make an indemnity claim therefor (including whether and to what extent the Tilray Indemnified Party is entitled to indemnification, reimbursement, and compensation under this Agreement for such claim) subject to this Section 11; *provided, however*, that any such settlement or compromise effected without the written consent of the Stockholder Representative shall not be dispositive of the existence of an indemnifiable claim hereunder or the amount of Losses attributable to any such claim; *provided further, however*, that in no event shall a Tilray Indemnified Party be permitted to agree to any settlement or compromise of a Pending Claim without the prior written consent of the Stockholder Representative, which may be withheld in the Stockholder Representative's sole discretion. Notwithstanding the foregoing, the Tilray Indemnified Party shall not, without the Stockholder Representative's consent on behalf of the Indemnifying Parties (which consent shall not be unreasonably withheld, conditioned or delayed with respect to a Third Party Claim other than a Pending Claim), settle, discharge or compromise any Third Party Claim or consent to the entry of any judgment if such settlement, discharge or compromise that (A) involves any finding or admission of any violation of applicable Law on behalf of the Indemnifying Parties or any of its Affiliates or any of their respective Representatives, (B) does not cause each Indemnifying Party that is party to such Third Party Claim to be fully and unconditionally released from all Liability with respect to such claim, or (C) imposes equitable remedies or material non-monetary obligations on the Indemnifying Party.

(c) With respect to the Pending Claims, after the Effective Time, the Tilray Indemnified Parties may engage any counsel of their choosing, subject to their sole discretion, *provided* that the Tilray Indemnified Parties shall reasonably consult with the existing litigation counsel previously engaged by Privateer.

**11.5 Procedures for Inter-Party Claims**. In the event that a Tilray Indemnified Party determines to make a claim for Losses against any Indemnifying Parties hereunder (other than as a result of a Third Party Claim), the Tilray Indemnified Party shall give prompt written notice thereof to the Stockholder Representative specifying the amount of such claim and the nature and basis of the alleged breach giving rise to such claim; *provided, however*, that no delay on the part of the Tilray Indemnified Party in notifying the Stockholder Representative shall relieve the Indemnifying Parties of any Liability hereunder, except to the extent that the Stockholder Representative has been prejudiced by the Tilray Indemnified Party's failure to give such notice. The Tilray

50

11/19/2019                                                S-4/A

Table of Contents

Indemnified Party shall provide the Indemnifying Party with reasonable access to its books and records during normal business hours upon reasonable advance notice solely for the purpose of allowing the Indemnifying Party a reasonable opportunity to verify any such claim for Losses. The Stockholder Representative shall notify the Tilray Indemnified Party within 30 calendar days following its receipt of such notice if the Indemnifying Parties dispute Liability to the Tilray Indemnified Party under this Section 11. If the Stockholder Representative does not so notify the Tilray Indemnified Party, the claim specified by the Tilray Indemnified Party in such notice shall be conclusively deemed to be a Loss of the Indemnifying Parties under this Section 11, and in the case of any notice in which the amount of the claim (or any portion of the claim) has been finally determined, the Stockholder Representative and Tilray shall jointly instruct the Escrow Agent to deliver to Tilray, on behalf of the Tilray Indemnified Parties, the Released Shares, or, in the case of any notice in which the amount of the claim (or any portion of the claim) is estimated, the Released Shares as calculated on such later date when the amount of such claim (or such portion of such claim) becomes finally determined. If the Stockholder Representative has timely disputed Liability with respect to such claim as provided above, the Indemnifying Party and Tilray shall negotiate in good faith to resolve such dispute. Promptly following the final determination of the amount of the Losses which the Tilray Indemnified Party has suffered (whether determined in accordance with this Section 11.4(b) or by a court of competent jurisdiction pursuant to Section 12.4), the Stockholder Representative and the Tilray shall jointly instruct the Escrow Agent to deliver to Tilray, on behalf of the Tilray Indemnified Parties, the Released Shares.

  11.6 Exclusive Remedy. This Section 11 shall be the sole and exclusive remedy of the Tilray Indemnified Parties from and after the Closing Date for any claims arising under this Agreement; provided, however, that the foregoing shall not limit the right of any Tilray Indemnified Party to injunctive relief pursuant to equitable Law or any other equitable remedy, any rights under Section 12.9 hereto, or any right or remedy arising by reason of any Fraud Claim. The obligations of the Indemnifying Parties under this Section 11 shall not be reduced, offset, eliminated or subject to contribution by reason of any action or inaction by Privateer that contributed to any inaccuracy or breach giving rise to such obligation, it being understood that the Indemnifying Parties, not Privateer, shall have the sole obligation for the indemnification, compensation and reimbursement obligations under this Section 11.

  11.7 Release of Escrow. On the 18-month anniversary of the Closing Date (such later date being the "*Escrow Release Date*"), the Escrow Agent shall release to the Exchange Agent for issuance to each Privateer Stockholder in accordance with such holder's Escrow Allocation, the number of Escrow Shares equal to (a) the Escrow Shares on the Escrow Release Date *minus* (b) the *quotient of* (i) the maximum amount of all Losses for which any Tilray Indemnified Party has timely made a claim for indemnification that has not been finally determined and fully satisfied by Released Shares in accordance with this Section 11, and (ii) the Tilray Trailing Price on the Escrow Release Date. In the event any portion of the Escrow Shares are not released on the Escrow Release Date as a result of the reduction in respect of the foregoing sentence, following the final determination of any of such outstanding claims and, as applicable, release of Released Shares in full satisfaction of all outstanding indemnity claims in accordance with and subject to the terms and conditions of this Section 11, the Stockholder Representative shall be entitled to, and Tilray shall promptly and in any event within two Business Days of such final determination and full satisfaction of all outstanding indemnity claims, direct the Escrow Agent to release to the unreleased number of Escrow Shares to the Exchange Agent for issuance to each Privateer Stockholder in accordance with such holder's Escrow Allocation.

## 12.   MISCELLANEOUS PROVISIONS

  12.1 Amendment. This Agreement may be amended with the approval of the respective boards of directors or other governing bodies of Privateer, Merger Sub, and Tilray at any time (whether before or after obtaining the Required Privateer Stockholder Vote or the Required Tilray Stockholder Vote); provided, however, that after any such approval of this Agreement by a Party's stockholders, no amendment shall be made without the further approval of such stockholders if the further approval of such stockholders is required by Law. This Agreement may not be amended except by an instrument in writing signed on behalf of each of Privateer, Merger Sub and Tilray.

51

Table of Contents

**12.2 Waiver.**

(a) No failure on the part of any Party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

(b) No Party shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Party and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

(c) No extension or waiver by Tilray or Merger Sub shall require the approval of the stockholders of Tilray unless such approval is required by Law, and no extension or waiver by Privateer shall require the approval of the Privateer Stockholders unless such approval is required by Law.

**12.3 Entire Agreement; Counterparts; Exchanges by Electronic Transmission.** This Agreement, together with the Transaction Documents, constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among or between any of the Parties with respect to the subject matter hereof and thereof. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by all Parties by electronic transmission in .PDF format shall be sufficient to bind the Parties to the terms and conditions of this Agreement.

**12.4 Applicable Law; Jurisdiction.** This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of laws. In any action or proceeding between any of the Parties arising out of or relating to this Agreement or any of the Contemplated Transactions, each of the Parties: (a) irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the Court of Chancery of the State of Delaware or, to the extent such court does not have subject matter jurisdiction, the United States District Court for the District of Delaware or, to the extent that neither of the foregoing courts has jurisdiction, the Superior Court of the State of Delaware; (b) agrees that all claims in respect of such action or proceeding shall be heard and determined exclusively in accordance with clause (a) of this Section 12.4; (c) waives any objection to laying venue in any such action or proceeding in such courts; (d) waives any objection that such courts are an inconvenient forum or do not have jurisdiction over any Party; (e) agrees that service of process upon such Party in any such action or proceeding shall be effective if notice is given in accordance with Section 12.7 of this Agreement; and (f) irrevocably and unconditionally waives the right to trial by jury.

**12.5 Attorneys' Fees.** In any action at law or suit in equity to enforce this Agreement or the rights of any of the Parties, the prevailing Party in such action or suit (as determined by a court of competent jurisdiction) shall be entitled to recover its reasonable out-of-pocket attorneys' fees and all other reasonable costs and expenses incurred in such action or suit.

