**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  1:19-cv-25019-SINGHAL/McAliley**

INFINITY GLOBAL CONSULTING
GROUP INC., et al.,

        Plaintiffs,

v.

TILRAY, INC., et al.,

        Defendants.

_____/

**DECLARATION OF DARA REDLER IN SUPPORT OF MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION**

I, Dara Redler, declare as follows:

I am over the age of 18 and competent to testify to the matters stated in this declaration.  I have been employed by Tilray, Inc. ("Tilray") since January 21, 2019 and am currently the General Counsel of Tilray.  I make this declaration based on personal knowledge and Tilray's records generated, maintained, and relied upon in the ordinary course of its business.

**Tilray, Inc.**

1.      Tilray is a Delaware Corporation with its principal place of business in Nanaimo, British Columbia, Canada.

2.      Tilray does not have, nor has it ever had, an office located in the State of Florida.

3.      Tilray does not have, nor has it ever had, employees, agents or personal representatives physically located in the State of Florida.

4.      Tilray does not have, nor has it ever had, leadership based in Florida and has never otherwise directed its operations from the State of Florida.

5.      Tilray is not licensed or registered to do business in Florida, and does not have a registered agent in the state.

6.      The burden on Tilray to litigate this case in the State of Florida would be substantial and disruptive to its business operations.

### Privateer Evolution, LLC

7.      In December 2019, Tilray and Privateer Holdings, Inc. merged, with Privateer Evolution, LLC emerging as the successor to Privateer Holdings.  Privateer Evolution is a wholly owned subsidiary of Tilray.

8.      Privateer Evolution is a Delaware limited liability company with its principal place of business in Seattle, Washington.

9.      Privateer Evolution does not have, nor has it ever had, an office located in the State of Florida.

10.     Privateer Evolution does not have, nor has it ever had, employees, agents or personal representatives physically located in the State of Florida.

11.     Privateer Evolution does not have, nor has it ever had, leadership based in Florida and never directed its operations from the State of Florida

12.     Privateer Evolution does not now sell, nor has it ever sold, goods or services in the State of Florida.

13.     Privateer Evolution is not licensed or registered to do business in Florida, and does not have a registered agent in the state.

14.     The burden on Privateer Evolution to litigate this case in the State of Florida would be substantial and disruptive to its business operations.

**Communications with Plaintiffs' Counsel**

15.     On November 27, 2019, counsel for Plaintiffs, Peter Gonzalez, sent an email to me and representatives of Privateer Holdings, Inc., attaching a draft complaint signed by Plaintiffs' counsel and verified by Plaintiff Joseph Vazquez.  A true and correct copy of that draft complaint (without its exhibits) is attached as **Exhibit A.**

16.     On November 30, 2019, Mr. Gonzalez sent another email to me requesting that Tilray and Privateer Holdings accept service via email of the verified California complaint in the form attached as **Exhibit A.**

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED this 18th day of May 2020 at Atlanta, Georgia.

DocuSigned by:

*Dara Redler*

203D2CE992E941D...

Dara Redler

# EXHIBIT A

1   PETER A. GONZÁLEZ, ESQ. (Fla. Bar No. 036919)
JOSEPH R. GOMEZ, ESQ. (Fla. Bar No. 724319)

2   SMGQ LAW
201 Alhambra Circle, Suite 1205

3   Miami, Florida 33134

4   Telephone:    (305) 377-1000
Facsimile:    (786) 304-2217

5   Emails: pgonzalez@smgqlaw.com; jgomez@smgqlaw.com
*Attorneys for Plaintiffs*

6

7             **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                    **FOR THE COUNTY OF LOS ANGELES**

8

9

| | |
|---|---|
| 10   INFINITY GLOBAL CONSULTING GROUP INC., a Florida corporation, JOSEPH M. VAZQUEZ III, an individual; and JOSEPH M. VAZQUEZ III, derivatively, as a shareholder, and on behalf of, TRIMAX Corporation, a Nevada corporation | Case No.:<br><br>**VERIFID COMPLAINT FOR:**<br><br>1. **Emergency Temporary and Injunctive Relief;**<br>2. **For Breach of Fiduciary Duties;**<br>3. **For Conversion;**<br>4. **For Fraud;**<br>5. **For Intentional Interference with Contractual Relations;**<br>6. **For Negligent Interference with Prospective Economic Relations; and**<br>7. **For Aiding and Abetting** |

                 Plaintiffs,

14         vs.

15   TILRAY INC., a Delaware corporation;
PRIVATEER HOLDINGS INC., a Delaware
corporation, LEFT COAST VENTURES, INC., a
Delaware corporation, EKO HOLDINGS LLC, a
California limited liability company; BRETT
CUMMINGS, an individual, HUGO
SAAVEDRA, an individual; DEBRA
SAAVEDRA, an individual; EQUITABLE
TRANSITIONS INC., a California corporation;
and DOES 1 through 20,  inclusive;

                 Defendants.

**JURY TRIAL DEMANDED**

Action Filed:

DATED: November 21, 2019

1       Plaintiffs, INFINITY GLOBAL CONSULTING GROUP INC., a Florida corporation

2  ("Infinity Consulting"), and JOSEPH M. VAZQUEZ III, individually (Mr. Vazquez"), and

3  derivatively, as a shareholder on behalf of Trimax Corporation, a Nevada corporation (each a

4

5  "Plaintiff" and, collectively, "Plaintiffs") hereby file this action: (a) for emergency temporary and

6  permanent injunctive relief; (b) for breach of fiduciary duty;  (c) for conversion; (d) for fraud; (e)

7  for intentional interference with contractual relations; (f) for negligent interference with prospective

8  economic relations; and (g) for aiding and abetting the foregoing torts.  In support of this

9  Complaint, Plaintiffs allege as follows:

10

11  **I.    PRIVATEER HOLDINGS' UNLAWFUL SCAM TO ACQUIRE THE ASSETS OF TRIMAX CORPORATION**

12

13  **A.  Introduction**

14      1.    This action is brought to seek redress for a sophisticated scam, unscrupulously and

15  unlawfully perpetuated by Privateer Holdings Inc., a Delaware corporation ("Privateer"),  its

16  affiliates, and other parties named as Defendants herein, to *fraudulently* remove all the assets of a

17  public company, Trimax Corporation, a Nevada corporation ("Trimax") (OTC: TMXN) for

18  virtually no consideration, leaving all of Trimax creditors' debts unpaid, and rendering its

19  shareholders' investments in Trimax completely worthless.

20

21      2.    Privateer is a private equity firm which beneficially owns and controls approximately

22  75% of a publicly traded corporation named Tilray, Inc., a Delaware corporation ("Tilray"), which

23  is traded on the NASDAQ stock exchange under the symbol "TLRY".  Tilray touts itself as a global

24  leader in cannabis research, cultivation, processing and distribution, and as a leading supplier of

25  cannabis flower and extract products to customers which included patients, physicians, pharmacies,

26  hospitals, governments and researchers on five continents. Tilray's market capitalization is currently

27  over $2 billion. As such, Privateer's 75% stock ownership in Tilray is presently valued at over $1.5

28  billion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     3.      Prior to the scam described below and orchestrated by Privateer and the other Defendants named herein, Trimax owned, through its subsidiary, Saavy Naturals Inc., a Nevada corporation ("Saavy Naturals"), all of the assets of the business known as Saavy Naturals, which included its infamous brand which marketed and sold luxurious high quality all-natural products such as edible soaps, body creams, body scrubs, bath bombs, hair care products, candles and other products online and in retail stores.

     4.      Saavy Naturals was founded by Hugo Saavedra ("Mr. Saavedra") and Debra Saavedra (collectively, the "Saavedras") in 2014.  Hugo Saavedra is the sole director of Trimax and Saavy Naturals. He and Debra Saavedra are the sole senior executives of the companies.  Saavy Naturals gained popularity when the Saavedras first appeared on the popular television show, *Shark Tank*, which aired on November 6, 2015. Saavy Naturals' revenue spiked significantly after the *Shark Tank* episode aired. Saavy Naturals grew rapidly and obtained agreements with Walmart, among others to roll-out Saavy Naturals Everyday's free-standing custom-made pallet displays, which hold 1,152 individual soaps in 12 scents.

     5.      In late 2018, Saavy Naturals received purchase orders for over 200 Walmart locations to distribute its handcrafted soaps to the states of Indiana, Texas, Tennessee, New Hampshire, Arizona, Florida, Michigan, Virginia, Oregon, Colorado, New York, Wisconsin, Missouri, Pennsylvania, California, Illinois, Montana, Louisiana, Delaware, Alabama, North Carolina, Kentucky and Mississippi. Saavy Naturals also projected that it would expand its locations in order to reach its goal of distributing to over 1,000 Walmart locations nationwide. Thus, Saavy Naturals' future prospects were positive and rising rapidly. See Trimax Press Releases from September 2018 and December 2018 attached hereto as **Exhibit A**.   Indeed, in November 2018, Bed Bath & Beyond's online division was going so well that it requested a meeting at their corporate office to discuss putting Saavy Natural's complete line of products into their over 1,000 BBB retail locations.