**12.6 Assignability.** This Agreement shall be binding upon, and shall be enforceable by and inure solely to the benefit of, the Parties and their respective successors and permitted assigns; *provided, however,* that neither this Agreement nor any of a Party's rights or obligations hereunder may be assigned or delegated by such Party without the prior written consent of the other Parties, and any attempted assignment or delegation of this Agreement or any of such rights or obligations by such Party without the other Parties' prior written consent shall be void and of no effect.

52

11/19/2019                                                                                          S-4/A

Table of Contents

12.7 Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly delivered and received hereunder (a) one Business Day after being sent for next Business Day delivery, fees prepaid, via a reputable international overnight courier service, (b) upon delivery if delivered by hand, or (c) on the date delivered in the place of delivery if sent by email (with a written or electronic confirmation of delivery) prior to 5:00 p.m. Pacific time, otherwise on the next succeeding Business Day, in each case to the intended recipient as set forth below:

if to Tilray or Merger Sub:

> Tilray, Inc.
> 1100 Maughan Road
> Nanaimo, BC, Canada, V9X 1J2
> Attention: Dara Redler, General Counsel; Maryscott Greenwood, Chair of the Special Committee of the Board
> Email: scotty.greenwood@tilray.com

with a copy to (which shall not constitute notice):

> Paul Hastings LLP
> 200 Park Avenue
> New York, NY 10166
> Attention: Luke P. Iovine, III, Jason Rabbitt-Tomita, Erik J. Lindemann
> Email: lukeiovine@paulhastings.com, jasontomita@paulhastings.com, eriklindemann@paulhastings.com

if to Privateer:

> Privateer Holdings, Inc.
> 2701 Eastlake Avenue E., 3rd Floor
> Seattle, WA 98102
> Attention: Michael Blue, Managing Director
> Email: michael.blue@privateerholdings.com

with a copy to (which shall not constitute notice):

> Cooley LLP
> 1700 7th Ave, Suite 1900
> Seattle, WA 98101
> Attention: John Robertson, Steve Tonsfeldt, Kassendra Galindo
> Email: jrobertson@cooley.com, stonsfeldt@cooley.com, kgalindo@cooley.com

if to the Stockholder Representative:

> Michael Blue
> 2701 Eastlake Avenue E., 3rd Floor
> Seattle, WA 98102
> Attention: Michael Blue
> Email: michael.blue@privateerholdings.com

with a copy to (which shall not constitute notice):

> Cooley LLP
> 1700 7th Ave, Suite 1900
> Seattle, WA 98101
> Attention: John Robertson, Steve Tonsfeldt, Kassendra Galindo
> Email: jrobertson@cooley.com, stonsfeldt@cooley.com, kgalindo@cooley.com

53

11/19/2019                                                S-4/A

Table of Contents

**12.8** <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions of this Agreement or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If a final judgment of a court of competent jurisdiction declares that any term or provision of this Agreement is invalid or unenforceable, the Parties agree that the court making such determination shall have the power to limit such term or provision, to delete specific words or phrases or to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be valid and enforceable as so modified. In the event such court does not exercise the power granted to it in the prior sentence, the Parties agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term or provision.

**12.9** <u>Other Remedies; Specific Performance</u>. Except as otherwise provided herein, any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy. The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any Party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate this Agreement) in accordance with its specified terms or otherwise breaches such provisions. Accordingly, the Parties acknowledge and agree that the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity and prior to the valid exercise of any termination right by the Parties in accordance with <u>Section 9.1</u>. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance or other equitable relief on the basis that any other Party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

**12.10** <u>No Third Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the Parties, the Tilray Indemnified Parties to the extent of their respective rights pursuant to <u>Section 11.2</u>, and the D&O Indemnified Parties to the extent of their respective rights pursuant to <u>Section 5.6</u>) any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**12.11** <u>Expenses</u>. Except as otherwise provided herein, all fees and expenses incurred in connection with this Agreement and the Contemplated Transactions shall be paid by the Party incurring such expenses, whether or not the Merger is consummated, except that Tilray will be responsible for up to $1,000,000 of Privateer Transaction Expenses that are unpaid as of the Effective Time.

**12.12** <u>Acknowledgement; Waiver of Conflicts; Retention of Privilege</u>.

(a) Each of the Parties hereto acknowledges and agrees that Cooley has acted as counsel to Privateer in various matters involving a range of issues and as counsel to Privateer in connection with the negotiation of this Agreement and consummation of the Contemplated Transactions.

(b) In connection with any matter or dispute under this Agreement, each of Tilray and Merger Sub hereby irrevocably waives and agrees not to assert, and agrees to cause the Surviving Company following the Closing to irrevocably waive and not to assert, any conflict of interest arising from or in connection with (i) Cooley's prior representation of Privateer and (ii) Cooley's representation of the Stockholder Representative and/or any of the Securityholders (collectively, the "**Protected Parties**") prior to and after the Closing.

54

Table of Contents

(c) Each of Tilray and Merger Sub further agrees, on behalf of itself and, after the Closing, on behalf of the Surviving Company, that all communications in any form or format whatsoever between or among any of Cooley, any of the Protected Parties, or any of their respective Representatives that relate in any way to the negotiation, documentation and consummation of the Contemplated Transactions or, beginning on the date of this Agreement, any dispute arising under this Agreement (collectively, the "***Deal Communications***") shall be deemed to be retained and owned collectively by the Protected Parties, shall be controlled by the Stockholder Representative on behalf of the Protected Parties and shall not pass to or be claimed by Tilray or Merger Sub or, following the Closing, the Surviving Company. All Deal Communications that are subject to the attorney-client privilege (the "***Privileged Deal Communications***") shall remain privileged after the Closing and the privilege and the expectation of client confidence relating thereto shall belong solely to the Stockholder Representative and the Protected Parties, shall be controlled by the Stockholder Representative on behalf of the Protected Parties, and shall not pass to or be claimed by any of Tilray, Merger Sub or, following the Closing, the Surviving Company; *provided, further*, that nothing contained herein shall be deemed to be a waiver by any of Tilray, Merger Sub or any of their respective Affiliates (including, after the Closing, the Surviving Company and its Affiliates) of any applicable privileges or protections that can or may be asserted to prevent disclosure of any such communications to any third party.

(d) Notwithstanding the foregoing, in the event that a dispute arises between Tilray and Merger Sub or, after the Closing, the Surviving Company, on the one hand, and a third party other than the Stockholder Representative or the Securityholders, on the other hand, Tilray and Merger Sub or, following the Closing, the Surviving Company, may assert the attorney-client privilege to prevent the disclosure of the Privileged Deal Communications to such third party; *provided, however*, that neither Tilray or Merger Sub, nor, following the Closing, the Surviving Company may waive such privilege without the prior written consent of the Stockholder Representative (such consent not to be unreasonably withheld, conditioned, or delayed). In the event that Tilray or Merger Sub or, following the Closing, any Protected Party is legally required by order of a Governmental Body to access or obtain a copy of all or a portion of the Privileged Deal Communications, Tilray shall immediately (and, in any event, within five Business Days) notify the Stockholder Representative in writing (including by making specific reference to this <u>Section 12.12(d)</u>) so that the Stockholder Representative can seek a protective order and Tilray agrees to use all commercially reasonable efforts to assist therewith.

(e) To the extent that Privileged Deal Communications maintained by Cooley constitute property of its clients, only the Stockholder Representative and the Protected Parties shall hold such property rights and Cooley shall have no duty to reveal or disclose any such Privileged Deal Communications by reason of any attorney-client relationship between Cooley, on the one hand, and Privateer, on the other hand so long as such Privileged Deal Communications would be subject to a privilege or protection if they were being requested in a proceeding by an unrelated third party.