**B.**   **Privateer's and Left Coast Ventures' Interest in Saavy Naturals:**
**The First Unlawful Overture to Acquire its Assets**

6.      At approximately this same time period (beginning in August of 2018), Privateer became interested in acquiring a major ownership stake in Saavy Naturals as a potential complement to its line of Cannabidiol ("CBD") products offered by its various subsidiaries, including its main subsidiary, Tilray.   Brett Cummings, who represented himself to be the Chief Executive Officer ("CEO") of both Privateer and Left Coast Ventures, Inc., a Delaware corporation ("Left Coast Ventures") told the Saavedras and Plaintiff Vazquez, who was an advisor and business consultant to Trimax and Saavy Naturals through his wholly owned entity, Infinity Consulting, that Privateer was interested in Saavy Naturals because of the credibility that Saavy Naturals had established with its products on *Shark Tank* and *The Home Shopping Network*. In addition, he advised that Privateer was interested in having Saavy Naturals create and develop a full line of beauty/skin healthcare products that were 100% all natural and infused with CBD oil, and also, in having Saavy Naturals manufacture the product line as a private label.  Privateer was also interested in Saavy Naturals because of the quality of the products made and the fact that they were selling in Walmart, Bed Bath & Beyond, Costco, Whole Foods, Gelsons, among others. These already existing relationships would prove valuable to Privateer with their plans to create a new line of all-natural CBD infused beauty care products.

7.      Following various discussions with the Saavedras, Privateer presented two (2) term sheets for investments in Saavy Naturals.  Attached hereto as  **Exhibit B** is an email from Mr. Cummings describing the proposed transactions on behalf of Privateer together with the term sheets.  One of the term sheets proposed a $1.5 million investment in Saavy Naturals which calculated the pre-money valuation of Saavy Naturals at $2.5 million for a total post-money valuation of $4 million. This initial offer was for a 37.5% minority stake in Saavy Naturals. The

Case 1:19-cv-25019-AHS   Document 59-1   Entered on FLSD Docket 05/18/2020   Page 9 of 48

$2.5 million pre-money valuation was actually less than the market capitalization of Trimax (which included its wholly owned subsidiary, Saavy Naturals). For example, on November 1, 2018, Trimax's total market capitalization was approximately $4 million.

8. Based on the term sheets presented and after discussions with Mr. Cummings and the Saavedras, it became apparent to Plaintiffs that Privateer was proposing to take Saavy Naturals "private" in a transaction where only the Saavedras and Privateer would end up as owners of the assets of Trimax, including the Saavy Naturals brand and that, as a result, they would own together with Privateer all of the corporate opportunities created by the new proposed business structures. As a consequence, Plaintiff Vazquez became concerned that the creditors and public shareholders of Trimax would not participate in this proposed transactions, or receive any of their benefits. Mr. Vazquez could not see how, based on the structure of the transactions as presented, that the creditors and public shareholders would ever be compensated for their respective stakes in Trimax.

9. As a consequence, in October of 2018, Mr. Vazquez advised Hugo Saavedra that he would be shirking his fiduciary duties to the constituents of Trimax if he allowed the assets of Saavy Naturals to be transferred to Privateer in the transactions as proposed by Privateer.

10. At approximately this same time period, Mr. Vazquez participated in several calls with Mr. Cummings and the Saavedras concerning the proposed transactions. In each call, Mr. Vazquez stressed the importance of protecting the creditors and shareholders of Trimax. However, Privateer's Brett Cummings would have none of this talk. Rather, he reiterated during a call that Privateer was not going to enter into any investment transaction where any of its money would be used to pay existing creditors or shareholders of Trimax. At one point during a discussion about the amount of the outstanding debt of Trimax, Mr. Cummings stated "Well, you've created quite the mess, haven't you Hugo [Saavedra]?"  He went on to say: "Privateer will not put in a single dollar in this company if we have to take on a single penny of debt or liability from Saavy Naturals."

11.     In a subsequent call also in October of 2018, Mr. Vazquez learned that Privateer was now instructing Mr. Saavedra to "bankrupt Saavy Naturals" as a way to allow Privateer to acquire a stake in Saavy Naturals without adequately compensating any of its existing creditors or shareholders for the real value of the business. Following the end of the call, Mr. Vazquez was incredulous with Mr. Cummings' proposals and told Mr. Saavedra to walk away from Privateer.

12.     After a few days had passed, Mr. Vazquez believed that the proposed transactions were dead, and that the Saavedras were no longer pursuing a deal with Privateer since the Saavedras did not raise the issue again with him.  As such, Mr. Vazquez continued to work with the Saavedras in the normal course of business without any knowledge of any continued proposals from Privateer or its affiliates.  However, on December 18, 2018, one of the creditors of Trimax called Mr. Vazquez and asked him to assist him in locating Mr. Saavedra who was not returning his calls. Mr. Vazquez promptly emailed Mr. Saavedra and urged him to return the creditor's calls.  Mr. Saavedra did not respond.

13.     Thereafter, for several weeks, Mr. Vazquez called Mr. Saavedra several times and sent him 19 work related emails but Mr. Vazquez never received a single response.  Suddenly, after years of being a trusted advisor to Mr. Saavedra, Mr. Vazquez was apparently and inexplicably on the "outs."  As explained below, this was because Mr. Saavedra was now under the influence of Privateer's and Left Coast Ventures' Brett Cummings.

**C.    Privateer's and Left Coast Ventures Loan to Own Scheme**

14.     After months of continued silence, in March of 2019, Mr. Vazquez received a letter from Defendant Equitable Transitions Inc., a Delaware corporation (Equitable Transitions") advising him that all of the assets of Saavy Naturals had been assigned to Equitable Transitions as an "assignee for the benefit of creditors".  Mr. Vazquez was taken aback to learn that Saavy Naturals no longer owned any assets and that all its assets were now in the hands of a professional asset liquidator.

15.     However, little did Mr. Vazquez know that this was only the first leg of the scheme. Privateer had put aside the original investment transactions it had proposed in its term sheets; those were no longer part of the plan.  Instead, in its place was a plan far more devious, unethical and unlawful.

16.     Eventually, Mr. Vazquez learned that the transfer to Equitable Transitions was all part of an elaborate "loan to own" scheme (the "Loan to Own Scheme") that, unbeknownst to him, had occurred in late December of 2018 and was being orchestrated by Privateer through its authorized agent, Brett Cummings, and by the Saavedras and others to defraud the creditors and shareholders of Saavy Naturals by facilitating a fraudulent transfer of all of the assets of Saavy Naturals to a newly-formed entity, Eko Holdings, LLC, a California limited liability company ("Eko"). As detailed more fully below, the total consideration paid by Eko for all of these assets of Saavy Naturals was a mere $70,000 plus supposed partial loan forgiveness of $41,000 of Eko debt. *This strikingly low figure was far less than the $700,000 or more owed to creditors, significantly less than Privateer's own proposed pre-money valuation of Saavy Naturals at $2.5 million, and considerably less than the market capitalization of Saavy Naturals which was close to $4 million at the time.*

**D.     Privateer, Left Coast Ventures, and Eko – All One and the Same**

17.     Notably, at the time of this sham transaction on or about December 24, 2018, Eko was owned and controlled by Left Coast Ventures, and Left Coast Ventures was a wholly owned subsidiary of Privateer.  More importantly, upon information and belief (i) no portion of the consideration presumably paid by Eko in the Loan to Own Scheme was used for the benefit of the creditors of Saavy Naturals or for the benefit of the shareholders of Trimax, and (ii) all, or almost entirely all, of the proceeds went to pay for the fees and transaction expenses of Equitable Transitions.  All of this was known to all of the Defendants at the time of the illicit transaction, as

they all participated in the planning of this scheme.  In short, the transaction amounted to what was essentially an unlawful conversion of the assets of Saavy Naturals and Trimax for no consideration.

18.      Evidence of Left Coast Ventures ownership of, and close association with, Eko during at all times material hereto, includes, but is not limited to, the following: (i) immediately after the closing of the purchase of Saavy Naturals' assets by Eko in the Loan to Own Scheme in late December 2018, the demo website of Left Coast Ventures reflected Saavy Naturals as one of its "portfolio businesses" (attached hereto as **Exhibit C** is a copy of such Left Coast Ventures demo website); (ii) at all times thereafter, Saavy Naturals continues to be listed without interruption on Left Coast Venture's demo website as a portfolio business; (iii) both Brett Michel (not named as a Defendant herein) and Brett Cummings are employees of Left Coast Ventures, and Brett Cummings was the principal perpetrator of the Loan to Own Scheme, and Brett Michel met with an appraiser of Saavy Naturals' assets in connection with the Loan to Own Scheme, as reflected on the liquidation appraisal letter (the "Liquidation Opinion") attached hereto as **Exhibit D**; (iv) the publicly identified corporate office address of Left Coast Ventures and Eko listed in its corporate filings are exactly the same: 975 Corporate Center Parkway, Suite 120, Santa Rosa, California, 94507 (see corporate filings of Left Coast Ventures and Eko attached hereto as **Exhibit E**; (v) the website for "saavynaturals.com" lists info@ekonaturals.us as its contact email address, and GoDaddy lists the registered entity owner of "ekonaturals.us" as Left Coast Ventures, and further lists the registrant's email contact as: brett.cummings@privateerholdings.com (see attached GoDaddy Registration for "ekonaturals.us" attached hereto as **Exhibit F;** (vi) Eko has an office address located at 20338 Corisco Street, Chatsworth, California 91311, and Left Coast Ventures' LinkedIn profile lists a Chatsworth, California location as an additional office of Left Coast Ventures (copy of LinkedIn profile attached hereto as **Exhibit G**; and (vii) upon information and belief, all email communications between the Saavedras and Brett Cummings concerning the Loan to Own Scheme were conducted by Mr. Cummings through his email address at Left Coast

Ventures: Brett@leftcoastventures.us or his email address at Privateer:

brett.cummings@privateerholdings.com.