(f) Each of Tilray and Merger Sub agrees on behalf of itself and, following the Closing, the Surviving Company, to the extent that Tilray or Merger Sub or, after the Closing, the Surviving Company, receives or takes physical possession of any Privileged Deal Communications, such physical possession or receipt shall not, in any way, be deemed a waiver by any of the Protected Parties or any other Person, of the privileges or protections described in this <u>Section 12.12</u>, and neither Tilray or Merger Sub nor, following the Closing, the Surviving Company shall (i) assert any claim that any of the Protected Parties or any other Person waived the attorney-client privilege, attorney work-product protection or any other right or expectation of client confidence applicable to any Privileged Deal Communications, or (ii) seek to obtain the Privileged Deal Communications from Cooley so long as such Privileged Deal Communications would be subject to a privilege or protection if they were being requested in a proceeding by an unrelated third party.

**12.13** <u>Construction</u>.

(a) References to "cash," "dollars" or "$" are to U.S. dollars.

55

Table of Contents

(b) For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include masculine and feminine genders.

(c) The Parties have participated jointly in the negotiating and drafting of this Agreement and agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in the construction or interpretation of this Agreement, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

(d) As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(e) Except as otherwise indicated, all references in this Agreement to "Sections," "Exhibits" and "Schedules" are intended to refer to Sections of this Agreement and Exhibits and Schedules to this Agreement, respectively.

(f) Any reference to legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations, and statutory instruments issued or related to such legislations.

(g) The bold-faced headings and table of contents contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement, and shall not be referred to in connection with the construction or interpretation of this Agreement.

(h) The Parties agree that each of the Privateer Disclosure Letter and the Tilray Disclosure Letter shall be arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in this Agreement. The disclosures in any section or subsection of the Privateer Disclosure Letter or the Tilray Disclosure Letter shall qualify other sections and subsections in this Agreement to the extent it is readily apparent on its face from a reading of the disclosure that such disclosure is applicable to such other sections and subsections.

(i) Each of "delivered" or "made available" means, with respect to any documentation, that prior to 11:59 p.m. (Pacific time) on the date that is two Business Days prior to the date of this Agreement (i) a copy of such material has been posted to and made available by a Party to the other Parties and their Representatives in the electronic data room maintained by such disclosing Party or (ii) such material is disclosed in the Tilray SEC Documents filed with the SEC prior to the date hereof and publicly made available on the SEC's Electronic Data Gathering Analysis and Retrieval system.

(j) Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any date on which banks in New York, New York are authorized or obligated by Law to be closed, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next regular Business Day.

*(Remainder of page intentionally left blank)*

56

11/19/2019                                                S-4/A

Table of Contents

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

TILRAY, INC.

By:      /s/ Mark Castaneda
Name:   Mark Castaneda
Title:    Chief Financial Officer

*[Signature Page to Agreement and Plan of Merger and Reorganization]*

Table of Contents

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

DOWN RIVER MERGER SUB, LLC

By:      /s/ Mark Castaneda
Name:   Mark Castaneda
Title:   Authorized Person

*[Signature Page to Agreement and Plan of Merger and Reorganization]*

11/19/2019                                                    S-4/A

Table of Contents

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

PRIVATEER HOLDINGS, INC.

By:  /s/ Michael Blue
Name: Michael Blue
Title: President and Managing Partner

*[Signature Page to Agreement and Plan of Merger and Reorganization]*

11/19/2019                                    S-4/A

Table of Contents

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first above written.

STOCKHOLDER REPRESENTATIVE

By:  /s/ Michael Blue
Name: Michael Blue

*[Signature Page to Agreement and Plan of Merger and Reorganization]*

11/19/2019                                                     S-4/A

Table of Contents

**EXHIBIT A**

**CERTAIN DEFINITIONS**

For purposes of this Agreement (including this Exhibit A):

"*Acquisition Inquiry*" means, with respect to a Party, an inquiry, indication of interest or request for information (other than an inquiry, indication of interest or request for information made or submitted by the other Party to such Party) that would reasonably be expected to lead to an Acquisition Proposal.

"*Acquisition Proposal*" means, with respect to a Party, any offer or proposal, whether written or oral (other than an offer or proposal made or submitted by or on behalf of the other Party or any of its Affiliates to such Party) contemplating or otherwise relating to any Acquisition Transaction with such Party.

"*Acquisition Transaction*" means any transaction or series of related transactions involving:

(i) any merger, consolidation, amalgamation, share exchange, business combination, issuance of securities, acquisition of securities, reorganization, recapitalization, tender offer, exchange offer or other similar transaction: (A) in which a Party is a constituent Entity; (B) in which a Person or "group" (as defined in the Exchange Act and the rules promulgated thereunder) of Persons directly or indirectly acquires beneficial or record ownership of securities representing more than 20% of the outstanding securities of any class of voting securities of a Party or any of its Subsidiaries; or (C) in which a Party or any of its Subsidiaries issues securities representing more than 20% of the outstanding securities of any class of voting securities of such Party or any of its Subsidiaries; or

(ii) any sale, lease, exchange, transfer, license, acquisition or disposition of any business or businesses or assets that constitute or account for 20% or more of the consolidated book value or the fair market value of the assets of a Party and its Subsidiaries, taken as a whole.

"*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"*Aggregate Cash Option Consideration*" means (i) the Cash Merger Consideration, *multiplied by* (ii) the quotient of the (A) Privateer Service Provider Options, *divided by* (B) the Privateer Exchange Shares.

"*Aggregate Exercise Price*" means the aggregate exercise price of all In-the-Money Options.

"*Aggregate In-the-Money Option Value*" means (i) the product of (A) the Option FMV, *multiplied by* (B) all In-the-Money Options, *less* (ii) the Aggregate Exercise Price.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which banks in New York, New York are authorized or obligated by Law to be closed.

"*Cash Consideration Shares*" means a number of shares of Tilray Class 2 Common Stock equal to the sum of (i) the Stock Cash Consideration Shares, *plus* (ii) the Option Cash Consideration Shares. For purposes of determining the Cash Consideration Shares, the number of shares of Tilray Class 2 Common Stock shall be rounded down to the nearest whole share. The calculation of the Cash Consideration Shares shall be set forth in the Allocation Certificate.

A-1

Table of Contents

"*Cash-Out Options Allocation*" means the allocation of the Individual Option Cash Consideration, with respect to each grant of In-the-Money Options (with the grants of In-the-Money Options with the lowest exercise price being allocated the Individual Option Cash Consideration and cashed out and cancelled first, in ascending order by exercise price until all of the Individual Option Cash Consideration is exhausted), the aggregate number of In-the-Money Options, per grant, equal to the lesser of (i) the total number of options in that grant to which a portion of Individual Option Cash Consideration has not yet been allocated and (ii) the *quotient of* (A) the Individual Option Cash Consideration payable to that Optionholder and not yet allocated, *divided by* (B) the Option FMV *less* the applicable exercise price for such grant. For purposes of determining the Cash-Out Options Allocation, the number of shares of In-the-Money Options to be cancelled with respect to each grant shall be rounded down to the nearest whole share.

"*Claim*" mans threatened or actual claim, action, suit, proceeding or investigation, whether civil, criminal or administrative.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Consent*" means any approval, consent, ratification, permission, waiver or authorization (including any Governmental Authorization).

"*Contemplated Transactions*" means the Merger, the Preferred Stock Conversion and the other transactions and actions contemplated by this Agreement.

"*Contract*" means, with respect to any Person, any written or oral agreement, contract, subcontract, lease (whether for real or personal property), mortgage, license, sublicense or other legally binding commitment or undertaking of any nature to which such Person is a party or by which such Person or any of its assets are bound or affected under applicable Law.

"*D&O Matter*" means any Claim by or on behalf of any securityholders Privateer, or any Subsidiary of Privateer, or by or in the right of Privateer, or any Subsidiary of Privateer, pertaining to (i) the fact that he or she is or was an officer or director of Privateer, or any Subsidiary of Privateer, or any action or omission or alleged action or omission by such Person in his or her capacity as an officer or director, or (ii) this Agreement, any other Transaction Document, or the Contemplated Transactions, whether in any case asserted or arising before or after the Effective Time.

"*DGCL*" means the General Corporation Law of the State of Delaware.

"*Dissenter Costs*" means the amount, if any, by which (i) the amount paid as a result of holders of Dissenting Shares having perfected (and not waived, withdrawn or otherwise lost) their rights pursuant to the DGCL exceeds (ii) the consideration that would have been paid to such holders pursuant to the terms of this Agreement with respect to such Dissenting Shares if no demand for appraisal or dissenters' rights had been made by the holders of such Dissenting Shares.