19.     Privateer's relationship with Left Coast Ventures is undeniable.  Pursuant to an S-4 filed by Tilray on October 10, 2019, Left Coast Ventures was a wholly owned subsidiary of Privateer until February of 2019, at which time Privateer distributed all of its shares of Left Coast Ventures to its shareholders in anticipation of a proposed merger with Tilray. The merger is scheduled to close in the fourth quarter of 2019, as discussed more fully below. As a consequence, it is undisputed that Left Coast Ventures was owned by Privateer at the time of the Loan to Own Scheme, and continued to be owned by Privateer at least through January 31, 2019.

20.     Saavy Naturals' general assignment for the benefit of creditors and concomitant loan and sale to a newly formed entity, Eko, was a thinly-veiled, sham transaction. As described more fully herein, it left no money after expenses for the creditors and numerous shareholders of Trimax, a publicly held corporation.  Privateer, however, did just fine. Privateer achieved the exact purpose which was declared from the very beginning by its authorized representative, Brett Cummings, in his discussions with the Saavedras and Plaintiff Vazquez, which was to acquire the assets of Saavy Naturals without paying a single cent to the existing creditors and shareholders of Trimax.

21. The actions of Privateer, Left Coast Ventures and Eko, as effectuated by Brett Cummings, the Saavedras, and others "shocks the conscience."

22.     Privateer and Left Coast Ventures were well aware of the actions of Brett Cummings in effectuating this scam.  The CEO of Left Coast Ventures is Brett Cummings.

23.     The Board of Directors of Left Coast Ventures are Michael Blue and Christian Groh. The Board of Directors of Privateer include two of the same directors: Michael Blue and Christian Groh, in addition to Brendan Kennedy. *How could Brett Cummings as the CEO of Left Coast Ventures (a wholly owned subsidiary of Privateer at the time of the sham transaction) effectuate a purchase of all of the assets of a public company for what amounted to "fake consideration"*

*without the express knowledge and consent of Michael Blue, Christian Groh and Brendan Kennedy? Moreover, how could he do so when immediately prior to the sham transaction Privateer's very own valuation established Saavy Naturals at millions of dollars more than the illusory price paid in the sham transaction? Either these members of the Board of Directors of Privateer and Left Coast Ventures were grossly negligent in their oversight duties of its senor most executive or they were complicit in the fraud.* Any fraudulent, manipulative, or deceptive conduct by such members of the Board in connection with a purchase of the assets of Saavy Naturals, if proven, could subject such persons to personal liability and to potential Securities and Exchange Commission ("SEC") disciplinary actions. Either way, Privateer and Left Coast Ventures, among other Defendants in this lawsuit, should be held strictly accountable for the fraud perpetuated on the creditors and shareholders of Trimax. This Verified Complaint seeks to do just that by not only seeking compensatory damages and other damages, but also punitive damages, as permitted by law.

## II.   **PARTIES**

24.     Plaintiff, Joseph M. Vazquez III is an individual who resides in Miami-Dade, Florida and is *sui juris*.

25.     Plaintiff, Infinity Consulting Inc. is a Florida corporation with a principal place of business located in Miami-Dade County, Florida.

26.     Plaintiff, Trimax Corporation, in whose name Plaintiff Vazquez has additionally brought this action derivatively as a shareholder of Trimax, is a Nevada corporation with a principal place of business located in Los Angeles County, California.

27.     Defendant Privateer Holdings, Inc. is a Delaware corporation registered to do business as a foreign corporation in California.

28.     Defendant Left Coast Ventures, Inc. is a Delaware corporation registered to do business as a foreign corporation in California.

VERIFIED COMPLANT

29.    Defendant Eko Holdings LLC is a California limited liability company conducting business in Los Angeles, California.

30.    Plaintiffs are informed and believe that at all times material hereto, Defendant Brett Cummings was and is an individual residing in Contra Costa County, California, and engaged in business dealings in Los Angeles, California.

31.    Defendant Hugo Saavedra was and is an individual who resides in and conducts business in Los Angeles County, California.

32.    Defendant Debra Saavedra was and is an individual who resides in and conducts business in Los Angeles County, California

33.    Defendant Equitable Transitions Inc. is a California corporation with its primary place of business located in Los Angeles County, California.

34.    Defendant Tilray, Inc. is a Delaware corporation conducting business in Los Angeles, California. Tilray is being named in this suit solely as an indispensable party since Plaintiffs is seeking an emergency injunction in Count I herein to stop a proposed merger between Privateer and Tilray which is scheduled to occur in the next few days, as more fully described herein.  For the avoidance of doubt, there are no allegations of wrongdoing or damages sought against Tilray in this action at this time. Any reference to Defendants herein does not include Tilray unless Tilray is specifically identified as being included as a Defendant.

35.    The true names, identities, and capacities, whether individual, corporate or otherwise, of Defendants Does 1 through 20, inclusive, and each of them, are unknown to Plaintiffs. Plaintiffs therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants sued herein as a "Doe" Defendant is in some fashion responsible for the events and occurrences set forth herein.  Plaintiffs will seek leave to amend this Verified Complaint when the true identity of each fictitiously named "Doe" Defendant is ascertained though discovery or otherwise.

1       36.    Some or all of the Defendants were acting as the agents, representatives, employees,

2   and/or alter egos of each other, and in doing the acts alleged herein were acting within the course

3   and scope of such agency, representation, employment, and/or alter ego relationship and with their

4   Co-Defendants' permission and consent.

5       37.    All of the Defendants conspired and agreed among and/or between themselves or

6   with other Defendants to do the acts complained of, and by the conduct described herein, carried

7   into action and completed their schemes, thus injuring and damaging Plaintiffs, Trimax, and Saavy

8   Naturals, as set forth herein. In engaging in such conduct with other Defendants, these Defendants

9   have co-extensive liability for the conduct of such other Defendants. Except for Defendant Tilray,

10  any reference in any cause of action to a Defendant or Defendants shall include the Defendants

11  named in such cause of action and all Doe Defendants.

12  ### III.    JURISDICTION AND VENUE

13      38.    Jurisdiction is proper in this Court as the amount in controversy exceeds $25,000.00.

14  This action is not subject to any requirement for Plaintiffs to comply with a claims Statute. This

15  action is not subject to Civil Code §§1812.10 or 2984.4.

16      39.    Venue is proper in this Court because: (a) much of the conduct described herein

17  occurred in this County, and accordingly many of the causes of action alleged herein arose in Los

18  Angeles County; (b) Plaintiffs are informed and believe, and thereon allege, that, all Defendants

19  reside in and/or conduct business in Los Angeles County; and (c) the contracts, documents and

20  instruments that are the subject of the Loan to Own Scheme between Saavy Naturals and some of

21  the Defendants described herein were executed in and to be performed in Los Angeles County.

## IV. GENERAL ALLEGATIONS

### A. The Loan to Own Scheme Significantly Damaged the Plaintiffs

40. Plaintiff Infinity Consulting is one of the creditors of Trimax who was defrauded by the Loan to Own Scheme. Infinity Consulting was an advisor and outside business consultant to Trimax pursuant to an Advisory Service Agreement entered into by Infinity Consulting and Trimax on or about August 1, 2017 (the "Advisory Agreement"). A copy of the Advisory Agreement is attached hereto as **Exhibit H**. The sole owner, president and CEO of Infinity Consulting is Plaintiff, Joseph M. Vazquez III.

41. As a result of the Loan to Own Scheme, Trimax was left with no assets within which to pay Infinity Consulting's invoices for services rendered to Trimax pursuant to the Advisory Agreement. As of the date hereof, Plaintiff is owed at least $93,382.00 (exclusive of interest, attorneys' fees and court costs) for past consulting services pursuant to the invoice dated May 1, 2019 attached hereto as **Exhibit I**.

42. In addition to the invoices which remain unpaid as a result of the Loan to Own Scheme, Mr. Vazquez's reputation and that of Infinity Consulting have been severely and irreparably damaged as a result of the scheme perpetuated by Privateer and the other Defendants. Mr. Vazquez's experience includes eight years of corporate management at executive levels for a retail franchise organization, six years in the financial service industry holding series 6, 7, 63 and series 24 principals licenses (OSJ), and twenty-five years in the private investment banking field. Mr. Vazquez has never been notified or been involved in a single NASD/FINRA/SEC complaint, arbitration, censure or investigation. Mr. Vazquez is a consummate professional who has enjoyed a reputation for honesty, integrity and for obtaining substantial results for his clients throughout his career.

43. Mr. Vazquez's business has been built primarily on a referral basis, and he has never had to solicit or advertise for clients. Those referrals mostly come from a network of professionals

1    comprised of securities lawyers, auditors, accountants, hedge funds, credit facilities, news

2    distribution outlets, and marketing companies.  However, those referrals have largely dried up.

3          44.    Because of the Loan to Own Scheme, virtually every single person that Mr. Vazquez

4    introduced to Trimax was burned and is owed money. These monies have amounted to hundreds of

5    thousands of dollars.  Worse, Trimax shareholders have incorrectly assumed that Mr. Vazquez was

6    somehow in on the scam perpetuated by Privateer, the Saavedras' and the other Defendants. In

7    various stockholder messaging boards, stockholders have accused Mr. Vazquez on being "in on the

8    scheme." They have called him a scam artist, googled his home address, and have resorted to

9    making physical threats, including death threats.  Moreover, they have threatened to contact the

10   authorities and the SEC on the entirely false basis that he participated in Privateer's and Left

11   Coast's orchestrated multi-million dollar scam.

12

13         45.    Further, as a result of Privateer's and Left Coast Ventures' intentional interference

14   with the business relationship that Mr. Vazquez and Infinity Consulting had with Trimax, the

15   Advisory Agreement was terminated, and the entire business relationship between Trimax and

16   Infinity Consulting has ended. But for such intentional interference, the business and contractual

17   relationship between Trimax and Infinity Consulting would have undoubtedly continued as it had

18   for years before.  Now, there is no Advisory Agreement, and Saavy Naturals has no business or

19   assets within which to continue any business or contractual relationship with Infinity Consulting

20   and Mr. Vazquez.