"*DLLCA*" means the Limited Liability Company Act of the State of Delaware.

"*Docklight Letter Agreement*" means the letter agreement by and between Docklight Brands Inc. (and any successor or assignee) and Tilray

"*Effect*" means any effect, change, event, circumstance, or development.

"*Encumbrance*" means any lien, pledge, hypothecation, charge, mortgage, security interest, lease, license, option, easement, reservation, servitude, adverse title, claim, infringement, interference, option, right of first refusal, preemptive right, community property interest or restriction or encumbrance of any nature

A-2

Table of Contents

(including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the receipt of any income derived from any asset, any restriction on the use of any asset and any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset), and "*Encumber*" shall have corresponding meaning.

"*Enforceability Exceptions*" means the (i) Laws of general application relating to bankruptcy, insolvency and the relief of debtors; and (ii) Law governing specific performance, injunctive relief and other equitable remedies.

"*Entity*" means any corporation (including any non-profit corporation), partnership (including any general partnership, limited partnership or limited liability partnership), joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), firm, society or other enterprise, association, organization or entity, and each of its successors.

"*Environmental Law*" means any federal, state, local or foreign Law relating to pollution or protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including any Law or regulation relating to emissions, discharges, releases or threatened releases of Hazardous Materials, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"*Equity Interest*" means any share, capital stock, partnership, member or similar interest in any Entity, and any subscription, option, call, warrant, right, security instrument (including debt securities) or obligation or any other security, either currently or otherwise convertible, exchangeable or exercisable into such.

"*Equityholder Matter*" means any Claim by or on behalf of any current or former securityholder of Privateer or any Subsidiary of Privateer, or any other Person, asserting, alleging or seeking to assert rights or remedies relating to Equity Interests of Privateer or any Subsidiary of Privateer, including any Claim asserted, based upon or related to (a) the Privateer Stockholder Written Consent or the Required Privateer Stockholder Vote, (b) the ownership or rights to ownership of any Equity Interests of Privateer or any Subsidiary of Privateer, or (c) any rights of a securityholder of Privateer or any of its Subsidiaries, including any rights to Equity Interests, preemptive rights or rights to notice or to vote Equity Interests, and any other claim by any current or former securityholder of Privateer or any Subsidiary of the Privateer relating to this Agreement, the Transaction Documents, any of the Contemplated Transactions.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" means Citibank, N.A., or another third party escrow agent to be mutually agreed by Tilray and Privateer.

"*Escrow Allocation*" means the following allocation of the Escrow Amount among the Privateer Stockholders (a) with respect to each Privateer Stockholder, a number of shares of Tilray Class 2 Common Stock equal to the product of (i) such Privateer Stockholder's Pro Rata Portion, *multiplied by* (ii) the first one-half of the Escrow Amount (the "*Stockholder Escrow Shares*") and (b) with respect to a Founder, a number of shares of Tilray Class 2 Common Stock equal to the product of (i) the applicable Founder Pro Rata Portion, *multiplied by* (ii) the remaining one-half of the Escrow Amount (the "*Founder Escrow Shares*").

"*Escrow Amount*" means a number of shares of Tilray Class 2 Common Stock equal to the *quotient of* (a) $125,000,000, *divided by* (b) the Tilray Closing Price. For purposes of determining the Escrow Amount, the number of shares of Tilray Class 2 Common Stock shall be rounded down to the nearest whole share.

"*Escrow Shares*" means, at any given time after Closing, the number of shares of Tilray Class 2 Common Stock then remaining in the account in which the Escrow Agent has deposited the Escrow Amount in accordance with the Escrow Agreement (as calculated in accordance with the Escrow Allocation).

A-3

S-4/A

Table of Contents

"*Exchange Act*" means the Securities Exchange Act of 1934.

"*FMV*" means lower of (i) the Tilray Closing Price and (ii) the Offering Price.

"*Founder*" means any of the following individuals and Entities: (a) Brendan Kennedy, (b) Michael Blue, (c) Christian Groh, (d) any Permitted Entity (as such term is defined in the Amended and Restated Privateer Charter) of any of the foregoing individuals and (e) any Permitted Transferee (as such term is defined in the Amended and Restated Privateer Charter) of any of the foregoing individuals or Permitted Entities (as such term is defined in the Amended and Restated Privateer Charter).

"*Founder Pro Rata Portion*" means, with respect to a Founder, a percentage equal to the *quotient of* (a) the Tilray Class 2 Common Stock Consideration Shares allocated to such Founder pursuant to Section 1.5(a)(iii) and in accordance with the Privateer Allocation, *divided by* (b) the Tilray Class 2 Common Stock Consideration Shares issued to all Founders, the calculation of which shall be set forth in the Allocation Certificate.

"*Founders Guarantee Agreement*" means that the guarantee agreement by and among Tilray and each of the Founders.

"*Fraud*" means an act in the making of a specific representation or warranty of Privateer expressly set forth in this Agreement or any other Transaction Document, committed by a Person making such express representation or warranty or their Affiliates or, with respect to any such representations and warranties of Privateer, any of the Privateer's Subsidiaries, with reckless disregard for the accuracy of such representations and warranties or with the intent to deceive another Person, and to induce him, her or it to enter into the contract and requires (a) a false representation of material fact expressly set forth in the representations and warranties set forth in this Agreement or any other Transaction Document; (b) knowledge that such representation is false; (c) an intention to induce the Person to whom such representation was made or any of their Affiliates to act or refrain from acting in reliance upon it; (d) reliance upon which that Person suffers damages.

"*GAAP*" means generally accepted accounting principles and practices in effect from time to time within the United States applied consistently throughout the period involved.

"*Governmental Authorization*" means any: (a) permit, license, certificate, certification, franchise, permission, approval, exemption, variance, exception, order, clearance, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law; or (b) right under any Contract with any Governmental Body.

"*Governmental Body*" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, bureau, instrumentality, official, ministry, fund, foundation, center, organization, unit, body or Entity and any court or other tribunal, and for the avoidance of doubt, any taxing authority); or (d) self-regulatory organization (including Nasdaq).

"*Hazardous Materials*" means any pollutant, chemical, substance and any toxic, infectious, carcinogenic, reactive, corrosive, ignitable or flammable chemical, or chemical compound, or hazardous substance, material or waste, whether solid, liquid or gas, that is subject to regulation, control or remediation under any Environmental Law, including without limitation, crude oil or any fraction thereof, and petroleum products or by-products.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

A-4

"*Immediate Family Member*" means with respect to any Person who serves as a director, executive officer, partner, member or in a similar capacity of such specified Person, means such Person's spouse, parents, children and siblings, including adoptive relationships and relationships through marriage, or any other relative of such Person that shares such Person's home (other than employees or tenants).

"*In-the-Money Options*" means any Privateer Service Provider Option for which the applicable exercise price is less than the Option FMV.

"*Indebtedness*" means the sum of the following, whether or not contingent or due and payable: (i) indebtedness of Privateer or any of its Subsidiaries for borrowed money, including convertible debt; (ii) obligations of Privateer or any of its Subsidiaries evidenced by bonds, debentures, notes or other similar instruments; (iii) obligations of Privateer or any of its Subsidiaries in respect of letters of credit or other similar instruments (or reimbursement agreements in respect thereof) or banker's acceptances; (iv) obligations of Privateer or any of its Subsidiaries to pay the deferred and unpaid purchase price of property or services, which purchase price is due more than three (3) months after the date of placing such property in service or taking delivery thereof and title thereto or the completion of such services; (v) capitalized lease obligations of Privateer or any of its Subsidiaries; (vi) indebtedness of third parties which is either guaranteed by Privateer or any of its Subsidiaries or secured by an Encumbrance on the assets of Privateer or any of its Subsidiaries; (vii) any overdue accounts payable of Privateer or any of its Subsidiaries; (viii) any acceleration, termination fees, pre-payment fees, balloons or similar payments on any of the foregoing; and (ix) all accrued interest on any of the foregoing.

"*Individual In-the-Money Option Value*" with respect to a holder of Privateer Service Provider Options, the *product of* (i) each In-the-Money Option held by such holder, *multiplied by* (ii) the Option FMV, less applicable exercise price for such grant.