21

22         46.    Privateer, Left Coast and Brett Cummings and the other Defendants must have

23   known that their Loan to Own Scheme would leave many creditors of Trimax (including Infinity

24   Consulting) without recourse to collect  the debts owed to them, and would also permanently harm

25   the current and future business relationships between Trimax and its suppliers and service

26   providers. This is exactly what occurred to Infinity Consulting and such damage is continuing.

27

28

**B.**     <u>The Specifics of the Loan to Own Scheme Are Outrageous</u>

47.     The particulars of the Loan to Own Scheme are damning and hard to imagine.

48.     Over the course of five (5) days, between December 19, 2018 and December 24, 2018, Privateer, Left Coast Ventures, the Saavedras, Brett Cummings and Equitable Transitions engaged in a rapid process to liquidate Saavy Naturals without an adequate valuation or marketing of any kind, and contrary to Privateer's very own valuation of Saavy Naturals.

49.     Upon information and belief, Privateer's and Left Coast Ventures' Brett Cummings was the "quarterback" of the operation. The timing of the scheme reflects that it could not be anything other than a thinly veiled scam.

50.     The following orchestrated series of events sets forth the indicia of a conspiracy to defraud, conversion, and the other torts described herein:

(i)     At approximately the same time period in October of 2018 when Brett Cummings was advising Hugo Saavedra to bankrupt Saavy Naturals, Hugo Saavedra, at the direction of Brett Cummings, engaged Equitable Transitions to obtain a report from Parasec Global Document Filing & Retrieval ("<u>Parasec Report</u>") of all UCC-1 filings and liens relating to Saavy Naturals. The purpose of obtaining the report was to confirm the extent of the secured debt of Saavy Naturals and to put in place a plan for Privateer to obtain the assets of Saavy Naturals without adequate consideration and without paying off any of the secured and unsecured creditors of Saavy Naturals.  The Parasec Report was issued to Equitable Transitions on October 22, 2018. It showed at least three (3) UCC-1 liens that were active at the time of the Parasec Report on all the tangible and intangible assets of Trimax and Saavy Naturals.

(ii)     Understanding from the Parasec Report and from discussions with Hugo Saavedra that Saavy Naturals had hundreds of thousands of secured and

unsecured debts, Brett Cummings, while acting on behalf of Privateer and Left Coast Ventures, put into motion a plan to avoid paying even "a single penny of debt," as Brett Cummings had put it, to any of Saavy Naturals creditors or to the shareholders of Trimax.

(iii)    The first step in the process was to confirm that Saavy Naturals was the owner of the assets that Privateer and Left Coast wanted to acquire as part of the scheme.   Soon thereafter, on December 19, 2018, as part of the plan, Saavy Naturals obtained a legal opinion (the "Legal Opinion") from the law firm of Carmel, Milazzo, & Dichiara LLP ("CMD").  The Legal Opinion indicated that its purpose was to opine on "the ownership of the corporate assets."  The Legal Opinion was issued to The Hamer Group Insolvency Solutions (the "Insolvency Solutions") and was addressed to the attention of Insolvency Solutions' principal, Nigel Hamer ("Mr. Hamer"). A true and correct copy of the Legal Opinion is attached hereto as **Exhibit J**.  Importantly, Mr. Hamer— the principal of the Hamer Group and recipient of the Legal Opinion—was employed, at all times material hereto, by Equitable Transitions, which soon thereafter became the assignee for the benefit of creditors.

(iv)    The Legal Opinion states that in rendering its opinion, it only considered those documents provided to it by Saavy Naturals.  Notably, those documents did not include any documents referencing the security interests held by creditors in the assets of Saavy Naturals. Therefore, the Legal Opinion does not render an opinion on whether the assets of Saavy Naturals were subject to any security interests or UCC filings.  Such information appears to have been intentionally withheld from the attorneys.

(v)    The next day, on December 20, 2018, at Mr. Saavedra's request (but at the overall direction of Brett Cummings), Scott Van Horn of Van Horn Auctions

& Appraisal provided Mr. Saavedra on behalf of Saavy Naturals with the Liquidation Opinion of Saavy Naturals. The Liquidation Opinion is based on a physical site inspection of Saavy Natural's premises. **See Exhibit D** (Liquidation Opinion, p. at 1). The Liquidation Opinion notes that present at the premises at the time of the inspection were Mr. Saavedras and Brett Michel. The presence of Brett Michel as representative of Privateer and Left Coast Ventures at the inspection site represents another key tie to those entities' collective involvement in the scheme since he was involved in the initial conference calls with Saavy Naturals and at least one conference call with Mr. Vazquez in October 2018.

(vi)     The Liquidation Opinion notes that Mr. Van Horn "was asked to perform an on-site estimation, specifically, a 'liquidation' opinion of value of the assets within the establishment." Id. The Liquidation Opinion specifically states that the liquidation values are not "fair market values," but cash value at auction and should not be considered "as a final sales value when selling a business as a turn-key operation." The Liquidation Opinion concludes that the fixtures and equipment have a liquidation value of between $12,000 and $13,000, and the raw materials, work in progress, and finished goods have a liquidation value between $6,500 and $7,000. See *Id*. (Liquidation Opinion, p. at 2).

(vii)     The Liquidation Opinion's "limiting conditions" provide that "[n]o additional values or appraisals have been made requiring such tangibles as patents, rights to manufacture, trademarks, goodwill, going concern, product line, customer lists, etc." See *Id*. (Liquidation Opinion, p. at 4). Thus, in addition to not valuing the physical assets at fair market value, the Liquidation Opinion purposely states that it does not value the intangible, intellectual property of Saavy Naturals, despite that this was clearly the highest component of the total value of Saavy Naturals' assets.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(viii)   The next step in the process was for Brett Cummings to establish a subsidiary which would be the acquiror of the assets of Saavy Naturals.  The establishment of subsidiaries to own the assets of each of their businesses is how Left Coast Ventures and Privateer customarily operate their businesses. Therefore, on the same day, December 20, 2018, as the Liquidation Opinion was issued, Brett Cummings formed Eko as a California limited liability company. There is no doubt that Eko was formed in contemplation of acquiring the assets of Saavy Naturals in the sham transaction.  Indeed, within a few days of its formation, Eko loaned monies to Saavy Naturals, and shortly thereafter, did, in fact, acquire all the assets of Saavy Naturals.  In addition, the name "Eko" may have been chosen deliberately so as to use that name in the marketing of Saavy Naturals' brand.  Currently, on the Saavy Naturals website, the contact information utilizes the name Eko as its email address: info@ekonaturals.us.

(ix)   Just two days after the formation of Eko, on December 22, 2018, Eko made a secured loan to Saavy Naturals in the original principal amount of $78,000 (the "Eko Loan"). The Eko Loan was evidenced by a Secured Promissory Note (the "Eko Note") and Security Agreement (the "Eko Security Agreement"  together with the Eko Note, the "Eko Loan Documents"). True and correct copies of the Eko Loan Documents are attached hereto as **Exhibit  K**.  The Eko Loan was suspiciously structured to mature *just nine (9) days after the execution dat*e—on December 31, 2018—at which time Saavy Naturals was liable for payment of the entire principal balance of the Eko Loan. **See Exhibit K** (Eko Note, ¶ 1 at 1).  It is inconceivable that Privateer's Brett Cummings would loan monies to Saavy Naturals with a maturity date of 9 days unless there was a specific plan for repayment.  Indeed, the facts bear out that the debt would be used as partial consideration for the purchase of the assets

of Saavy Naturals from Equitable Transitions, as assignee for the benefit of creditors, which was structured to occur just a few short days later.

(x)    Indeed, just two (2) days after execution of the Eko Note, on December 24, 2018, Saavy Naturals made a general assignment for the benefit of creditors (the "General Assignment") to Equitable Transitions as assignee.[1]   A true and correct copy of the Notice of Assignment for the Benefit of Creditors and the General Assignment of Saavy Naturals, Inc. is attached hereto as **Exhibit L**.   David Richard Haberbush ("Mr. Haberbush") is the Chief Executive Officer, Secretary, and Chief Financial Officer of Equitable Transitions. Mr. Hamer— the principal of the Hamer Group and recipient of the Legal Opinion—is employed by Equitable Transitions.  It was Mr. Hamer who executed the General Assignment on behalf of Equitable Transitions. **See Exhibit L**.

(xi)    Then, remarkably, on December 24, 2018—the same day as the General Assignment—Mr. Hamer executed a Bill of Sale on behalf of Equitable Transitions as assignee.  A true and correct copy of the Bill of Sale is attached hereto as **Exhibit M**. The Bill of Sale transferred all of the assets of Saavy Naturals to Eko. **See Exhibit M**. The consideration provided by Eko included retirement of $41,000 of secured debt related to the Eko Loan and a cash payment in the amount of $70,000.

(xii)    The price paid for the assets was bewildering since it is the job of the assignee to use its best efforts to maximize the proceeds from the sale and disposition of the assets.  In this case, Equitable Transitions used no such best

---

[1] A general assignment for the benefit of creditors is a state law alternative to filing a federal bankruptcy. Essentially, it is supposed to involve the assignment of an insolvent company's assets to a third party assignee who is selected by the company and charged with the duty of liquidating the company's assets to satisfy the creditors' claims against the company.

efforts, and evidently did nothing to market the assets.  Equitable Transitions never obtained a valuation of the most significant key assets of Saavy Naturals, which were its intellectual property. It sold all of the assets of Saavy Naturals to Eko relying solely on the Liquidation Opinion which valued only the tangible assets at their "liquidation value".    In short, Equitable Transitions engaged in a pre-planned scheme to sell the assets to Eko without undertaking the most basic due diligence or any marketing efforts with respect to all of the assets of Saavy Naturals.