"*Individual Option Cash Consideration*" means (i) the Optionholder Cash Percentage, *multiplied by* (ii) the Aggregate Cash Option Consideration.

"*Intellectual Property Rights*" means and includes all past, present, and future rights of the following types, which may exist or be created under the Laws of any jurisdiction in the world: (i) rights associated with works of authorship, including exclusive exploitation rights, copyrights, moral rights, software, databases, and mask works; (ii) trademarks, service marks, trade dress, logos, trade names and other source identifiers, domain names and URLs and similar rights and any goodwill associated therewith; (iii) rights associated with trade secrets, know how, inventions, invention disclosures, methods, processes, protocols, specifications, techniques and other forms of technology; (iv) patents and industrial property rights; (v) other similar proprietary rights in intellectual property of every kind and nature; (vi) rights of privacy and publicity; and (vii) all registrations, renewals, extensions, statutory invention registrations, provisionals, continuations, continuations-in-part, provisionals, divisions, or reissues of, and applications for, any of the rights referred to in clauses "(i)" through "(vi)" above (whether or not in tangible form and including all tangible embodiments of any of the foregoing, such as samples, studies and summaries), along with all rights to prosecute and perfect the same through administrative prosecution, registration, recordation or other administrative proceeding, and all causes of action and rights to sue or seek other remedies arising from or relating to the foregoing.

"*IRS*" means the United States Internal Revenue Service.

"*Knowledge*" means, with respect to an individual, that such individual is actually aware of the relevant fact or such individual would reasonably be expected to know such fact in the ordinary course of the performance of such individual's employment responsibilities after reasonable inquiry. Any Person that is an Entity shall have Knowledge if any officer or director of such Person as of the date such knowledge is imputed has Knowledge of such fact or other matter.

Table of Contents

"*Law*" means any federal, state, national, foreign, material local or municipal or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, order, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body (including under the authority of Nasdaq or the Financial Industry Regulatory Authority).

"*Legal Proceeding*" means any claim, action, cause of action, suit, demand, tender of indemnity, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Body or any arbitrator or arbitration panel.

"*Liability*" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"*Lock-up Provisions*" means the terms and provisions set forth in the Form of Stockholder Lock-up Agreement attached hereto as **Exhibit C** (as well as any Lock-up Agreement entered into by any Privateer Stockholder).

"*Nasdaq*" means the Nasdaq Stock Market, including the Nasdaq Global Select Market or such other Nasdaq market on which shares of Tilray Common Stock are then listed.

"*Offering*" means an underwritten, at-the market offering, or other registered public offering of Tilray Common Stock or other offering of Tilray securities consummated by Tilray prior to the Closing.

"*Offering Price*" means the weighted-average price associated with each identifiable portion of funds designated for Cash Merger Consideration as follows: (i) in the case of an underwritten public offering, the public offering price of a share of Tilray Class 2 Common Stock in such offering, *less* any underwriting discounts, commissions or other compensation, (ii) in the case of an at-the-market offering, the weighted-average price per share of Tilray Class 2 Common Stock sold in such offerings, *less* any discounts, commissions or other compensation and (iii) in the case in which Tilray uses cash from any other offering of Tilray securities to be allocated as Cash Merger Consideration, the net sale price of a share of Tilray Class 2 Common Stock (after taking into account discounts, commissions or other compensation).

"*Option Cash Consideration Shares*" means the product of (i) the Total Cash-Out Options, *multiplied by* (ii) the Option Exchange Ratio.

"*Option Exchange Ratio*" means the following ratio: the *quotient of* (i) the Total Merger Consideration *less* the Escrow Amount, *divided by* (ii) the Privateer Exchange Shares.

"*Option FMV*" means (i) the FMV, *multiplied by* (ii) the Option Exchange Ratio.

"*Option Merger Consideration*" means a number of shares of Tilray Class 2 Common Stock equal to (i) the product of (A) the Privateer Service Provider Options, *multiplied by* (B) the Option Exchange Ratio, *less* (ii) the Option Cash Consideration Shares.

"*Optionholder's Cash Percentage*" means the *quotient of* (i) the Individual In-the-Money Option Value, *divided by* (ii) the Aggregate In-the-Money Option Value.

A-6

Table of Contents

"***Ordinary Course of Business***" means, with respect to any Entity, such actions taken in the ordinary course of its normal operations and consistent with its past practices; *provided, however*, that for the avoidance of doubt, Ordinary Course of Business shall exclude any breach of Contract or violation of applicable Law.

"***Organizational Documents***" means, with respect to any Person (other than an individual), (i) the certificate or articles of association or incorporation or organization or limited partnership or limited liability company, and any joint venture, limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (ii) all bylaws, regulations and similar documents or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"***Party***" or "***Parties***" means Privateer and the Stockholder Representative, on the one hand, and Tilray and Merger Sub, on the other hand.

"***Pending Claim***" means the matters set forth on **Schedule B**.

"***Permitted Encumbrance***" means: (i) any liens for current Taxes not yet due and payable or for Taxes that are being contested in good faith and for which adequate reserves have been made on Privateer Unaudited Interim Balance Sheet; (ii) minor liens that have arisen in the Ordinary Course of Business and that do not (in any case or in the aggregate) materially detract from the value of the assets or properties subject thereto or materially impair the operations of Privateer or any of its Subsidiaries; (iii) statutory liens to secure obligations to landlords, lessors or renters under leases or rental agreements; (iv) deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance or similar programs mandated by Law; (v) non-exclusive licenses of Intellectual Property Rights granted by Privateer or any of its Subsidiaries, in the Ordinary Course of Business and that do not (in any case or in the aggregate) materially detract from the value of the Intellectual Property Rights subject thereto; and (vi) statutory liens in favor of carriers, warehousemen, mechanics and materialmen, to secure claims for labor, materials or supplies.

"***Person***" means any individual, Entity or Governmental Body.

"***Pre-Closing Liabilities***" means any and all Liabilities of Privateer or any of its Subsidiaries arising out of or imposed upon or incurred by any Person as a result of any action, omission, fact or circumstance existing or occurring prior to the Effective Time. For clarity, Pre-Closing Liabilities includes Pre-Closing Taxes.

"***Pre-Closing Tax Period***" means any Tax period ending on or prior to the Closing Date.

"***Pre-Closing Taxes***" means (i) any and all Liability for Taxes of Privateer or any of its Subsidiaries for any Pre-Closing Tax Period or the portion of any Straddle Period ending on the Closing Date, (ii) any and all Liability for Taxes of any Person (A) as a result of Treasury Regulation Section 1.1502-6 or any analogous or similar state, local or foreign law or regulation or as a result of filing any consolidated, combined, unitary or aggregate Tax Return with such Person prior to the Closing Date; or (B) as a transferee or successor by law, pursuant to a Contract entered into prior to the Closing Date, or any other relationship in existence as of the Closing Date, and (iii) the Privateer Stockholders' share of Transfer Taxes pursuant to Section 5.10(f).

"***Privateer Allocation***" means the following allocation of the Stock Merger Consideration among the Privateer Stockholders:

(a) with respect to a Founder, a number of shares of Tilray Class 1 Common Stock equal to the *product of* (i) the Tilray Class 1 Common Stock Consideration Shares, *multiplied by* (ii) the *quotient of* (A) the number of shares of Privateer Capital Stock held by such Founder, *divided by* (B) the number of shares of Privateer Capital Stock held by all Founders;

A-7

Table of Contents

(b) with respect to each Privateer Stockholder, a number of shares of Tilray Class 2 Common Stock equal to (i) the *product of* (A) such holder's Pro Rata Consideration Ratio, *multiplied by* (B) the Total Merger Consideration, (ii) *less* the number of shares of Tilray Class 2 Common Stock equal to the *quotient of* (A) the Pro Rata Cash Portion with respect to such holder, *divided by* (B) the Offering Price (rounded up to the nearest whole share), and (iii) *less* in the case of a Founder, the number of shares of Tilray Class 2 Common Stock equal to the number of shares of Tilray Class 1 Common Stock allocated to such Founder pursuant to subsection (a) of this definition; and

(c) with respect to each Privateer Stockholder, the portion of Cash Merger Consideration equal to such holder's Pro Rata Cash Portion;

in each case, all in accordance with the Amended and Restated Privateer Charter.