(xiii)    The price paid for the assets of Saavy Naturals by Eko is telling.  The cash portion of the purchase price paid by Eko was $70,000.00.   Did any of this money go to creditors which is the purpose of such an assignment?  No, upon information and belief, *not a single penny.*  Instead, all or virtually all of it went to Equitable Transitions to pay for its $65,000 priority fee[2] for serving as assignee and the remaining $5,000 went for its administrative and legal expenses, as determined in Equitable Transitions' sole and absolute discretion pursuant to the terms of the General Assignment.   Upon information and belief, the $70,000 figure was chosen by Brett Cummings and the other Defendants because this would be the minimum amount of cash needed to pay for the transaction expenses of the General Assignment, and would, at the same time, leave nothing for the creditors of Saavay Naturals or for the shareholders of Trimax, which was Privateer's Brett Cummings stated intention all along.

(xiv)    The non-cash portion of the purchase price, which was the retirement of $41,000 of the $78,000 of secured debt owed by Saavy Naturals pursuant to the Eko Loan, is an absolute and complete farce. Upon information and belief, this

---

[2] The General Assignment entitles Equitable Transitions to receive priority distributions from the proceeds of the Saavy Naturals sale before payment to creditors. See **Exhibit L** (General Assignment, at 6).

supposed "additional consideration" was chosen for a good reason:  the retirement of a portion of the Eko Loan would appear to be akin to "real consideration," but require no additional cash outlay.  Since there would be no monies remaining for creditors and shareholders after payment of the substantial transaction expenses (i.e., the fees of Equitable Transitions and related parties), there would need to be some sort of additional consideration provided to at least theoretically cover the amount of the liquidation value given to the assets of Saavy Naturals by the Liquidation Opinion.  The release of $41,000 of debt from the Eko Loan debt would presumably cover the alleged liquidation value of approximately $20,000 placed by the Liquidation Opinion on the physical assets, and perhaps, provide a little something more for the intangible assets for which no value was given by the Liquidation Opinion.

(xv)    However, the release of this debt and this portion of the consideration was, in all events, imaginary and non-existent because the transaction provided that all of the assets of Saavy Naturals were being transferred pursuant to the General Assignment. Thus, whether or not Eko released any debt, it knew that its loan would be totally worthless and there was no chance of repayment since Saavy Naturals no longer owned any assets to enable it to pay the amount of debt outstanding on the Eko Loan. Thus, the $41,000 of supposed, additional consideration was a total ruse, and amounted to what was essentially an outright conversion or theft of the assets of Saavy Naturals for no consideration.

(xvi)    At the end of the day, all of these steps in the sham transaction accomplished one thing: Privateer and Left Coast Ventures acquired through a newly established, wholly owned subsidiary: Eko, all of the assets of Saavy Naturals without paying a single penny to the creditors or the shareholders of Trimax.

1
2
3
4
5
6
7

Moreover, not only did Eko acquire the assets, it essentially acquired all ongoing operations of Saavy Naturals. In fact, upon information and belief, Eko kept all of the factory employees including Saavy Natural's controller and V.P. of Sales and offered both Hugo and Debra Saavedra lucrative positions with Eko. Factually, they never missed a single day of operations in fulfilling purchase orders, and even moved to a much larger facility.

8
9
10
11
12

51.     Privateer's and Left Coast Ventures' Brett Cummings accomplished all of this with willing participants which included the Saavedras and Equitable Transitions, who knowingly disregarded and violated their fiduciary duties in order to benefit themselves (at the expense of creditors and shareholders).

13
14
15
16
17
18
19
20
21
22
23

52.     Prior to any assignment for the benefits of creditors by Trimax, its board of directors would have had a duty to maximize shareholder value and to protect a company's creditors. Among other things, the board of directors of Trimax and Saavy Naturals should have first attempted to engage in possible alternatives to maximize shareholder value, such as a sale of the company which would not only make the creditors whole but would also leave the shareholders with a recovery of their investment and possibly returns on their investment. None of this occurred here. Rather, in a matter of five (5) days, a Legal Opinion as to the ownership of the assets of Saavy Naturals was obtained, a Liquidation Opinion as to the value was obtained, an assignment for the benefit of creditors was made pursuant to a General Assignment, and a sale of all the assets of Saavy Naturals occurred pursuant to a Bill of Sale to Eko.

24
25
26
27
28

53.     Upon information and belief, Eko continues to operate as Saavy Naturals. Indeed, Plaintiffs are informed and believe, and on that basis allege, Mr. Saavedra is employed by Eko in its operations of the Saavy Naturals brand and business.

**C.** **Defendants' Conspiracy to Commit Tortious Acts**

54.     Each of the Defendants acted collectively over the course of only several days, to obtain the Legal Opinion and the Liquidation Opinion to estimate the liquidation value of Saavy Naturals at an artificially low price to facilitate the sham General Assignment and sale to Eko.

55.     Plaintiffs are informed and believe, and on that basis allege, that Brett Cummings on behalf of Privateer and Left Coast Ventures, together with the other Defendants, collectively proposed and structured the General Assignment and sham sale to Eko. Indeed, Mr. Hamer reviewed the Asset Opinion even before Equitable Transitions became the Assignee for the Benefit of Creditors.  Plaintiffs are further informed and believe, and on that basis allege, that Brett Cummings orchestrated the proposed sham sale through the General Assignment, particularly in light of the proximity in time between Eko's formation, Saavy Natural's execution of the Eko Loan, and Equitable Transition's execution of the General Assignment and Bill of Sale. The collective acts resulted in the torts described in Counts II-VII, *infra*.

56.     Plaintiffs are informed and believe, and on that basis allege, that Defendants were each aware that the other Defendants planned to commit the torts described in Counts II-VII, *infra*.

57.     Plaintiffs are further informed and believe, and on that basis allege, that each of the Defendants agreed with the other Defendants to commit the torts described herein and each intended to commit the torts described herein.

58.     As a direct and proximate result of these and other acts, Defendants caused Plaintiffs to suffer significant  damages in an amount to be determined at trial including loss of their stock investment, loss of accounts receivables for services rendered, damage to reputation, lost profits, lost business opportunities, and other material harm caused derivatively to Trimax and Saavy Naturals. Defendants' actions were done with oppression, fraud, or malice entitling Plaintiffs to punitive damages.

1

**D.**   **Plaintiff Vazquez Brings Counts Derivatively on Behalf of Trimax and Saavy Naturals**

2

3   59.   Trimax and Saavy Naturals are Nevada corporations. It has been the law in Nevada

4   that directors have a fiduciary duty to act in the best interests of all shareholders. Officers of a

5   corporation owe a similar duty to the corporation. At all times material hereto, Hugo Saavedra

6   served as the sole director of Trimax and Saavy Naturals, as well as their President. At all times

7   material hereto, Debra Saavedra served as Secretary of both companies, and identified herself as

8   President of Saavy Naturals.  Based upon the acts and omissions of the Saavedras in direct violation

9   of their fiduciary duties to act in the best interests of Trimax and Saavy Naturals, a pre-suit demand

10   to bring the derivative claims asserted in Counts II through V, and Count VIII of this action is

11   excused as a futile and useless act.  The Saavedras personally engaged in the unscrupulous and

12   unlawful acts of stripping all the assets out of Trimax and Saavy Naturals for virtually no

13   consideration, which amounted to an unlawful conversion and/or theft of the assets of the

14   companies which was in direct conflict with the advice given to them by their business consultant

15   Plaintiff, Vazquez.   Upon information and belief, the Saavedras personally profited from the Loan

16   to Own Scheme by obtaining for themselves new executive positions and enriched compensation

17   packages with Eko, one of the principal perpetrators of the scheme and acquiror of all the assets of

18

19   Saavy Naturals. In no event could the Saavedras be trusted to conduct an independent, objective and

20   thorough investigation of the alleged wrongdoing, as they are completely conflicted and complicit

21   as direct co-conspirators in the Loan to Own Scheme. The wrongful conduct of the Saavedras is not

22   subject to protection under the business judgment rule.   See *Shoen v. SAC Holding Cor*p., 122 Nev.

23

24   621 (Nev. 2006).

25

26   60.   At all times material hereto, Plaintiff Joseph Vazquez was a shareholder, and

27   continuously has been, and is a shareholder of Trimax, which owns 100% of Saavy Naturals.

28

1  Plaintiff Vazquez and his undersigned counsel will adequately and fairly represent the interests of

2  Trimax and Saavy Naturals in enforcing and protecting their rights.

3  ### COUNT I- FIRST CAUSE OF ACTION

4  **For *Emergency* Injunctive Relief Against Privateer and Tilray**

5  
6        61.    Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on

7  behalf of Trimax and Saavy Naturals,  hereby re-allege and incorporate by reference the above

8  Paragraphs 1-60, inclusive, as though fully set forth herein.

9        62.    This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez,

10  individually, and Joseph Vazquez, derivatively, on behalf of Trimax and Saavy Naturals.

11  Defendants Privateer and Tilray are scheduled to vote on a proposed merger on or about December

12  6, 2019, whereby Privateer will merge with and into a merger subsidiary, with the merger

13  subsidiary surviving as a wholly owned subsidiary of Tilray. A copy of said merger agreement is

14  
15  attached hereto as **Exhibit N** (the "Merger Agreement").