"*Privateer Associate*" means any current or former employee, independent contractor, officer or director of Privateer or any of its Subsidiaries.

"*Privateer Board*" means the board of directors of Privateer.

"*Privateer Capital Stock*" means the Privateer Common Stock and the Privateer Preferred Stock.

"*Privateer Class 1 Common Stock*" means the Class 1 Common Stock, $0.0001 par value per share, of Privateer.

"*Privateer Class 1 Options*" means options or other rights to purchase shares of Privateer Class 1 Common Stock issued by Privateer.

"*Privateer Class 2 Common Stock*" means the Class 2 Common Stock, $0.0001 par value per share, of Privateer.

"*Privateer Class 3 Common Stock*" means the Class 3 Common Stock, $0.0001 par value per share, of Privateer.

"*Privateer Class 3 Options*" means options or other rights to purchase shares of Privateer Class 3 Common Stock issued by Privateer.

"*Privateer Closing Tax Opinion*" means a written opinion from Cooley, dated as of the Closing Date, based on the facts, representations, assumptions and exclusions set forth or described in such opinion, and substantially in the form set forth in **Schedule C-3**, to the effect that the Merger will qualify for the Intended Tax Treatment. In rendering such opinion, Cooley shall be entitled to rely upon customary assumptions, representations, warranties and covenants reasonably satisfactory to it, including the representations set forth in the Privateer Tax Representation Letter and the Tilray Tax Representation Letter.

"*Privateer Common Stock*" means the Privateer Class 1 Common Stock, Privateer Class 2 Common Stock, and Privateer Class 3 Common Stock.

"*Privateer Contract*" means any Contract: (i) to which Privateer or any of its Subsidiaries is a Party; (ii) by which Privateer or any of its Subsidiaries or any Privateer IP or any other asset of Privateer or its Subsidiaries is or may become bound or under which Privateer or any of its Subsidiaries has, or may become subject to, any obligation; or (iii) under which Privateer or any of its Subsidiaries has or may acquire any right or interest.

A-8

11/19/2019                                                                S-4/A

Table of Contents

"*Privateer ERISA Affiliate*" means any corporation or trade or business (whether or not incorporated) that is treated with Privateer or any of its Subsidiaries as a single employer within the meaning of Section 414 of the Code.

"*Privateer Exchange Shares*" means the total number of shares of Privateer Common Stock outstanding immediately prior to the Effective Time (expressed on an as-converted to Privateer Common Stock basis and assuming the effectiveness of the Preferred Stock Conversion), (i) including (A) the total number of shares assuming the exercise of all Privateer Service Provider Options immediately prior to the Effective Time and (B) the issuance of shares of Privateer Common Stock in respect of all other outstanding options, restricted stock awards, warrants or rights to receive such shares, whether conditional or unconditional and including any outstanding options, warrants or rights triggered by or associated with the consummation of the Merger and (ii) excluding any shares issuable upon exercise of the Tilray Service Provider Options.

"*Privateer Fundamental Representations*" means the representations and warranties of Privateer set forth in Sections 2.1 (Due Organization; Subsidiaries), 2.3 (Authority; Binding Nature of Agreement), 2.4 (Vote Required), 2.6 (Capitalization; Ownership of the Owned Shares), and 2.20 (No Financial Advisors).

"*Privateer IP*" means all Intellectual Property Rights that are owned or purported to be owned by, assigned to, or licensed to, Privateer or its Subsidiaries.

"*Privateer Material Adverse Effect*" means any Effect that is or would be reasonably expected to be materially adverse to the business, assets, or Liabilities of Privateer and its Subsidiaries, taken as a whole. In addition to, and without limiting, the foregoing, any Effect that is or would reasonably be expected to be materially adverse to the business, assets, or Liabilities of Privateer and its Subsidiaries, taken as a whole, but excluding the ownership of capital stock of Tilray, shall also constitute a Privateer Material Adverse Effect.

"*Privateer Options*" means Privateer Class 1 Options and Privateer Class 3 Options, collectively.

"*Privateer Plan*" means the Privateer Holdings, Inc. 2011 Equity Incentive Plan, as amended.

"*Privateer Preferred Stock*" means the Series A Preferred Stock, the Series B Preferred Stock and the Series C Preferred Stock.

"*Privateer Registration Statement Tax Opinion*" means a written opinion from Cooley, dated as of such date as may be required by the SEC in connection with the filing of the Registration Statement, based on the facts, representations, assumptions and exclusions set forth or described in such opinion, and substantially in the form set forth in **Schedule C-2**, to the effect that the Merger will qualify for the Intended Tax Treatment. In rendering such opinion, Cooley shall be entitled to rely upon customary assumptions, representations, warranties and covenants reasonably satisfactory to it, including the representations set forth in the Privateer Tax Representation Letter and the Tilray Tax Representation Letter.

"*Privateer Service Provider*" means a holder of Privateer Options that is not a Tilray Service Provider.

"*Privateer Service Provider Options*" means the Privateer Class 1 Options and the Privateer Class 3 Options held by a Privateer Service Provider.

"*Privateer Stockholder*" means a holder of Privateer Capital Stock.

"*Privateer Transaction Expense Overage*" means the amount of Privateer Transaction Expenses greater than $1,000,000 that are unpaid as the Effective Time.

A-9

11/19/2019                                                    S-4/A

Table of Contents

"*Privateer Transaction Expense Shares*" means a number of shares of Tilray Class 2 Common Stock equal to the *quotient of* (i) the amount of Privateer Transaction Expense Overage, *divided by* (ii) the Tilray Closing Price. For purposes of determining the Privateer Transaction Expense Shares, the number of shares of Tilray Class 2 Common Stock shall be rounded down to the nearest whole share. The calculation of the Privateer Transaction Expense Shares shall be set forth in the Allocation Certificate.

"*Privateer Transaction Expenses*" means all fees and expenses incurred by Privateer at or prior to the Effective Time in connection with the Contemplated Transactions and this Agreement, including any fees and expenses of legal counsel and accountants, the maximum amount of fees and expenses payable to financial advisors, investment bankers, brokers, consultants, and other advisors of Privateer, including any and all fees and expenses relating to the Privateer D&O Tail Policy; *provided* that 100% of the following shall not be considered Privateer Transaction Expenses: (i) the fees paid to the SEC in connection with filing the Registration Statement, the Proxy Statement, and any amendments and supplements thereto with the SEC; (ii) the Nasdaq Fees; (iii) the fees and expenses paid or payable to the Exchange Agent pursuant to the engagement agreement with the Exchange Agent; (iv) the fees and expenses paid or payable to the Escrow Agent pursuant to the engagement agreement with the Escrow Agent; and (v) any fees and expenses incurred by the financial printer or the proxy solicitor in connection with the filing and distribution of the Registration Statement and any amendments and supplements thereto with the SEC (without duplication of the fees and expenses addressed in clause (ai) above).

"*Privateer Unaudited Interim Balance Sheet*" means the unaudited consolidated balance sheet of Privateer and its consolidated Subsidiaries for the period ended June 30, 2019 made available to Tilray prior to the date of this Agreement.

"*Pro Rata Cash Portion*" means, with respect to any Privateer Stockholder, the amount of cash equal to the *product of* (i) the Cash Merger Consideration, *less* the Aggregate Cash Option Consideration, *multiplied by* (ii) such holder's Pro Rata Consideration Ratio; *provided* that the Pro Rata Cash Portion with respect to any Privateer Stockholder shall not exceed the amount of cash equal to the *product of* (A) the Offering Price, *multiplied by* (B) the number of shares equal to the *product of* (1) such holder's Pro Rata Consideration Ratio, *multiplied by* (2) the Total Merger Consideration, (3) *less* in the case of a Founder, the number of shares of Tilray Class 1 Common Stock allocated to such Founder pursuant to subsection (a) of the definition of the Privateer Allocation.

"*Pro Rata Consideration Ratio*" means, with respect to any Privateer Stockholder, the fraction equal to the *quotient of* (a) the number of shares of Privateer Capital Stock held by such holder, *divided by* (b) the Privateer Exchange Shares.