16        63.    Privateer currently owns approximately 75% of the stock of Tilray valued at

17  approximately $1.5 billion.  The reason for the merger is to effect the orderly release into the stock

18  market of the 75 million shares of Tilray common stock currently owned by Privateer.

19        64.    Under the terms of the Merger Agreement, Tilray will issue to the Privateer equity

20  holders newly issued and registered shares of Tilray common stock and options to purchase shares

21  
22  of Tilray common stock in an aggregate amount equal to the number of Tilray common shares

23  currently held by Privateer. As set forth in the Merger Agreement, at its sole election (to be made

24  prior to closing), Tilray may pay a portion of the merger consideration in cash in lieu of issuing an

25  equivalent number of shares of Tilray. All Tilray shares held by Privateer and all outstanding

26  Privateer stock will be cancelled upon consummation of the merger.

27        65.    Following the merger, Privateer will no longer be in existence as it will have merged

28  into Tilray's wholly owned subsidiary, which will have no assets to speak of. As a result, Privateer

1  will go from an entity which had over $1.5 billion in assets to an entity which is a subsidiary of

2  Tilray but which will have no assets thereafter.

3       66.     As described herein, Privateer orchestrated the Loan to Own Scheme through its

4  authorized agent, Brett Cummings, and is therefore responsible for millions of dollars of losses

5  suffered by Plaintiffs, and by Trimax and Saavy Naturals' creditors and shareholders.

6

7       67.     In addition, as a result of the egregious, unlawful, unethical nature of the scam

8  perpetuated by Privateer in concert with the other Defendants named herein, Plaintiffs intend to

9  seek more than $150 million in punitive damages against Privateer.

10      68.     Pursuant to California law, an award of punitive damages is often based on a party's

11  ability to pay or its net worth. "Wealth is an important consideration in determining . . . a punitive

12  damage award. Because the purposes of punitive damages are to punish the wrongdoer and to make

13  an example of him, the wealthier the wrongdoer, the larger the award of punitive damages." See

14  *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 78-84.

15

16      69.     An award of 10% of the total net worth of Privateer would be approximately $150

17  million.  Such an award if made would **not** be considered excessive under California law.  See

18  *Goshgarian v. George* (1984) 161 Cal.App.3d 1214, 1229-1230, 208 ("punitive damage awards

19  *exceeding* 10 percent of a defendant's net worth have generally been disfavored by the appellate

20  courts" but award amounting to approximately 10.7 percent of the defendant's net worth was not

21  unduly disproportionate to his wealth.)

22

23      70.     Indeed, an award in excess of 10% of a defendant's net worth is not unheard of in the

24  California courts and may be permissible if the facts support it.  In this case, the acts of Privateer

25  were malicious, oppressive, unlawful, deceitful, and fraudulent, and would therefore support the

26  highest award permissible under California law.

27

28

71.     If the merger is allowed to proceed, Plaintiffs will have no ability to recover the potential punitive damage award which could ensue against Privateer since the merger subsidiary in which Privateer merged into will have no assets within which to pay any damages awarded.

72.     Although the Merger Agreement between Privateer and Tilray provides that approximately $125 million of the Tilray shares being issued in the merger to the Privateer equity holders will be held in escrow in the event of any claims against Tilray or its subsidiaries by third parties arising from pre-closing liabilities and other indemnification obligations, the indemnification obligation runs between Tilray and Privateer, and it is not clear whether Plaintiffs would have standing to demand payment from the escrow account created for Privateer's indemnification obligations under the Merger Agreement.  In addition, the sum of $125 million which has been escrowed for this purpose is subject to other claims by Tilray, itself, and other creditors should there be additional indemnification claims made against the escrowed amount.

73.     Moreover, it is clear that the sum of $125 million--even if all of it is available to cover Plaintiffs' claims--might be insufficient to cover the total award of compensatory and punitive damages which might be awarded in this case based on the egregious and unscrupulous nature of the actions committed by Privateer. Finally, the Tilray shares which have been placed in escrow are subject to significant market fluctuations which can vary wildly, based on past Tilray's historical share price.  For example, in October 2018, Tilray stock was trading at almost $300 per share; it is now trading at $23 per share.

74.     Thus, Plaintiffs do not have an adequate remedy at law if the merger is allowed to occur and  there is a serious risk of irreparable harm absent injunctive relief.

75.     Based on the verified allegations and evidence proffered in this Verified Complaint, Plaintiffs have demonstrated and will demonstrate that they have a substantial likelihood that they will prevail on the merits of the case.

76.     The purpose of the merger is to effect the orderly release of the 75 million shares of Tilray common stock currently owned by Privateer.  Although a merger between Privateer and Tilray would allow the Tilray stock to be sold into the stock market in a more orderly fashion than might otherwise be the case, the harm to Privateer and Tilray if the merger does not occur or is otherwise delayed is not readily apparent. As part of the merger, the shares to be issued to the Privateer equity holders will be subject to a lock-up agreement which will preclude the sale or transfer of the stock received except in accordance with the lock-up agreement to be signed by the Privateer equity holders.

77.     However, restrictions on sale or transfer pursuant to the lock-up agreement will lapse as to 50% of the shares on the first anniversary following the merger, and the restrictions on the remaining 50% will lapse 12.5% on each quarter thereafter, such that all restrictions will lapse by the second anniversary of the merger.  Thus, while the merger does limit the amount of shares that can be sold at one time, it does little to prevent significant drops in share price after the first few months of the effective date of the merger.

78.     Moreover, currently, there is no lock-up agreement and there has been none since January of 2019.  Privateer has effectively managed its ownership of 75% ownership interest in Tilray without the need of a merger.  In fact, Privateer has every reason to prevent a dumping of its Tilray shares into the market over the short term, and an argument could be made that the merger is only likely to exacerbate the dumping of shares into the market after the expiration of the first year of the lock up.

79.     On the other hand, if the Court does not prevent the merger from going forward, all of the assets of Privateer will be disposed of in the merger in exchange for shares of Tilray stock which will no longer be in the possession of Privateer but instead in possession of its equity holders, and as a result, Plaintiffs will have no assets against which to pursue payment of its verified claims, except potentially only to the extent of the amount held in escrow pursuant to the terms of the

1  Merger Agreement. As noted, this amount may be insufficient to satisfy all of the damages which

2  may be awarded in this lawsuit.

3       80.    Accordingly, Plaintiffs seek a temporary and permanent injunction to prevent the

4  closing of the merger which is scheduled to occur on <u>December 6, 2019</u> or shortly thereafter,

5  pending the satisfaction of certain conditions to closing.

6

7       WHEREFORE, Plaintiffs pray for the relief set forth below.

8                       **COUNT II-SECOND CAUSE OF ACTION**

9

10                          **For Breach of Fiduciary Duty**
                            **Against The Saavedras**

11      81.    Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on

12  behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above

13
    Paragraphs 1-60, inclusive, as though fully set forth herein.
14

15      82.    This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez,

16  individually, and Joseph Vazquez, derivatively on behalf of Trimax and Saavy Naturals against the

17  Saavedras for breaches of their fiduciary duties as more fully described herein.

18      83.    At all times material hereto, there existed a fiduciary relationship between Trimax

19  and Saavy Naturals, on the one hand, and the Saavedras, on the other. Specifically, Hugo Saavedra

20  and Debra Saavedra owed fiduciary duties of loyalty and care to Saavy Naturals and Trimax as a

21  result of their serving as directors and/or officers of Trimax and Saavy Naturals.
22

23      84.    The duty of care required the Saavedras to act in a prudent manner and in the best

24  interests of Trimax and Saavy Naturals, with all of the information available to them. The duty of

25  loyalty required the Saavedras to put the interests of Trimax and Saavy Naturals above their own

26  pecuniary interests

27
        85.    The Saavedras breached their fiduciary duties owed to Trimax and Saavy Naturals
28
    by knowingly engaging in the Loan to Own Scheme and effecting the transfer of assets of Saavy

Naturals for practically no consideration. The Saavedras' purported transfer of assets violated Nevada corporate law in that the board of directors of Trimax and Saavy Naturals failed to obtain the consent of its shareholders to transfer all of Saavy Naturals' assets. This failure was intentional and plainly violated Nevada's corporate law.

86.   The Saavedras participated in the Loan to Own Scheme at a time where the market capitalization of Trimax reflected it was worth millions of dollars and that its prospects were bright in that Saavy Naturals had claimed strong sales, substantial national distribution agreements, and an intention to continue as a going concern in the months (and days) leading up to the sale. Yet, the Saavedras made no attempt (i) to obtain a valuation of Saavy Naturals as a going concern, (ii) to market the company, (iii) to engage an investment banker, or (iv) to obtain a fairness opinion.

87.   The Saavedras authorized and directed Saavy Naturals to enter into the Loan to Own Scheme where all, or virtually all, of the consideration paid was used for the fees and transaction expenses of Equitable Transitions.

88.   The Saavedras additionally breached their fiduciary duties by accepting as partial payment for the Saavy Naturals assets the cancellation of $41,000 of the $78,000 of secured debt owed by Saavy Naturals to Eko pursuant to the Eko Loan. The acceptance of such cancelation of debt as partial consideration made an already scandalous transaction a total farce. The release of this debt and this portion of the consideration was, in all events, imaginary and non-existent because the transaction provided that all of the assets of Saavy Naturals were being transferred pursuant to the General Assignment. Thus, whether or not Eko released any debt, the Saavedras knew that the Eko Loan would be totally worthless and there was no chance of repayment since Saavy Naturals no longer owned any assets to enable it to pay the amount of debt outstanding on the Eko Loan. Thus, the $41,000 of supposed, additional consideration was an unmitigated ruse, and amounted to what was essentially an outright conversion or theft of the assets of Saavy Naturals for no consideration.