"*Pro Rata Portion*" means, with respect to any Privateer Stockholder, a percentage equal to the *quotient of* (i) (A) the *sum of* the Tilray Class 1 Common Stock Consideration Shares, *plus* (B) the Tilray Class 2 Common Stock Consideration Shares, in each case allocated to such Privateer Stockholder pursuant to Section 1.5(a)(iii) and in accordance with the Privateer Allocation, *divided by* (ii) the Stock Merger Consideration, the calculation of which shall be set forth in the Allocation Certificate.

"*Proxy Statement*" means the proxy statement to be sent to Tilray's stockholders in connection with the Tilray Stockholders' Meeting.

"*Registration Statement*" means the registration statement on Form S-4 (or any other applicable form under the Securities Act to register Tilray Class 2 Common Stock) to be filed with the SEC by Tilray registering the public offering and sale of Tilray Class 2 Common Stock to some or all holders of Privateer Class 2 Common Stock and Privateer Class 3 Common Stock in the Merger, including all shares of Tilray Class 2 Common Stock to be issued in exchange for all shares of Privateer Class 2 Common Stock and Privateer Class 3 Common Stock in the Merger, as said registration statement may be amended prior to the time it is declared effective by the SEC.

A-10

11/19/2019                                                                                          S-4/A

Table of Contents

"**Related Party**" means, with respect to any specified Person: (i) any Affiliate of such specified Person, or any director, executive officer, general partner or managing member of such Affiliate; (ii) any Person who serves as a director, executive officer, partner, member or in a similar capacity of such specified Person; (iii) any other Person who holds, individually or together with any Affiliate of such other Person, more than 5% of the outstanding equity, ownership, or voting interests of such specified Person.

"**Released Shares**" means the greater of (i) the number of Escrow Shares (as allocated in accordance with the Escrow Allocation) equal to the *quotient* of (A) the amount of an indemnifiable Loss *divided by* (B) the Tilray Trailing Price on the date the indemnification obligation for such Loss becomes due and payable, rounded up to the nearest whole number and (ii) the total number of Escrow Shares (as allocated in accordance with the Escrow Allocation) if the number of Escrow Shares then remaining on such date is less than the number required by clause (i) of this definition.

"**Representatives**" means directors, officers, employees, agents, attorneys, accountants, investment bankers, advisors and representatives.

"**Reserve Amount**" means $50,000, designated for the Reserve Account.

"**Sarbanes-Oxley Act**" means the Sarbanes-Oxley Act of 2002.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Securityholder**" means a holder of Privateer Capital Stock or Privateer Options.

"**Series A Preferred Stock**" means the shares of the Series A Preferred Stock of Privateer, par value $0.0001 per share.

"**Series B Preferred Stock**" means the shares of the Series B Preferred Stock of Privateer, par value $0.0001 per share.

"**Series C Preferred Stock**" means the shares of the Series C Preferred Stock of Privateer, par value $0.0001 per share.

"**Stock Cash Consideration Shares**" means the quotient of (i) the Cash Merger Consideration, *less* the Aggregate Cash Option Consideration, *divided by* (ii) the Offering Price.

"**Stock Merger Consideration**" means (i) the Total Merger Consideration, *less* (ii) the Option Merger Consideration, *less* (iii) the Cash Consideration Shares.

"**Straddle Period**" means any taxable period of Privateer that includes, but does not end on, the Closing Date.

An Entity shall be deemed to be a "**Subsidiary**" of a Person if such Person directly or indirectly owns or purports to own, beneficially or of record, (a) an amount of voting securities or other interests in such Entity that is sufficient to enable such Person to elect at least a majority of the members of such Entity's board of directors or other governing body, or (b) at least 50% of the outstanding equity, voting, beneficial or financial interests in such Entity; *provided* that Tilray shall not be considered a Subsidiary of Privateer unless specifically indicated.

A-11

Table of Contents

"*Superior Offer*" means an unsolicited *bona fide* written Acquisition Proposal (with all references to 20% in the definition of Acquisition Transaction being treated as references to greater than 50% for these purposes) that is on terms and conditions that the Tilray Board, as applicable, determines in good faith, based on such matters that it deems relevant (including the likelihood of consummation thereof), as well as any written offer by Privateer to amend the terms of this Agreement, and following consultation with its outside legal counsel and outside financial advisors, if any, are more favorable, from a financial point of view, to Tilray's stockholders than the terms of the Contemplated Transactions.

"*Takeover Statute*" means any "fair price", "moratorium," "control share acquisition" or other similar anti-takeover Law.

"*Tax*" means any federal, state, local, foreign or other tax, including any income, capital gain, gross receipts, capital stock, profits, transfer, estimated, registration, stamp, premium, escheat, unclaimed property, customs duty, ad valorem, occupancy, occupation, alternative, add-on, windfall profits, value added, severance, property, business, production, sales, use, license, excise, franchise, employment, payroll, social security, disability, unemployment, workers' compensation, national health insurance, withholding or other taxes, duties, fees, assessments or governmental charges, surtaxes or deficiencies thereof of any kind whatsoever, however denominated, and including any fine, penalty, addition to tax or interest imposed by a Governmental Body with respect thereto.

"*Tax Return*" means any return (including any information return), report, statement, declaration, estimate, schedule, notice, notification, form, election, certificate or other document, and any amendment or supplement to any of the foregoing, filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to any Tax.

"*Tilray Associate*" means any current or former employee, independent contractor, officer or director of Tilray.

"*Tilray Board*" means the board of directors of Tilray.

"*Tilray Class 1 Common Stock*" means the Class 1 Common Stock, $0.0001 par value per share, of Tilray.

"*Tilray Class 1 Common Stock Consideration Shares*" means 16,666,667 shares of Tilray Class 1 Common Stock; *provided, however,* that the Tilray Class 1 Common Stock Consideration Shares will be reduced on a one-to-one basis by the amount by which the shares of Tilray Class 1 Common Stock held by Privateer immediately prior to the Effective Time is less than 16,666,667 shares. For example, if immediately prior to the Effective Time, Privateer owns 16,000,000 shares of Tilray Class 1 Common Stock, the Tilray Class 1 Common Stock Consideration Shares shall not exceed 16,000,000 shares. In no event shall the Tilray Class 1 Common Stock Consideration Shares exceed the lesser of (a) the number of shares of Tilray Class 1 Common Stock held by Privateer immediately prior to the Effective Time or (b) 16,666,667 shares.

"*Tilray Class 2 Common Stock*" means the Class 2 Common Stock, $0.0001 par value per share, of Tilray.

"*Tilray Class 2 Common Stock Consideration Shares*" means 58,333,333 shares of Tilray Class 2 Common Stock; *provided, however,* that the Tilray Class 2 Common Stock Consideration Shares will be reduced on a one-to-one basis by the amount by which the shares of Tilray Class 2 Common Stock held by Privateer immediately prior to the Effective Time is less than 58,333,333 shares (such that in no event shall such number exceed the lesser of (i) the number shares of Tilray Class 2 Common Stock held by Privateer immediately prior to the Effective Time or (ii) 58,333,333 shares), in each such case, *less* (A) the Cash Consideration Shares, *less* (B) the Privateer Transaction Expense Shares.

A-12

11/19/2019                                               S-4/A

Table of Contents

"*Tilray Class 3 Common Stock*" means the Class 3 Common Stock, $0.0001 par value per share, of Tilray.

"*Tilray Closing Price*" means the volume-weighted average closing trading price of a share of Tilray Class 2 Common Stock on Nasdaq for the five consecutive trading days ending five trading days immediately prior to the Closing Date.

"*Tilray Closing Tax Opinion*" means a written opinion from Paul Hastings, dated as of the Closing Date, based on the facts, representations, assumptions and exclusions set forth or described in such opinion, and substantially in the form set forth in **Schedule D-3** to the effect that the Merger will qualify for the Intended Tax Treatment. In rendering such opinion, Paul Hastings shall be entitled to rely upon customary assumptions, representations, warranties and covenants reasonably satisfactory to it, including the representations set forth in the Privateer Tax Representation Letter and the Tilray Tax Representation Letter.

"*Tilray Common Stock*" means the Tilray Class 1 Common Stock, the Tilray Class 2 Common Stock, and the Tilray Class 3 Common Stock.