89.     In a further breach of their fiduciary duties, after the sham transaction took place, the Saavedras failed to publicly disclose the sale of the assets of Trimax which would be considered to be a "material event." By not disclosing this material event, they not only harmed existing shareholders, but also allowed new unsuspecting investors to purchase shares, based on their recent prior press releases, in a completely worthless company.

90.     Upon information and belief, the Saavedras were at all times following the closing of the Loan to Own Scheme continuously employed by Eko with substantial positions and compensation packages and are currently still employed by Eko.  The Saavedras acted in a manner which was morally and ethically corrupt in engaging in the Loan to Own Scheme and breached every corporate and fiduciary norm by completely disregarding the interests of the creditors and shareholders of Trimax and Saavy Naturals in order to substantially benefit themselves in the form of new executive positions and enriched compensation packages with Eko.

91.     As a direct and proximate result of these and other acts, Trimax and Saavy Naturals suffered the loss of all their assets to the detriment of all of their creditors for no value, and the shareholders lost approximately $4 million of market capitalization, essentially overnight, rendering all of their shares completely and utterly worthless.

92.     Privateer, Left Coast Ventures, Brett Cummings, and Equitable Transitions knowingly directed, orchestrated, engineered, and conspired with, and aided and abetted the Saavedras' breach of their fiduciary duties to Trimax and Saavy Naturals.

93.     The Saavedras and the other Defendants actions were done with oppression, fraud, or malice entitling Trimax and Saavy Naturals to punitive damages.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT III-THIRD CAUSE OF ACTION

### For Recovery of a Fraudulent Conveyance
### Against All Defendants
### (Actual Fraud)

94.  Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein. .

95.  This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and Joseph Vazquez, derivatively, on behalf of Trimax and Saavy Naturals against all the Defendants for their unlawful commission of a fraud, as more fully described herein.

96.  Saavy Naturals transferred substantially all of its assets to Eko though the General Assignment pursuant to the Loan to Own Scheme with the intent to defraud its creditors and the shareholders of Trimax.  The transfer left Saavy Naturals completely insolvent. Further, Eko did not pay fair value for the transfer of the assets. Rather, the entire transaction was a fraudulent scam perpetuated by the Defendants in concert with each other.

97.  Plaintiffs are informed and believe that the going concern value of Saavy Naturals is millions of dollars more than the consideration paid by Eko, which was illusory.  Trimax and Saavy Naturals were harmed as a result of the transfer of assets to Eko because the General Assignment and sham sale to Eko rendered the monies due to creditors, including Plaintiff, Infinity Consulting, completely uncollectible, and also rendered the stock of the shareholders of Trimax entirely worthless. The sham transfer additionally caused other substantial harm as described hereinabove.

98.  Plaintiffs are entitled to an order voiding and recovering all transfers of the assets of Saavy Naturals made to Equitable Transitions and Eko pursuant to the Loan to Own Scheme including, but not limited to, the General Assignment, and the assets sold by Equitable Transitions to Eko pursuant to the Bill of Sale.

99.     The actions of Privateer, Left Coast Ventures, the Saavedras, Equitable Transitions, and Eko in facilitating the transfer of Saavy Naturals' assets were done with oppression, fraud, or malice entitling the Plaintiffs to punitive damages.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT IV-FOURTH CAUSE OF ACTION

### For Conversion
### Against All Defendants

100.    Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

101.    This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and Joseph Vazquez, derivatively, on behalf of Trimax and Saavy Naturals against all the Defendants for their unlawful conversion of the assets of Saavy Naturals as more fully described herein.

102.    Prior to the Loan to Own Scheme, Saavy Naturals owned all of its assets and the right to possess its assets.

103.    Defendants intentionally and substantially interfered with Saavy Natural's property by engaging in the Loan to Own Scheme which resulted in the unlawful transfer of all of its property to Eko.

104.    The transfer of the assets was accomplished without proper authorization and consent, as the board of directors of Trimax and Saavy Naturals did not obtain the consent of their shareholders to the transfer of all the assets of Saavy Naturals, which was required under Nevada corporate law.

105. The Defendants knew that the Saavedras transfer of assets was illegitimate and unlawful and knew that the entire Loan to Own Scheme was a fraud upon the creditors and shareholders of Trimax.

106. Trimax and Saavy Naturals were harmed by the Loan to Own Scheme as the creditors and shareholders of Saavy Naturals received nothing in return for the transfer. All, or virtually all, of the consideration paid was used for the fees and transaction expenses of Equitable Transitions. The release of $41,000 of the $78,000 of secured debt owed by Saavy Naturals to Eko pursuant to the Eko Loan as partial payment for the Saavy Naturals assets was, in all events, imaginary and non-existent because the transaction provided that all of the assets of Saavy Naturals were being transferred pursuant to the General Assignment. Thus, whether or not Eko released any debt, the parties orchestrating the scheme knew that the Eko Loan would be totally worthless and there was no chance of repayment since Saavy Naturals no longer owned any assets to enable it pay the amount of debt outstanding on the Eko Loan. Thus, this purported consideration was completely illusory.

107. The Defendants' conduct was a substantial factor in causing Plaintiffs' harm. As a direct and proximate result of these and other acts, Trimax and Saavy Naturals suffered the loss of all their assets to the detriment of all of their creditors for no value, and the shareholders lost approximately $4 million of market capitalization, essentially overnight, rendering all of their shares utterly worthless.

108. Privateer, Left Coast Ventures, Brett Cummings, the Saavedras and Equitable Transitions knowingly directed, orchestrated, engineered, and conspired with, and aided and abetted the conversion of all the assets of Trimax and Saavy Naturals.

109. The Defendants actions were done with oppression, fraud, or malice entitling Trimax and Saavy Naturals to exemplary and punitive damages.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT V-FIFTH CAUSE OF ACTION

### For Breach of Fiduciary Duty
### Against Equitable Transitions, Inc.

110.   Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively, on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

111.   This action is bought by Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and Joseph Vazquez, derivatively, on behalf of Trimax and Saavy Naturals against Equitable Transitions.

112.   At all times relevant hereto, there existed a fiduciary relationship between Saavy Naturals on the one hand and Equitable Transitions on the other. Specifically, Equitable Transitions owed fiduciary duties of loyalty and care to Saavy Naturals pursuant to the General Assignment and applicable law. Those duties included the obligation to "use its best efforts to maximize the proceeds from the sale and disposition" of Saavy Naturals' assets and "exercise reasonable care and diligence in discharging its duties" under the General Assignment for the benefit of creditors. *See* **Exhibit L** (General Assignment, § 1.4.2 at 2).

113.   Equitable Transitions further breached its fiduciary duties owed to Saavy Naturals by wholly abandoning its duties to investigate the value of Saavy Naturals' assets or to market Saavy Naturals' assets to maximize recovery for the benefit of creditors.  Plaintiffs are informed and believe, and on that basis allege, that Equitable Transitions undertook no marketing efforts.

114.   The Liquidation Opinion obtained admittedly addresses the liquidation value of Saavy Naturals' assets and does not consider Saavy Naturals' "goodwill, going concern, product line, customer lists, etc." *See id.* (Liquidation Opinion, at 4).  These considerations are fundamental to determine whether Eko paid fair value for all of the assets of Saavy Naturals, particularly where the market capitalization at the time of the transaction reflected it was worth millions of dollars and

that its prospects were bright in that Saavy Naturals had claimed strong sales, substantial national distribution agreements, and an intention to continue as a going concern in the months (and days) leading up to the sale.  Indeed, Trimax and Saavy Naturals had surpassed 200 locations for their custom pallet displays selling their hand crafted soaps to Walmart just 10 days prior to the sham transaction.

115.    Equitable Transitions further breached its fiduciary duties owed to Saavy Naturals by charging an exorbitant fee that is not consistent with the work performed. Equitable Transitions charged $65,000 for its services, plus expenses, to administer the General Assignment. Equitable Transitions' fee is nearly equal to the $70,000 cash proceeds from the sale. However, the sale to Eko occurred on the same day as the General Assignment, and there were few tasks that Equitable Transitions actually performed.

116.    Equitable Transitions additionally breached its fiduciary duties by accepting as partial payment for the Saavy Naturals assets the cancellation of $41,000 of the $78,000 of secured debt owed by Saavy Naturals to Eko pursuant to the Eko Loan. The acceptance of such cancelation of debt as partial consideration made an already scandalous transaction a total farce.  The release of this debt and this portion of the consideration was, in all events, imaginary and non-existent because the transaction provided that all of the assets of Saavy Naturals were being transferred pursuant to the General Assignment. Thus, whether or not Eko released any debt, Equitable Transitions knew that the Eko Loan would be totally worthless and there was no chance of repayment since Saavy Naturals no longer owned any assets to enable it pay the amount of debt outstanding on the Eko Loan. Thus, the $41,000 of supposed, additional consideration was an unmitigated ruse, and amounted to what was essentially an outright conversion or theft of the assets of Saavy Naturals for no consideration.

117.    As a direct and proximate result of these and other acts, Equitable Transitions breached its fiduciary duties to Saavy Naturals and caused Trimax and Saavy Naturals to suffer the

1  loss of all their assets to the detriment of all of their creditors and shareholders, and essentially

2  causing approximately $4 million in loss of market capitalization, essentially overnight.

3          118.    Privateer, Left Coast Ventures, the Saavedras, and Brett Cummings knowingly

4  directed, and aided and abetted Equitable Transitions' breach of is fiduciary duties to Trimax and

5  Saavy Naturals.

6

7          119.    Equitable Transitions' and the other Defendants actions were done with oppression,

8  fraud, or malice entitling Trimax and Saavy Naturals to exemplary and punitive damages.