"*Tilray Contract*" means any Contract: (i) to which Tilray or Merger Sub is a party; (ii) by which Tilray, Merger Sub or any Tilray IP or any other asset of Tilray or Merger Sub is or may become bound or under which Tilray or Merger Sub has, or may become subject to, any obligation; or (iii) under which Tilray or Merger Sub has or may acquire any right or interest.

"*Tilray Fundamental Representations*" means the representations and warranties of Tilray and Merger Sub set forth in Sections 3.1 (Due Organization; Subsidiaries), 3.3 (Authority; Binding Nature of Agreement), and 3.6 (No Financial Advisors).

"*Tilray IP*" means all Intellectual Property Rights that are owned or purported to be owned by, assigned to, or licensed to, Tilray or its Subsidiaries.

"*Tilray Material Adverse Effect*" means any Effect that would prevent or materially delay the ability of Tilray to consummate the Contemplated Transactions.

"*Tilray Registration Statement Tax Opinion*" means a written opinion from Paul Hastings, dated as of such date as may be required by the SEC in connection with the filing of the Registration Statement, based on the facts, representations, assumptions and exclusions set forth or described in such opinion, and substantially in the form set forth in **Schedule D-2**, to the effect that the Merger will qualify for the Intended Tax Treatment. In rendering such opinion, Paul Hastings LLP shall be entitled to rely upon customary assumptions, representations, warranties and covenants reasonably satisfactory to it, including the representations set forth in the Privateer Tax Representation Letter and the Tilray Tax Representation Letter.

"*Tilray SEC Documents*" means the registration statements, proxy statements, certifications and other statements, reports, schedules, forms and other documents furnished or filed by or on behalf of Tilray with the SEC, including any certifications and statements required by (i) Rule 13a-14 under the Exchange Act and (ii) 18 U.S.C. §1350 (Section 906 of the Sarbanes-Oxley Act).

"*Tilray Service Provider*" means the Persons set forth in Section A of the Privateer Disclosure Letter.

"*Tilray Service Provider Options*" means the Privateer Class 1 Options and the Privateer Class 3 Options held by a Tilray Service Provider.

"*Tilray Trailing Price*" means, with respect to any date, the volume-weighted average closing trading price of a share of Tilray Class 2 Common Stock on Nasdaq for the five consecutive trading days ending five trading days immediately prior to such date.

A-13

Table of Contents

"***Total Cash-Out Options***" means the aggregate total of all In-the-Money Options to which Individual Option Cash Consideration is allocated pursuant to the Cash-Out Options Allocation.

"***Total Merger Consideration***" means the *sum of* (i) the Tilray Class 1 Common Stock Consideration Shares, *plus* (ii) Tilray Class 2 Common Stock Consideration Shares, *plus* (iii) the Cash Consideration Shares.

"***Transaction Documents***" means this Agreement, the Stockholder Lock-up Agreements, the Escrow Agreement, the Privateer Disclosure Letter, the Tilray Disclosure Letter, the Allocation Certificate, and each other agreement, certificate, document and instrument contemplated hereby and thereby, including all Schedules, Annexes, and Exhibits hereto and thereto.

"***Transfer***" shall mean any direct or indirect (i) sale, transfer, assignment, pledge, hypothecation, mortgage, license, gift, creation of a security interest in or lien on, Encumbrance or other disposition to any Person, including those by way of hedging or derivative transactions or (ii) swap, hedge, short position, call or other arrangement that is designed to or which could reasonably be expected to lead to or result in, directly or indirectly, a transfer of the economic consequence of ownership of any Tilray Class 1 Common Stock or Tilray Class 2 Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery any Equity Interests in Tilray or any of its Subsidiaries or any other securities, in cash or otherwise.

"***Transfer Tax***" means any transfer, documentary, sales, use, stamp, registration, value added, real property and similar Taxes and fees (including any penalties and interest thereon).

"***Treasury Regulations***" means the United States Treasury regulations promulgated under the Code.

"***WARN Act***" means the Worker Adjustment Retraining and Notification Act of 1988, as amended, or any similar state or local plant closing mass layoff statute, rule or regulation.

Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Agreement | Recitals |
| Allocation Certificate | 5.15 |
| Amended and Restated Privateer Charter | 6.6 |
| Amended and Restated Tilray Charter | 6.6 |
| Anti-Bribery Laws | 2.23 |
| Cash Merger Consideration | 1.5(d) |
| Certificate of Merger | 1.3 |
| Class 1 Tilray Options | 5.5(b) |
| Class 3 Tilray Options | 5.5(c) |
| Closing | 1.3 |
| Closing Date | 1.3 |
| Cooley | 5.10(c) |
| Costs | 5.6(a) |
| Covenant Breach | 11.2(b) |
| Deal Communications | 12.12(c) |
| D&O Indemnified Parties | 5.6(a) |
| Dissenting Shares | 1.8(a) |
| Effective Time | 1.3 |
| End Date | 9.1(b) |
| Escrow Agreement | 5.20 |
| Escrow Release Date | 11.7 |
| Exchange Agent | 1.7(a) |

A-14

Table of Contents

| Term | Section |
|---|---|
| Exchange Fund | 1.7(a) |
| FLSA | 2.17(n) |
| Fraud Claim | 11.2(i) |
| FTC | 5.4(b) |
| Indemnifying Parties | 11.2 |
| Information Statement | 5.2(a) |
| Initial Receipt Period | 5.3(b) |
| Insurance Policies | 2.19 |
| Intended Tax Treatment | 5.10(ax |
| Intervening Event | 5.3(d)(ii) |
| Investor Agreements | 2.22(a) |
| Letter of Transmittal | 1.7(b) |
| Loss | 11.2 |
| Merger | Recitals |
| Merger Notification Filings | 5.4(c) |
| Merger Sub | Preamble |
| Nasdaq Fees | 5.9 |
| Nasdaq Listing Application | 5.9 |
| Notice Period | 5.3(d)(i) |
| Option Assumption Agreement | 5.5(b) |
| Owned Shares | 2.6(f) |
| Paul Hastings | 5.10(c) |
| Per Claim Threshold | 11.3(a) |
| Pre-Closing Period | 4.1(a) |
| Preferred Stock Conversion | 5.19 |
| Privateer | Preamble |
| Privateer Benefit Plan | 2.17(a) |
| Privateer Board Recommendation | 5.2(d) |
| Privateer Book Entry Shares | 1.6 |
| Privateer D&O Tail Policy | 5.6(d) |
| Privateer Disclosure Letter | 2 |
| Privateer Financials | 2.7(a) |
| Privateer Lock-up Agreement | 9.3(b) |
| Privateer Material Contract(s) | 2.13(a) |
| Privateer Permits | 2.14(e) |
| Privateer Real Estate Leases | 2.11 |
| Privateer Signatories | Recitals |
| Privateer Stock Certificate | 1.6 |
| Privateer Stockholder Matters | 5.2(a) |
| Privateer Stockholder Written Consent | 2.4 |
| Privateer Support Agreement | Recitals |
| Privateer Tax Representation Letter | 5.10(c) |
| Privileged Deal Communications | 12.12(c) |
| Protected Parties | 12.12(b) |
| Required Privateer Stockholder Vote | 2.4 |
| Required Tilray Stockholder Vote | 3.4 |
| Stockholder Lock-up Agreement | 1.7(b) |
| Stockholder Notice | 5.2(c) |
| Stockholder Representative | Preamble |
| Surviving Company | 1.1 |

A-15

Table of Contents

| Term | Section |
|---|---|
| Terminating Privateer Option | 5.5(e) |
| Terminating Privateer Option Consideration | 5.5(e) |
| Third Party Claim | 11.4(a) |
| Tilray | Preamble |
| Tilray Board Recommendation | 5.3(c) |
| Tilray Board Adverse Recommendation Change | 5.3(c) |
| Tilray Disclosure Letter | 3 |
| Tilray Indemnified Parties | 11.2 |
| Tilray Options | 5.5(c) |
| Tilray Signatories | Recitals |
| Tilray Special Committee | Recitals |
| Tilray Stockholder Matters | 5.3(a)(ii) |
| Tilray Stockholders' Meeting | 5.3(a)(ii) |
| Tilray Tax Representation Letter | 5.10(c) |
| Warranty Breach | 11.2(a) |

A-16