9          WHEREFORE, Plaintiffs pray for the relief set forth below.

10

11                              **COUNT VI-SIXTH CAUSE OF ACTION**

12                        **For Intentional Interference with Contractual Relations**
                                          **Against All Defendants**

13

14          120.    Plaintiffs, Infinity Consulting and Mr. Vazquez, hereby re-allege and incorporate by

15  reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

16

17          121.    Privateer, Left Coast, the Saavedras, and the other Defendants knew or should have

18  known that their Loan to Own Scheme would leave many creditors of Saavy Naturals, including

19  Plaintiff Infinity Consulting, without recourse to collect monies owed to them by Saavy Naturals,

20  and would also permanently harm the current and future business relationships between Saavy

21  Naturals and its suppliers and service providers, including Plaintiffs, Infinity Consulting and Joseph

22  Vazquez.

23          122.    Plaintiffs, Infinity Consulting and Joseph Vazquez, are further informed and believe

24  that each of the Defendants specifically knew of existing agreements and business arrangements

25  between Saavy Naturals and its creditors, suppliers and service providers, including the Advisory

26  Agreement either through due diligence for the Eko Loan, access to the Liquidation Opinion, or

27  otherwise.

28

123. Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants intended that Saavy Naturals breach the Advisory Agreement through the General Assignment and sham sale to Eko. Plaintiffs are further informed and believe, and on that basis allege, that each of the Defendants intended to utilize the General Assignment as an artifice to strip Saavy Naturals of its assets.

124. Plaintiffs are also informed and believe that each of the Defendants knew or should have known that their conduct in formulating and effecting the Loan to Own Scheme would potentially ruin the reputation and credibility of Plaintiffs Infinity Consulting and Joseph Vazquez, as business consultants, and cause them significant monetary damage, expose them to unlimited liability, and ultimately cause permanent, irreparable  damage to their business and professional relationships.

125. Defendants' conduct in planning, organizing, authorizing, and effectuating the General Assignment and sale to Eko caused Saavy Naturals to breach its obligations to Plaintiff Infinity Consulting under the terms of the Advisory Agreement and to permanently damage the reputation and credibility of Plaintiffs Infinity Consulting and Joseph Vazquez.

126. As a direct and proximate result of these and other acts, each of the Defendants caused Plaintiffs millions of dollars of damages in an amount to be determined at trial including lost profits, lost business opportunities, and other harm.

127. Each of the Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## COUNT VII-SEVENTH CAUSE OF ACTION

### For Negligent Interference with Prospective Economic Relations
### Against All Defendants

128.    Plaintiffs, Infinity Consulting and Mr. Vazquez, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

129.    At all times material hereto, Plaintiffs and Saavy Naturals were in an economic relationship pursuant to the terms of the Advisory Agreement.

130.    Plaintiffs Infinity Consulting and Joseph Vazquez are further informed and believe that each of the Defendants specifically knew of existing agreements and business arrangements between Saavy Naturals and its creditors, suppliers and service providers, including the Advisory Agreement either through due diligence for the Eko Loan, access to the Liquidation Opinion, or otherwise.

131.    Defendants knew or should have known that the economic relationship between Plaintiffs and Saavy Naturals would be disrupted if Defendants failed to act with reasonable care. Plaintiffs are informed and believe, and on that basis allege, that Defendants knew that the General Assignment and sham sale to Eko was certain to disrupt Saavy Naturals' performance of its obligations under the Advisory Agreement.

132.    Moreover, Plaintiffs are also informed and believe that each of the Defendants knew or should have known that their conduct in formulating and effecting the Loan to Own Scheme would potentially ruin the reputation and credibility of Plaintiffs Infinity Consulting and Joseph Vazquez, as business consultants, and cause them significant monetary damage, expose them to unlimited liability, and ultimately cause permanent, irreparable  damage to their business and professional relationships.

133.    Defendants did not act with reasonable care by planning, organizing, authorizing, and effectuating the General Assignment and sham sale to Eko.

134.    As set forth more fully herein, each of the Defendants engaged in wrongful conduct to interfere with the economic relationship between Plaintiffs and Saavy Naturals. Among other things, Defendants entered into a scheme to fraudulently convey all of the assets of Saavy Naturals to Eko pursuant to the Loan to Own Scheme.

135.    The General Assignment disrupted the economic relationship between Plaintiffs and Saavy Naturals as set forth in the Advisory Agreement. The General Assignment rendered worthless the fees due and owing to Plaintiff, Vazquez, as well as all other payment entitlements under the Advisory Agreement.

136.    As a direct and proximate result of these and other acts, each of the Defendants negligently interfered with Plaintiffs' rights under the Advisory Agreement and caused Plaintiffs to suffer millions of dollars of losses and damages described herein in an amount to be determined at trial including lost profits, lost business opportunities, and other harm.

137.    Each of the Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiffs pray for the relief set forth below.

### COUNT VIII-EIGHTH CAUSE OF ACTION

**For Aiding and Abetting**
**Against All Defendants**

Plaintiffs, Infinity Consulting and Mr. Vazquez, individually, and derivatively on behalf of Trimax and Saavy Naturals, hereby re-allege and incorporate by reference the above Paragraphs 1-60, inclusive, as though fully set forth herein.

138.    Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions acted collectively over the course of only several months and days, to obtain the Legal Opinion and the Liquidation Opinion in order to provide an artificially low estimate of the liquidation value of Saavy Naturals to justify and facilitate the General Assignment and sham sale.

Indeed, Mr. Hamer reviewed the Asset Opinion even before Equitable Transitions became the assignee. Plaintiffs are informed and believe, and on that basis allege, that Eko, through Privateer's and Left Coast Ventures' Brett Cummings, orchestrated the sham sale through the General Assignment, particularly in light of the proximity in time between Eko's formation, Saavy Natural's execution of the Eko Loan, and Equitable Transition's execution of the General Assignment and Bill of Sale. The collective acts resulted in the torts described in Counts II, III, IV, V, VI and VII, *supra*.

139. Plaintiffs are informed and believe, and on that basis allege, that Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions each knew that the other Defendants planned to commit the torts described herein against Plaintiffs and Trimax and Saavy Naturals.

140. Plaintiffs are informed and believe, and on that basis allege, that Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions each substantially assisted or encouraged the other Defendants to commit the torts described herein against Plaintiffs and Trimax and Saavy Naturals.

141. Plaintiffs are informed and believe, and on that basis allege, that the conduct of Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions in substantially assisting or encouraging the other Defendants to commit the torts described herein was a substantial factor in the harm caused to the Plaintiffs as a result of the torts.

142. Accordingly, each Defendant is liable for aiding and abetting the commission of the torts described in Counts II, III, IV, V, VI and VII, *supra*.

143. As a direct and proximate result of these and other acts, Defendants Privateer, Left Coast, Brett Cummings, the Saavedras, Eko, and Equitable Transitions caused Plaintiffs and Trimax and Saavy Naturals to suffer the losses and damages described herein in an amount to be determined at trial including lost profits, lost business opportunities, and other harm. Defendants'

1    actions were done with oppression, fraud, or malice entitling the Plaintiffs to exemplary and

2    punitive damages.

3                    WHEREFORE, Plaintiffs pray for the relief set forth below.

4

5                                    **<u>PRAYER FOR RELIEF</u>**

6                    WHEREFORE, Plaintiffs respectfully pray for a judgment on each count against each of the

7    Defendants as follows:

8                    1.      For a temporary and permanent injunction preventing the merger between

9

10                          Tilray and Privateer scheduled to occur on or shortly after December 6, 2019.

11                   2.      For an order voiding the transfer of the assets of Saavy Naturals to Eko

12                          pursuant to the Bill of Sale;

13                   3.      For actual, compensatory, consequential, restitutionary, and punitive damages

14                          according to proof;

15                   4.      For pre-judgment and post-judgment interest according to proof;

16

17                   5.      For attorneys' fees and costs in accordance with applicable statutory and

                            decisional law; and

18

19                   6.      For such other and further relief as the Court deems just and proper in favor

20                          of the Plaintiffs.

21

22                                          **SANCHEZ-MEDINA, GONZALEZ, QUESADA,**
                                            **LAGE, GOMEZ & MACHADO LLP**

23                                          Attorneys for Plaintiffs
                                            201 Alhambra Circle, Suite 1205

24                                          Coral Gables, Florida 33134
                                            Tel: 305.377.1000

25                                          Fax: 305.424.0237

26

27                                          By:   s/ Peter A. Gonzalez
                                                  PETER A. GONZÁLEZ, ESQ.

28                                                Florida Bar No. 036919
                                                  Email: PGonzalez@SMGQLAW.com

1

### JURY TRIAL DEMAND

2

     Plaintiffs hereby demand a trial by jury of all issues which are subject to adjudication by a

3

trier of fact.

4

5

                           **SANCHEZ-MEDINA, GONZALEZ, QUESADA,**

                           **LAGE, GOMEZ & MACHADO LLP**

6

                           Attorneys for Plaintiffs

                           201 Alhambra Circle, Suite 1205

7

                           Coral Gables, Florida 33134

                           Tel: 305.377.1000

8

                           Fax: 305.424.0237

9

10

                           By:    s/ Peter A. Gonzalez

11

                                PETER A. GONZÁLEZ, ESQ.

                                Florida Bar No. 036919

12

                                Email: PGonzalez@SMGQLAW.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION STATEMENT

Under penalties of perjury, I declare that I have read the foregoing Plaintiffs' Verified Complaint, and the facts stated in it are true and correct to the best of my knowledge and belief.

       s/Joseph M. Vazquez III

JOSEPH M. VAZQUEZ III